UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
JACOB FRYDMAN, UNITED REALTY ADVISORS,
LP, and PRIME UNITED HOLDINGS, LLC,

                                                  Plaintiffs,

        -against-                                                14 Civ. 8084 (JGK) (MHD)

ELI VERSCHLEISER, ALBERT AKERMAN, DAVID O.        **AMENDED**
WRIGHT, ASHER GULKO, THE FISHOFF FAMILY           **COMPLAINT**
FOUNDATION, BENJAMIN FISHOFF,  STEVEN
VEGH, JAFFA HOLDINGS, LLC, ELAN JAFFA,            **JURY DEMAND**
WHITEGATE FUNDING, LLC, PINCUS RAND, MARK
APPEL,  MULTI CAPITAL GROUP OF COMPANIES,
LLC, ERIC FISCHGRUND, RAUL DELFORNO, OPHIR        
PINHASI, JOSEPH SPIEZIO, INTERMEDIA.NET, INC,
ALEX ONICA, FRANK CHANDLER, CAESARS
ENTERTAINMENT CORPORATION,  and DOES 1
through 15 inclusive,

                                                  Defendants.
-----------------------------------------------------------------------X

        Plaintiff JACOB FRYDMAN ("Frydman"), pro se, and Plaintiffs UNITED REALTY

ADVISORS, LP ("United Realty") and PRIME UNITED HOLDINGS, LLC ("Prime United"),

through their undersigned attorney Lewis S. Fischbein, P.C. (Frydman, United Realty and Prime

United are sometimes collectively referred to as "Plaintiffs"), complaining of Defendants ELI

VERSCHLEISER ("Verschleiser"), ALBERT AKERMAN ("Akerman"), DAVID O. WRIGHT

("Wright"), ASHER GULKO ("Gulko"), THE FISHOFF FAMILY FOUNDATION ("FFF"),

BENJAMIN FISHOFF ("Fishoff"),  STEVEN VEGH ("Vegh"), JAFFA HOLDINGS, LLC

("JH"), ELAN JAFFA ("Jaffa"), WHITEGATE FUNDING, LLC ("WF"), PINCUS RAND

("Rand"), MARK APPEL ("Appel"),  MULTI CAPITAL GROUP OF COMPANIES, LLC

("Multi Group"), ERIC FISCHGRUND ("Fischgrund"), RAUL DELFORNO ("Delforno"),

OPHIR PINHASI ("Pinhasi"), JOSEPH SPIEZIO ("Spiezio"), INTERMEDIA.NET, INC.

("Intermedia"), ALEX ONICA ("Onica"), FRANK CHANDLER ("Chandler"), CAESARS ENTERTAINMENT CORPORATION ("Caesars") and DOES 1 - 15 ("Does") (FFF, Vegh, JH, WF and Appel are each individually referred to as a "defendant" and are collectively referred to as the "LP Defendants"; Verschleiser, Akerman, Wright, Gulko, Fishoff, Jaffa, Rand, Multi Group, Fischgrund, Delforno, Pinhasi, Onica, Chandler, Spiezio and Does 1 – 15 are each individually referred to as a "defendant" and together with the LP Defendants are sometimes collectively referred to as the "Class A Defendants"; Intermedia is also individually referred to as a "defendant"; Caesars is also individually referred to as a "defendant"; and Intermedia, Caesars and the Class A Defendants are sometimes collectively referred to as "Defendants"), as and for their Amended Complaint, allege as follows:

## NATURE OF THE ACTION

1.        This is an action for civil damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"); civil damages for false designations of origin, false descriptions and dilution under Section 43(a) of the Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. § 1125(a) ("False Descriptions"); civil damages for direct and contributory trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); civil damages for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)) ("Unfair Competition"); civil damages for trademark infringement and unfair competition under New York common law; civil damages under the Anticybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)) (the "Anti-cybersquatting Act"),  for violations of Article 5 of the New York Civil Rights Law concerning the misappropriation of a person's name or likeness and the right of privacy; for fraud; for trade libel; for libel per se; for misappropriation of trade secrets; for injurious falsehoods; for tortious interference with existing business relations;  for  tortious  interference  with  prospective  business  relations/economic

advantage; for intentional infliction of emotional distress; for civil conspiracy; for libel; for unreasonable intrusion upon seclusion; for prima facie tort; for negligence/innkeeper liability; for breach of contract; for defamation; for indemnification; for punitive damages; for injunctive relief barring defendants' culpable conduct; and otherwise as described in this Amended Complaint.

## INTRODUCTION

2.      Plaintiff Jacob Frydman is the CEO and Chairman of the board of United Realty Trust Incorporated, a public non-traded Real Estate Investment Trust ("United Realty Trust" or the "REIT"), and CEO and Chairman of Plaintiff United Realty, a private real estate investment and advisory firm which acts as an external advisor to the REIT.  Frydman is also the CEO and Chairman of the board of Plaintiff Prime United, a financial services holding company which owns Cabot Lodge Securities, Inc. ("CLS"), a nation-wide FINRA member broker dealer which acts as the dealer manager for the offering of securities by the REIT to the public, and which also owns CL Wealth Management, LLC ("CLWM"), an SEC Registered Investment Advisor. Frydman is also a principal in numerous businesses that invest in, develop, own, operate, manage and/or otherwise deal with real estate which he operates as the "United Realty Group of Companies."  Frydman is also Chairman of the board of CLS.

3.      The REIT is currently in process of a public offering of over $1 billion of its common stock.

4.      Plaintiffs bring this action against Frydman's former partner and current competitor, Verschleiser, and the other Class A Defendants who are Verschleiser's agents, associates and co-conspirators, for damages for violations of the federal statutes set forth above, for committing the torts set forth above, for breach of contract, for indemnification and otherwise as set forth herein,

each of whom is responsible in some manner for conduct alleged in this Amended Complaint and Plaintiffs' damages as more fully detailed herein.

5.    Plaintiffs bring this action against Caesars, which owns and operates Caesars Palace & Convention Center in Las Vegas, Nevada, and which furnished a vehicle for the commission of the pattern of racketeering conducted by the Class A Defendants, and/or knowingly, recklessly or negligently permitted one or more of the Doe 1 – 15 Defendants to trespass upon their property to facilitate the illegal and tortious activities complained of herein.

6.    Plaintiffs bring this action against Akerman, a disgraced former chief compliance officer of CLS, and a former employee of United Realty, who on December 16, 2015 was found to have breached his duties of loyalty, fidelity and obedience to CLS and United Realty by having been solicited and/or bribed by Verschleiser to steal confidential financial information and trade secrets of Plaintiffs, CLS and the REIT for the sole purpose of providing Verschleiser, Wright and Gulko with confidential and proprietary information which they believed could be used by them to cause the LP Defendants to file a baseless state court lawsuit against inter alia Plaintiffs Frydman and Prime United, *Fishoff Family Foundation v. Frydman*, Index No. 653838//14 (the "Fishoff Lawsuit"), for the purpose of leaking it to the press to further the Class A Defendants' criminal enterprise by defaming inter alia those Plaintiffs.  As set forth in greater detail herein, after being caught red-handed in the theft of confidential information and trade secrets, and having a TRO issued against him and most of the other Defendants (*i.e.*, those other than FFF, JH, WF, Spiezio, Intermedia and Caesars) (later converted to a preliminary injunction for the balance of the instant action) based on such theft, the fruits of which were used illegally by Akerman, Verschleiser, Wright and Gulko to incite the LP Defendants to file their aforementioned baseless and defamatory lawsuit, and potentially facing the ramifications of this action, Akerman fabricated a story to seek to insulate him from liability, falsely asserting that he

acted for the benefit of the shareholders of the REIT as a whistleblower. To support that false claim, on February 13, 2015, more than two months after he stole confidential and proprietary materials, Akerman, on information and belief at the request of Verschleiser, fabricated false claims against Frydman which are unsupported by any facts with respect to a nominal transaction which occurred almost two (2) years earlier, and on that date sent a letter addressed to the SEC Office of the Whistleblower (the "False Claims Letter") to try to cover and hide his criminal tracks.

7.      On information and belief, the False Claims Letter signed by Akerman was actually written by or at the direction of Verschleiser.

8.      Plaintiffs assert against Akerman claims, among others, for defamation and malicious prosecution with respect to the false claims made by him in the False Claims Letter as well as other false claims made by Akerman to FINRA and other regulatory authorities at the request and on behalf of Verschleiser.  Plaintiffs reserve the right to bring a qui tam civil action under the False Claims Act, 31 U.S.C. §§ 3729-3733, against Akerman and Verschleiser for such false claims.

9.      Motivated by his desire to destroy Frydman and his businesses, including without limitation United Realty and Prime United, Verschleiser is a culpable person who conducts the affairs of an enterprise, Multi Group, through a pattern of racketeering, by inter alia committing numerous criminal acts of computer fraud, mail fraud and wire fraud (as well as other predicate acts more fully set forth herein) in a way which proximately has, and continues to, cause injury to Plaintiffs.

10.     As more fully detailed herein, Verschleiser embarked on a criminal mission to seek to destroy Frydman and his businesses almost from the minute they split as partners by engaging in a scheme to deceive the public by misusing Frydman's name and likeness and the name and

marks of Frydman's businesses to defraud the public, including without limitation prospective investors in various investment funds, including without limitation the REIT.

11.     Verschleiser and the Class A Defendants (who are Verschleiser's co-conspirators) sought to injure Plaintiffs and Frydman's other businesses by, among other things:

   a.  taking control of Plaintiffs' company servers and exchange mail servers, and for more than 10 days, copying confidential information, deleting company data, locking out Frydman and several of his employees from accessing their email accounts and company servers; hacking into Plaintiffs' email exchange servers to identify persons with whom Frydman was doing business and then creating anonymous web sites from which Verschleiser and/or his co-conspirators sent anonymous emails to persons with whom Frydman was doing business encouraging them not to transact business with Frydman, in violation of the Computer Fraud and Abuse Act (the CFAA, 18 U.S.C. § 1030), the Electronic Communications Privacy Act (the ECPA, 18 U.S.C. § 2510 et seq.), the Stored Communications Act (the SCA, 18 U.S.C. § 2701 et seq.) and New York Penal Law Article 156 (relating to offenses involving computers), all as more particularly detailed in a related case filed in this Court, *United Realty Advisors, LP v. Verschleiser*, 14 Civ. 5903 ((JGK) (MHD) (the "Related Case");

   b.  physically threatening Frydman's employees; hiring disgruntled and/or discharged ex-employees of Frydman for the sole purpose of disparaging him; and seeking to coerce or bribe employees and ex-employees of Frydman and his businesses to make false claims against him and bring unsupportable lawsuits premised on false claims and fictitious manufactured "evidence" against Frydman;

c. asserting false and fraudulent claims against Frydman and the board of directors of the REIT to third party investors in United Realty; and seeking to coerce said investors to assert false claims against Frydman and bring unsupportable lawsuits against one or more of Plaintiffs;

d. making false and fraudulent claims against Frydman in advertisings, websites, domains, sub-domains, blogs and internet postings under a variety of names that all infringe upon his name, likeness, and the names and marks of his companies;

e. operating as part of a common enterprise to perpetuate Internet scams on unsuspecting prospective business associates and investors of Frydman using his name and likeness and the name and marks of his businesses through an ever-changing coterie of websites, domains, sub-domains, blogs and Internet postings that utilize the same or similar templates to generate the same fake news stories, fake reports, fake testimonials, fake blogs, fake twitter accounts and fake LinkedIn accounts which are intended to cause, and which have caused, prospective investors and other prospective business associates of Frydman to not do business with him and his businesses;

f. creating advertisement flyers which label Frydman as a "fraudster" and "lowlife" and transmitting or transporting those flyers through interstate commerce to one or more co-conspirators in Las Vegas, to be distributed under each hotel room door of approximately 1,000 industry executives attending the National Real Estate Investment Securities Association ("REISA") Conference at Caesars Palace & Convention Center on September 14 through 16, 2014, where Frydman was a sponsor and featured speaker, which drove the recipients to a fake blog entitled

"Jacob Frydman Fraud" which accused Frydman of being a "fraudster", "lowlife" and a "criminal";

g.  creating advertisement posters which label Frydman as a "fraudster" and "lowlife" and transmitting or transporting those posters through interstate commerce to one or more co-conspirators in Las Vegas, to be plastered over the real convention posters displayed at the Caesars Convention Center during the foregoing REISA Conference, which encouraged the viewers to go to a fake blog entitled "Jacob Frydman Fraud" which accused Frydman of being a "fraudster", "lowlife" and a "criminal";

h.  initiating at least three false and defamatory lawsuits for the sole purpose of fabricating a basis for the later dissemination of information intended to defame Frydman and his companies, including without limitation United Realty and Prime United, and then leaking those lawsuits to reporters whom Verschleiser and his co-conspirators manipulated into re-publishing those falsehoods without independently verifying their accuracy, thereby getting otherwise respectable news outlets to voluntarily become the criminal instruments of Verschleiser and his co-conspirators by recklessly abandoning their journalistic professionalism and intellectual honesty and republishing those defamatory statements;

i.  stealing confidential information and trade secrets belonging to Plaintiffs, and then illegally using the stolen information to cause certain of the co-conspirators to initiate knowingly baseless lawsuits against one or more of Plaintiffs which were prepared by Wright, Gulko and others at the direction of Verschleiser for the sole purpose of leaking said defamatory allegations to the news media, both in violation

of this Court's TRO and in violation of law, with the sole intent of causing Plaintiffs harm; and

j.  defaming Plaintiffs and seeking to cause severe damage to their reputations and businesses by filing false claims ostensibly as "whistleblowers" with the SEC and FINRA.

12.     Through Defendants' illegal and tortious acts as herein set forth, Plaintiffs have been denied valuable business opportunities, have and will continue to suffer damage to their business and property, and have suffered irreparable damage to their business reputation and goodwill.

## Related Case

13.     The Related Case was initiated by United Realty and Frydman against Verschleiser and several of his co-conspirators.[1]

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction over Plaintiffs' RICO, Lanham Act, False Descriptions, Unfair Competition and Anti-cybersquatting Act claims pursuant to 28 U.S.C. § 1331.

---

[1] In addition, Frydman and others have initiated a state court action against Verschleiser and his affiliates, *JFURTI v. Verschleiser*, Index No. 650803/14 (the "Frydman State Court Action"). That case is for breach of contract comprising four causes of action. The first cause seeks a declaratory judgment that Verschleiser breached Section 10 of the Separation Agreement between the parties dated December 3, 2013 (the "Separation Agreement") by disparaging Frydman and his affiliates; the second  seeks a declaratory judgment that Verschleiser also breached Section 10 by soliciting or recruiting former or current employees of United Realty; the third seeks a declaratory judgment that Verschleiser failed to restore all exchange servers, web hosting and computer servers of Frydman and his businesses to their status on or before November 15, 2013 by December 5, 2013, the deadline required for him to do so pursuant to Section 25 of the Separation Agreement; and the fourth seeks a preliminary and permanent injunction enjoining Verschleiser, pursuant to Section 11 of the Separation Agreement, from further disparaging plaintiffs. Except for costs of that action and attorney's fees which the successful party is entitled to under the Separation Agreement, the Frydman State Action seeks no monetary damages.

15.     This Court has supplemental jurisdiction over Plaintiffs' state law and common law claims pursuant to 28 U.S.C. § 1367(a), which are so related to their federal claims as to form part of the same case or controversy.

16.     Venue in this District is proper pursuant to 28 U.S.C. § 1965(a) because Defendants reside, are found, have an agent, or transact their affairs in this District. Venue in this District is also proper under 28 U.S.C. § 1965(b) because the ends of justice require that any defendant residing in another District be brought before this Court.  Venue is proper under 28 U.S.C. §1391 (b) as well in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Venue is also proper under principles of pendent venue because all claims arise out of the same nucleus of operative facts.

## PARTIES

17.     Plaintiff Jacob Frydman is an individual, maintains his principal place of business within this District, and is a citizen and resident of the State of New York.

18.     Plaintiff United Realty Advisors, LP is a Delaware Limited Partnership, with an office at 60 Broad Street, New York, NY 10004.

19.     Plaintiff Prime United Holdings, LLC is a Delaware Limited Liability Company, with an office at 60 Broad Street, New York, NY 10004.

20.     Defendant Eli Verschleiser is a citizen and resident of the State of New York with a residence at 3501 Avenue T, Brooklyn, NY 11234.

21.     Defendant Albert Akerman is a citizen and residence of the State of New York with a residence at 73 Marvin Avenue, Rockville Center, NY 11570, and was, until his termination for cause on December 15, 2014, the chief compliance officer of CLS.

22.     Defendant David O. Wright is, on information and belief, an individual attorney and a citizen and resident of the State of New York, with an office at 1012 Park Street, Peekskill, NY 10566.

23.     Defendant Asher Gulko is, on information and belief, an individual attorney and a citizen and resident of the State of New York, with an office in Verschleiser's office at 44 Wall Street, Second Floor, New York, NY 10005, and a residence at 261 Central Avenue, Apt. 4A, Lawrence, NY 11559.

24.     Defendant The Fishoff Family Foundation, is, on information and belief, a charitable foundation under the exclusive control of defendant Benjamin Fishoff, with an office at 240 Viola Road, Monsey, NY 10952.

25.     Defendant Benjamin Fishoff is a citizen and resident of the State of New York with an office at 240 Viola Road, Monsey, NY 10952.

26.     Defendant Steven Vegh is a citizen and resident of the State of New York with a residence at 572 Kensington Place, Cedarhurst, NY 11516.

27.     Defendant Jaffa Holdings, LLC is purported to be a limited liability company doing business in New York and is, on information and belief, an instrumentality of Defendant Elan Jaffa.

28.     Defendant Elan Jaffa is a citizen and resident of the State of New York with an office at 2394 Nostrand Avenue., Brooklyn, NY 11210, and a residence at 7344 136th Street, Flushing, NY 11367-2827.

29.     Defendant Whitegate Funding, LLC is a New York limited liability company controlled by Defendant Pincus Rand, with an office at 320 5th Avenue, Suite 705, New York, NY 10001.

30.     Defendant Pincus Rand is a citizen and resident of the State of New York with an office at 320 5th Avenue, Suite 705, New York, NY 10001 and a residence at 937 East 22nd Street, Brooklyn, NY 11210-2817.

31.     Defendant Mark Appel is a resident of the State of Florida, who conducts business in New York, with a residence at 9451 East Broad View Drive, Bay Harbor Islands, Florida 33154.

32.     Defendant Multi Capital Group of Companies, LLC is a New York limited liability company which, on information and belief, is an entity used by Verschleiser to invest in and develop real estate, and which operates as an umbrella organization for other entities owned and/or controlled by Verschleiser, including without limitation Multi Capital, LLC, a New York limited liability company, and/or Multi Capital Group I, LLC, a New York limited liability company, and/or Multi Investments, which, on information and belief, is a fictitious name through which Verschleiser and/or Multi Capital, LLC and/or Multi Capital Group I, LLC operate their various businesses, each having their principal place of business at 44 Wall Street, Second Floor, New York, NY 10005.

33.     Defendant Eric Fischgrund is an individual operating as a sole proprietor doing business as "FischTank", a "Marketing and PR Consultancy Provided by Eric Fischgrund," with an office at 44 Wall Street, Second Floor, New York, NY 10005, and is, on information and belief, a citizen and resident of the State of New Jersey.

34.     Defendant Raul Delforno was the head of Information Technology for United Realty until February 14, 2013, and is a citizen and resident of the State of New York with a residence at 2952 West 33rd Street, Apartment 2D, Brooklyn, NY 11224.

35.     Defendant Ophir Pinhasi is a former IT executive with United Realty, and is a citizen and resident of the State of New York with a residence at 254 West 98th Street, Apartment 64, New York, NY 10025.

36.     Defendant Joseph Spiezio is a citizen and resident of the State of New York with an office address at 500 Mamaroneck Avenue, Suite 320, Harrison, New York 10528, and a residence address at 564 Wynnewood Road, Pelham, NY, 10803.

37.     Defendant Intermedia.Net, Inc. is, on information and belief, a Delaware corporation, with an office at 120 West 45th Street, 26th Floor, Suite B, New York, NY 10036.

38.     Defendant Alexandru Onica is a former IT consultant for United Realty, and a citizen and resident of the State of New York with an address at 2828 45th Street, Astoria, NY 11103.

39.     Defendant Frank Chandler is a former sales executive for United Realty, and a citizen and resident of the State of Massachusetts with a residence at 20 Overlook Park, Newton, MA 02459.

40.     Defendant Caesars Entertainment Corporation is a Delaware corporation with an office at 120 Wooster St, New York, NY 10012.

41.     Plaintiffs are ignorant of the true names and capacities of the defendants sued in this Amended Complaint as Does 1 through 15 inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will seek to further amend their pleading to allege the true names and capacities of the Doe defendants when ascertained.   Each of the fictitiously named defendants is responsible in some manner for the conduct alleged in this Amended Complaint, and Plaintiffs' damages are actually and proximately caused by the conduct of such defendants.

42.     Based upon information and belief, Plaintiffs allege that at all times mentioned herein, Defendants Akerman, Wright, Gulko, FF, Fishoff, Vegh, JH, Jaffa, WF, Rand, Appel,

Fischgrund, Delforno, Pinhasi, Onica, Chandler, and Does 1 through 15 were each employed by, consultants to, or acting as agents of, and/or were co-conspirators of, Defendants Verschleiser and/or Multi Group, and each was acting as an agent and/or employee or co-conspirator of each other, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each other.

43. Defendant Intermedia is an Internet service provider who hosts, or hosted, the email exchange servers used by United Realty, Prime United, CLS and Multi Group, as well as certain other domains controlled by Verschleiser, and in violation of express instructions to the contrary from Plaintiffs Frydman and United Realty, negligently, or recklessly, assisted and/or permitted Verschleiser, Delforno, Onica and Pinhasi to illegally hack into Plaintiffs' hosted email exchange servers, and facilitated certain of the criminal actions of the Class A Defendants, as more fully set forth herein, and after learning of the criminal conduct of Verschleiser and certain of the other Class A Defendants, and in complete derogation of its duties to Plaintiffs United Realty and Frydman facilitated the illegal hacking by Verschleiser, Delforno, Onica and Pinhasi into United Realty, Prime United and Frydman's hosted email exchange servers, and as more specifically set forth herein, facilitated the theft and conversion of United Realty's, Prime United's, Frydman's and other of other businesses' confidential information and trade secrets by Verschleiser and his co-conspirators.

44. Defendant Caesars owns and operates Caesar's Palace & Convention Center in Las Vegas, and furnished a vehicle for the commission of the pattern of racketeering conducted by e Verschleiser and his co-conspirators, and/or knowingly, recklessly or negligently permitted one or more of the Doe 1 – 15 Defendants to trespass upon their property to facilitate the illegal and tortious activities complained of herein.

## FACTS COMMON TO ALL COUNTS

45.     In 2011, Frydman and Verschleiser, who had known each other for several years as a result of their involvement in New York real estate, but who had not previously conducted any business together, joined forces to sponsor the REIT, through which they planned to raise in excess of $1 Billion of equity for investment in real estate.

46.     In connection therewith and in pursuit of their various other business interests Frydman and Verschleiser formed more than 20 entities[2] (the "Entities"), and as of December 2, 2013, Verschleiser and Frydman, directly and indirectly through a variety of affiliates, jointly owned, operated and/or controlled the Entities, including the REIT, United Realty, the external advisor to the REIT, CLS, the FINRA remember broker dealer which is the dealer manager for the REIT, and Prime United, the financial services holding company which owns CLS.

47.     Prior to December 2, 2013, Frydman was CEO and Chairman, and Verschleiser was President and a member of the board of directors, of both the REIT and United Realty, and Frydman and Verschleiser held management or board positions with each of the other Entities.

48.     On December 2, 2013, as a result of Verschleiser's failure to adequately perform his Company Duties, among other things, and pursuant to the various operating or partnership agreements of the Entities, Frydman, removed Verschleiser as a manager of URA Holdings, and Frydman, as the manager of the general partner of United Realty, terminated Verschleiser's

---

[2] Those entities included United Realty; United Realty Advisor Holdings, LLC ("URA Holdings"); United Realty Trust Incorporated (the REIT); United Realty Partners, LLC; URA Property Management, LLC; United Realty Capital Markets, LLC; URP Investments, LLC; URTI GP, LLC; URTIGP Investments, LLC; URA Property Management, LLC; URTI LP, LLC; Riverside United Title Agency, LLC; Prime United; CLS; CLWM; CL General Agency, LLC; CLS Lending, LLC;  American United Securities, LLC;  AUS Holdings, LLC;  United 866 Management, LLC; United Realty 866 UN Plaza, LLC; and United Realty Capital Operating Partnership, L.P.

employment with United Realty (as president) for "cause" by serving a termination notice upon Verschleiser.  The removal notice and the termination notice are attached as Exhibit "N".

49.     Unbeknownst to Frydman, immediately after being served with the termination notice, Verschleiser wrongfully and without authorization directly, and/or with the assistance of others, accessed and hijacked United Realty's (and Prime United's, Frydman's and CLS's) hosted email exchange servers, Internet domain hosting servers and computer networks, giving Verschleiser unfettered control over same, and the ability to hack into and intercept the emails of United Realty employees, to create backups of United Realty email data and trade secrets, to download and copy all of such data, and then to delete all of said data from United Realty's email exchange servers, permanently depriving United Realty of its important confidential and/or proprietary information, data and trade secrets.

50.     On December 3, 2013, Frydman advised Intermedia that Verschleiser was fired and was not authorized to access the United Realty email exchange system, and was not authorized to access its email exchange servers.

51.     As a result of Frydman's communication with Intermedia, Intermedia properly excluded Verschleiser from accessing the United Realty email exchange servers, and locked him out of Host Pilot, the Intermedia administrative control dashboard which controlled the United Realty email exchange account, by, among other things, causing its administrator G. Citrigno (adm) to "lock-out" Verschleiser's alias login, "2good2b4@att.net" on December 3, 2013 at 8:43:01 a.m. Pacific Time.

52.     On December 4, 2013, at 2:05:05 p.m. Pacific Time, in derogation of its duties to United Realty, Intermedia purposefully, negligently and/or recklessly breached its obligations to United Realty and Frydman by causing its administrator J. Erice (adm) to "un-lock" Verschleiser's login, 2good2b4@att.net, giving Verschleiser unfettered access to the United

Realty email exchange servers and its Host Pilot administrative control dashboard, by which, until December 10, 2013, Verschleiser and his co-conspirators were permitted by Intermedia to take control and hijack United Realty's email exchange servers.

53.     Intermedia's actions in granting Verschleiser access to United Realty's email exchange servers were in direct violation of Frydman's instructions to Intermedia, and in express violation of Intermedia's duties to United Realty.

54.     Because the REIT is a public company with full SEC reporting obligations, the removal of Verschleiser as manager of URA Holdings and the termination of his employment as president of United Realty triggered a four-day time clock to file a Form 8-K with the SEC disclosing said events.

55.     Verschleiser did not wish to have the basis of his termination publicly disclosed and sought to negotiate a consensual arrangement which would include the rescinding of the termination and removal notices in exchange for his voluntary resignation from the Board of Directors of United Realty and the REIT.

56.     On December 3, 2013, Verschleiser and Frydman and certain of their respective affiliates, negotiated, and just after midnight on December 4, 2013, executed a Sale and Purchase of Membership Interest Agreement, *i.e.*, the Separation Agreement.  The Separation Agreement is attached as Exhibit "A".

57.     Pursuant to the Separation Agreement, in exchange *inter alia* for Frydman's affiliates agreeing to make certain payments to Verschleiser and rescinding the termination and removal notices, Verschleiser voluntarily resigned from each and every position or office he held as a manager, officer, director or employee of United Realty, the REIT and each of the other Entities jointly owned by his and Frydman's affiliates (collectively referred to in the Separation Agreement as the "Entities"), and Verschleiser and his affiliates sold and transferred to

Frydman's affiliates all of Verschleiser's direct and indirect ownership interest in all but two of the Entities (the "Sold Entities").

58.     As a result of the Separation Agreement, as of December 4, 2013, Verschleiser ceased being a manager, officer, director and/or employee of any of the Entities, and had no further right, title or interests in any of the Sold Entities, and agreed that he would not represent himself as being an employee, officer, manager, member, director, agent or representative of any of the Entities for any purpose.

59.     Verschleiser also agreed at Section 10 of the Separation Agreement that for a period of eighteen (18) months following the Separation Date: (i) he will not, alone nor in concert with others, directly or indirectly, employ or solicit the employment of, or assist others in employing or soliciting the employment of, any individual employed by any of the Entities; and (ii) he will not disparage or encourage or induce others to disparage Frydman or his businesses.

60.     Verschleiser also agreed to restore control of the Company's technology back to Frydman, and to restore Frydman's and United Realty's other employees' mailboxes which Verschleiser had wrongfully disabled, and agreed at Section 25 of the Separation Agreement "to restore all exchange servers, web hosting and the Entities' computer servers to their status on or before November 15, 2013 and to provide Frydman with all owner and administrative passwords by the close of business on December 5, 2013."

61.     Notwithstanding Verschleiser's undertaking pursuant to Section 25 of the Separation Agreement, Verschleiser failed and refused, notwithstanding numerous demands from Frydman, to restore the United Realty email exchange servers, web hosting servers and computer network to their status on or prior to November 15, 2013, as a result of which Frydman and other employees of United Realty were shut out of their email accounts, were unable to send or receive any company emails, could not access the Host Pilot administrative dashboard for

their hosted email exchange servers, and could not gain access to United Realty's hosted internet domain servers nor the United Realty computer network.

62.     Almost from the minute he signed the Separation Agreement, Verschleiser embarked on a mission to destroy Frydman and his businesses, including without limitation United Realty and Prime United, through criminal, illegal and tortious acts as detailed hereafter, with the goal of causing existing and prospective investors, business associates and selling agents to elect not to invest with, or transact business with, Frydman and his businesses.

63.     Verschleiser pursued his criminal enterprise through a pattern of racketeering activity affecting interstate commerce for the sole purpose of causing harm and damage to Frydman, and injuring Frydman's business relationships, with the goal of destroying Frydman's businesses and causing Frydman and his businesses, including without limitation United Realty and Prime United, significant monetary and emotional damage.

## FIRST PREDICATE ACTS

### CRIMINAL VIOLATIONS OF THE CFAA, THE ECPA, THE SCA, AND NEW YORK PENAL LAW ARTICLE 156 (RELATING TO COMPUTER OFFENSES)

64.     On December 2, 2013, immediately after being fired from United Realty, Verschleiser wrongfully and without authorization accessed and hijacked United Realty's hosted email exchange servers by illegally accessing "Host Pilot," the administrative dashboard controlling the United Realty exchange servers, and removing Frydman as the account owner and giving himself unfettered control over the entire United Realty email exchange servers. Verschleiser made his alias, "2good2b4@att.net", the new owner of the account, and then blocked Frydman from having any access thereto and disabled his and other employees' email.

65.     While in complete control of United Realty's technology, through December 10, 2013 (the "Initial Infiltration Period"), Verschleiser set the stage for an intensive, long-term,

organized, criminal conspiracy to wrongfully access Plaintiffs' confidential and proprietary information and trade secrets, intercept email communications, and conduct fraudulent activities in connection with United Realty's email exchange servers, networks and domains or subdomains with the intention of causing harm to Plaintiffs.

66.    During the Initial Infiltration Period, Verschleiser illegally created back-ups of email account mail boxes, proprietary information, confidential data and trade secrets, and, after downloading and copying same, permanently deleted same from United Realty's computers.

67.    Verschleiser also created aliases and distribution list members through which he would continue to have undetectable access to United Realty's email exchange servers and be able to intercept Plaintiffs' data long after the Initial Infiltration Period. In fact through at least mid-March 2014 (the "Ongoing Interception Period"), unbeknownst to Plaintiffs, Verschleiser and his co-conspirators,[3] without authorization, accessed Frydman's email account at will, at times logging into that email account as themselves or aliases which they created, and at times using various services provided by companies that enable the hiding, masking and/or encryption of their IP identities, logging in to Frydman's email account as Frydman but from IP addresses used by Verschleiser and his agents, so as to disguise themselves as Frydman, for the purpose of infiltrating Frydman's email account un-noticed, and intercepting his emails.

68.    The actions of Verschleiser and his co-conspirators described in the preceding several paragraphs constitute violations of the CFAA, the ECPA, the SCA and New York Penal Law Article 156 (relating to offenses involving computers),[4] all as more specifically detailed in

---

[3] In express breach of Section 10 of the Separation Agreement, Verschleiser solicited United Realty employee Delforno, then head of technology, to become employed by Verschleiser while still employed by United Realty, to act as his secret mole within the Company to assist in undertaking illegal activities by giving Verschleiser on-going access to United Realty's exchange servers and other networks, as well as to act as Verschleiser's IT employee in setting up his and his new organizations' -- Multi Group, Magenu and OurPlace NY's -- technology.

the timeline of events through March 21, 2014 attached as Exhibit "B" and incorporated herein, and which criminal activities constitute some of the predicate acts giving rise to the RICO claims being asserted in this Amended Complaint.

69.     Verschleiser and/or his agents and co-conspirators, using services provided by Surfeasy, a company which enables those wishing to hide their on-line identities by masking their IP addresses, established anonymous Internet domains or subdomains and email accounts and identities, and specifically "informedconsumer@mail.com" and "friendsofEli@gmx.com," which Verschleiser created solely as a means to facilitate his criminal enterprise by transmitting "anonymous" disparaging emails to persons whom Frydman was dealing with, and whose identities could only have been obtained by hacking into Frydman's email account.

70.     By virtue of his illegal hacking, Verschleiser learned that Frydman was negotiating a $10 million loan to finance the acquisition of a medical office building in Myrtle Beach, South Carolina and the identity and email addresses of the bankers with whom he was dealing. Verschleiser also discovered that Frydman was negotiating a new corporate headquarters sublease for space in the building at 180 Maiden Lane, as well as the identity and email address of the sub-landlord with whom United Realty was then in final negotiations to execute a very favorable $1.4 million sublease at below market rent.

71.     Armed with this information, on February 10 and 11, 2014, Verschleiser sent highly disparaging "anonymous" emails to the bankers and the sub-landlord each stating: "As an informed consumer we wish you to be one as well.  You are about to enter into an agreement with an individual who alledgedly [sic] does anything and everything NOT to pay his vendors

---

[4] Plaintiffs do not assert any stand-alone claims against any of the Defendants other than Akerman and Intermedia under the CFAA, the ECPA, the SCA or New York Penal Law Article 156, each of which is separately dealt with in the Related Case. Plaintiffs do, however, allege violations of the foregoing statutes against Akerman and Intermedia in this Amended Complaint.

and or circumvent any written agreement he or his affiliated entities have. As long as it is to his benefit he 'may' pay in partial, but as soon as he chooses to he will 100% stop paying and choose to litigate the matter. Do a simple Nexus Lexus search and look closely into his litigous [sic] nature and background. Do a google search 'Jacob Frydman Fraud' 'Jacob Frydman Lawsuit' and think twice. Ask yourself, why so many company [sic] names over such a short period of time? Every two to 4 years a new 'venture'? Be an informed consumer, dont [sic] get hurt. Speak to ANY ex employee, any ex creditor, from bank to local phone company, from office supplies company to landlords. The record speaks for itself. Speak not to someone currently doing business with Mr Frydman, speak to 3 former companies that did, former employees, or partners that have. Be an informed consumer, dont [sic] get hurt."

72.     As a result of the foregoing Verschleiser caused the loss of the $10 Million loan, and the loss of the very favorable $1.4 million sublease.

## SECOND PREDICATE ACTS

### VIOLATION OF THE HOBBS ACT (18 U.S.C. § 1951), ACTS OF EXTORTION, ATTEMPTED EXTORTION, FILING FALSE CLAIMS IN A STATE COURT LAWSUIT, FALSIFYING EVIDENCE AND COMMITTING PERJURY IN CONNECTION THEREWITH

73.     During the fall of 2013, Frydman and Verschleiser were attempting to acquire 866 UN Plaza, for $200 million in a joint venture with another firm, with a view to converting that building to commercial condominiums.

74.     As a result of Verschleiser's failure to raise his portion of the equity for that deal, the joint venture partner had the right to keep 100% of the deal for themselves, which they elected to do.

75.     On December 16, 2013, after Verschleiser had no on-going interest in any of the Entities, Frydman negotiated a $2 million fee to be paid to one of the Sold Entities for work performed on the 866 UN Plaza transaction.

76.     Verschleiser had no rights to that fee or any portion thereof, having given up all rights thereto under the Separation Agreement.

77.     Notwithstanding that Verschleiser had no rights to that fee or any portion thereof, on the morning of December 18, 2013, Verschleiser phoned Frydman seeking to extort him.  As a result of his illegal hacking into Frydman's email, Verschleiser knew that Frydman had instructed Citibank to return all of the funds invested by third party investors for the 866 UN PlazA transaction, yet Verschleiser threatened that unless Frydman agreed to pay Verschleiser $500,000.00 Verschleiser would file a lawsuit against Frydman that afternoon making false claims that Frydman had failed to return investor funds raised by Frydman for that transaction and leak it to the press to embarrass Frydman.

78.     Verschleiser's acts constitute extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, which states: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both."

79.     "Extortion" means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  "Fear" includes threatened fear of economic loss.

**The First Defamatory Lawsuit**

80.     Frydman refused to be extorted by Verschleiser.  So Verschleiser filed a state court lawsuit, *DJZV Holdings, LLC v. Frydman*, Index No. 654346/13, based on false and fraudulent claims, asserting that Frydman failed to return investor funds in the amount of $4.9 million, when in fact, Verschleiser knew that Frydman had previously instructed Citibank to immediately

return those funds by wire transfer (the "First Defamatory Lawsuit").

81.     In fact, Verschleiser, who learned that Frydman instructed Citibank to return those funds by wire transfer because he had intercepted private emails between Frydman and his bankers at Citibank as a result of Verschleiser's illegal hacking into Frydman's email account, attempted to coerce Citibank to not make those wire transfers (thereby hoping to give credence to his false accusations) by causing his lawyers to write to Citibank, demanding that it ignore Frydman's instructions because Verschleiser wrongfully asserted rights to those funds. See letter from Verschleiser's lawyers to Citibank attached as Exhibit "C".

82.     Because Verschleiser had no rights to the accounts which held the funds which were being returned to investors, having given them up in the Separation Agreement, Citibank refused to honor his lawyers' demands, and the funds were returned to the investors before the First Defamatory Lawsuit was actually filed.

83.     Verschleiser nonetheless initiated that Lawsuit with the filing of an order to show cause seeking a temporary restraining order and preliminary injunction.

84.     Justice Sherwood denied the motion for a temporary restraining order, set a briefing schedule between December 18, 2013 and January 13, 2014, and scheduled a hearing to be held before Justice Bransten, who is the judge to which the First Defamatory Lawsuit was assigned.

85.     Earlier in that Lawsuit, in papers filed on December 18, 2013 by Frydman opposing the motion for a TRO, and throughout the hearing on the TRO, Frydman raised the fact that Verschleiser was removed as a manager and his employment as president of United Realty was terminated on December 2, 2013 by Frydman based on a lengthy list of "bad boy" acts, including without limitation unauthorized distributions of Company funds to himself and/or his affiliates, wasting company assets, excessive absenteeism, committing fraud in connection with an application of one of the Entities with the Florida Division of Securities by misrepresenting that

he had not been arrested and charged with a crime when in fact he had been, failing to attend board of director meetings of the REIT, and a litany of other willful acts of misconduct or gross neglect.

86.     At no time from the filing of the First Defamatory Lawsuit through the briefing schedules did Verschleiser deny that he was removed and fired by Frydman on December 2, 2013.  Specifically, not once in any of the court  filings made or hearings held in that matter did Verschleiser assert that he was not removed by Frydman and fired on December 2, 2013 as asserted by Frydman, or that the removal and termination notices which were attached as exhibits to Frydman's papers were inaccurate.  Nor did Verschleiser at any time through a January 13, 2014 hearing in that Lawsuit assert that it was not he who was removed and terminated on December 2, 2013, but rather, that it was Frydman who was removed and terminated by Verschleiser prior thereto.

87.     At the conclusion of the January 13, 2014 hearing, Judge Bransten denied the motion for preliminary injunction, granted Frydman's motion to dismiss (based on an arbitration agreement) and dismissed the case with prejudice.

88.     Being unable to extort Frydman, Verschleiser initiated the First Defamatory Lawsuit for the sole purpose of fabricating a basis for the later dissemination of information intended to defame Frydman and his companies.

89.     On information and belief, Verschleiser effected his defamatory purpose by immediately leaking the First Defamatory Lawsuit to reporters at the *Real Deal, Law 360* and *Investment News* and with the intent to manipulate at those publications into re-publishing those defamatory falsehoods without independently verifying their accuracy, thereby getting otherwise respectable news outlets to voluntarily become the criminal instruments of Verschleiser and his co-conspirators.

90.     The *Real Deal,* a publication owned and published by Korangy Publishing Inc., recklessly abandoned its journalistic professionalism and intellectual honesty by failing to undertake any independent investigation to ascertain the accuracy or truthfulness of the allegations asserted by Verschleiser and his affiliates in the First Defamatory Lawsuit and recklessly republished those defamatory statements.

91.     *Law 360*, a publication owned and published by Portfolio Media, Inc., recklessly abandoned its journalistic professionalism and intellectual honesty by failing to undertake any independent investigation to ascertain the accuracy or truthfulness of the allegations asserted by Verschleiser and his affiliates in the First Defamatory Lawsuit and recklessly republished those defamatory statements.

92.     *Investment News*, a publication owned and published by Crain Communication Inc., recklessly abandoned its journalistic professionalism and intellectual honesty by failing to undertake any independent investigation to ascertain the accuracy or truthfulness of the allegations asserted by Verschleiser and his affiliates in the First Defamatory Lawsuit and recklessly republished those defamatory statements.

93.     On or about April 17, 2014, Verschleiser sent a written defamatory statement to the *Real Deal* stating: "'He [Frydman] lost in court and the judge did not award him the injunction. I ultimately decided to resign as the President and Treasurer of United Realty Trust due to the fraud and actions of my ex-partner Mr. Jacob Frydman as outlined in my lawsuits against him."

94.     The *Real Deal* re-published Verschleiser's defamatory statement on April 17, 2014.

**Verschleiser Manufactures Fake Evidence**

95.     Verschleiser appealed Judge Bransten's January 13, 2014 ruling, and filed a motion for reargument. In that motion, Verschleiser miraculously produced for the first time "new evidence" in the form of two fraudulent letters, each dated November 29, 2013 (the "November

29th Letters"), the first entitled "Notice of Removal" (of Frydman) and the second purporting to

terminate Frydman's employment (*see* Index No. 654346/13, NSECF Doc. Nos. 62-63 (Motion

Seq. 003, Verschleiser mov. aff., Exhs. C-D), pursuant to which Verschleiser claimed that it was

not Frydman who removed or terminated Verschleiser on December 2, 2013, but rather it was

Verschleiser who removed and terminated Frydman first, on November 29, 2013.   The

November 29th Letters are attached as Exhibit "D".

96.      Specifically, on February 18, 2014 in connection with his reargument motion,

Verschleiser submitted an affidavit, attached as Exhibit "E", proffering the November 29th

letters and averring in paragraphs 11 through 13 that:

> On November 29, 2013, following a series of breaches, misrepresentations, and
> "bad boy acts"…Frydman was removed for cause as a Manager of United Realty
> Holdings, LLC….In addition, the General Partner of United Realty Advisors, LP
> terminated Frydman's employment with United Realty Advisors, LP…. After
> being served with the Notice of Removal for Cause and the Notice of Termination
> of Employment, Frydman allegedly served me with substantially similar notices….

97.      Verschleiser's affidavit was false and fraudulent and constitutes the perpetration of

a fraud on the court as well as perjury.

98.      On July 23, 2014, at his deposition in the Frydman State Court Action, Verschleiser

changed his story four times in a span of just several seconds!  Verschleiser first testified that he

"hand delivered" the November 29th Letters to Frydman at their offices on November 29, 2013;

then seconds later he testified that he "did not hand deliver" them to Frydman, but "put them on

[Frydman's] desk on November 29th"; then seconds later he testified that it was not on

November 29th as he was not in the office that day, but that he did it "over that weekend" of

November 30 through December 1, 2013; and then seconds later Verschleiser changed his story

yet again, admitting that it could not have been over that weekend because he was not in the

office then.  Finally, Verschleiser concluded that he "did not remember" when he allegedly put

the November 29th Letters on Frydman's desk.  Verschleiser's deposition transcript is attached as Exhibit "F".

99.     The November 29th Letters were each created by Verschleiser to stand for the (utterly false) proposition that it was *not* Verschleiser who was terminated by Frydman on December 2, 2013, but rather it was Verschleiser who terminated Frydman *first*, on November 29, 2013.

100.    In truth, the November 29th Letters did not exist on November 29th as claimed by Verschleiser.

101.    Rather, they were fraudulently created by Verschleiser on or after December 3, 2013 after Verschleiser received, and then copied Frydman's December 2, 2013 removal and termination notices to Verschleiser.

102.    The pdf files of the November 29th Letters in native file format reveal metadata that proves that those letters were actually created on December 3, 2013, *after* Verschleiser received the December 2, 2013 removal and termination notices from Frydman.  See metadata of the pdfs of the November 29th Letters attached as Exhibit "G".

103.    Plaintiffs allege that the sole reason Verschleiser filed the First Defamatory Lawsuit against Frydman was to publically shame and/or disparage him by falsely asserting that Frydman had misappropriated or failed to return investor funds, and using that allegation as the basis for making false and fraudulent statements about Frydman to the media, including without limitation the April 17, 2014 false and defamatory statement published by the *Real Deal* that Verschleiser decided to resign as the President and Treasurer of United Realty Trust due to the fraud and actions of Frydman as outlined in Verschleiser's lawsuits against him.

104.    On April 17, 2014, a *Real Deal* article, which is attached as Exhibit "H", quoted a "written statement" submitted by Verschleiser accusing Frydman of Fraud.

105.     On information and belief Verschleiser solicited Fischgrund, a former United Realty employee, to direct Verschleiser's criminal public relations efforts to defame and disparage Frydman and United Realty.

106.     On information and belief Fischgrund, directly and through his company FischTank Marketing, has created numerous websites, blogs and domains through which he seeks to promote Verschleiser, and on which he ghosts articles which are published under Verschleiser's name.  Plaintiffs believe, and expect to prove at the trial on the merits, that as part and parcel of this activity, Fischgrund, directly or through FischTank Marketing, also has created and ghost-written numerous of the offensive and illegal websites, domains and blogs of which Plaintiffs complain of herein, as Verschleiser's agent.

### THIRD PREDICATE ACTS

### PERJURY

107.     Evidence obtained through discovery in the Frydman State Court Action proves unequivocally that Verschleiser hacked into the United Realty email exchange server from his home in Brooklyn, NY (IP address 100.2.2.26) and other locations, using his true identity, Eli.v@urpa.com, as well as aliases he admits are his, including 2good2b4@att.net, through "Host Pilot"-- the administrative controls component of the United Realty email exchange server.  See sampling of Host Pilot log attached as Exhibit "I".

108.     As can easily be seen from the highlighted entries on Exhibit "I", Verschleiser spent dozens of hours manipulating the Host Pilot administrative area of United Realty's email exchange server through his known log-in, "Eli.V@urpa.com" as well as through his alias "2good2b4@att.net", which Verschleiser conceded both in responses to interrogatories and at a deposition belong to him.  The level of technical skill necessary to do what Verschleiser did in United Realty's Host Pilot is way beyond the skill of the typical email user.

109.    Verschleiser has often stated that he began his career in the on-line poker business, and the on-line pornography business, and gained his intricate knowledge of computers and information technology as a result of those endeavors.

110.    Thousands of pages of logs evidencing Verschleiser's technological knowledge of accessing and manipulating settings in United Realty's Host Pilot exists, and at least one email from DelForno to Verschleiser, dated December 4, 2013, exists providing step-by-step instructions on how to change "permissions" on United Realty's Host Pilot.  That email is attached as Exhibit "J"; it includes a screenshot of the permissions settings on United Realty's Host Pilot.

111.    Notwithstanding that mountain of evidence, Verschleiser consistently lied about his knowledge of such instructions and ability to manipulate Host Pilot at his deposition.

112.    On not less than 26 separate occasions, Verschleiser specifically denied knowledge of anything about an email exchange server other than that it receives and sends emails;[5] and on not less than six separate occasions, Verschleiser denied knowing what "Host Pilot" is.[6]

113.    Verschleiser also testified under oath that he was not familiar with Intermedia (Ver. Dep. Tr. at p. 119 l.11) even though he admitted that his own companies, including Multi Group, maintain their email exchange servers on Intermedia (id. at p. 67 l.3-8), and that he did not know what an administrator does on an email exchange server (id. at p. 117 l.10).

---

[5] See Verschleiser Deposition transcript (Exhibit "F") at p.132 l.15; p.132 l.24; p.133 l.9; p.133 l.17; p.133 l.25; p.134 l.8; p.134 l.16; p.134 l.25; p.135 l.8; p.135 l.18; p.136 l.2; p.145 l.12; p.146 l.12; p.148 l.5; p.148 l.18; p.149 l.3; p.152 l.6; p.153 l.11; p.161 l.2; p.164 l.20; p.170 l.5; p.170 l.11; p.171 l.12; p.172 l.7; p.174 l.2; and p.226 l.3.

[6] See Verschleiser Deposition transcript at p.113 l.20; p.113 l.24; p.115 l.17; p.119 l.5; p.125 l.13; and p.128 l.5.

114.     Verschleiser's deposition was equally revealing on other subjects. At page 3, line 11 of the deposition transcript Verschleiser was asked: "Q. Have you ever been arrested?  A. no, I have not."

115.     Verschleiser's sworn response is yet another act of perjury.

116.     As is clear from the arrest record and sworn deposition of police officer Christopher Ruppenthal provided in *People of the State of New York v. Eliyahu Verschleiser*, Criminal Court of the City of New York, County of Queens, No. 2012QNO21085, Verschleiser was in fact arrested on April 16, 2012 for committing the offense of criminal impersonation of a police officer in the second degree (PL 190.25-3).  The arrest record, Ruppenthal deposition and docket of the Criminal Court are attached as Exhibit "K".

117.     That is not the first time Verschleiser had been arrested, indicted or convicted of a crime.

118.     Verschleiser had previously been indicted by a federal grand jury for bank fraud under 18 U.S.C. § 1344 in connection with a "scheme to cause financial institutions to make payments upon forged, counterfeit and worthless checks, to obtain the proceeds of those checks and to conceal the proceeds of those checks," in violation that criminal statute. The federal indictment is attached as Exhibit "L".

119.     Rather than face those charges Verschleiser fled to a foreign country. He returned approximately two years later and was convicted in a plea bargain of one count of failure to appear in violation of 18 U.S.C. § 3146(a) (1) and (b)(l)(B).   Verschleiser's plea bargain agreement is attached as Exhibit "M".

120.     On information and belief, Verschleiser was again arrested in 2014 in New Jersey for impersonating a police officer.

## FOURTH PREDICATE ACTS

### WIRE FRAUD IN CONNECTION WITH EMAILS
### TO CRAIG GOULD AND DAVID NEWMAN

121.     On February 24, 2014, an email was sent by Verschleiser, or at his direction by one of the other Class A Defendants, from "FriendsOfEli@gmx.com" to Craig Gould ("Gould"), the CEO of CLS, which stated:  "If you haven't seen Eli's filing last week jump online and take a look…Look at Eli's letter terminating Jacob…Be careful – you might want to exit before the sexual harassment suits, class action suits, Eli and [M]orty's suits all coming!  Warning you, better have insurance protecting you!  You've been warned.  It will be a messy 30 days.  Be careful!"

122.     The email directed Gould to the November 29th Letters.

123.     As noted, the November 29th Letters were false and fraudulent, and created by Verschleiser as part of his criminal enterprise.  In them Verschleiser fraudulently stated inter alia that Frydman made unauthorized distributions to himself; made fraudulent disclosures to the SEC; fraudulently induced investors, including Alan Stahler ("Stahler"), to make loans to the Company; conspired to defraud investors; made materially dishonest representations of fact at public conventions and conferences; acted in a morally reprehensible manner; and dealt with employees in a sexist, condescending and vulgar sexual manner.

124.     Each of those statements were false in that Frydman did not make unauthorized distributions to himself; did not make fraudulent disclosures to the SEC; did not fraudulently induce investors, including Stahler, to make loans to the Company; did not conspire to defraud investors; did not make materially dishonest representations of fact at public conventions and conferences; did not act in a morally reprehensible manner;  and did not deal with employees in a sexist, condescending and vulgar sexual manner.

125.     Verschleiser knew that the statements made by him about Frydman in the (fake) November 29th Letters were false and fraudulent, and were intentionally made by Verschleiser to deceive the readers of said letters, with the intent of harming Plaintiffs.

126.     On April 14, 2014, Verschleiser transmitted an email to David Newman, a member of the board of directors of the REIT, attaching the November 29th Letters and stating: "I was told that I should share this with you as it is likely to become a very public story in the near future. It seems apparent that the board is unaware of any of this...."

## FIFTH PREDICATE ACTS

**A COMMON ENTERPRISE TO PERPETUATE INTERNET SCAMS ON UNSUSPECTING PROSPECTIVE BUSINESS ASSOCIATES AND INVESTORS OF FRYDMAN; WIRE FRAUD; AND MAKING FALSE AND FRAUDULENT CLAIMS AGAINST FRYDMAN IN ADVERTISINGS AND BLOGS UNDER A VARIETY OF NAMES THAT ALL INFRINGE UPON FRYDMAN'S GOOD NAME, LIKENESS, AND THE NAMES AND MARKS OF HIS COMPANIES**

127.     Verschleiser conducted a common enterprise to perpetuate Internet scams on the public, and specifically on unsuspecting prospective business associates and investors of Frydman using Frydman's name and likeness and the name and marks of Frydman's businesses through an ever-changing coterie of websites, domains, blogs, Internet postings and advertisements that utilize the same templates to generate the same fake news stories, fake reports, fake testimonials, fake blogs, fake twitter accounts and fake LinkedIn accounts which are intended to, and which have caused prospective investors and others not to do business with Frydman and his businesses.

128.     In today's digital world, Frydman's existing and prospective investors and business associates typically undertake some level of due diligence by searching the Internet through web browsing search engines such as Google, Yahoo and Bing, where, since March 21, 2014, they have encountered a barrage of seemingly endless websites, domains, blogs and Internet posts

created and published, transmitted or distributed by Verschleiser and/or the other Class A Defendants.

129.    The websites, domains, blogs and Internet posts are made to look like legitimate online news articles, blogs, social networking postings or similar websites containing testimonials in which individuals claim to have been defrauded, cheated or otherwise wrongly treated by Frydman.

130.    None of said websites, domains, blogs and internet posts is published by actual news outlets.

131.    The false Internet postings are variations based on templates, often with identical content appearing on numerous seemingly unrelated websites, domains and blogs.

132.    For example, many sites use the same photograph and likeness of Frydman with the word "FRAUD" emblazoned on, over and/or under the photo of Frydman.

133.    Since March 21, 2014, Verschleiser and his co-conspirators have posted at least 156 such false posts in a continuous scheme which is currently on-going.

134.    On or about March 21, 2014, Verschleiser, alone or with the assistance of one or more of the other Class A Defendants, posted a false and fraudulent report allegedly by an "Ex Employee Whistle Blower" entitled "Jacob Frydman," with the subheading, "Jacob Frydman, Jake Frydman, Jake the snake Frydman, Jacob A Frydman, United Realty Partners, United Realty Trust,...Master of deception, Megalomaniac, Scam, Fraud, Thief, Criminal, Ponzi," on Ripoffreport.com.

135.    That report provides: "Jacob Frydman is trying to raise money from the public through a Non Traded REIT, United Realty Trust. He has induced many to work for his failing company by promising them stock as an incentive which he never delivers. His partner who funded the company resigned and sued him for stealing and fraud. Jacob Frydman will wine

you, dine you, then screw you.  He does not pay his bills, even the smallest of them.  He will not reimburse you.  He will sign documents and then completely ignore and define them to his liking. Look closely at his track record.  You will see the truth by doing some simple homework on Jacob Frydman or the dozens of failed businesses and companies he has created every few years and over the course of his career.  He may have one or two success stories, but when digging deeper the truth of the success is ultimately uncovered as a failure.  Can it be a scam?  Is it like Madoff on a small scale?  Is there a fraud taking place?  How many banks are screwed?  Is there a criminal hiding within?  Protect yourself as the poor innocent people get hurt daily in this fictitious world of Wall Street wannabes.  Ask your lawyer to do the homework before investing with any suspect."  The March 21, 2014 Ripoffreport.com posting is attached as Exhibit "O".

136.     The above quoted post is false and fraudulent in that Frydman does issue promised stock and does pay his bills.  The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses (including without limitation United Realty and Prime United) and his property.

137.     On April 12, 2014, on information and belief, Verschleiser, alone or with the assistance of others, posted another false and fraudulent post on ComplaintsBoard.com claiming that Jacob Frydman and United Realty "will not give you back your money when you ask for it back.  be [sic] aware.  look up the ceo Jacob frydman [sic] and it seems like he is not honest or a wall street thief."  The Complaintsboard.com post is attached as Exhibit "P".

138.     The above quoted post is false and fraudulent in that Frydman does make redemptions and is not a thief.  The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his and his property.

139.     On April 12, 2014, Verschleiser posted yet another false and fraudulent disparaging post on ScamGuard.com from his home IP address 108.29.11.176, claiming that: "United Realty:

They take your investment in the stock they sell and then dont [sic] let you get the money back. This company is supposed to be public and audited by earnst [sic] and young. they [sic] promise to give you your money back and when you request it they say you can not get it back. it is a non- traded reit [sic] that i now see has many problems. i will call the sec to complain. Please help me it is all of my retirement money." The April 12, 2014 Scamguard.com posting bearing report ID number 6887, as well as the account information from Scamguard.com showing that the April 12, 2014 posting bearing report ID number 6887, originated from IP address 108.29.11.176 is attached as Exhibit "Q".

140.     The above quoted post is false and fraudulent in that Verschleiser and the other Class A Defendants never invested with Frydman's REIT, never sought any redemptions and Frydman does return money when redemptions are requested, and was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

141.     On April 14, 2014, on information and belief, Verschleiser and his co-conspirators posted yet another false and fraudulent post on REITwrecks.com claiming that "i [sic] searched Jacob Frydman and see fraud cases with this ceo [sic] of United Realty[sic]." The April 14, 2014 Reitwrecks.com posting is attached as Exhibit "R".

142.     The above quoted post is false and fraudulent in that there are no fraud cases against Frydman as CEO of United Realty.  The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

143.     On April 17, 2014, the *Real Deal* magazine reported that "[i]n a written statement to The Real Deal, Verschleiser noted: 'He lost in court and the judge did not award him the injunction. I ultimately decided to resign as the President and Treasurer of United Realty Trust

due to the fraud and actions of my ex-partner Mr. Jacob Frydman as outlined in my the lawsuits against him.'"

144.    The written statement sent by Verschleiser to the *Real Deal* magazine is false and fraudulent in that (i) the judge in that case (the Frydman State Court Action) has yet to rule on Frydman's injunction; (ii) Verschleiser did not resign as the President and Treasurer of United Realty Trust due to the fraud of Frydman; and (iii) Frydman did not commit any fraud. Verschleiser sent the referenced statement by mail or electronically through interstate wires to the *Real Deal* magazine for the sole purpose of deceiving the public and disparaging Frydman and causing harm and injury to Frydman, his businesses and his property.

145.    On April 17, 2014, on information and belief, Verschleiser, Spiezio and his co-conspirators posted yet another false and fraudulent disparaging post on Ripoff Report.com claiming that "Jacob Frydman will do anything to hurt anyone."  The April 17, 2014 Ripoffreport.com posting is attached as Exhibit "S".

146.    The above quoted post is false and fraudulent in that Frydman will not do anything to hurt anyone.  The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

147.    On June 27, 2014, on information and belief, Verschleiser and his co-conspirators posted yet another false and fraudulent disparaging post on a blog titled: "Jacob Frydman Fraud", using the likeness and name of Frydman without permission, and containing the following immediately under the likeness of Frydman: "Biggest real estate FRAUD man – Jacob Frydman."  The June 27, 2014 "Jacob Frydman Fraud" blog posting is attached as Exhibit "T".

148.    The above quoted post is false and fraudulent in that Frydman does not commit fraud, and is not the "Biggest real estate FRAUD man."  The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman,

his businesses and his property.

149.    On June 27, 2014, on information and belief, Verschleiser and his co-conspirators posted yet another disparaging post on a blog titled: "Jacob Frydman CRIMINAL FRAUD", using the likeness and name of Frydman without permission, and containing the following immediately above the likeness of Frydman: "#Jacob Frydman #Real estate #Fraud #Criminal #Scam # Alert." The foregoing June 27, 2014 blog posting is attached as Exhibit "U".

150.    The above quoted post is false and fraudulent in that Frydman is not a criminal, and does not commit fraud.  The quoted post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

151.    On June 28, 2014, on information and belief, Verschleiser, and his co-conspirators posted yet another false and fraudulent disparaging post on a blog titled: "Jacob Frydman Fraud", using the likeness and name of Frydman without permission, and containing the following immediately under the likeness of Frydman: "Biggest real estate FRAUD man – Jacob Frydman".  The June 28, 2014 blog posting is attached as Exhibit "V".

152.    The above quoted post is false and fraudulent in that Frydman does not commit fraud, and is not the "Biggest real estate FRAUD man."  The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

153.    On June 28, 2014, on information and belief, Verschleiser, alone or with the assistance of others, posted yet another disparaging post on a blog titled: "JACOB FRYDMAN SCAM", using the likeness and name of Frydman without permission, and containing the following immediately above the likeness of Frydman: "Don't Become A Victim Of Real Estate & Mortgage Fraud!! REMEMBER THIS FACE!"  The foregoing June 28, 2014 blog posting is

attached as Exhibit "W".

154. The above quoted post is false and fraudulent in that Frydman does not commit fraud. The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

155. On June 29, 2014, on information and belief, Verschleiser and his co-conspirators posted yet another false and fraudulent disparaging post on Twitter titled: "Jacob Frydman @FRAUD_man   STOP Real Estate Fraud!! DON'T TRUST THAT SCUMBAG", using the likeness of Frydman, and containing the following immediately above the likeness of Frydman: "FRAUD FRAUD FRAUD." The June 29, 2014 Twitter posting is attached as Exhibit "X".

156. The above quoted post is false and fraudulent in that Frydman does not commit fraud, and is not a scumbag. The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

157. On September 5, 2014, on information and belief, Verschleiser and his co-conspirators supplemented the blog referred to in the preceding paragraph with: "The CEO Jacob Frydman (AKA Jake The Snake) has many lawsuits against him especially for FRAUD.... Everything in his United Realty Trust prospectus is bullshit. He claims to have a track record. Look closely at each one....As a master in LITIGATION the con man Jake the Snake mobster wanna be Frydman aka Jacob Frydman has so many liens against him because he sues, loses in court and then still fights. the liens he may ultimately settle as a way to get a discount. But the records show it all. From the smallest few hundred dollars to the larger ones where he screws lawyers and lawfirms that represent him." The September 5, 2014 blog posting is attached as Exhibit "Y".

158. The above quoted post is false and fraudulent in that nothing in the United Realty

Trust prospectus is bullshit, Frydman is not a snake, con man or mobster, he has no liens against him, and he does not have many suits against him for fraud. The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

159.    On September 12, 2014, on information and belief, Verschleiser and his co-conspirators supplemented the blog referred to in the preceding paragraph with: "Would a lender make a loan to Jacob Frydman and his United Realty Trust ?  Many lenders have been alledaagly [sic] screwed by United Realty Trust s CEO Jacob Frydman. MANY."   The September 5, 2014 blog posting is attached as Exhibit "Z".

160.    The above quoted post is false and fraudulent in that many lenders have not been screwed by Frydman as United Realty Trust's CEO. The quoted post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

161.    On July 12, 2014, on information and belief, Verschleiser and his co-conspirators posted yet another false and fraudulent disparaging post on REITwrecks.com claiming that: "United Realty Trust Jacob Frydman Fraud by PutJacobInJail » Sat Jul 12, 2014 look into the CEO before giving them money. He clearly has many issues relating to FRAUD. Jacob Frydman of http://www.urpa.com has been sued many times for fraud One lawsuit alleges that Mr. Frydman defaulted on his personal guaranty of a $12 million loan PAF Capital made to McDonald Ave. Acquisition LLC.  The suit claims that after defaulting on his guaranty, Mr. Frydman represented to PAF Capital that he could not afford to honor his guaranty and provided PAF Capital with what they now believe are fraudulent financial statements in an effort to get PAF Capital to settle with Mr. Frydman for a significant haircut. He can end up in Jail." The July 12, 2014 REITwrecks.com posting is attached as Exhibit "AA".

162.     The above quoted post is false and fraudulent in that Frydman does not have issues with fraud, the claims asserted in the referenced lawsuit were dismissed, and Frydman is not likely to end up in jail.  The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

163.     On July 12, 2014, on information and belief, Verschleiser and his co-conspirators posted yet another disparaging post, and in fact violated Frydman's privacy rights, by illegally using his name and likeness to create a blog entitled "JacofFrydmanFraud", through which he posted the following words under a large banner that stated: "FRAUD" with a large picture of Mr. Frydman's face that stated: "JACOB FRYDMAN SCAM Posted by jacob It is amusing to see that the SEC and FINRA lets a complete fraud take place with a public company http://www.United Realtyrealtytrust.com Jacob Frydman steals old peoples money, has his friends and lawyers on his independent board, then buys notes with other notes and gives it to the public in exchange for cash he NEVER paid for it."

164.     The above quoted post is false and fraudulent in that it was not posted by Frydman, Frydman does not commit fraud, he is not perpetuating a scam, there is no fraud taking place at United Realty, Frydman does not steal old people's money, and he does pay his notes and obligations. The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

165.     On July 12, 2014, on information and belief, Verschleiser, alone or with the assistance of others, posted yet another disparaging post on Reitwrecks.com entitled "United Realty Trust Jacob Frydman Fraud" by PutJacobInJail asserting: "look into the CEO before giving them money. He clearly has many issues relating to FRAUD. Jacob Frydman of http://www.urpa.com has been sued many times for fraud. One lawsuit alleges that Mr. Frydman defaulted on his personal guaranty of a $12 million loan PAF Capital made to McDonald Ave.

Acquisition LLC. The suit claims that after defaulting on his guaranty, Mr. Frydman represented to PAF Capital that he could not afford to honor his guaranty and provided PAF Capital with what they now believe are fraudulent financial statements in an effort to get PAF Capital to settle with Mr. Frydman for a significant haircut. He can end up in Jail." The July 12, 2014 Reitwrecks.com posting is attached as Exhibit "AC".

166.   The above quoted post is false and fraudulent in that Frydman does not have issues with fraud, the claims asserted in the referenced lawsuit were dismissed, and Frydman is not likely to end up in jail.   The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

167.   On July 15, 2014, Verschleiser and his co-conspirators posted yet another false and fraudulent disparaging post on ScamGuard.com stating: "Jacob Frydman and United Realty - Beware: The too good to be true United Realty - Frydman new scam.  The CEO has many lawsuits against him especially FRAUD...."  The July 15, 2014 ScamGuard.com posting is attached as Exhibit "AD".

168.   The above quoted post is false and fraudulent in that Frydman does not have issues with fraud and United Realty is not a scam. The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

169.   On September 6, 2014, Verschleiser, alone or with the assistance of others, posted yet another disparaging post on Scamorg.com ostensibly as an interview of United Realty Trust, stating: "This is the Filing the REIT just filed. This means that NONE of the money raised is going to real estate. It means he took out loans, preffered loans [sic], and outside investors (NOT THE REIT) to buy the property, and put in a few dollars from the REIT.  So you ask WHERE IS THE money Jake Frydman raises???????????? He pays it to his other companies. United Realty

Capital, United Realty Advisors, and all the other United Realty Companies he can suck cash from. READ AND UNDERSTAND THE FINANCIALS OF THIS COMPANY PLEASE PROTECT YOURSELF FROM FRAUD." The September 6, 2014 Scamorg.com posting is attached as Exhibit "AE".

170.    The above quoted post is false and fraudulent in that money raised is going to real estate, and Frydman does not pay out REIT money to his other companies, and there is no fraud going on at United Realty. The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

171.    On September 9, 2014, Verschleiser and his co-conspirators posted yet another disparaging post on Reitwrecks.com, "Re: United Realty Trust Jacob Frydman Fraud" by [sic] United Realty Trust » stating "Ask Yourself why the CEO Jacob Frydman http://en.wikipedia.org/wiki/Jacob_Frydman(aka Jake the Snake ) has dozens of lawsuits against him for fraud and stealing. Dozens of litigations many many with Fraud. Makes you wonder whats [sic] next. Madoff ???? Jake Frydman hires Architects, Contractors, Electricians, and Plumbers etc, for his house he calls Ledge Rock and then sues them all .....Why? to scare them and not to pay them. Read these litigations and you will be in shock! As a master in LITIGATION the con man Jake the Snake mobster wanna be Frydman aka Jacob Frydman has so many liens against him because he sues, loses in court and then still fights. the liens he may ultimately settle as a way to get a discount. But the records show it all. From the smallest few hundred dollars to the larger ones where he screws lawyers and lawfirms that represent him. He hires lawyers, leases copy machines, gets Internet service, hires executives and employees (dozens of them) and SCREWS them ALL. READ the lawsuits. There are probably hundreds more in arbitration but just have your lawyer get you a copy of these lawsuits and weep for those

that their money is gone already. THE PARTIAL LIST (when you read them highlight the word FRAUD).        Everything        in        his        United        Realty        Trust http://www.urpa.com/bio_frydman.htmlprospectus is bullshit. He claims to have a track record. Look VERY closely at each one....The DHL building is only fractionally owned by him and he has many lawsuits against him in that deal because he is a thief and a con artists. He is not "the guy" who did the deal, he just lucked out and owns a share in the deal. He pretends to have done the old global crossing building BUT once again the guy only got a small piece of the deal as he was at the right place at the right time. He was even sued by the main owners of these two deal BOTH of the DEALS the Majority partners sued him. JUST read the "Tunnel Associates, LLC" litigation and see for yourself who did the DHL deal and who owns and controls it.....not to difficult to read English [sic]. The global crossing deal he claims he did, just take one look at the article    and    lawsuits    http://www.nydailynews.com/archives/money/nypd-horses-ousted-building-dispute-article-1.639493 ask yourself, Is my money safe here?"  The September 9, 2014 Reitwrecks.com posting is attached as Exhibit "AF".

172.    The above quoted post is false and fraudulent, as it was not posted by United Realty; Frydman does not have dozens of lawsuits against him for fraud and stealing; Frydman does not hire Architects, Contractors, Electricians, and Plumbers etc, for his house he calls Ledge Rock and then sues them all; Frydman is not a con man, a Snake, mobster, or wanna be; Frydman does not have any liens against him; Frydman does not hire lawyers, lease copy machines, get Internet service, hire executives and employees (dozens of them) and SCREW them ALL; nothing in the United Realty Trust prospectus is bullshit; Frydman does not have many lawsuits against him in the DHL deal; Frydman is not a thief and a con artist; he is the either the sole or one of the "control" persons in both the DHL deal and the Global Crossings deal; and Frydman was never sued by the "main owners" or "Majority partners" in the DHL deal or the Global Crossings deal.

The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

173.     On September 12, 2014, Verschleiser, alone or with the assistance of others, posted yet another disparaging post on Reitwrecks.com, "Re: United Realty Trust Jacob Frydman Fraud" by [sic] United Realty Trust » "Would a lender make a loan to Jacob Frydman and his United Realty Trust http://www.unitedrealtytrust.com ? Many lenders have been alledaagly [sic] screwed by United Realty Trust s CEO Jacob Frydman. MANY."  The September 12, 2014 Reitwrecks.com posting is attached as Exhibit "AG".

174.     The above quoted post is false and fraudulent as it was not posted by United Realty Trust, nor have United Realty's lenders been screwed by Frydman.  The post was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

175.     During September 2014, Verschleiser and his co-conspirators posted yet another false and fraudulent disparaging post on Scam.com stating: "United Realty Trust REIT - The CEO Jacob Frydman (AKA Jake The Snake) has many lawsuits against him mostly doing FRAUD.  If you just write in google search Jacob Frydman Fraud , or Jacob Frydman Lawsuit you will see so many that you will save your money.  Please do not get hurt and give them your money.  You worked for it. Don't let the liar salesman sell you his big return on real estate."  The September 2014 Scam.com posting is attached as Exhibit "AH".

176.     The above quoted post is false and fraudulent, was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

177.     During September 2014, Verschleiser, alone or with the assistance of others, created a fake LinkedIn account under Frydman's name and violated Frydman's privacy rights,

by illegally using his name and likeness and plastering the word "FRAUD" across his picture, and asserting that Frydman's employment is "SCAM at REAL ESTATE." The fake LinkedIn account is attached as Exhibit "AI".

178.    The above quoted LinkedIn account is false and fraudulent, and was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

179.    During September 2014, Verschleiser, alone or with the assistance of others, created a fake employee review on Ebosswatch.com calling Frydman a "Bad Boss" and stating: "United Realty Partners is run by a fellow named Jacob Frydman who is guaranteed to fire you or push you out within 9 months. Jacob Frydman will never let you do the job you know how to do as he always knows better. There maybe some fraud going on there as well. When I was employed at United Realty Partners and CLS Securities (a Broker Dealer owned by Jacob Frydman and his partners) it was nice when Jacob did not show up or was traveling. those days everyone at our offices was relaxed and also was able to get work done. As soon as Jacob Frydman came in the entire situation went bad. He tried to control everything. Thinking he was the best thing since sliced bread. Also he gets drunk and talks crap to the girls, which is possible sexual harassment." The fake employee review is attached as Exhibit "AJ".

180.    The above quoted employee review is false and fraudulent, and was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

181.    During September 2014, Verschleiser, alone or with the assistance of others, created another fake employee review on Ebosswatch.com calling Frydman a "Bad Boss" and stating: "United Realty Trust – Feel under pressure waiting for FBI to raid the company."…"Its kind of interesting that the Fraud on Wall Street still goes on and nothing is done about it.… Did

anyone do their homework on Jacob Frydman." The foregoing fake employee review is attached as Exhibit "AK".

182.     The above quoted employee review is false and fraudulent, and was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

183.     During September 2014, Verschleiser, alone or with the assistance of others, created a yet another fake employee review on Ebosswatch.com calling Frydman a "Bad Boss" and stating: "United Realty Trust – Under investigation for fraud by FINRA and SEC."…"The company is run by a man who has been sued for fraud over 20 times by 20 different parties all in the past 10 years. Jacob Frydman seems to only know how to get by stealing from others." The foregoing fake employee review is attached as Exhibit "AL".

184.     The above quoted employee review is false and fraudulent, and was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

185.     During September 2014, Verschleiser, alone or with the assistance of others, created still another fake employee review on Ebosswatch.com calling Frydman a "Bad Boss" and stating: "United Realty Trust – A public company with a bad CEO that is likely a target of investigations with the government and the SEC."…"If the CEO would leave it would be wonderful place to work." The foregoing employee review is attached as Exhibit "AM".

186.     The above quoted post is false and fraudulent, was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

187.     Since September 2014, Verschleiser and the other Class A Defendants have created numerous additional websites, domains, posts and publications containing false and fraudulent

information with respect to Frydman, United Realty and Frydman's other businesses, and which, in most cases, illegally use the name and likeness of Frydman and the names and marks of the other Plaintiffs and Frydman's other businesses.

188.    One such website, named "unitedrealty-trust.com" having the URL http://unitedrealty-trust.com/, describes the independent directors of the REIT as follows:

a.   Robert S. Levine: "Robert S. Levine, a shady attorney sits on the "independent" board of United Realty Trust. Mr Levine has been involved in numerous closely held companies with Jacob Frydman, and has been a party to the Fraud thereto".

b.   Dr. Daniel Aronzon: "Dr. Daniel Z. Aronzon M.D., F.A.A.P. is an independent director. Mr. Aronzon is a scum laude graduate of Union where they cut his balls off. He obviously has no clue how to read english (sic) or would see what Jacob Frydman has been involved in.

c.   David Newman: "David B. Newman is an independent director, and a Senior Managing Director and investment banker at Brock Securities LLC. Brock an unheard of likely unsuccesful (sic) "Investment Banking firm".

d.   Rick Vitale (former director): "Used Car Salesman It has been said that Rick sucks Frydmans (sic) Dick all too often."

189.    The above quoted post is false and fraudulent, was created by Verschleiser or at his direction and/or by the other Class A Defendants to cause harm and injury to Frydman, his businesses and his property.

190.    Plaintiffs reserve the right to add introduce such additional websites, domains, posts and publications containing false and fraudulent information with respect to Frydman, United Realty and Frydman's other businesses at the trial of this matter.

## SIXTH PREDICATE ACTS

### A COMMON ENTERPRISE TO PERPETUATE INTERNET SCAMS ON UNSUSPECTING PROSPECTIVE BUSINESS ASSOCIATES AND INVESTORS OF FRYDMAN; WIRE FRAUD; AND MAKING FALSE AND FRAUDULENT CLAIMS AGAINST FRYDMAN BY TRESPASSING THROUGH CAESAR'S PALACE & CONVENTION CENTER DURING THE NATIONAL REAL ESTATE INVESTMENT SECURITIES CONFERENCE

191.     The primary distribution channel pursued by Frydman and United Realty for the sale of shares in the REIT is through the independent broker dealer network.

192.     There are approximately 3,500 independent broker dealer firms in the United States, and each firm has one or more (some firms have more than 15,000) registered representatives who sell securities to their clients.

193.     Generally, a sponsor makes presentations at events hosted by the associations which support the independent broker dealers and at conferences attended by independent broker dealers to introduce them to the investment opportunities being offered by such sponsors.

194.     A sponsor must obtain a selling agreement with a broker dealer, which enables the broker dealer to become part of the selling group of soliciting brokers, and only then can a sponsor present its offering to the registered representatives of that broker dealer, who then may introduce the investment product to their suitable clients.

195.     During 2013 the non-traded REIT and direct participation program industry raised approximately $24 billion (up from approximately $10 billion the prior year) in new equity investment for non-traded REITS and direct real estate investments and BDCs. The amount of capital expected to be raised by the independent broker dealer community or non-traded REITS and direct real estate investments and BDCs in 2014 was expected to be approximately $30 billion.

196.     While the amount of capital has tripled in the past three years, the number of sponsors has significantly declined.

197.     Given the amount of capital being raised, the number of contracting sponsors, the various investment objectives and the performance metrics of the REIT, Frydman and/or United Realty should be able to raise several hundred million dollars of equity annually.

198.     There are several industry associations focusing on the nontraded REIT space, the largest of which is REISA (n/k/a ADISA).

199.     REISA holds several conferences and conventions annually, the largest of which is held in the fall in Las Vegas.

200.     In 2014, the fall REISA conference was held at Caesars Palace & Convention Center on September 14 through 16.

201.     Approximately 1,000 individuals, all associated in one way or another with the non-traded REIT industry, registered to attend that conference.

202.     Many of the conference attendees are product related specialists or due diligence officers or principals associated with independent broker dealers, as well as registered representatives looking to learn about new offerings.

203.     The fall REISA conference is the premier showcase for sponsors to introduce their investment products and opportunities.  Sponsors spend significant money and time preparing for the conference.

204.     Frydman through United Realty is a sponsor of the fall REISA conference and was scheduled to speak twice during the conference, the second time, in a special session for the entire conference, known as "Shark Tank."

205.     As part of Verschleiser's criminal scheme, Verschleiser and his co-conspirators decided to "crash" the conference in an effort to embarrass Frydman, by distributing false

advertising flyers and posting false posters over real posters, each of which directed the recipient or reader, including the independent broker dealers, registered representatives and other attendees at the fall 2014 REISA conference, to one of Verschleiser's false and fraudulent blogs that spew vituperative falsehoods against Frydman.

206.     Verschleiser and his co-conspirators embarked upon a scheme to illegally and tortiously interfere with Frydman's sponsorship of the conference and to paint Frydman in a false light with the intent to damage his reputation and his businesses.

207.     To facilitate their scheme, Verschleiser and his co-conspirators created false and fraudulent advertisement flyers which labeled Frydman as a "Fraudster" and "Lowlife" and transmitted or transported those advertisement flyers through interstate commerce to one or more Doe defendant co-conspirators in Las Vegas, to be distributed under each hotel room door of approximately 1,000 industry executives attending the fall 2014 REISA conference.

208.     On the early morning of September 15, 2014, one or more of the Doe defendants, who were agents and co-conspirators of Verschleiser, distributed those advertisement flyers under the hotel room doors of all participants at the conference.

209.     The false and fraudulent advertisement flyers stated:

<strong>"Would you invest with a fraudster?</strong>

<strong>Google</strong>

<strong>JACOB FRYDMAN FRAUD</strong>

<strong>And save yourself from this lowlife</strong>

<strong>Btw, he is CEO of United Realty Trust"</strong>

A copy of one of these advertising flyers is attached as Exhibit "AN".

210.     In addition, to facilitate their scheme, Verschleiser and his Class A Defendant co-conspirators plastered similar false and fraudulent advertisement posters on the 35 or more real

convention posters hanging throughout the public spaces of the Caesars Palace convention center on September 16, 2014 commencing approximately one hour before Frydman's main conference presentation.

211.    The real posters were provided in the common space of the convention center to direct attendees to the various events, including Frydman's speaking engagement.  As attendees began coming into the convention center to go to the session at which Frydman was scheduled to speak they were greeted with the 35 or more false and fraudulent advertising posters which had the same language as the advertisement flyers distributed the prior day.  A copy of a photograph showing the fake advertising posters plastered over a real poster is attached as Exhibit "AO".

<b><u>SEVENTH PREDICATE ACTS</u></b>

<b>FURTHERING THE COMMON ENTERPRISE TO PERPETUATE INTERNET<br>SCAMS ON UNSUSPECTING PROSPECTIVE BUSINESS ASSOCIATES AND<br>INVESTORS OF FRYDMAN; WIRE FRAUD; AND MAKING FALSE AND<br>FRAUDULENT CLAIMS AGAINST AND UNITED REALTY</b>

212.    Since the fall 2014 REISA conference, Verschleiser, and on information and belief, together with his public relations co-conspirator Fischgrund and Gulko and Wright, "upped the ante" by creating and then distributing and publishing numerous additional defamatory and disparaging statements about Frydman and United Realty.

213.    Many of these additional defamatory and disparaging statements were published on web sites, domains, sub-domains and blogs which illegally used Frydman's name, and the names and marks of United Realty and Frydman's other companies.

214.    Plaintiffs hereby provide a partial listing of URLs created by Verschleiser, Delforno, Onica, Pinhasi, Fischgrund, Chandler, Gulko and/or Wright for the sole purpose of defaming or disparaging Frydman and his companies, including without limitation United

Realty, and which illegally use Frydman's name, and the names and marks of United Realty and

Frydman's other companies, and which defamatory/disparaging statements were published using

several anonymous names, monikers and aliases, including without limitation "United Realty

Trust", "JACOB FRYDMAN CRIMINAL", "Jacob Frydman", "jacob_frydman_scam", "JAKE

THE SNAKE", "JAKE", "HIS ALIAS", "JAK", JACOB FRYDMAN UNITED REALTY

TRUST", "LENDERS SCREWED BY JACOB FRYDMAN", "Former Employee",

"Jacobfrydmanfraud", "Ex Employee Whistle Blower", and "PutJacobInJail".

215.    The defamatory/disparaging statements made, created, posted, distributed,

disseminated, published and/or posted by Verschleiser, Delforno, Onica, Pinhasi, Fischgrund,

Chandler, Gulko and/or Wright include and are that Frydman and/or his business United Realty:

> a. is a "Fraudster";
> b. is a "cheat";
> c. is a "lowlife";
> d. is a "criminal";
> e. is a "liar salesman";
> f. committed "Fraud";
> g. is "dishonest";
> h. has many lawsuits against him;
> i. is the "Biggest real estate FRAUD man";
> j. is a "thief and a liar";
> k. misappropriates investor money;
> l. is a "scumbag";
> m. files fraudulent financial statements;
> n. is a "con artist";
> o. is a "con man";
> p. is a "mobster";
> q. operates a "Ponzi" scheme;
> r. intentionally defrauds vendors and service providers;
> s. uses business organizations for concealment of fraudulent activities;
> t. is "dishonest";
> u. engages in sexual harassment of his employees;
> v. steals from others;

216.    The defamatory/disparaging statements made, created, posted, distributed,

disseminated, published and/or posted by Verschleiser, Akerman, Delforno, Onica, Pinhasi,

Fischgrund, Chandler, Spiezio, Gulko, Wright and/or Does 1 - 15 currently appear, or appeared

at the following "URLs":

    a. http://www.scam.com/showthread.php?t=617288
    b. http://www.scamorg.com/united-realty-trust-inc-a3
    c. https://twitter.com/FRAUD_man
    d. https://twitter.com/FRAUD_man/status/483315261135933440
    e. https://twitter.com/FRAUD_man/status/483315970464034817
    f. https://twitter.com/FRAUD_man/status/483314759652347904
    g. http://jacobfrydmanfraud.weebly.com/
    h. http://jacobfrydmanfraud.weebly.com/contact.html
    i. http://jacobfrydmanfraud.weebly.com/about.html
    j. http://jacobfrydmanfraud.weebly.com/blog/jacob-frydman-real-estate-fraud
    k. http://jacobfrydmanfraud.weebly.com/blog/jacob-frydman-real-estate-fraud#comments
    l. http://jacobfrydmanscam.blogspot.com/
    m. http://jacobfrydmanscam.blogspot.com/2014/06/dont-become-victim-of-real-estate.html
    n. http://jacobfrydmanscam.blogspot.com/search/label/%23fraud
    o. http://jacobfrydmanscam.blogspot.com/search/label/%23nyc
    p. http://jacobfrydmanscam.blogspot.com/search/label/%23real%20estate
    q. http://jacobfrydmanscam.blogspot.com/search/label/%23scam
    r. http://jacobfrydmanscam.blogspot.com/search/label/%23jacob%20frydman
    s. http://jacobfrydmanscam.blogspot.com/2014_06_01_archive.html
    t. http://jacobfrydmanscam.blogspot.com/search/label/%23alert
    u. https://www.blogger.com/profile/09509411744856969823
    v. http://jacobfrydmancriminal.wordpress.com/
    w. http://jacobfrydmancriminal.wordpress.com/2014/06/27/jacob-frydman/
    x. http://jacobfrydmancriminal.wordpress.com/tag/jacob-frydman-real-estate-fraud-criminal-scam-alert/
    y. http://jacobfrydmancriminal.files.wordpress.com/2014/06/1.jpg?w=640
    z. http://jacobfrydmancriminal.wordpress.com/type/image/
    aa. http://jacobfrydmancriminal.wordpress.com/2014/06/27/jacob-frydman/#comments
    bb. http://jacobfrydmancriminal.wordpress.com/about/
    cc. http://unitedrealtytrust.yolasite.com
    dd. http://unitedrealtytrust.yolasite.com/contact-us.php
    ee. http://unitedrealtytrust.yolasite.com/links.php
    ff. http://unitedrealtytrust.yolasite.com/resources/Jacob-Frydman.jpg
    gg. http://jacobfrydmanfraud.wordpress.com/
    hh. http://jacobfrydmanfraud.wordpress.com/2014/06/27/jacob-frydman/
    ii. http://jacobfrydmanfraud.wordpress.com/about/
    jj. http://jacobfrydmanfraud.wordpress.com/author/jacobfrydmanfraud/
    kk. http://www.congoo.com/news/addstorycomment.aspx?st=279183306&Channel_ID=23&Category_ID=158

ll. http://www.ebosswatch.com/Company/Reviews/United-Realty-Trust/1397280050/0

mm. http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1397280497

nn. http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1397280879

oo. http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1397281010

pp. http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1409973214

qq. http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1409973483

rr. http://boardreader.com/jump/s10809/f565985/47a919819d36877b05d2625885c5b
d6e/aHR0cDovL3d3dy5zZY2FtLmNvbS9zaG93dGhyZWFFkLnBocD90PTYxNzI4
OCNwb3N0MTc4Njg1Ng==

ss. http://www.ripoffreport.com/r/Jacob-Frydman/Hyde-Park-New-York/Jacob-Frydman-Jake-Frydman-Jake-the-snake-Frydman-Jacob-A-Frydman-United-Realty-Partn-1132636

tt. http://www.ripoffreport.com/reports/specific_search/Jacob+Frydman

uu. http://www.reitwrecks.com/forum/viewtopic.php?f=2&t=841&sid=c462d4ecf9fe
652189536061b960b6af

vv. http://www.reitwrecks.com/forum/viewtopic.php?f=2&t=841

ww. http://www.reitwrecks.com/forum/viewtopic.php?f=19&t=840

xx. http://www.reitwrecks.com/forum/viewtopic.php?f=31&t=842

yy. http://www.reitwrecks.com/forum/viewtopic.php?f=20&t=843

zz. http://www.reitwrecks.com/forum/viewtopic.php?f=2&t=822

aaa. http://www.reitwrecks.com/forum/viewforum.php?f=19

bbb. http://www.reitwrecks.com/forum/viewforum.php?f=2

ccc. http://www.reitwrecks.com/forum/viewtopic.php?t=841&p=3792

ddd. http://www.reitwrecks.com/forum/viewtopic.php?f=2&t=854

eee. http://www.reitwrecks.com/forum/viewtopic.php?t=822&p=3596

fff. http://www.reitwrecks.com/forum/viewtopic.php?t=842&p=3784

ggg. http://www.complaintsboard.com/complaints/united-realty-trust-inc-fraud-and-ponzi-c725684.html

hhh. http://www.glassdoor.com/Reviews/United-Realty-Partners-Reviews-E794582.htm

iii. http://www.glassdoor.com/Reviews/Employee-Review-United-Realty-Partners-RVW4040838.htm

jjj. http://www.glassdoor.com/Reviews/Employee-Review-United-Realty-Partners-RVW4682451.htm

kkk. http://www.glassdoor.com/Reviews/Employee-Review-United-Realty-Partners-RVW5044063.htm

lll. http://nypost.com/2014/11/17/real-estate-honcho-stiffs-contractors-over-measly-amounts/

mmm. http://therealdeal.com/blog/2014/11/17/united-realtys-jacob-frydman-mired-in-suits-over-hyde-park-home/

nnn. http://therealdeal.com/blog/2014/04/17/feud-between-united-realty-ceo-firms-ex-president-turning-ugly%E2%80%A8/

ooo. http://whitecollarfraud.blogspot.com/2012/09/real-estate-investor-who-fled-country.html

ppp. http://www.law360.com/articles/589209/amid-1b-ipo-reit-founder-accuses-ex-partner-of-fraud

qqq. http://www.law360.com/articles/589209/amid-1b-ipo-reit-founder-accuses-ex-partner-of-fraud

rrr. http://www.law360.com/articles/497084/fund-transfer-in-200m-un-plaza-deal-draws-investor-suit

sss. http://www.litinsider.com/motionDetails.jsp?id=1202659672665&Evunp_Holdings_v_Jacob_Frydman&slreturn=20141020031939

ttt. http://www.scamorg.com/jacob-frydman-8f

uuu. http://www.scamorg.com/united-realty-01

vvv. https://www.facebook.com/people/Jacob-Frydman/100005915925184

www. http://www.congoo.com/news/addstorycomment.aspx?st=279183306&Channel_ID=23&Category_ID=158

xxx. http://www.congoo.com/news/addstorycomment.aspx?st=279183306&Channel_ID=34&Category_ID=158

yyy. http://www.complaintsboard.com/complaints/united-realty-trust-inc-fraud-and-ponzi-c725684.html

zzz. http://www.complaintsboard.com/complaints/united-realty-trust-jacob-frydman-dishonest-fraud-c706751.html

aaaa. http://www.scamguard.com/categories/ponzi-scheme-scams/jacob-frydman/8467/petty-thief-and-fraud/

bbbb. http://www.scamguard.com/categories/investment-scams-complaints/unitedrealtytrust/8615/jacob-frydman-and-united-realty-beware-the-too-good-to-be-true-united-realty-frydman-new-scam

cccc. http://www.scamguard.com/categories/investment-scams-complaints/unitedrealtytrustcom/6887/they-take-your-investment-in-the-stock-they-sell-you-and-then-dont-let-you-get-the-money-back

dddd. https://www.linkedin.com/pub/jacob-frydman/9a/389/626

217.    The defamatory/disparaging statements made, created, posted, distributed, disseminated, published and/or posted by Verschleiser, Akerman, Delforno, Onica, Pinhasi, Fischgrund, Chandler, Spiezio, Gulko, Wright and/or Does 1 - 15 currently appear, or appeared at the following identified paid domain websites attacking Frydman and/or his companies:

jacobfrydmancriminal.com

jacob-frydman.org

unitedrealty-trust.com

jacobfrydmanthief.com

jacobfrydmanfraud.com

- 56 -

united-realtytrusts.com

unitedrealtytrusts.com

unitedrealtyfrydman.com

218.     The defamatory/disparaging statements made, created, posted, distributed, disseminated, published and/or posted by Verschleiser, Akerman, Delforno, Onica, Pinhasi, Fischgrund, Chandler, Spiezio, Gulko, Wright and/or Does 1 - 15 currently appear, or appeared at the following identified free hosting websites attacking Frydman and/or his companies:

unitedrealtytrust.weebly.com

jacobfrydmanfraud.wordpress.com

jacobfrydmanfraud.weebly.com

jacobfrydmancriminal.wordpress.com

jacobfrydmanfraudalert.tumblr.com

219.     The websites identified in paragraph 217 as paid domains utilize matching infrastructure – including IP addresses, name servers, and registrars – as well as similar language, content, and images. On information and belief, these websites are operated by Verschleiser and the Class A Defendants.

220.     All eight of the paid domain websites identified in paragraph 217 are registered through the Public Domain Registry and are associated to the same name servers: NS1.RX-NAME.NET, NS2.RX-NAME.NET, NS3.RX-NAME.NET.

221.     The following websites which are not controlled by Defendants contain similarly disparaging/defamatory content against Plaintiffs, and on information and belief the disparaging/defamatory content against Plaintiffs were posted on said websites by Verschleiser and the other Class A Defendants:

http://www.reitwrecks.com/forum/viewtopic.php?f=2&t=841

http://www.congoo.com/news/addstorycomment.aspx?st=279183306&Channel_ID=23&Category_ID=158

http://www.scamorg.com/united-realty-trust-inc-a3

http://www.ebosswatch.com/Company/Review/United-Realty-Trust/1397280497

222.   The first paid website attacking Frydman was the domain jacobfrydmancriminal.com, which was registered on June 23, 2014.

223.   Four of the five free websites (listed below) appear to have been set up after the foregoing first paid website was registered:

jacobfrydmancriminal.wordpress.com

jacobfrydmanfraud.weebly.com

jacobfrydmanfraud.wordpress.com

jacobfrydmanfraudalert.tumblr.com

224.   The posts made to the sites listed in paragraph 223 are dated June 27, 2014, June 28, 2014 and August 12, 2014.

225.   On information and belief, in December 2014, one or more of the Defendants or their agents registered jacob-frydman.org, thus reverting to using paid websites to attack Plaintiffs.

226.   A sudden surge in domain registration occurred in February of 2015. One domain, unitedrealty-trust.com, was registered on February 3, 2015 and then five domains, unitedrealtyfrydman.com, united-realtytrusts.com, unitedrealtytrust.com, jacobfrydmanthief.com, and jacobfrymanfraud.com, were registered on February 17, 2015.

227.   All of the paid domains servers are hosted on the same IP address, located in Ukraine: 194.54.83.230.

228.     Plaintiffs reserve the right to include such additional defamatory/disparaging statements made, created, posted, distributed, disseminated, published and/or posted by the Defendants, or any of them, hereafter and up to and through the trial of this matter.

## EIGHTH PREDICATE ACTS

### FILING FALSE ALLEGATIONS AGAINST FRYDMAN IN LAWSUITS FOR THE SOLE PURPOSE OF LEAKING THOSE LAWSUITS TO THE PRESS IN ORDER TO DEFAME FRYDMAN

229.     One of the underhanded criminal tools Verschleiser, Wright, Gulko and Akerman apparently like to use in their quest to destroy and bring harm to Frydman and his companies, and which has been repeated at least three times, is to initiate (or orchestrate the initiation by other co-conspirators) of false and defamatory lawsuits against Frydman and his companies for the sole purpose of fabricating a basis for the later dissemination of information intended to disparage and defame Frydman and his companies.

230.     Because Verschleiser (wrongly) believes that one is protected and has immunity from a claim for defamation based on statements made in a lawsuit,[7] Verschleiser has, on at least three separate occasions initiated, or caused his co-conspirators to initiate lawsuits based on knowingly false and fabricated claims against Frydman, Frydman's companies and the independent members of the REIT's Board of Directors as the first step in his scheme.

231.     As soon as he files or causes his co-conspirators to file these baseless lawsuits, Verschleiser leaks copies of the complaint to the media, and identifies persons at these media outlets whom he believes he can manipulate to print the false, baseless and defamatory allegation

---

[7] But if the purpose of initiating litigation in state court in New York is solely for the purpose of defaming another that immunity disappears and the wrongdoer is held liable for defamation. *See Williams v. Williams,* 23 N.Y.2d 592, 298 N.Y.S.2d 473 (1969), in which the Court of Appeals noted that the exception to the Fair Reporting Privilege under Civil Rights Law § 74 applies to *parties* who initiate false and defamatory lawsuits for the sole purpose of fabricating a basis for the later dissemination of information intended to defame the defendant.

so as to give credence to those claims.

232.    Verschleiser and Fischgrund, his public relations co-conspirator, know that some reporters are lazy and will publish any salacious allegations against an individual who they view as "newsworthy" if alleged in a court filing.

233.    Verschleiser effected the first such media manipulation on December 18, 2013, just two weeks after he signed the Separation Agreement and covenanted and promised not to disparage Frydman or his companies.  As set forth above, Verschleiser filed the First Defamatory Lawsuit against Frydman that afternoon, making false claims that Frydman had failed to return investor funds raised by Frydman for the 866 UN Plaza transaction (when he in fact knew that Frydman had returned all investor money) and then leaked the complaint to the *Real Deal*, *Law 360* and *Investment News*.Verschleiser initiated that First Defamatory lawsuit for the sole purpose of fabricating a basis for the later dissemination of information intended to defame Frydman and United Realty.

234.    The *Real Deal*, *Law 360* and *Investment News* permitted themselves to be used by Verschleiser as his criminal tool, and each provided to Verschleiser, free of charge, an advertising platform which Verschleiser could never otherwise have obtained, to publish as "factual" the false allegations made by Verschleiser in his complaint.

## NINTH PREDICATE ACTS

### A COMMON ENTERPRISE TO STEAL PLAINTIFFS' CONFIDENTIAL INFORMATION, AND THEN DISTRIBUTE THAT INFORMATION TO LIMITED PARTNERS OF UNITED REALTY IN ORDER TO FILE FALSE CLAIMS AGAINST FRYDMAN, PRIME UNITED AND OTHERS

235.    On or about October 8, 2014, Prime United, CLS and CLWM entered into a highly confidential transaction with a third party (the "Transaction").

236.    Verschleiser solicited Akerman, who held an extremely sensitive position as Chief Compliance Officer of CLS, to conspire with Verschleiser, his in-house attorney, Gulko, and an

outside attorney, Wright, to steal proprietary, confidential information and trade secrets, including without limitation the very fact of the Transaction and its terms, belonging to United Realty and/or CLS (the "Stolen Trade Secrets") and to use the Stolen Trade Secrets to further Verschleiser's and his co-conspirators' on-going criminal conspiracy against Plaintiffs.

237.    The Stolen Trade Secrets include without limitation:

    a.   The very fact of the Transaction and its terms;

    b.   The highly confidential list of all the shareholders who invested through CLS in the REIT;

    c.   Highly confidential financial information regarding the performance of CLS, the REIT and other of Frydman's companies; and

    d.   The highly confidential list of all the broker dealers comprising the selling group of soliciting broker dealers of the current $1 Billion REIT offering.

238.    On information and belief, Verschleiser and his co-conspirators intended and intend to use this highly sensitive data and the other Stolen Trade Secrets to further injure Plaintiffs, by among other things:

    a.   Contacting each of the REIT's shareholders and inundating them with disparaging statements of the type and nature which Verschleiser had posted on the Internet in order to further his criminal scheme to destroy Plaintiffs;

    b.   Causing the third party to "walk away" from the Transaction because of the breach of confidentiality and because the third party does not want to be associated with the false claims asserted by Verschleiser's cronies in the Fishoff Lawsuit as hereafter set forth – which, on information and belief was brought solely to derail the Transaction;

    c.   Contacting each broker dealer that is a member of the United Realty selling group, and inundating them with disparaging statements of the type and nature which Verschleiser has posted on the Internet in order to further his criminal scheme to destroy Plaintiffs, by getting them to drop out of the selling group; and

    d.   Using the Stolen Trade Secrets in other devious and criminal ways which Verschleiser and his co-conspirators could dream up.

**Verschleiser Solicits and Bribes Akerman**

239.    Until he was fired as a result of the actions set forth herein, Akerman, in his capacity as CLS Chief Compliance Officer, had access to extremely confidential and proprietary company information and trade secrets.

240.    Also, Akerman was a minority limited partner investor in United Realty, having been induced by Verschleiser to invest in it when Verschleiser was still involved.  As such, and because Akerman was the Chief Compliance Officer of CLS, which was the dealer-manager of the $1 Billion offering of securities now underway by the REIT, Akerman had access to sensitive data, confidential and proprietary information and trade secrets of CLS, United Realty and their affiliates.

241.    In addition, because Akerman was Chief Compliance Officer, he had access to all the confidential filings made by CLS and its attorneys with FINRA, including access to the electronically filed Transaction document, which was then being reviewed by FINRA for approval.

242.    Akerman has been under increasing financial pressure.  He approached Frydman in late 2013 to tell him that he needed money as he was struggling financially.

243.    On December 20, 2013, Frydman caused one of his affiliates to lend Akerman $50,000, which was to be repaid in June 2014.  Akerman was unable to repay that loan, and it is in default.

244.    Since that time, Akerman has consistently come to Frydman with requests for more money.  In an effort to try to help Akerman, Frydman asked Gould to seek out ways to assist Akerman.

245.    Gould gave Akerman a number of CLS's "house accounts" so that he could earn extra commissions, and gave him the ability to increase his income by giving him the right to sell securities and maintain his own "book of business" in addition to being the Chief Compliance

Officer.

246.     In addition, CLS loaned Akerman $20,000.

247.     Apparently, none of that was enough to keep Akerman loyal.  He needed more, and he began communicating with Verschleiser seeking money.

248.     Verschleiser solicited Akerman to secretly work for him and to use his position of trust and confidence with CLS and the other Plaintiffs to steal confidential information for Verschleiser to use against Plaintiffs.

249.     Verschleiser also solicited Akerman to source a broker-dealer that Verschleiser could buy and Akerman would run for Verschleiser, all while Akerman was employed by CLS, and to provide Verschleiser with information on what was transpiring at CLS, United Realty and the REIT.

250.     In exchange for his ethics, his duties of loyalty and his obligations of trust and confidence, Verschleiser promised to advance Akerman, upon information and belief, $100,000.

251.     Desperate for money, Akerman sold his soul to Verschleiser, and consented, and conspired with Verschleiser to breach Akerman's agreements with CLS and United Realty, and to breach his duties of loyalty to CLS and United Realty.

252.     Akerman did so by, among other things, acting as Verschleiser's mole within Plaintiffs' and their affiliates' organization (while at the same time Akerman was consistently manifesting hatred for Verschleiser and loyalty and fidelity to Frydman), by providing Verschleiser with the Stolen Trade Secrets, and working for Verschleiser in sourcing a broker-dealer for him to buy and which would compete with CLS.

**Verschleiser Solicits Limited Partner Investors**
**in United Realty to Join His Criminal Conspiracy**

253.     Since December 4, 2013, Verschleiser sought to solicit investors or other providers

of capital to United Realty and their agents, including without limitation JH, Jaffa, Isabelle Kirschenbaum ("Kirschenbaum"), FFF, Fishoff, Appel, WF, Rand, Veigh, Morty Davis ("Davis"), Ellis Mirsky ("Mirsky"), Dr. Alexandrau ("Aexandrau"), Stahler, Eli J. Verschleiser (a cousin of Verschleiser, "Cousin"), and others.

254.    Verschleiser did so by falsely asserting claims against Frydman and the other Plaintiffs and the board of directors of the REIT in order to have one or more of the foregoing investors or other providers of capital in turn bring false and unsupportable allegations in lawsuits against Frydman, United Realty, Frydman's other companies and the independent directors of the REIT.

255.    Specifically, on June 3, 2014, Frydman received a Demand to Inspect Books and Records of United Realty on behalf of Jaffa (the "Demand").

256.    Prior to receiving that Demand, Frydman had never received any United Realty investor request to inspect records. The Demand stated that it sought to determine "whether Company funds were misappropriated" and "whether the Company's Board of Directors has engaged in wrongdoing and breached their fiduciary and contractual obligations to the Stockholder."

257.    On June 10, 2014, Frydman learned that Kirschenbaum and Fishoff, who are also United Realty limited partner investors, retained the same law firm that issued the Demand, and joined Jaffa's request to inspect United Realty's books and records.[8]

258.    Frydman does not interact with Jaffa, Kirschenbaum or Fishoff, and any knowledge

---

[8] It is obvious Jaffa and Kirschenbaum had no interest in reviewing the financial information they requested. On June 3, 2014 Frydman wrote to Jaffa's lawyer, agreeing to provide the financial information they were entitled to under law, and in accordance with the REIT's Charter, including the REIT's by laws, minutes of the proceedings of the stockholders, and annual statements of affairs, and that those documents would be available for inspection and copying at United's New York office on June 16, 2014. Neither Jaffa, Kirschenbaum, nor their lawyer, nor any one acting on their behalf elected to review the available documents.

which they may have about United Realty could only have come from their interaction with Verschleiser.

259.    Jaffa, Fishoff and Kirschenbaum (as well as Vegh, Rand and Appel) are each known associates of Verschleiser.

260.    On information and belief, the Demand was instigated by Verschleiser, and Verschleiser bombarded Jaffa, Fishoff and Kirschenbaum with false, defamatory and fraudulent statements and allegations against Frydman and the independent members of the REIT board of directors, including without limitation that they had each misappropriated company funds and otherwise committed wrongdoing, as Verschleiser's way of cajoling Jaffa, Fishoff and Kirschenbaum to make the Demand, and eventually bring a malicious prosecution against inter alia Frydman, Prime United, CLS, CLWM, Gould and the independent members of the REIT board of directors, *i.e.*, the Fishoff Lawsuit.

261.    Similarly, in various in-person and/or telephone conversations between Frydman and Mirsky, Alexandrau, Stahler, Davis and Rand, Frydman learned that Verschleiser had embarked on an on-going campaign to disparage Frydman, and knowingly lie to other investors in United Realty and the REIT by making false and defamatory accusations about Frydman and the independent members of the REIT board of directors in order to solicit and persuade each of those persons to participate in or initiate one or more lawsuits against inter alia Frydman, Prime United and the independent members of the REIT board of directors, based on false allegations.

**Verschleiser Solicits Wright and**
**Gulko to Join His Criminal Conspiracy**

262.    Wright is a lawyer who practices in Pleasantville, New York.

263.    During 2014, Wright represented APF Fire Protection, Inc. and Alexander P. Francese ("Francise"), its owner, in an arbitration brought by an affiliate of Frydman for

negligently damaging a fire and life safety system installed in a residence Frydman uses in the Hudson Valley. Although his clients lost their counterclaims, the arbitrator awarded Wright in excess of $30,000 in legal fees, and Frydman's affiliate appealed that award. This apparently has incensed Wright.

264.    On information and belief, Wright and Verschleiser found each other because Francese, Wright's client, had seen some of the disparaging and defamatory blog posts published by Verschleiser on the Internet, and Francese copied Verschleiser by posting at least one offensive post himself, and Verschleiser must have found that post, which Plaintiffs believe led him to Franchese, who led Verschleiser to Wright.

265.    On information and belief, Verschleiser and Wright conspired together to get Julia Marsh of the New York Post to write a disparaging article about Frydman in that newspaper on November 17, 2014.

266.    Verschleiser who had previous dealings with Marsh (who had contacted Verschleiser in connection with Frydman's suit challenging the appointment of Verschleiser, a convicted criminal, as treasurer of a Jewish charity) on information and belief, led Wright to Marsh – to get her to write a story in which Write was extensively quoted.

267.    The articles states that "Penny-pinching is 'Jacob Frydman's method of doing business,' said David Wright, the lawyer for the company APF Fire Protection, citing a measly $6,700 bill.... Wright accused Frydman of trying to bully him into dropping a suit by threatening to 'litigate me into the ground like I was something he scraped of the bottom of his shoe.'"

268.    Wright and Verschleiser's hatred for Frydman gave them common ground. On information and belief, Verschleiser recruited Wright to represent Defendants FFF, Vegh, JH, Appel and WF, each an associate of Verschleiser, in the filing of a most outlandish set of claims

which are false, defamatory and unsupportable, *i.e.*, the Fishoff Lawsuit (also, the "Second Defamatory Lawsuit"), in which Wright filed his own wholly untruthful affirmation.

269.    Although Verschleiser is not a party thereto, the Second Defamatory Lawsuit is Verschleiser's brainchild. On information and belief, Verschleiser wanted to stop the Transaction by getting the third party to walk away from the contract, or if he could not do that, then by trying to get ahold of the proceeds of the Transaction.

270.    To do so, Verschleiser needed to find a lawyer he could manipulate, one who would not be terribly concerned with contractual undertakings, rights of parties and legal principles. Verschleiser found that lawyer in Wright.

271.    On information and belief, Verschleiser acted as the conductor of the band. He put Wright and Akerman together with Verschleiser's in-house lawyer, Gulko, and for weeks, Verschleiser, Wright, Gulko and Akerman were having secrete joint communications, getting Akerman to steal the Stolen Trade Secrets, giving one or more of the Stolen Trade Secrets to Wright, and introducing Wright to FFF, Fishoff, Vegh, JH, Jaffa, WF, Rand and Appel, who were limited partners of United Realty (or their principals) and each of whom were Verschleiser's cronies.

272.    On information and belief, although they approached all of the limited partner investors in United Realty, Verschleiser, Wright, Akerman and Gulko could only persuade Verschleiser's cronies, Fishoff, Vegh, Jaffa, Appel and Rand, to join in their scheme (either directly or through investment vehicles). Verschleiser acted as instigator and leader of the pack. He told Akerman what to look for, and steal. He directed Gulko and Wright in the "claims" to assert in the Fishoff Lawsuit.

273.     But Verschleiser did not want his "fingerprints" anywhere near the Lawsuit.  He is not a named party – and in fact everything that he, Fishoff, Jaffa, Appel, Vegh and Rand did violated one or more of their respective agreements with Frydman or United Realty.

274.     Emails discovered on Akerman's computer shortly after Akerman was fired by CLS reveal that Verschleiser recruited Wright to conspire with Verschleiser and Gulko to steal Plaintiffs' and/or their affiliates' confidential information and trade secrets by bribing or otherwise criminally inducing Akerman to become one of their co-conspirators, and use his position of trust and confidence as CLS's Chief Compliance Officer, and his access into CLS's Global Relay (a secure compliance email review tool) and FINRA's confidential Broker Dealer portal, to steal such confidential information and Trade Secrets, which Verschleiser, Wright and Gulko hoped they could use (together with their false and defamatory allegations against inter alia Frydman, Prime United, CLS, CLWM, Gould and the independent REIT board members) to persuade Verschleiser's cronies to file what became the Fishoff Lawsuit (the Second Defamatory Lawsuit).

275.     Having lost his first attempt to use a lawsuit replete with false and fraudulent claims against Frydman, Verschleiser was motivated to have an even more outlandish set of claims filed.  Those claims were fabricated by Verschleiser, Wright, Akerman, Gulko, Fishoff, Vegh, Appel, Rand and Jaffa (directly or through investment vehicles) in the Second Defamatory Lawsuit, which was filed on December 15, 2014.

276.     The Second Defamatory Lawsuit is barely more than hyperbole and wildly outrageous and unsupportable allegations against Frydman, made by Defendants FFF, Vegh, JH, Appel and WF.  That Lawsuit makes claims to the proceeds of the Transaction, derivatively on behalf of United Realty, when the claimants knew that United Realty had no rights with respect thereto.  With that unsupportable foundational claim, the claimants used that Lawsuit as a canvas

on which to fabricate defamatory statements about Frydman which they intended to immediately leak to the press upon the filing of the complaint.

277.     The fabricated defamatory statements made in the Second Defamatory Lawsuit, include without limitation:

a. At Paragraph 23 of the complaint, that "Frydman desperately needs money"

b. At Paragraph 24, that "Frydman has been discovered to have a number of unsatisfied judgments"

c. At Paragraph 24, that Frydman "has not even been able to satisfy a judgment docketed against his personal residence"

d. At Paragraph 24, that "Frydman has recently been sued by several parties for millions of dollars for non-payment of loans and other breaches by entities he controls"

e. At Paragraph 24, that "Frydman has been engaged, almost full-time, in litigation with his former partner, and third parties for the past years at a great expense and to the neglect of the business"

f. At Paragraph 24, that "Frydman has taken compensation vastly in excess of any reasonable valuation of his services"

g. At Paragraph 24, that "Frydman has taken business assets for personal use"

h. At Paragraph 24, that "a Justice of the Supreme Court has recently found that Mr. Frydman engaged in transfers of approximately $1.3 million in connection with a Little Neck assisted care facility. The effect of those transfers – including draining $600,000 from bank accounts rendering a company insolvent, and forging an endorsement on a $700,000 check – was to defraud creditors"

i. At Paragraph 24, that "Frydman is believed to have borrowed up to $4 million - - a

personal debt he apparently intends to re-pay to himself using the proceeds of the [Transaction]"

j. At Paragraph 25, that "Jacob Frydman plans to use the proceeds from the [Transaction] to pay off a number of his own debts, individually and through a number of entities that he controls"

k. At Paragraph 25, that "Frydman is (a) insolvent and (b) judgment-proof"

l. At Paragraph 36, that "Jacob Frydman plans to use the proceeds of the [Transaction] to pay his own expenses and expenses of other entities he controls, unrelated to United Realty LP"

m. At Paragraph 38, that "At the same time as Jacob Frydman has admitted his plans to dissipate LP assets, his own history establishes that, when given the opportunity, he will do so"

n. At Paragraph 39, that "In connection with a real estate venture to acquire land, get approvals and construct an assisted care facility in Little Neck, New York, Jacob Frydman was recently found to have transferred huge sums of money in connection with imminent sale of partnership assets"

o. At Paragraph 39 and thereafter, a litany of "findings" against Frydman by the Honorable Joan A. Madden, Justice of the New York State Supreme Court

p. At Paragraph 49, that "Frydman cheated, or attempted to cheat, almost every single creditor, vendor and business associate on the project"

q. At Paragraph 49, that, with respect to a project that was completed in 2010, almost two years *before* United Realty was formed, Frydman carried out the project, at least in part, using assets he stole from various other entities, including at least $100,000 that he took from United Realty LP and/or its affiliates"

  r. At Paragraph 50, that "Frydman cheated, or tried to cheat every contractor in the project, leaving a long trail of litigations, arbitrations and at least one unsatisfied judgment"

  s. At Paragraph 79, that "In [a particular] action, [a litigant] seeks, among other relief, to hold Jacob Frydman liable for his personal guaranty on debt which now amounts to over $1 million"

278. The Second Defamatory Lawsuit was brought or instigated by co-conspirator Defendants Verschleiser, Wright, Gulko, FFF, Fishoff, Vegh, JH, Jaffa, WF, Rand and Appel, based on the Stolen Trade Secrets which Akerman stole, which resulted in the issuance of a Temporary Restraining Order in this action against Verschleiser, Multi Group, Fischgrund, DelForno, Parnasi, Onica, Chandler, Akerman, Wright, Gulko, Jaffa, Fishoff, Appel, Vegh and Rand prohibiting them and all those acting in concert with any of them from in any way, directly or indirectly, using, copying, publishing, disseminating, or disclosing to any person or further disclosing to any person all proprietary or confidential documents or information of the United Realty Group of Companies, Frydman or any of his other businesses obtained directly or indirectly by or from Akerman.

279. The complaint filed in the Second Defamatory Lawsuit was verified by Wright.

280. Wright's verification constitutes perjury.

281. The Second Defamatory Lawsuit was initiated solely so that it could be immediately leaked to the media.

282. However, pursuant to a so ordered stipulation the Second Defamatory Lawsuit was placed under provisional seal, making it difficult to leak it to the press.

283. But that did not stop these Defendants.

284. Notwithstanding the TRO issued in this action prohibiting the further use,

distribution or publication of the stolen documents, and the fact that the Second Defamatory Lawsuit was then "under seal" and the aforementioned so ordered stipulation specifically prohibited further disclosure of all assertions made in the complaint in that Lawsuit, one or more of the Class A Defendants did in fact leak the Lawsuit to *Investment News*.

285.   Frydman was contacted by *Investment News* shortly after the Lawsuit was filed, and asked for comment.

286.   Frydman inquired how *Investment News* was aware of the Second Defamatory Lawsuit since it was under seal.  The *Investment News* reporter disclosed that the suit was "sent to him by email."  Plaintiffs believe that the leaking of the Second Defamatory Lawsuit to *Investment News* could only have been the deed of Verschleiser, Wright, Gulko, Akerman, Fishoff, Jaffa, Vegh, Rand, Fishgrund and/or Appel.

287.   Frydman informed the reporters at *Investment News* that the Lawsuit was under seal, and that there was a TRO in place prohibiting further distribution, and no article appeared.

288.   On information and belief, once Verschleiser learned that the complaint in the Second Defamatory Lawsuit was under seal, he became incensed and demanded that Wright "do something about it" or get fired.

289.   Defendant Wright then concocted a cockamamie claim that in the 45 seconds between the time he signed the stipulation and it was submitted for "so ordering" by the court, it must have been changed by Frydman.

290.   The judge in the Second Defamatory Lawsuit refused to hear that argument without formal papers (which have never been submitted), and continued to have the Second Defamatory Lawsuit under seal.

291.   When Verschleiser realized that Wright was unable to get the venomous vituperative allegations of the complaint unsealed so that Verschleiser could leak the Second

Defamatory Lawsuit to the press – and by virtue thereof was unable to accomplish his sinister goal through Wright, Verschleiser,  who is not even a party to the Second Defamatory Lawsuit, fired Wright as the attorney of record for that Lawsuit, and caused a new attorney, Abe George ("George"), to be substituted as the attorney for plaintiffs.

292.    On information and belief, Verschleiser's first instruction to George was to violate both the so ordered stipulation requiring that the complaint in the Second Defamatory Lawsuit be under seal and the TRO issued in this action, by re-filing the complaint in only limited redacted form on the court's electronic filing system, hoping that it would then be both public and undetected that it was illegally made public.

293.    Plaintiffs Prime United and United Realty's counsel became aware of the fact that defendants caused an express violation of both the TRO and the so ordered stipulation in the Second Defamatory Lawsuit to be effected by the electronic refiling of the complaint in only limited redacted form, and advised the clerk of court that such refiling was improper unless made under seal.  As a result, the clerk of court sealed the refiling.

**The Filing of the Second Defamatory
Lawsuit was in Violation of Express
<u>Agreements Prohibiting Its Filing</u>**

294.    Verschleiser, Akerman, FFF, Vegh, JH, Appel and WF are all subject to various agreements which expressly prohibit the actions taken by them in initiating the Second Defamatory Lawsuit.

295.    Akerman is a party to an employment agreement with United Realty and/or CLS which provides in pertinent part:

> From the Effective Date until the date that is twelve (12) months after the date of the termination of your employment by the Company, you will not, without the prior written consent of the Company, directly or indirectly:

- 73 -

(i) solicit, induce or influence any person which has a business relationship with the Company,…[the REIT], each of their respective Affiliates and all members, officers, owners, partners, shareholders of the each of the foregoing (collectively the "Group") to discontinue or reduce the extent of such relationship in a manner in any way detrimental to the Group,

(ii) (A) recruit, solicit or otherwise induce or influence any employee, consultant or advisor of the Group, to discontinue such person's relationship with the Group or with any asset owned or operated by the Group or (B) hire any such employee, consultant or advisor,

(iii) be affiliated in any way with any company or person, which does any of the things which you are prohibited from doing under Sections (i) or (ii) above,

(iv) disparage the Group in any communications, whether in writing or orally, in a manner that could reasonably be expected to in any way intended to or which does injure the Group's business or reputation,

(v) divulge to anyone…, use, retain copies of or seek to benefit personally from any confidential information, Trade Secret (as defined below) or intellectual property of the Group…in each case directly or indirectly relating to or useful in or potentially useful in any aspect of the business of the Group…(collectively, "Confidential Information"). For purposes hereof, the term "Trade Secret" shall have the meaning given in the Delaware enactment of the Uniform Trade Secrets Act…, or

(vi) claim to have any right, title or interest of any kind or nature whatsoever in or to any …Confidential Information (including, without limitation, and for the avoidance of doubt, the Company's track record and investment performance records).…

In the event of a breach or a threatened breach of any of the covenants contained herein (the "Covenants"), the Group shall, in addition to any remedies it may have at law, have the right and remedy to have such Covenants specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any breach of any of such Covenants will cause irreparable injury to the Group and that money damages will not provide an adequate remedy to the Group.

296.     Pursuant to Paragraph 10 of the Separation Agreement, Verschleiser and his

affiliates expressly agreed:

that for a period of eighteen (18) months following the Separation Date: (i) they will neither alone nor in concert with others, directly or indirectly, employ or solicit the employment of, or assist others in employing or soliciting the employment of, any individual employed by any of the Entities…; (ii) they will not disparage or encourage or induce others to disparage any of the Frydman Parties or any of the Entities. For the purposes of this Agreement, the term "disparage" includes the making of false, defamatory or derogatory comments that could reasonably be expected to damage the reputation of the Frydman Parties or the Entities (or any of their officers, executives, or personnel). This paragraph shall survive the assignments contemplated herein and the expiration or earlier termination of this Agreement.

Any breach of the provisions of Paragraph…10 shall be considered a material breach of this Agreement….the Verschleiser Parties further agree that the Frydman Parties and the Entities may pursue and obtain injunctive relief without the posting of a bond….This paragraph shall survive the assignments contemplated herein and the expiration or earlier termination of this Agreement.

297.    Akerman, FFF, Vegh, JH, Appel and WF each executed a subscription agreement, which expressly provides at paragraph 15:

The Subscriber acknowledges and agrees that (i) it has received and will in the future receive certain confidential information ("Confidential Information") regarding the Partnership, the General Partner, the REIT, the Sponsor, the BD and the Entities (collectively, the "Partnership Entities") as well as the other Subscribers and/or Partners, (ii) such Confidential Information contains trade secrets and is proprietary, (iii) disclosure of such Confidential Information to third parties is not in the best interest of any of the Partnership Entities or the Partners and (iv) disclosure of such Confidential Information would cause substantial harm and damages to the Partnership Entities and the Partners.

298.    Akerman, FFF, Vegh, JH, Appel and WF each also executed and was a party to the limited partnership agreement of United Realty, pursuant to which each expressly agreed as follows:

Each Partner acknowledges and agrees that all Confidential Information is the property of the Partnership and/or other Covered Persons…. each Partner shall not, and shall not permit such Person's affiliates to, directly or indirectly use, rely on, disclose, divulge, furnish or make accessible to anyone any Confidential Information….

299.    The actions of Verschleiser, Akerman, FFF, Vegh, JH, Appel and WF are express breaches and violations of the above referenced agreements.

**Unless Stopped, Verschleiser and His Associates Will Use the
Stolen Trade Secrets to Further Injure Frydman and his Companies**

300.    Unless enjoined and restrained, Verschleiser, Akerman, Wright and Gulko and their associates, including Fishoff, Vegh, Jaffa, Rand and Appel, will continue to violate their express agreements, will likely continue to wrongfully use the Stolen Trade Secrets they stole from Plaintiffs and their affiliates and will use that information to further defame and disparage Frydman, United Realty and Frydman's other businesses, and cause serious and irreparable harm

- 75 -

to Plaintiffs.

301.    By virtue of the myriad of wrongs committed by these individuals and their associates, they have knowingly and tortiously interfered with Plaintiffs' prospective business relations or economic advantage and existing and prospective contracts with investors, soliciting broker dealers, registered representatives associated with those broker dealers, employees, contractors, professionals and others with whom Plaintiffs pursue business relationships. And they have viciously disparaged and defamed Frydman and United Realty.

302.    As a result of their unlawful conduct to date, it is likely that unless enjoined and restrained, these individuals and their associates will continue to tortiously interfere with Plaintiffs' existing and prospective business relationships and expose Plaintiffs' existing and prospective business relationships to false, derogatory, defamatory, negative and intentionally misleading "information" about Frydman and his businesses, which appears whenever a prospective business relationship undertakes an Internet search.

303.    Plaintiffs do not have any adequate remedy at law for the foregoing misappropriation and theft of Stolen Trade Secrets, tortious interference with existing and prospective business relations or economic advantage and existing and prospective contracts, defamation and disparagement. Unless enjoined and restrained, the Class A Defendants and their associates will continue to cause substantial damages, loss and suffering, including the continuing loss of goodwill and reputation. Such loss cannot be properly calculated and thus constitutes irreparable harm and an injury for which Plaintiffs have no adequate remedy at law.

**As a Result of the Filing of the Second**
**Defamatory Lawsuit It Is likely that Plaintiff**
**Prime United Will Lose the Transaction**

304.    A condition precedent to closing the Transaction is that it requires FINRA approval prior to April 8, 2014.

305.    FINRA will not approve the Transaction as long as the Second Defamatory Lawsuit is pending.

306.    Should the Second Defamatory Lawsuit remain pending through April 29, 2014, Plaintiff Prime United will have lost the Transaction and its proceeds.

307.    Defendants Akerman, FFF, Vegh, JH, Appel and WF have each contractually indemnified inter alia Plaintiff Prime United in connection with such eventuality.

308.    By virtue of their actions, Wright, Fishoff, Jaffa and Rand have indemnified inter alia Plaintiff Prime United under common law in connection with such eventuality.

309.    In connection with their contractual indemnification, defendants Akerman, FFF, Vegh, JH, Appel and WF have also indemnified the expenses incurred by Plaintiffs in connection with this action and the Second Defamatory Lawsuit, and Akerman has also indemnified the expenses incurred by Plaintiff Frydman in connection with the Third Defamatory Lawsuit as hereinafter described.

310.    On January 30, 2015, United Realty exercised its (and its affiliates') indemnification rights with respect to the indemnifications described in the preceding paragraph, and made demand on Akerman, FFF, Vegh, JH, Appel and WF for $115,000 through that date. Additional and increased demands will be forthcoming as expenses are incurred.

311.    The agreement with respect to such indemnification requires that payment must be made within 15 days of a demand thereof, and further provides that:

> If any Limited Partner fails to make full payment to the Partnership...within 15 days after receipt by such Limited Partner (a "Defaulting Person") of written notice from the Partnership with respect to such failure to pay the General Partner may (but shall not be obligated to) take one or more or none of the following actions:
>
> (i) pursue and enforce all rights and remedies the Partnership may have against such Defaulting Person with respect to such failure or breach, including initiating a lawsuit to collect (A) the overdue amount or any damages resulting from such breach and (B) all costs and expenses (including legal fees and expenses) incurred by the Partnership to pursue and

enforce all such rights and remedies, in each case with interest calculated thereon at a rate equal to the Base Rate plus six percentage points per annum, compounded annually (but not in excess of the highest rate per annum permitted by law);

(ii) reduce such Defaulting Person's share of any amounts such Defaulting Person is entitled to receive from the Partnership by (A) the amount due that such Defaulting Person has failed to pay to the Partnership or (B) such other amount as determined by the General Partner;

(iii) reduce such Defaulting Person's Sharing Percentage and/or Commitment; and/or

(iv) offer all or any part of the Defaulting Person's interest in the Partnership to the Limited Partners (other than the Defaulting Person) pro rata according to their respective Sharing Percentages....

## TENTH PREDICATE ACTS

### PERJURY BY DEFENDANT WRIGHT

312.    The complaint in the Second Defamatory Lawsuit was verified by Defendant Wright.

313.    Wright's verification, dated December 15, 2014, was made under penalties of perjury.

314.    The verification stated in pertinent part: "I hereby verify that the foregoing Verified Complaint is true to my knowledge, except where stated to be upon information and belief, in which case it is true to the best of my knowledge, information and belief."

315.    Wright's verification of the complaint in the Second Defamatory Lawsuit was false and fraudulent in that each of the following statements made therein was false and knowingly so:

   a. "In connection with the creation of United Realty LP, the limited partners invested approximately $4.9 million" (complaint, paragraph 14);

   b. "Prime United has agreed to [the Transaction] for such a low price, not based on any exercise of business judgment, but because (a) Prime United's managing member, Jacob Frydman, desperately needs money, and (b) because defendant Gould has some relationship with [the third party involved in the Transaction]" (paragraph 23);

c. "Mr. Frydman has been discovered to have a number of unsatisfied judgments against various of his controlled entities – indeed he has not even been able to satisfy a judgment docketed against his personal residence" (paragraph 24);

d. "Mr. Frydman has recently been sued by several parties for millions of dollars for non-payment of loans and other breaches by entities he controls" (paragraph 24);

e. "Mr. Frydman has taken compensation vastly in excess of any reasonable valuation of his services" (paragraph 24);

f. "Mr. Frydman has taken business assets for personal use, such as putting his housekeeper and stepson Alex Libin on the payroll and taking the company lawyer for personal litigations" (paragraph 24);

g. "a Justice of the Supreme Court has recently found that Mr. Frydman engaged in transfers of approximately $1.3 million in connection with a Little Neck assisted care facility. The effect of those transfers – including draining $600,000 from bank accounts rendering a company insolvent, and forging an endorsement on a $700,000 check – was to defraud creditors" (paragraph 24);

h. "In connection with the resignation of his former partner, from United Realty LP and related entities, Frydman is believed to have borrowed up to $4 million - - a personal debt he apparently intends to re-pay to himself using the proceeds of the [Transaction]" (paragraph 24)

i. "Upon information and belief, Jacob Frydman plans to use the proceeds from the [Transaction] to pay off a number of his own debts, individually and through a number of entities that he controls, leaving the Limited Partners with no remedy because Frydman is (a) insolvent and (b) judgment-proof" (paragraph 25);

j. "In fact,…the proceeds of [Transaction]… represent an asset of United Realty LP, an asset that Frydman has no power to sell" (paragraph 26);

k. "[The Transaction]…constitutes a breach of the LP Agreement…" (paragraph 32):

l. "The [Transaction] also violates the explicit terms of the Irrevocable Commitment dated September 17, 2012" (paragraph 34);

m. "Jacob Frydman plans to use the proceeds of the [Transaction], to pay his own expenses and expenses of other entities he controls, unrelated to United Realty LP" (paragraph 36);

n. "At the same time as Jacob Frydman has admitted his plans to dissipate LP assets, his own history establishes that, when given the opportunity, he will do so" (paragraph 38);

o. "Frydman was found to have dissipated over $1 million on the Savoy - Little Neck project, then lying about it under oath" (paragraph 38);

p. "Jacob Frydman was recently found to have transferred huge sums of money in connection with imminent sale of partnership assets" (paragraph 39);

q. "The Court also found that Jacob Frydman had endorsed a $722,000 check intended for the Savoy Little Neck limited partnership, but deposited it into another entity, apparently to defraud the creditors of that limited partnership" (paragraph 41);

r. "The Court also observed what has become a familiar pattern in Jacob Frydman's business dealings: an almost impenetrable web of entities serving no apparent purpose - except to insulate Frydman from creditors" (paragraph 42);

s. "the Court found that Jacob Frydman had told at least three different versions of the facts concerning a $425,000 transfer, two of those inconsistent versions being under oath (i.e., perjury)" (paragraph 43);

t. "Significantly, Frydman failed to list the Savoy - Little Neck Project in the REIT Prospectus in the section describing his background in clear violation of SEC rules and regulations" (paragraph 44);

u. "The significance of Frydman's litigation history - completely undisclosed and almost impossible to gleam from the web of entities he creates - is that a creditor will not have any remedy of law against him" (paragraph 47);

v. "in the Savoy-Little Neck case, even the lawyers he hired, were not able to penetrate the layers of unnecessary LLC's, and by the time they figured out under which corporate shell the money was stolen, the three-year statute of limitations had run" (paragraph 47);

w. "Frydman cheated, or tried to cheat every contractor in the project, leaving a long trail of litigations, arbitrations and at least one unsatisfied judgment" (paragraph 51);

x. "Frydman took at least $100,000 in assets from United Realty LP and used those assets in connection with the Ledgerock project – for his personal residence. Although he undoubtedly took more money, and in many different ways, here are the thefts that are known…" (paragraph 53);

y.  "Upon information and belief, Larson has never provided any services to or for United Realty LP or any affiliate, and she operated out of Frydman's personal residence as his 'housekeeper,' yet she received a paycheck and email address from the Company" (paragraph 54);

z.  "The problem with this conduct, of course, is that it violates New York's ban on champerty – purchasing a Note just to sue, and not legitimately to enforce it. NY Judiciary Law Section 489" (paragraph 70);

aa. "It is estimated that Frydman wasted his own time, and the resources of United Realty, LP easily in excess of $500,000 in his effort to cheat Spiezio and Franchese out of the property -- all for naught" (paragraph 72);

bb. "there is no benefit to United Realty LP from the expenditure of assets on the Parker Note Litigation, and the expenditure of partnership assets constitutes waste and mismanagement by Frydman, arising from his gross negligence or willful misconduct" (paragraph 76);

cc. "Further, notwithstanding having grossly overpaid for a non-performing asset on information and belief, Frydman and his affiliates continue to reap fees unjustly from United Realty LP pursuant to ancillary services agreements that obligate United Realty LP to continue to pay Frydman and his affiliates" (paragraph 82);

dd. "Frydman has also deliberately failed to file many 8-K Forms with the SEC in connection with the pending litigation(s), as required by law" (paragraph 83);

ee. "A number of unsatisfied judgments have been rendered against Frydman" (paragraph 92);

ff. "defendants knew but failed to disclose the pending litigation that had been commenced on or about April 26, 2010 against Allied Beacon for claims related to fraud, which in May 2013 resulted in a judgment against it for $1,607,500.00, effectively shutting down its operations" (paragraph 99);

gg. "In fact, the Note was never Frydman's to assign, and it is apparently worthless; Frydman has caused the expenditure of at least $500,000 in litigations costs, wasted countless hours of his own time, and exposed the REIT to regulatory action and litigation" (paragraph 103);

hh. "Frydman failed to honor his fiduciary duties and communicate to any of the Limited Partners or the Board of Directors, the issues surrounding the internal