disputes and/or any possibility that there would be a minimal shortfall in the amount of funds for the transaction, and that as a result, the transaction would be lost" (paragraph 107);

ii. "The effect of this change was to unfairly, and without legal authority, give to the General Partner a greater share of profit-sharing than had been agreed in the original LP Agreement" (paragraph 113);

jj. "Frydman also took for himself 'compensation' amounting to over $750,000 dollars during the past year. This compensation is grossly excessive, and amounts to theft of partnership property" (paragraph 114);

kk. "It is believed that much of the money used by Mr. Frydman recently to construct his multi-million dollar home in Hyde Park, New York, was taken from corporate assets" (paragraph 115)

316.     Each and every one of the quoted statements, verified by Wright as being true, is false and fraudulent, and was made by Wright with malice solely to defame Frydman in connection with Wright and Verschleiser's intention to file the Second Defamatory Lawsuit solely to leak it to the press.

317.     As such, under the holding of *Williams v. Williams*, *supra*, the foregoing statements constitute defamation.

318.     Based on the foregoing, Wright's verification constitutes perjury.

## ELEVENTH PREDICATE ACTS

### PERJURY BY DEFENDANT JAFFA

319.     In connection with the Second Defamatory Lawsuit, Defendant Jaffa submitted an affidavit, sworn to December 15, 2014 (the "Jaffa affidavit").

320.     The Jaffa affidavit stated at the outset: "I am a principal of Jaffa Holdings LLC, plaintiff in this action. I submit this affidavit in support of plaintiffs' motion for preliminary injunction and related relief."

321.    The Jaffa affidavit was false and fraudulent in that each of the following statements made therein was false and knowingly so:

a.  "we have every reason to believe the GP intends to take the entire [proceeds of the Transaction] and use it to pay off his personal debts – and not to provide one penny to the Limited Partnership" (paragraph 3);

b.  "[Frydman] is being sued for millions of dollars on personal guarantees in default" (paragraph 4);

c.  "A REIT that has an affiliated Broker-Dealer enjoys incalculably greater credibility in the market then a REIT which lacks a BD. I say this with some authority, having been involved in the establishment and operation of REITs, and in investments involving REITs for more than 20 years." (paragraph 12);

d.  "We also have good reason to believe that the entire transaction revolved around self-dealing and was conceived by and for, Jacob Frydman, apparently because he is starved for cash" (paragraph 18);

e.  "Mr. Frydman has recently been found to have engaged in what can only be described as frauds" (paragraph 19);

f.  "I think most of us were astonished to see that a person of what we thought was Jacob Frydman's caliber, would stoop to draining bank accounts of hundreds of thousands of dollars, and forging an endorsement on a check for $725,000. But that seems to be exactly what the judge said he did" (paragraph 19);

g.  "It is a spider web of companies, seemingly established for the very purpose of shifting funds - just as apparently occurred in the Savoy-Little Neck litigation. If Mr. Frydman is allowed to sprinkle the proceeds of the [Transaction] among these many entities, it could take years to find the money. Leaving us and the limited partnership without any remedy" (paragraph 20);

h.  referring to Frydman: "One need not be a rocket scientist to conclude that a person who is being sued by a host of creditors; who has a track record of dissipating funds from other businesses; and who isn't able to satisfy a string of judgments, is not a person to be trusted with Limited Partnership assets" (paragraph 21);

i.  "But there's more. I am informed that, since Mr. Verschleiser resigned from the business, Frydman 'loaned' the Limited Partnership some $4 million" (paragraph 22)

j.  "I am further informed that he intends to repay himself from the…proceeds of the …[T]transaction – leaving nothing to the limited partnership." (paragraph 22);

k. "As such, I believe this represents self-dealing and a breach of Frydman's contractual and fiduciary duties owed to the limited partners and to United Realty LP" (paragraph 22);

l. "I see that one creditor has been in litigation for 10 years to collect on its $250,000 judgment. This could be *us* in a few years, chasing Jacob Frydman to recoup limited partnership assets, absent immediate judicial intervention" (footnote 4);

m. "Based on the quantity of litigation activity, Frydman has easily incurred $1 million in legal fees for this period. Where the funds came from; why this is a legitimate partnership expense, how this affects our financials, is completely undisclosed" (paragraph 27);

n. "Compounding his transgressions, we recently learned that Frydman has altered the terms of the Limited Partnership Agreement, to give himself5 greater distributions than had been agreed with the investors subscribed to the venture. (paragraph 28);

o. referring to Frydman: "putting his housekeeper on the payroll, hiring his own son, and spending enormous amounts of time in what appears to be his hobby of litigating, the compensation is excessive" (paragraph 31);

p. referring to Frydman: "Particularly with a history of dissipating assets and leaving judgments unsatisfied, there is good reason to fear the same will happen here". (paragraph 36)

322.    Each and every of the quoted statements, made by Jaffa under oath as being true, is false and fraudulent, and was made by Jaffa with malice solely to defame Frydman in connection with Jaffa and Verschleiser's intention to file the Second Defamatory Lawsuit solely to leak it to the press.

323.    As such, under the holding of *Williams v. Williams*, the foregoing statements by Jaffa constitute defamation.

324.    Based on the foregoing, the Jaffa affidavit constitutes perjury.

## TWELFTH PREDICATE ACTS

### AKERMAN ACTING FOR VERSCHLEISER FILES FALSE ALLEGATIONS AGAINST FRYDMAN IN LAWSUIT FOR THE SOLE PURPOSE OF LEAKING THAT LAWSUIT TO THE PRESS IN ORDER TO DEFAME FRYDMAN

325.    Having been thwarted from affecting their true intention of leaking the Second Defamatory Lawsuit to the media, Defendants Verschleiser and Akerman, in express violation of the TRO and preliminary injunction issued in this action, embarked on a new scheme to take certain of the defamatory allegations asserted in the under seal Second Defamatory Lawsuit and redraft that Lawsuit as a claim by Akerman against Frydman to be filed and then immediately leaked to the media before anyone would find out that it had in fact been filed.

326.    To affect their sinister plot, on February 6, 2015, on information and belief Verschleiser and Akerman conspired to have Akerman commence a state court lawsuit, *Akerman v. Frydman*,[9] Index No. 650351/2015 (the "Third Defamatory Lawsuit").

327.    The Third Defamatory Lawsuit simply copies certain of the same defamatory allegations asserted against Frydman in the Second Defamatory Lawsuit and then adds additional unfounded and unsupportable accusations against Frydman, including without limitation that Frydman is under investigation by FINRA, and that Frydman misappropriates investor and public funds.

328.    Among the other falsehoods and misrepresentations of fact, the Third Defamatory Lawsuit falsely and fraudulently asserts:

  a.    at paragraph 32 of the amended complaint: "between the dates of March 31, 2014 and October 31, 2014 there were numerous transactions by or directed by Jacob Frydman that were cause for concern, and in some instances, in complete violation of law";

  b.    at paragraph 42 (a) of the amended complaint: "Mr. Frydman….has not even been able to satisfy the judgment docketed against his personal residence";

---

[9] The complaint in the Third Defamatory Lawsuit was amended one business day later (*i.e.*, on February 9, 2015) to include additional defendants.

   c.  at paragraph 42 (b) of the amended complaint: "Mr. Frydman has recently been sued by several third parties for millions of dollars for nonpayment loans and other breaches by entities he controls";

   d.  at paragraph 42 (c) of the amended complaint: "Mr. Frydman has been engaged, almost full-time, in litigation with his former partner, Ellie Verschleiser, for the past year to the neglect of the business";

   e.  at paragraph 42 (e ) of the amended complaint: "Mr. Frydman has taken business assets for personal use";

   f.  at paragraph 42 (f ) of the amended complaint: "Mr. Frydman admittedly recently lost some $2 million"

   g.  at paragraph 43 of the amended complaint: "Frydman is (a) insolvent and (b) judgment proof";

   h.  at paragraph 45 of the amended complaint: "Frydman and Gould were under investigation by FINRA";

   i.  at paragraph 60 of the amended complaint: "Frydman...wrongfully exerted dominion and control over Plaintiff's property";

   j.  at paragraphs 86 and 105 of the amended complaint: "Frydman caused a false and defamatory U-5 to be filed with FINRA"

329.    Within minutes of the filing of the Third Defamatory Lawsuit, Frydman received a telephone call from a reporter at the *Real Deal* informing him that the complaint filed in the Third Defamatory Lawsuit was just emailed (*i.e.*, leaked) to the *Real Deal*.

330.    The *Real Deal* then proceeded to re-publish the defamatory falsehoods contained within the allegations of the complaint in the Third Defamatory Lawsuit without independently verifying their accuracy, thereby getting an otherwise respectable news outlet to voluntarily

become the criminal instrument of Verschleiser and his co-conspirators by recklessly abandoning their journalistic professionalism and intellectual honesty and republishing those defamatory statements.

331.    On information and belief, Verschleiser and Akerman also leaked the complaint filed in the Third Defamatory Action to *Investment News*, which they knew was the publication of choice for persons working within the independent broker dealer network.

332.    *Investment News* then proceeded to re-publish the defamatory falsehoods contained within the allegations of the complaint in the Third Defamatory Lawsuit without independently verifying their accuracy, thereby getting an otherwise respectable news outlet to voluntarily become the criminal instrument of Verschleiser and his co-conspirators by recklessly abandoning their journalistic professionalism and intellectual honesty and republishing those defamatory statements.

333.    The actions of Verschleiser, Akerman, the *Real Deal* and *Investment News* constitutes violations of this Court's TRO and preliminary injunction and constitute defamation.

334.    As a result of the publications made by the *Real Deal* and *Investment News,* Plaintiff United Realty was bombarded with inquiries from broker dealers who were doing business as soliciting broker dealers with the REIT, resulting in several of the broker dealers terminating and/or suspending selling agreements with United Realty, and during just the three days after said articles were published, resulting in the cancelation of subscriptions which were not yet accepted representing in excess of $650,000.00 of the REIT's common stock.

## THIRTEENTH PREDICATE ACTS

### PERJURY BY DEFENDANT AKERMAN

335.    The complaint in the Third Defamatory Lawsuit was verified by Defendant Akerman.

336.     Akerman's verification was sworn to February 6, 2015.

337.     Defendant Akerman's verification of the complaint in the Third Defamatory Lawsuit was false and fraudulent in that each and every one of the statements in the complaint quoted iabove, verified under oath by Akerman as being true, is false and fraudulent, and was made by Akerman with malice solely to defame Frydman in connection with Akerman and Verschleiser's intention to file the Third Defamatory Lawsuit solely to leak it to the press.

338.     As such, under the holding of *Williams v. Williams*, the statements referenced above by Akerman constitute defamation.

339.     Based on the foregoing, Akerman's verification of the Third Defamatory Lawsuit constitutes perjury.

## FOURTEENTH PREDICATE ACTS

### AKERMAN AS VERSCHLEISER'S AGENT FILES FALSE ALLEGATIONS AGAINST FRYDMAN AND UNITED REALTY WITH THE SEC

340.     To further affect their sinister plot, on February 13, 2015, on information and belief Verschleiser, Akerman and Spiezio conspired to have Akerman file a baseless and false claim ostensibly as a "whistleblower" against Frydman and United Realty with the SEC.

341.     Akerman is a disgraced former Chief Compliance Officer of CLS.

342.     On December 15, 2014, Akerman was fired for cause by Gould because, as noted, Akerman was found to have stolen the Stolen Trade Secret in express violation of his employment agreement, in violation of law and in violation of his duties of loyalty, fidelity and obedience to CLS and United Realty.

343.     On information and belief, prior to April 17, 2014, Verschleiser and Spiezio became acquainted.

344.     Spiezio is, on information and belief, in the waste disposal business, operates through R&S waste services and previously was a construction contractor.

345.     Spiezio has a long history of being accused of significant wrongdoing.  Like his new friends Akerman and Verschleiser, Spiezio has no compunction about lying to a court.

346.     Indeed, in an order dated October 20, 2009, Justice Alan D. Scheinkman of the New York Supreme Court, Westchester County, stated that "the affidavit Spiezio submitted in opposition to the prior motion for summary judgment contained statements bordering on perjury."

347.     In 2010, Spiezio was found by the Louisiana State Licensing Board to have violated Louisiana State Licensing laws, specifically LA R.S. 37:2167(A), by acting as a residential building contractor without a license, and was fined more than $59,950.00.  The Nineteenth Judicial District Court upheld the Board's decision on June 12, 2012, and the Court of Appeals for the First Circuit affirmed the District Court's decision on March 22, 2013.

348.     In May of 2008, The Guardian newspaper published a front page story entitled, "Connected Developer Joe Spiezio Calls His Latino Workers Spics And Steals Their Wages," and informed readers of a federal lawsuit filed by some 20 Latino workers, employees of Spiezio, charging him, his accountant and his bookkeeper with violations of the Federal Fair Labor Standards Act, as well as New York State Labor Law.  Spiezio was charged with a number of intentional unlawful acts, including violations of wage and hour laws, as well as failing to pay overtime wages "for work in excess of 40 hours per week" as well as "periodically requiring work on Sundays without compensation at all."  In addition, the complaint alleged that Spiezio appropriated, in cash, for his own benefit, 20 percent of the wages paid to all of the Latino manual laborers and carpenters on the false representation that it was for "taxes to be withheld for, and paid by, Defendants to federal, state and Yonkers tax authorities."  The complaint further alleged

that "[i]n actuality, that money, beginning in 2000, was stolen and not paid to any taxing authority."

349.　　According to an article published on December 5, 2015 in the Yorktown Daily Voice, in a memorandum filed in New York Supreme Court, C.R.P. a competing garbage collection company, accused Spiezio of illegally obtaining a garbage hauling contract in Yonkers, NY by using politicians to take over a contract awarded to another company to avoid the vetting process, and of always planning to illegally take over the business after the first company was awarded the bid.

350.　　Indeed, Spiezio himself took a page out of Verschleiser's playbook of falsely making disparaging and defamatory postings on the Internet. On April 17, 2014, Spiezio, on information and belief, posted the following on RipoffReport.com: "Jacob Frydman, Winter Investors, Summer Investors, Parker Note Always tries to scam and use others money to take properties New York New York. Jacob Frydman will do anything to hurt anyone. He has tried to steal properties by using money from others to buy mortgages and then tries to foreclose. He tries to take from investors and investments. He will soon be in jail for this and check the records back to his role as an attorney in Ohio."

351.　　On February 13, 2015, on information and belief, Verschleiser, again acting as puppet master, caused Akerman to send the False Claims Letter to the SEC and to copy 17 third parties on the Letter, including without limitation the IRS, FINRA, Ernst & Young, Proskauer Rose, Fact Right, Brock Capital, the Department of the Treasury and Buttonwood Investment Services.

352.　　The sole purpose of copying the False Claims Letter to the third parties was to defame and cause harm to Plaintiffs.

353.     Akerman, Verschleiser and, upon information and belief, Spiezio must have assumed that the governmental agencies to which Akerman sent a copy of the False Claims letter would initiate investigations based on the false claims asserted therein.

354.     Akerman, Verschleiser and, upon information and belief, Spiezio, must have assumed that by copying the False Claims Letter to industry due diligence firms, like FactRight and Buttonwood (both of whom provide third party due diligence reports to independent broker dealers with respect to the REIT), they would further harm Plaintiffs' businesses, and require that these firms modify their current due diligence reports to include the false accusations made in the False Claims Letter, and that the False Claims Letter would further negatively impact the ability of Plaintiffs to attract new selling group participants, and would further the likelihood of putting Plaintiffs out of business.

355.     Indeed, the False Claims Letter is yet another fabrication, created by Akerman, Verschleiser and, upon information and belief, Spiezio, in the hope that the Letter would insulate Akerman from liability.

356.     Akerman sent the False Claims Letter on February 13, 2015, *more than two months* after he stole the Stolen Trade Secrets.  Akerman claimed that he didn't really "steal" any documents, but instead was simply taking them in his role as a whistleblower.  Yet the Stolen Trade Secrets that Akerman stole and which he turned over to Verschleiser and the other co-conspirators had *nothing* to do with the Parker Avenue transaction which was the subject of the False Claims Letter.  In fact, not a single one of the documents comprising the Stolen Trade Secrets was attached to or referenced in the False Claims Letter.

## FIFTEENTH PREDICATE ACTS

## EXTORTION

357.     To further affect his sinister plot, on February 13, 2015, at approximately 4 p.m., Defendant Verschleiser telephoned Gould and demanded that if Gould did not resign from CLS within the next 30 minutes, he would be subject to ongoing litigation "for the next 10 years."

358.     In fact, at least an hour and a half before Akerman's False Claims Letter was sent to the SEC, Verschleiser, who on information and belief was the puppet master and force behind the False Claims Letter, advised Gould in that same telephone conversation that the False Claim Letter was going to be sent later that day. Verschleiser stated "at the end of the day, when all this goes down, SEC and all the suits go down because you're going to see what's going to happen within the next few hours, actually. Um, you're just going to have to defend yourself for the next 10 years. Cause I put 5 million into an account for this. I have 4.6 left and you're just going to be part of that."

359.     Later during the same conversation, Verschleiser stated "and you'll see next week and the lawsuits what they say. You will be one of those named parties. That's all. You'll see on Tuesday (ostensibly referring to the next Tuesday, February 17, 2015) when one of them is filed, then you'll see Friday (ostensibly referring to the next Friday, February 20, 2015) when the second one is filed and you'll see them [in] a letter today that's going to FINRA, the SEC, everybody. All about 30 parties in your copy on that letter. But that's just to show you what's going to happen."

360.     Also during the same conversation, Verschleiser demanded that Gould quit his job within the next 30 minutes or face ongoing horrific and false litigations. Verschleiser stated: "I'm going to repeat it again and you can write it down. Either pick sides, which seemingly you have and if you are going to stick on Jacob Frydman's side you're going to be named in a bunch of independent lawsuits via a bunch of different people and those people are going to sue you and they will continuously sue you until they win."

361.     Verschleiser then threatened criminal actions unless he obtained what he wanted civilly. He stated "so he'll go to jail. The DA is investigating, the FBI is investigating, they're all investigating he's going to go to jail. That's all"…"Stay with his side and you will be served for fucking my side. That's all, that's what I'm telling you."

362.     The foregoing constitutes extortion.

## RECENT DEFAMATION BY VERSCHLEISER

363.     On March 11, 2015 at 3:56 AM EDT,  Verschleiser wrote an email to Plaintiff from his eli.v@multigroups.com email address and copied Defendant Fishoff, and at 4:18:08 AM EDT republished said email to Abe George, Esq., Defendants Rand, Appel, Jaffa, Vegh, Dr. Daniel Aronzon, Verschleiser's cousin, Eli J. Verschleiser, David Newman, Esq. and Robert S. Levine, Esq. stating, inter alia:

> Seemingly you are too scared to meet me in front of the board of directors and the money partners in our companies. This has been telling to all of your immoral, unethical and criminal tactics which as you have seen will not deter my attorneys from pursuing you, until you are brought to justice. It is unfortunate for the investors that I brought into this mess. I mistakenly did not make a few phone calls prior to introducing and allowing you into my world (and into my office - which I thankfully got you out of).

> Just as I got you removed from my office a year ago so too you will no longer be related to United, Cabot or all of the affiliated entities. It may take another year but the end is what counts.

> When I originally removed you for cause, and fired you I should have left it that way. Thinking that I was protecting the innocent bystanders and all the moneys WE put in was my second mistake in our relationship (remember the QuickBooks don't lie which shows the 14+ million WE put in versus the few hundred thousand you stole from the company and then "put back into it" as your so called investment.

> I am always ready to meet you in front of the board and any of our investment partners (whom you are now screwing too).

364.     At the time of Verschleiser's republishing of the above referenced email to Abe George, Esq., Defendants Rand, Appel, Jaffa, Vegh, Dr. Daniel Aronzon, Verschleiser's cousin, Eli J. Verschleiser, David Newman, Esq. and Robert S. Levine, Esq., Verschleiser sent an

additional email stating, inter alia, "As it turns out we are not the only ones you stole from over the past 20 years. Seemingly we are just a small minority of individuals in an endless ocean of victims."

## OTHER WRONGFUL ACTS

365.    On December 19, 2013, knowing that Frydman was out of New York on a business trip, Verschleiser entered upon the premises then occupied by United Realty and physically assaulted and threatened physical harm to Frydman's employees.

366.    In violation of his contractual undertakings to the contrary, after being terminated as an employee of United Realty, Verschleiser solicited the assistance of then existing and former employees and consultants of United Realty, including without limitation Defendants Delforno, Fischgrund, Chandler, Pinhasi and Onica, to assist Verschleiser in the criminal enterprise he was conducting as here set forth.

367.    During December 2013, while Delforno was still employed by United Realty as head of all of its information technology, in total disregard to his obligations and duties to United Realty, and in express violation of the Separation Agreement, Verschleiser solicited Delforno, and Delforno agreed to become part of the criminal enterprise being conducted by Verschleiser and conspired with Verschleiser to hijack United Realty's email exchange servers, domain hosting servers and computer networks, to give Verschleiser unfettered control over same and the ability to hack into and intercept the emails of United Realty employees, to steal trade secrets and other data, and otherwise assist Verschleiser and his criminal enterprise in matters relating to technology and computers and otherwise take direction from Verschleiser and assist in his criminal enterprise.

368.    Fischgrund and Chandler, both former employees of United Realty, on information and belief, were solicited by Verschleiser, and agreed to become part of Verschleiser's criminal

enterprise and conspired with Verschleiser to act as directed by him, including without limitation to create, draft, publish and or post advertisements, blogs and Internet postings, advise on public relation matters and industry matters, and otherwise take direction from Verschleiser and assist in his criminal enterprise.

369.     Pinhasi and Onica, both former employees or consultants of United Realty, on information and belief, agreed to become part of Verschleiser's criminal enterprise and conspired with Verschleiser to act as directed by him, including without limitation to provide technology and computer related assistance and otherwise take direction from Verschleiser and assist in his criminal enterprise.

370.     Defendants Doe 1 – 15, on information and belief, agreed to become part of Verschleiser's criminal enterprise and conspired with Verschleiser to act as directed by him, including, without limitation to transport and distribute the advertisement flyers to attendees' rooms at  Caesars Palace & Convention Center, and plaster fake advertisement posters over real posters at the Convention Center, during the aforementioned September 2014 REISA conference, and/or to create, publish and or post advertisements, blogs and Internet postings and otherwise take direction from Verschleiser and assist in his criminal enterprise.

**Intermedia and Verschleiser**

371.     On or about February 11, 2014, Frydman alerted Intermedia's CEO that he suspected illegal and unauthorized access into his email account, after two business associates, whose identities were not publically known, received anonymous disparaging emails.

372.     Thereafter Frydman was contacted by Intermedia's Chief Operating Officer, John McCormick, and its head of security, Ryan Barrett ("Barrett"), who began an investigation.

373.     On February 13, 2014, Barrett emailed Frydman and included notes from Barrett's security engineer, Ninad, who investigated Frydman's case.

374.     On February 13, 2014, Barrett voluntarily provided Frydman and United Realty with certain logs from Ninad.

375.     Ninad determined that during the period of January 12 to February 11, 2014, in addition to Frydman and his assistant (and wife) Monica accessing Frydman's email account, a computer workstation called "RDELFORNO-X1" accessed Frydman's account 78 times, and another computer workstation called "ELI-X1CARBON" accessed Frydman's email account 46 times.  Barrett attached two data logs to his transmittal email.

376.     Those data logs belong to Intermedia and show access into Intermedia servers. None of the logs provides any confidential emails whatsoever, let alone any of Verschleiser's private emails.  The first log, entitled "ELI-X1CARBON," shows the number of times that the computer ELI-X1CARBON accessed any of Intermedia's servers between January 14 and 16, 2014.  The second log, entitled "United Realty.csv", shows every successful login, from all computers, to Frydman's email account during the period of January 12 to February 11, 2014.

377.     Frydman and United Realty and Verschleiser and his various companies both use Intermedia as their hosted email exchange server provider.  Frydman maintains email exchange accounts for two of his companies, United Realty (which uses the URPA domain) and CLS (which uses the CLS domain), with Intermedia. Apparently, Verschleiser maintains email exchange accounts for at least three of his companies with Intermedia:  Multi Group (which uses the Multi Group domain), Magenu (which uses the Magenu domain) and a personal account Eliv (which uses the Eliv domain).

378.     Between February and June 2014, Verschleiser, directly, and through counsel, contacted Intermedia and, on information and belief, threatened to sue Intermedia for allegedly violating Verschleiser's privacy rights for providing Frydman and United Realty with the aforementioned logs.

379. As a result, more than four months after Intermedia voluntarily provided the logs, and after Verschleiser threatened to sue Intermedia, Intermedia's former counsel, in an unsigned draft letter, requested that the logs be returned.

380. Intermedia publishes a Master Servicer Agreement with respect to its relationship with its hosted email exchange customers.

381. Pursuant to that Agreement, Intermedia is prohibited from permitting unauthorized persons access to information stored on a customer's email exchange server hosted at Intermedia.

382. As described above, Intermedia negligently and or recklessly granted Verschleiser access to Frydman and United Realty's email exchange servers hosted on Intermedia's networks in violation of its Master Services Agreement and the express instructions to the contrary from Frydman.

383. As a result of Intermedia's negligent and/or reckless acts as above set forth, Intermedia permitted Verschleiser to illegally access Plaintiffs' email exchange servers and, for more than 10 days, copy confidential information, delete company data, lock out Frydman and several of his employees from accessing their email accounts and company servers, hack into the email exchange servers to identify persons with whom Frydman was doing business, and then create anonymous websites from which Verschleiser and/or his co-conspirators sent anonymous emails to persons with whom Frydman was doing business encouraging them not to transact business with Frydman, in violation of the CFAA, the ECPA, the SCA and New York Penal Law Article 156 (relating to offenses involving computers).

384. By virtue of the foregoing, Intermedia was an instrumentality used by Verschleiser in his criminal enterprise as here described.

## OTHER FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS

385.     Defendant Verschleiser, directly and through Defendant Multi Group, and Plaintiffs are engaged in the commercial real estate business. In that regard, they all raise capital from investors and invest that capital in real estate transactions. They all use intermediaries, including third party broker dealers, to source investors, and then work with those intermediaries to seek to raise capital from those investors. They all seek to originate investment transactions through owners who have properties for sale, real estate brokers and intermediaries, such as lenders and special servicers who hold real assets in their REO portfolios, as well as through title companies and qualified 1031 intermediaries. They all seek to finance those transactions with debt which they source directly or indirectly from lenders such as banks, insurance companies and other financial institutions, through investors and non-traditional lenders, and through intermediaries such as mortgage brokers. They all seek tenants for their properties directly and through intermediaries such as leasing brokers. They all work with and retain professionals such as lawyers, accountants, appraisers, architects and engineers. They all work with and retain property management companies, contractors, title companies, insurers and consultants. They all work with and retain marketing professionals in marketing their projects, and placing advertisements, public relations materials and internet postings with media outlets. They all work with elected officials, town boards, planning boards, zoning boards, building inspectors, and a variety of governmental agencies. They all compete for high quality employees. In many cases, due to the size or complexity of the projects they are involved with, they "partner-up" with institutional investors, such as pension funds, endowments and other real estate developers as joint venture partners.

386.     Simply stated, the commercial real estate business is a business of capital and relationships in addition to skill and acumen.

387.     No matter how qualified a real estate investor or developer may be, without the ability to build relationships with other participants in the industry, raise capital, source deals, contract with professionals, and get a fair hearing from governmental officials and agencies, a real estate investor and developer has no likelihood of success.

388.     A real estate investor/developer's reputation is his single most important asset. Investors, lenders, intermediaries, professionals, tenants, contractors and all of the other participants upon which a real estate investor or developer relies to succeed need to determine where to invest their limited resources, especially their capital and their time.

389.     In today's digital world, before someone invests money, lends money, agrees to enter into a contract to "tie-up" a real estate asset and take it off the market for the period it takes to close, commit their time and resources to a project, "partner-up", provide goods or services, or rent space, they generally start by running a simple internet search on the person with whom they are about to transact business.

390.     It takes years to build a good reputation, but it only takes a few false blog posts to destroy it.

391.     Verschleiser, the other Class A Defendants who are Verschleiser's co-conspirators, and Multi Group are attempting to manipulate, and have manipulated the market to deprive Plaintiffs and their affiliates of capital, business relationships and opportunities through a scheme to destroy Frydman's reputation so as to deprive him and his businesses of capital, investors, lenders, transaction opportunities, tenants, the ability to work with professionals, intermediaries, elected officials, governmental agencies and the like.

392.     Through Defendants' illegal and tortious acts, Plaintiffs have been denied valuable business opportunities, have suffered damage to their business and property, and have suffered irreparable damage to their business reputation and goodwill.

393.     Defendants' fraudulent scheme complained of here constitutes a fraud upon everyone that Frydman and his businesses rely on to transact business.  It is fraud upon existing and prospective investors and intermediaries, including third party broker dealers, who source investors, because they are falsely told that Frydman will "steal their money and not return it." It is a fraud upon owners who have properties for sale, real estate brokers and intermediaries, such as lenders and special servicers who hold real estate assets in their portfolios, because they are falsely told that Frydman will not close on these transactions, or that he will "screw them." It is a fraud on lenders such as banks, insurance companies and other financial institutions, non-traditional lenders, and intermediaries such as mortgage brokers, because they are falsely told that Frydman will not repay his debts.  It is a fraud upon prospective tenants, and brokers representing prospective tenants, because they are falsely told that Frydman will not honor his agreements, and falsely told that he is not responsible for those transactions which make up his track record of successful real estate transactions, that he is a thief, fraudster, criminal, scam artist, Ponzi schemer, and the like.  It is a fraud upon prospective professionals such as lawyers, accountants, appraisers, architects and engineers because they are falsely told that Frydman will not honor his agreements or pay their bills.  It is a fraud upon elected officials, town boards, planning boards, zoning boards, building inspectors, and a variety of governmental agencies because it falsely paints Frydman as a criminal and fraudster with whom they should not be doing business.  It is a fraud upon prospective employees because it falsely paints Frydman as a person that they would not want to work with.  It is a fraud upon prospective partners because it falsely portrays Frydman as an unethical "lowlife" and "fraudster" who they would not want to associate or partner with.

***Culpable Person***

394.   Verschleiser is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. § 1961(3).

395.   Verschleiser is a "Culpable Person" under RICO.

*Enterprise*

396.   Verschleiser is, on information and belief, the direct or indirect owner, and principal control person of Multi Group.

397.   According to Wikipedia, "…Verschleiser is a founding partner and acting Chairman of the Multi Group of Companies, a private equity real estate investment banking firm. Multi Capital LLC is the Capital Markets division of the Multi Group of Companies, and Multi Investment is the acquisition arm of the Multi Group of Companies. Through his companies,… Verschleiser has been involved in over $7 billion USD of real estate transaction[s]."

398.   According to its LinkedIn page, Multi Group has "successfully been involved in excess of $7 Billion Dollars of real estate transactions. Whether acquiring for our own account or providing debt for a client the Multi Group of Companies is a full scale commercial real estate platform."  Its specialties include "Acquisitons [sic], Equity Investments, Strategic Advisory Services, Debt Placement, Commercial Real Estate Industry."  It was founded in 1994, employs between 11 and 50 employees, and has its headquarters at 44 Wall Street, Second Floor, New York, NY.

399.   Verschleiser is, on information and belief, the direct or indirect owner, and principal control person of Multi Investments, LLC.

400.   According to the Multi Group web site, "With years of experience in successful real estate investment, development, and lending, Multi Investment has built a reputation for Expertise Backed by Results. We have demonstrated the ability to translate deep industry knowledge and continuous market tracking into successful business decisions. At Multi

Investment we maintain an unyielding entrepreneurial spirit, which keeps the pipeline full of exciting, high-growth opportunities. Our vision is to be the premier real estate investment and operating company in our markets as recognized by our people, our partners, and the investment community. Our Mission is to deliver exceptional work place environments and innovative solutions. Our people bring pride, passion and commitment to real estate."

401.    Verschleiser is, on information and belief, the direct or indirect owner, and principal control person of Multi Capital.

402.    According to the Multi Group web site, "Multi Capital is a Real Estate Investment Banking firm whose prime focus is our client's interest. As a part of The Multi Group of Companies, we have successfully been involved in excess of $7 billion Dollars of real estate transactions. Over the last decade, Multi Capital has built an array of complementary financial and advisory services. Today, Multi Capital offers, owners, investors and developers comprehensive debt structures, corporate advisory, and construction consulting services, as well access to a wide variety of investment and financial services. For Owners: Multi Capital is a Real Estate Investment Banking firm, specializing in the full spectrum of real estate financing. This is the case whether it is the acquisition or refinancing of an office building, shopping center, industrial building, mixed-use, multi-family property or health related facility. For Developers: In today's challenging development business building the right team is the single most important task you do to ensure your success. Our initial review in selecting the clients to work with begins by assessing what parts of the team are intact and which core disciplines are missing. Our emphasis is to consult and build out the balance of the team whenever necessary. We essentially have two sides that we offer our Developer clients, the Consulting side and the Capital side. While many of clients find their way to us in seek of capital we often find through discovery they need us for other development disciplines as well."

403.   Multi Group is a person distinct from the enterprise or enterprises known as Multi Investments and Multi Capital, which further comprise other persons with various employment, contractor or supplier relationships, and maintain staffed facilities in Manhattan, New York, and on information and belief, Brooklyn, New York and Hollywood, Florida.

404.   Multi Group is an umbrella entity which acts as the enterprise which oversees other entities which are affiliates of Verschleiser, each of which is also involved in the real estate business.

405.   Multi Group comprises an "enterprise" as defined in 18 U.S.C. § 1961(4).

406.   The Multi Group enterprise comprises other persons with various employment or contractor relationships, including without limitation the Class A Defendants, Multi Capital and Multi Investments.

407.   The Multi Group enterprise has an existence apart from and beyond the racketeering activity complained of in this action, and is an entity distinct from the person Eli Verschleiser.

408.   It is noteworthy that Verschleiser, who on numerous occasions has referred to himself as a "criminal" and who has great fondness for organized crime, chose "Multi Group" as the name for his umbrella entity. "Multi Group," according to Wikipedia, is a "business conglomerate in Bulgaria mostly known for its alleged involvement in various scandals and organized crime. Its founder is the Bulgarian businessman Iliya Pavlov, who was its leader until his assassination on March 7, 2003. In 1995, the Minister of Internal Affairs of the Republic of Macedonia, Ljubomir Frckoski, publicly claimed that 'a powerful multinational company from neighboring country' was behind the assassination attempt of Kiro Gligorov on 3 October 1995, with the Macedonian media pointing at Multigroup as a suspect."

***Interstate Commerce***

409.     The activities of the enterprise and the predicate acts of racketeering complained of here affect interstate commerce.

410.     Verschleiser and the other Class A Defendants affected interstate commerce through the use of mail, interstate wires and other instrumentalities of interstate commerce in executing their plan or scheme to defraud prospective investors and business associates of Frydman and his businesses into believing that false and fraudulent Internet postings and blogs, as well as entries on LinkedIn and Twitter, falsely identifying or manifesting themselves as having been posted by Frydman or his businesses, and using Frydman's name and likeness and the names and marks of his businesses, and asserting that the statements which state that Frydman is a "Fraudster", "Lowlife", "Criminal", "Thief", etc., are accurate, real or legitimate, and which were created, posted and transmitted with the intent to defraud the audience to whom they are directed, so as to cause the recipient or viewer not invest with or do business with Frydman.

411.     In executing this plan or scheme, it was reasonably foreseeable that the mail or wires will be used, and in fact the Class A Defendants did use the mail or wires or other instrumentalities of interstate commerce to further the scheme.

412.     Additionally, on information and belief, Multi Group uses Network Solutions as its domain hosting service, which in turn uses Web.com to host the Multi Group website, with both Network Solutions and Web.com's servers being located out-of-state in Florida, and uses Intermedia, an out-of-state Internet service provider being located in California, for its email exchange server through which it sends all of its Internet email communications as described above. As such, all Internet and website communications from Multi Group are carried over interstate wire transmissions no matter whether any particular recipient or viewer is located within or without New York.

413.    Verschleiser and Multi Group advertise and promote their businesses on LinkedIn and other Internet websites. All communications posted by Verschleiser and Multi Group through LinkedIn and other Internet websites make use of interstate wire communications.

414.    Each and every Internet posting placed by Verschleiser and the other Class A Defendants as hereinabove described make use of interstate wire communications.

415.    On information and belief, the advertisement posters and advertisement flyers disseminated by the Doe 1 – 15 Defendants at Caesars Palace & Convention Center during the aforementioned September 2014 REISA conference were transmitted from Verschleiser's and/or Multi Group's New York facility to Las Vegas by the use of the U.S. mail or an interstate common carrier, or transmitted over interstate wires and printed in Nevada.

416.    On information and belief, the fraudulent statements and misrepresentations submitted by Verschleiser to the *Real Deal* magazine as above described were transmitted by Verschleiser through the use of to the U.S. mail or by email transmission over interstate wires.

417.    The fraudulent statements and misrepresentations complained of here were relied on by Plaintiffs' and their affiliates' existing and prospective business associates, investors and lenders, as well as industry executives who attended the foregoing REISA conference and the public at large, who made decisions not to invest with or otherwise not do business with Plaintiffs and their affiliates in reliance on said fraudulent statements and misrepresentations.

*Pattern of Racketeering*

418.    Verschleiser and the other Class A Defendants have violated the provisions of 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the conduct of the affairs of an enterprise or enterprises, through a pattern of racketeering activity, as further set forth with the required specificity under each separate count.

419.    The pattern of racketeering activity described here and conducted and operated by Verschleiser and the other Class A Defendants commenced on or about December 4, 2013 and continues through the present day.

420.    The pattern of racketeering conducted by Verschleiser and effected by the Class A Defendants consisted of multiple predicate acts which are related and continuous and have the same or similar purposes, results, participants, victims, methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events, the last of which occurred within 10 years after the commission of a prior act of racketeering activity as described above, and as such constitute a "pattern of racketeering" as defined in Section 1961(5) of RICO.

421.    The pattern of racketeering conducted by Verschleiser and the other Class A Defendants as set forth here has continued on a consistent basis since December 4, 2013, has seen no cessation, and in fact has been escalating with greater frequency over time, which evidences an ongoing threat of continuity.

422.    The pattern of racketeering conducted by Verschleiser and the other Class A Defendants in violation of 18 U.S.C. § 1962(c) has caused injury to the business and property of Plaintiff as contemplated by 18 U.S.C. §1964(c), as set forth with the required specificity under each separate count.

### *Racketeering Activity*

423.    Verschleiser and the other Class A Defendants' predicate acts as above set forth constitutes "racketeering activity" as defined in section 1961(1) of RICO, in that they involve criminal violations of the of the CFAA, the ECPA, the SCA and New York Penal Law Article 156 (relating to offenses involving computers); mail and wire fraud in violation of 18 U.S.C. Chapter 63; perjury in violation of violation of the Federal Perjury Statute, 18 U.S.C. § 1621; attempted extortion; violation of the Hobbs Act, 18 U.S.C. § 1951, filing false claims in a state

court lawsuit and falsifying evidence and committing perjury in connection therewith; conducting a common enterprise to perpetuate Internet scams on unsuspecting existing and prospective business associates and investors of Frydman and his businesses; and making false and fraudulent claims against Frydman in advertisings, websites, domains or subdomains, blogs and other Internet posts under a variety of names that all infringe upon his name, likeness, and the names and marks of his businesses; and violations of the Lanham Act, 15 U.S.C. § 1125(a), trespassing upon and through Caesars Palace & Convention Center during the September 2014 REISA conference to perpetuate a fraud upon participants at that conference by making false and fraudulent advertising claims against Frydman and directing the readers of same to a false and fraudulent blog, all with the intent to damage the business and property of Plaintiffs and their affiliates.

### *Injury*

424.     Plaintiffs are each a "person" who sustained injury to his business or property by reason of Defendants' violation of Sections 1962 of RICO.

425.     Plaintiffs' injuries under Section 1962(c) stems from the predicate acts conducted by the Class A Defendants as described above.

426.     Plaintiffs' injuries under Section 1962(d) stems from the overt acts committed by the Class A Defendants as here stated.

### *Statute of Limitations*

427.     The complained-of unlawful activities are ongoing.  The doctrine of continuing tort or injury applies to the claims asserted here.  Therefore, there is no time bar to this action other than the 10-year outer limit for civil RICO.

### *Standing to sue*

428.     Plaintiffs' standing to bring civil RICO claims will be established by them showing a pattern of violation of 18 U.S.C. § 1962 by the Class A Defendants, with such violations directly causing injury to Plaintiffs' business or property, which Plaintiffs allege here and set forth with the required specificity herein under each separate count.

## COUNT I

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### SECTION 1962(c)

429.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth here.

430.     This Count is against Verschleiser and the other Class A Defendants.

431.     Multi Group is an enterprise engaged in and whose activities affect interstate commerce.

432.     Verschleiser and the other Class A Defendants are employed by or associated with the enterprise.

433.     Verschleiser and the other Class A Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally injuring Plaintiffs and their businesses.

434.     Pursuant to and in furtherance of their fraudulent scheme, Verschleiser and the other Class A Defendants committed multiple related acts of racketeering activity in the form of the predicate acts identified above.

435.     The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

436.    Verschleiser and the other Class A Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above in violation of 18 U.S.C. § 1962(c).

437.    Verschleiser and the other Class A Defendants' fraudulent scheme complained of constitutes a fraud upon everyone that Frydman and his businesses rely on to transact business, as set forth above.

438.    As a direct and proximate result of Verschleiser and the other Class A Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that they have been denied valuable business opportunities, have suffered damage to their business and property, and have suffered irreparable damage to their business reputations and goodwill.

439.    Specifically, and as shall be proven at trial, Plaintiffs and/or their affiliates lost a $10 million mortgage loan being negotiated with Bancorp, lost a $1.4 million lease being negotiated with Opera Real Estate, lost joint venture opportunities, lost numerous prospective selling agreements, lost numerous prospective investors, lost numerous business opportunities, lost sales of common stock of the REIT, have had members of the REIT's selling group terminate or suspend selling agreements, suffered irreparable damage to their business reputation and goodwill; and otherwise suffered severely as shall be proved at trial.

440.    As a result of Verschleiser and the other Class A Defendants' violations of Section 1962(c) of RICO, Plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $160 million.

441.    18 U.S.C. § 1964(c) creates a private right of action for treble damages for the criminal wrongs complained of here.

## COUNT II

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### SECTION 1962(d) - CONSPIRACY

442.    The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

443.    This Count is against Verschleiser and the other Class A Defendants.

444.    Verschleiser and the other Class A Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by conducting and participating in the conduct of the affairs of the enterprise through a pattern of racketeering activity as above set forth.

445.    Verschleiser and the other Class A Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the foregoing conduct so as to constitute a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

446.    As a direct and proximate result of the conspiracy, the overt acts taken in furtherance of it, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that they have been denied valuable business opportunities, have suffered damage to their business and property, and have suffered irreparable damage to their business reputations and goodwill.

447.    As a result of Verschleiser and the other Class A Defendants' violations of Section 1962(d) of RICO, Plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $160 million.

## COUNT III

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### SECTION 1964(a) - EQUITABLE RELIEF

448.    The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

449.     This Count is against Verschleiser and the other Class A Defendants.

450.     18 U.S.C. § 1964(a) empowers district courts to "prevent and restrain" Racketeer Influenced and Corrupt Organization Act violations, thus authorizing injunctive relief.  It does so generally rather than limiting the jurisdiction conferred only to cases brought by the Attorney General or some other public actor.

451.     As a direct and proximate result of Verschleiser and the other Class A Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered the continuing loss of their goodwill and reputation. That continuing loss cannot be properly calculated and thus constitutes irreparable harm and an injury for which Plaintiffs have no adequate remedy at law.

452.     Plaintiff will continue to suffer irreparable harm unless this Court enjoins Verschleiser and the other Class A Defendants' racketeering activities and conduct.

## COUNT IV

### DIRECT VIOLATIONS OF THE LANHAM ACT, FEDERAL
### UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN
### 15 U.S.C. § 1125(a)

453.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

454.     This Count is against Verschleiser and the other Class A Defendants.

455.     Plaintiffs' standing to bring claims under the Lanham Act, and state unfair competition and trade practices law is established by the business competitor relationship between Plaintiffs on the one hand and Verschleiser and Multi Group and their respective agents, employees and consultants on the other hand.

456.     As explained above, Verschleiser and the Class A Defendants have created, or caused Does 1-15 to create on their behalf, and posted, published and or transmitted, websites,

domains or subdomains, blogs and/or Internet postings which were created, posted, published and/or transmitted to deceive the public into believing the truth of the false and fraudulent statements made therein about Frydman and his businesses, by creating advertising flyers and posters which were directed towards attendees at the September 2014 national REISA conference asking them to "google" Frydman so as to bring up search results including fake websites, domains, blogs, and other Internet postings; by misusing Frydman's name and likeness and the name, likeness and marks of his businesses with the sole intent to cause injury and damage to Plaintiffs, their property and their businesses.

457.    If one were to search the Internet during the relevant period referenced herein through a search engine such as Google, Bing or Yahoo! and type in Frydman's name or United Realty's name, the results generated would include numerous fake websites, domains or subdomains, blogs and postings, including without limitation those described above, that prominently display Frydman's name and likeness and the names and marks of his businesses which were created by or at the direction of Verschleiser and the other Class A Defendants, with the sole intent and purpose to deceive persons with whom Plaintiffs do business and the public and cause the public to confuse said websites, domains or subdomains, blogs and postings as "real" or "legitimate," when in fact they are materially false and fraudulent and maliciously created or posted with the intent to cause harm and damage to Plaintiffs and their businesses.

458.    These fake websites, domains or subdomains, blogs postings and advertisements all include Frydman's name, and often also include his likeness. These fake websites, domains or subdomains, blogs postings and advertisements usually also include United Realty's name and marks.

459.     Often Frydman's name is juxtaposed to the word "fraud", "scam" and "criminal, as in "Jacob Frydman Fraud", "Jacob Frydman Scam", "United RealtyJacob Frydman Fraud" and "Jacob Frydman Criminal Fraud."

460.     These fake websites, domains or subdomains, blogs and posts falsely and fraudulently explicitly state that Frydman is a "fraudster", "criminal", "thief", "lowlife", "scam artist", "con man", and the like.

461.     Many of the fake websites, domains, blogs and posts also use a photograph of the likeness of Frydman, oftentimes with the word "FRAUD", alone or with other defamatory words, either over, above or below said photograph.

462.     Verschleiser and the other Class A Defendants have used, and are continuing to use false and misleading descriptions and representations of fact about Frydman and his businesses which are intended to cause existing and prospective investors and business associates not to invest with or transact business with Frydman and his businesses, which false and misleading statements reasonably would influence the intended audience to elect not to invest with or transact business with them, when in fact such statements are inaccurate, false, fraudulent and/or misleading.

463.     The inaccurate, false, fraudulent and/or misleading statements made by Verschleiser and the other Class A Defendants concern the nature, characteristics and qualities of Frydman and his businesses and the products and/or or services he offers suitable investors.

464.     The inaccurate, false, fraudulent and/or misleading statements made by Verschleiser and the other Class A Defendants are material, in that a significant number of prospective investors or business associates who are the intended audience of those statements would likely attach importance to them in determining whether to invest with, or transact business with, Frydman and his businesses.

465.     An existing or prospective investor considering an investment in a security offered or sponsored by Frydman or the REIT would likely consider and be influenced by claims that Frydman is a thief, criminal, fraudster, scam artist, Ponzi schemer, etc. in making an investment decision.

466.     Similarly, an existing or prospective business associate, lender or vendor considering a business transaction with Frydman or his businesses would likely consider and be influenced by such claims or a claim that Frydman "screws" everyone he deals with in making an a decision as to whether to transact business with Frydman or his businesses.

467.     The inaccurate, false, fraudulent and/or misleading statements made by Verschleiser and the other Class A Defendants as above described are representations regarding commercial matters, and were made in commercial advertising or promotion.

468.     The false and misleading statements made by Verschleiser and the other Class A Defendants about Frydman and his businesses as above described were made in connection with services and products offered by Frydman and his businesses which are used in commerce.

469.     Plaintiffs have been, and are likely to continue to be damaged by the false and misleading statements made by Verschleiser and the other Class A defendants as above set forth.

470.     Plaintiffs have not authorized Verschleiser and the other Class A defendants to use Frydman's name or likeness or the names or marks of his businesses in any of said fake websites, domains or subdomains, blogs, posts or advertisements.

471.     Plaintiffs have not sponsored or approved any of Verschleiser and the other Class A defendants' websites, domains or subdomains, blogs, posts, and advertisements which wrongly use Frydman's name and likeness and the names and marks of his business.

472.     Verschleiser and the other Class A defendants adopted and continue to use in commerce Frydman's name and likeness and the names and marks of his business, with full

knowledge of their infringing use of Frydman's name and likeness and the names and marks of his businesses to cause confusion, mistake and/or deception.

473.    Verschleiser and the other Class A defendants have deliberately and willfully attempted to trade on Frydman's name and likeness and the names and marks of Frydman's businesses in an effort to damage Frydman and his business's reputations in connection with the products and services which they offer, as well as in order to confuse consumers as to the origin and sponsorship of the websites, domains or subdomains, blogs, posts, and advertisements wrongfully created and disseminated, posted or published by Verschleiser and the other Class A defendants to pass same off as describing the services and products of Plaintiffs in commerce.

474.    Verschleiser and the other Class A defendants' unauthorized and tortious conduct has also deprived and will continue to deprive Plaintiffs of the ability to control the perception of Plaintiffs and the products and services offered by Plaintiffs and their affiliates and injuring the reputation and goodwill of Plaintiffs and their affiliates.

475.    Verschleiser and the other Class A defendants' conduct is likely to cause confusion, mistake or deception as to the affiliation, connection or association of the Class A Defendants' scheme with respect to Plaintiffs, and as to the origin, sponsorship or approval of Plaintiffs and the products and services offered by Plaintiffs and their businesses, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1).

476.    As a result of Verschleiser and the other Class A Defendants' aforesaid conduct, Plaintiffs have suffered commercial damage, as well as the continuing loss of the goodwill and reputation established by Plaintiffs in their and their affiliates' marks.

477.    As a result of Verschleiser and the other Class A Defendants' violations of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1), Plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $160 million as a result of, among other things:

a.  existing members of the selling group of soliciting broker dealers cancelling or suspending selling agreements with Plaintiffs or their affiliates;

b.  broker dealers who were considering becoming part of the selling group of soliciting broker dealers ceasing their due diligence inquiries or otherwise electing not to do business with Plaintiffs or their affiliates;

c.  financial advisors who are or were associated with members of the selling group of soliciting broker dealers cancelling their investor clients' subscriptions for the purchase of the common stock of the REIT;

d.  financial advisors who are or were associated with members of the selling group of soliciting broker dealers electing not to sell shares in the REIT and other financial services products sponsored by Plaintiffs or their affiliates;

e.  Lenders with whom Plaintiffs or their affiliates were negotiating loans, and/or from whom Plaintiffs were seeking credit denying new credit to Plaintiffs;

f.  Lenders who issued term sheets, applications or indications of interest to lend money to Plaintiffs and/or their affiliates terminating such term sheets, applications or indications of interest or on negatively modifying the terms on which such loans would be made;

g.  Sellers of financial services and/or broker dealer firms with whom Plaintiffs were negotiating transactions electing not to do business with Plaintiffs;

h.  Sellers of financial services and/or broker dealer firms with whom Plaintiffs had entered into non-disclosure agreements, term sheets and/or letters of intent terminating or electing not to proceed with respect to said transactions;

i.  Sellers of real estate assets with whom Plaintiffs were negotiating, and/or had entered into non-disclosure agreements, term sheets and/or letters of intent

terminating or electing not to proceed with Plaintiffs with respect to said transactions;

j.   Potential merger targets with whom Plaintiffs were negotiating merger agreements electing not to proceed with the proposed mergers;

k.   Potential licensors of branded trademarks with whom Plaintiffs were negotiating licensing agreements electing not to finalize such license agreements; and

l.   Otherwise as shall be proved at the trial in this action.

478.   Pursuant to 15 U.S.C. § 1125, in assessing damages the court may enter judgment, according to the circumstances of the case, for treble damages in any sum above the amount found as actual damages, not exceeding three times such amount.

## COUNT V

### VIOLATIONS OF THE LANHAM ACT
### INJUNCTIVE RELIEF
### 15 U.S.C. § 1125(a)

479.   The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

480.   This Count is against Verschleiser and the other Class A Defendants.

481.   By reason of the foregoing, Plaintiffs hereby asserts a claim against Verschleiser and the other Class A Defendants for injunctive and monetary relief pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), with regards to the false designation of origin and false descriptions and representations in commerce.

482.   As a result of Verschleiser and the other Class A Defendants' aforesaid conduct, Plaintiffs have suffered commercial damage, as well as the continuing loss of the goodwill and reputation established by Plaintiffs in their businesses and marks.

483.     This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which Plaintiffs have no adequate remedy at law.

484.     Plaintiffs will continue to suffer irreparable harm unless this Court enjoins Verschleiser and the other Class A Defendants' conduct.

## COUNT VI

### VIOLATIONS OF THE ANTI-CYBERSQUATTING CONSUMER PROTECTION ACT (CYBERPIRACY)
### 15 U.S.C. § 1125(d)

485.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

486.     This Count is against Verschleiser and the other Class A Defendants.

487.     As alleged above, Verschleiser and the other Class A Defendants have registered, trafficked in, and/or used numerous Internet domain names that contain or consist of Frydman's and United Realty's names and marks, which under 15 U.S.C. § 1125(d) (1) (A) includes a personal name which is protected as a mark (the "Infringing Internet domain Names"), including, without limitation each of the URLs identified above.

488.     Verschleiser and the other Class A Defendants, without regard to the goods or services of the parties, are using the Infringing Internet domain Names (which include Frydman's name) without Plaintiffs' authorization, and with a bad faith intent to profit from Frydman's and United Realty's names and marks by diverting and doing business with those persons who, but for Verschleiser's and the other Class A Defendants' wrongful conduct, would have done business with Plaintiffs, in violation of 15 U.S.C. § 1125(d), as Frydman and United Realty's names and marks are distinctive, and are identical or confusingly similar to the names and marks being used by Verschleiser and the other Class A Defendants to deceive prospective investors

and business associates of Frydman and United Realty from investing with, or doing business with, them.

489.    Verschleiser and the other Class A Defendants' use of Frydman's and United Realty's names and marks with the intent to divert consumers, prospective investors and business associates of Plaintiffs to numerous sites accessible under domain names that could harm the goodwill represented by their names and marks, either for commercial gain or with the intent to tarnish or disparage the names and marks, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of said sites.

490.    The Infringing Internet Domain Names do not resolve to websites or blogs owned, licensed or controlled by Plaintiffs.  Rather, they resolve to websites controlled and/or used by Verschleiser and the other Class A Defendants.

491.    Verschleiser and the other Class A Defendants did not, and could not, reasonably have believed that their use of the Infringing Internet Domain Names constituted fair use or was otherwise lawful.

492.    As a result of Verschleiser and the other Class A Defendants' wrongful use of the Infringing Internet Domain Names, Plaintiffs have suffered substantial damages, as well as the continuing loss of goodwill and reputation. This continuing loss cannot be properly calculated and thus constitutes irreparable harm and an injury for which Plaintiffs have no adequate remedy at law. PlaintiffS will continue to suffer irreparable harm unless this Court enjoins Verschleiser and the other Class A Defendants' conduct and orders that the Infringing Internet Domain Names be transferred to one or more of Plaintiffs.

493.    As a result of  Verschleiser and the other Class A Defendants' violations of the Anti-Cybersquatting Consumer Protection Act (Cyberpiracy), 15 U.S.C. § 1125(d), Plaintiffs

have been damaged in an amount to be determined at trial believed to be not less than $160 million.

494.     Pursuant to 15 U.S.C. § 1125, in assessing damages the court may enter judgment, according to the circumstances of the case, for treble damages in any sum above the amount found as actual damages, not exceeding three times such amount.

495.     Additionally, Plaintiffs request that Verschleiser and the other Class A Defendants' use and operation of domains or subdomains containing and using Frydman's and United Realty's names and marks and the names and marks of Frydman's other businesses be preliminarily and permanently enjoined and removed from the Internet.

## COUNT VII

## COMMON LAW UNFAIR COMPETITION

496.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

497.     This Count is against Verschleiser and the other Class A Defendants.

498.     Plaintiffs have protected and/or protectable common law rights in their distinct and valuable names and marks, and in the distinct and valuable names and marks of their businesses.

499.     Plaintiffs and their businesses use names and marks in commerce and in conjunction with their legitimate business operations, and have expended time, labor and talent in establishing their good name in commerce.

500.     As set forth in detail above, Verschleiser and the other Class A Defendants have engaged in unfair competition by intentionally using Plaintiffs' names and likeness to trade on Plaintiffs' names and marks in order to confuse consumers.

501.     The Class A Defendants' conduct has, and is likely to continue to cause, confusion, mistake or deception with respect to the Plaintiffs' activities in the mind of the public, and/or as

to the affiliation, connection or association of Plaintiffs with the false and fraudulent websites, domains, blogs, posts and advertisements created, posted, distributed and/or transmitted by Verschleiser and the other Class A Defendants.

502.    Verschleiser and the other Class A Defendants have misappropriated Plaintiffs' property rights for commercial advantage.

503.    Verschleiser and the other Class A Defendants have acted unfairly by committing the wrongs described above.

504.    The actions of Verschleiser and the other Class A Defendants as described above were undertaken intentionally and in bad faith.

505.    Verschleiser and the other Class A Defendants' unlawful and willful conduct as described above constitutes unfair competition and false designation of origin in violation of Plaintiffs' rights at common law.

506.    Verschleiser and the other Class A Defendants' unlawful and unfair conduct has led to a material diminution of the reputation and goodwill established by Plaintiffs in their names and marks.

507.    Verschleiser and the other Class A Defendants' common law unfair competition violations have directly and proximately caused and continue to cause injury and damage to Plaintiffs by, among other things, causing Plaintiffs to lose control of their business reputations, causing confusion, diverting customers, investors, sales, and otherwise causing significant commercial loss.

508.    Verschleiser and the other Class A Defendants' violations of law have damaged Plaintiffs in an amount to be determined at trial believed to be not less than $160 million.

509.     Additionally, as a result of Verschleiser and the other Class A Defendants' unfair competition, Plaintiffs have suffered, and will continue to suffer, irreparable harm and Plaintiffs have no adequate remedy at law.

510.     Additionally, Plaintiffs request that Verschleiser and the other Class A Defendants' operation of domains or subdomains containing and using Frydman and United Realty's names and marks and the name and marks of their businesses be preliminarily and permanently enjoined.

## COUNT VIII

## FRAUD AGAINST CLASS A DEFENDANTS

511.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

512.     This Count is against Verschleiser and the other Class A Defendants.

513.     Defendant Verschleiser and the other Class A Defendants intentionally made numerous representations of material facts which were and are untrue, and which Defendant Verschleiser and the other Class A Defendants knew to be untrue, and which were made with the intent to deceive, and for the purpose of being re-published and to mislead Plaintiffs' existing and prospective investors and business associates and other audiences to which the representations were directed to curtail or not do business with or not invest with Plaintiffs, and which were reasonably relied on by the recipients of said representations, thereby depriving Plaintiffs of property or legal rights or otherwise causing injury and damage to Plaintiffs.

514.     The conduct of Verschleiser and the other Class A Defendants as above set forth constitutes fraud.

515.    As a result of the fraud committed by Verschleiser and the other Class A Defendants, Plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $160 million.

516.    In addition to such damages, Plaintiffs seek punitive damages as a result of the egregious and/or public nature of the fraud committed by Defendant Verschleiser and the other Class A Defendants.

## COUNT IX

### MALICIOUS PROSECUTION
### WITH RESPECT TO THE FIRST DEFAMATORY LAWSUIT

517.    The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

518.    This Count is against Verschleiser.

519.    Verschleiser filed the First Defamatory Lawsuit without probable cause to do so and with malice as a motivating factor. In initiating the First Defamatory Lawsuit Verschleiser did not have reasonable grounds to believe the allegations made in that proceeding, and he initiated the First Defamatory Lawsuit with a purpose other than obtaining a judgment in the proceeding.

520.    The First Defamatory Lawsuit was dismissed with prejudice in favor of defendants in that Lawsuit which included Frydman.

521.    Verschleiser filed a notice of appeal with respect to that dismissal.

522.    Verschleiser failed to timely perfect his appeal.

523.    Verschleiser withdrew his notice of appeal.

524.    The filing of the First Defamatory Lawsuit constitutes malicious prosecution.

525.     As a result of malicious prosecution, Plaintiff Frydman has been damaged in an amount to be determined at trial believed to be not less than $20 million.

## COUNT X

### MALICIOUS PROSECUTION
### WITH RESPECT TO THE THIRD DEFAMATORY LAWSUIT

526.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

527.     This Count is against Verschleiser and Akerman.

528.     Verschleiser and Akerman conspired to file a false and fraudulent lawsuit, the Third Defamatory Lawsuit, without probable cause to do so and with malice as a motivating factor.

529.     Akerman initiated the Third Defamatory Lawsuit as the criminal instrumentality of Verschleiser, solely to leak that Lawsuit to the media in order to defame and cause injury to Frydman. In initiating the Third Defamatory Lawsuit neither Verschleiser nor Akerman had reasonable grounds to believe the allegations made in that proceeding, and they initiated or caused the First Defamatory Lawsuit to be initiated with a purpose other than obtaining a judgment in that proceeding.

530.     The Third Defamatory Lawsuit used, and was based at least in large part on, the Stolen Trade Secrets.

531.     By virtue of the foregoing, the filing of the Third Defamatory Lawsuit also constituted an express violation of the TRO and preliminary injunction issued in this action

532.     Akerman has discontinued the Third Defamatory Lawsuit with prejudice in favor of Plaintiff Frydman.

533.    The acts of Defendant Verschleiser in causing Akerman to initiate and file the Third Defamatory Lawsuit and Akerman's initiation of the Third Defamatory Lawsuit constitute malicious prosecution.

534.    As a result of Defendants Verschleiser and Akerman's malicious prosecution, Plaintiff Frydman has been damaged in an amount to be determined at trial believed to be not less than $20 million.

**COUNT XI**

**LIBEL**

535.    The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

536.    This Count is against Verschleiser, Akerman, Wright, Gulko, FF, Fishoff, Vegh, JH, Jaffa, WF, Rand, and Appel (the "Libel Defendants").

537.    The Libel Defendants knowingly initiated/filed and/or conspired to file the First Defamatory Lawsuit, the Second Defamatory Lawsuit, the Third Defamatory Lawsuit and/or the False Claims Letter knowing that they had no basis to do so, and asserting false and fraudulent defamatory statements in said Lawsuits and the False Claims Letter solely in order to leak same to the media so as to dupe the media into republishing said defamatory statements.

538.    In furtherance of their scheme, and after the initiation of each of the First Defamatory Lawsuit, the Second Defamatory Lawsuit, the Third Defamatory Lawsuit and/or the False Claims Letter, the Libel Defendants leaked said First Defamatory Lawsuit, the Second Defamatory Lawsuit, the Third Defamatory Lawsuit and/or the False Claims Letter to media outlets, including without limitation *Real Deal*, *Law 360*, *Investment News* and the New York Post, and on the Internet as well.

539.     On information and belief, the Libel Defendants will assert that one or more of such statements are protected under the common law privilege generally applicable to statements made in the course of judicial proceedings.

540.     The Libel Defendants are not entitled to immunity for the above statements because the First Defamatory Lawsuit, the Second Defamatory Lawsuit, the Third Defamatory Lawsuit and/or the False Claims Letter were brought solely for the purpose of cloaking said statements with the appearance of privilege.  Further, the Libel Defendants' statements were not made in furtherance of any litigation objective and were not reasonably related to the subject matter of the proceedings.

541.     Said statements were and are false.

542.     Said statements were defamatory per se on their face, and because they have injured Plaintiffs in their business and profession.

543.     In publishing those defamatory statements, the Libel Defendants wrongfully and willfully intended by such publication to injure Frydman's personal and business reputation and to injure the other Plaintiffs' business reputations and good names.

544.     At the time the Libel Defendants uttered and caused to be published the libelous matter set forth above, they acted with actual malice because they knew the statements were false or, in the alternative, they failed to ascertain the accuracy of the statements and instead published them with reckless or grossly negligent disregard for the truth whether they were true or not.

545.     *Real Deal*, *Law 360* and *Investment News* published/re-published the libelous matter set forth above, and failed to ascertain the accuracy of the statements and instead published them with reckless or grossly negligent disregard for whether they were true or not.

546.     As a direct result of the foregoing defamatory conduct and statements, Frydman has suffered injury to his personal and business reputation, and the other Plaintiffs have suffered

injury to their business reputations and good names, and have been damaged in an amount to be determined at trial believed to be in excess of $160 Million.

547.    In addition, because of the wanton, willful and malicious nature of the foregoing wrongful conduct, Plaintiffs are also entitled to recover punitive damages.

## COUNT XII

## TRADE LIBEL

548.    The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

549.    This count is against Verschleiser and the other Class A Defendants.

550.    The actions of Verschleiser and the other Class A Defendants as above set forth constitute trade libel as Verschleiser and the other Class A Defendants knowingly published false matters that are derogatory to Plaintiffs' business and which were calculated to prevent or interfere with relationships between Plaintiffs and others to Plaintiffs' detriment.

551.    The statements knowingly published by Verschleiser and the other Class A Defendants were false, were published to third persons, were published with malice, and resulted in damages to Plaintiffs.

552.    As a result of the trade libel committed by Verschleiser and the other Class A Defendants, Plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $160 million.

553.    In addition, because of the wanton, willful and malicious nature of the foregoing wrongful conduct, Plaintiffs are also entitled to recover punitive damages.

## COUNT XIII

## LIBEL PER SE

554.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

555.     This Count is against Verschleiser and the other Class A Defendants.

556.     The actions of Verschleiser and the other Class A Defendants set forth above constitute libel per se.

557.     As set forth above, Verschleiser and the other Class A Defendants made written defamatory statements of fact concerning Plaintiffs, which they published to third parties, with actual malice, which were false, which were per se actionable and which have harmed and will continue to harm Plaintiffs' reputations, including lowering those reputations and/or deterring investors and other business associates and prospective investors and business associates and others from investing with, associating and/or dealing with Plaintiffs.

558.     The Class A Defendants' conduct amounts to libel per se under the law and damages are presumed.

559.     As a result of the Class A Defendants' conduct constituting libel per se, Plaintiffs have been damaged in that they have suffered humiliation, embarrassment, injury to reputation and standing in the community, mental suffering, and anguish and anxiety, in an amount to be determined at trial believed to be not less than $50 million.

560.     In addition, because of the wanton, willful and malicious nature of the foregoing wrongful conduct, Plaintiffs are also is entitled to recover punitive damages.

## COUNT XIV

## MISAPPROPRIATION OF TRADE SECRETS

561.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

562.     This Count is against Verschleiser, Delforno, Onica, Pinhasi, Akerman, Wright, Gulko, FF, Fishoff, Vegh, JH, Jaffa, WF, Rand, Appel, and Intermedia.

563.     The actions of Verschleiser, Delforno, Onica and Pinhasi in hacking in to Plaintiffs' email exchange servers and stealing highly confidential information relating to whom Plaintiffs were then transacting business, and specifically, that Plaintiffs were then negotiating with Bancorp for a $10 million loan, and with Opera Real Estate to sublease new corporate facilities at 180 Maiden Lane, and then improperly using that information to Plaintiffs' detriment constitutes the misappropriation of trade secrets.

564.     Verschleiser, Delforno, Onica and Pinhasi could not have hacked into Plaintiffs' email exchange servers were it not for Intermedia's negligence and/or recklessness in permitting Verschleiser access to Host Pilot for those servers after being instructed not to permit same by Frydman on December 3, 2013.

565.     As a result of their hacking as permitted by Intermedia, Verschleiser, Delforno, Onica and Pinhasi learned of the identities of Bancorp and Opera Real Estate in breach of the Separation Agreement and as a result of discovery by improper means.

566.     That information was confidential and protected so as to constitute trade secrets.

567.     Verschleiser, Delforno, Onica and Pinhasi acquired said trade secrets through a breach of confidence, by fraud and bad faith, or by unfair means, all with the knowing or reckless assistance of Intermedia.

568.     Verschleiser, Delforno, Onica and Pinhasi used or disclosed said trade secrets to the detriment of Plaintiffs by sending "anonymous" emails allegedly from informedconsumer@mail.com to representatives of both Bancorp and Opera Real Estate with the intent and for the purpose of injuring Plaintiffs and their businesses.

569. As a result of the misappropriation of trade secrets by Verschleiser, Delforno, Onica and Pinhasi with the assistance of Intermedia as above set forth, Plaintiffs have been damaged in that they lost a $10 million loan and a $1.4 million, below market sublease.

570. As a result of such misappropriation by Verschleiser, Delforno, Onica and Pinhasi with the assistance of Intermedia, Plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $12 million.

571. Verschleiser, Akerman, Wright, Gulko, FF, Fishoff, Vegh, JH, Jaffa, WF, Rand, and Appel all conspired to steal the Stolen Trade Secrets.

572. Verschleiser, Wright, Gulko, FF, Fishoff, Vegh, JH, Jaffa, WF, Rand, and Appel effected their scheme through Akerman, who at the time was the chief compliance officer of CLS, and had access to the Stolen Trade Secrets.

573. Pursuant to their conspiracy, Verschleiser, Akerman, Wright, Gulko, FF, Fishoff, Vegh, JH, Jaffa, WF, Rand, and Appel illegally used and disclosed the Stolen Trade Secrets in connection with the initiation of the Second Defamatory Lawsuit and the Third Defamatory Lawsuit.

574. Pursuant to their conspiracy, Verschleiser, Akerman, Wright, Gulko, FF, Fishoff, Vegh, JH, Jaffa, WF, Rand, and Appel illegally used and disclosed the Stolen Trade Secrets in leaking the Second Defamatory Lawsuit and the Third Defamatory Lawsuit to the media.

575. As a result of the misappropriation of trade secrets by Verschleiser, Akerman, Wright, Gulko, FF, Fishoff, Vegh, JH, Jaffa, WF, Rand, and Appel as above set forth, Plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $50 million.

## COUNT XV

## INJURIOUS FALSEHOOD

- 130 -

576.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

577.     This count is against Verschleiser and the other Class A Defendants.

578.     Verschleiser and the other Class A Defendants knowingly published false and derogatory matter with respect to Plaintiffs' businesses of a kind calculated to prevent others from dealing with Plaintiffs and their businesses or otherwise intending to, and in fact, interfering with Plaintiffs' relations with others, to Plaintiffs' detriment.

579.     Verschleiser and the other Class A Defendants' conduct as above described constitutes the tort of injurious falsehood in that the statements published by them in websites, domains, blogs, internet posts and advertisements, and with respect to the False Claims Letter, which was leaked to the media, and with respect to statements made by Verschleiser and Wright to the *New York Post*, *Law 360*, *Investment News* and the *Real Deal*, and which were re-published by said publications,   were false and fraudulent, were published and/or re-published to third persons, with malice, and resulted in special damages.

580.     The statements made were intended to, and did denigrate Plaintiffs and the quality of Plaintiffs' businesses, products and services.

581.     The statements were intended to, and did cause the audiences of the statements to assume that Plaintiffs' investment products, and specifically the REIT, did not meet regulatory requirements or standards for the sale of securities, or was a fraudulent scheme which would result in investors losing their money.

582.     As a direct result of Verschleiser and the other Class A Defendants' commission of the tort of injurious falsehood, Plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $160 million.

583.     In addition, because of the wanton, willful and malicious nature of the foregoing wrongful conduct, Plaintiffs are also is entitled to recover punitive damages.

## OTHER FACTS COMMON TO TORTIOUS INTERFERENCE
## WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS

584.     Plaintiffs sponsor pooled real estate investment vehicles and funds, and raise capital primarily through the independent broker dealer network.

585.     Plaintiffs and their affiliates have numerous existing business relationships with numerous FINRA member broker dealers, thousands of registered representatives associated with such broker dealers, and hundreds of existing investors, in addition to other business relationships with persons engaged in the various areas of the real estate business.

586.     In addition, Plaintiffs consistently seek to develop new business relationships with the intention of entering into new contractual and other business relationships with hundreds of broker dealers, thousands of registered representatives associated with such broker dealers, and prospective investors, in addition to other prospective business relationships.

587.     Plaintiffs have personnel devoted to market to and develop new business relationships.

588.     Plaintiffs have been well positioned to raise capital, acquire assets and develop business relationships, but have been stymied by the illegal, wrongful malicious and intentional acts of Verschleiser and the other Class A Defendants as complained of here.

589.     Plaintiffs have contractual and prospective contractual relationships with independent broker dealers who search Frydman's and his businesses' names on search engines and view the prominent display of websites, domains, blogs and other Internet postings wrongfully created, posted, published and/or transmitted by Verschleiser and one or more of the other Class A Defendants.

590.     Plaintiffs have business relationships and prospective business relationships with registered representatives associated with independent broker dealers who search Frydman's and his businesses' names on search engines and view the prominent display of websites, domains, blogs and other Internet postings wrongfully created, posted, published and/or transmitted by Verschleiser and one or more of the other Class A Defendants.

591.     Plaintiffs have contractual and prospective contractual relationships with clients of registered representatives associated with independent broker dealers who have invested in, and who may invest in, investment opportunities sponsored by Frydman and his businesses, who search Frydman's and his businesses' names on search engines and view the prominent display of websites, domains, blogs and other Internet postings wrongfully created, posted, published and/or transmitted by Verschleiser and one or more of the other Class A Defendants .

592.     Plaintiffs have contractual and prospective contractual relationships with owners of real estate assets who have properties for sale, real estate brokers and intermediaries, lenders and special servicers, title companies and qualified 1031 intermediaries who have access to real estate assets which potentially could be attractive acquisitions for Frydman and his businesses, each of whom search Frydman's and his businesses' names on search engines and view the prominent display of websites, domains, blogs and other Internet postings wrongfully created, posted, published and/or transmitted by Verschleiser and one or more of the other Class A Defendants.

593.     Plaintiffs have contractual and prospective contractual relationships with banks, insurance companies and other financial institutions, through investors and non-traditional lenders, and through intermediaries such as mortgage brokers who have access to debt and equity capital which potentially could be lent to or invested with Frydman and his businesses, each of whom search Frydman's and his businesses' names on search engines and view the prominent

display of websites, domains, blogs and other Internet postings wrongfully created, posted, published and/or transmitted by Verschleiser and one or more of the other Class A Defendants.

594.   Plaintiffs have contractual and prospective contractual relationships with tenants and leasing brokers who have access to tenants who are in the market to rent space potentially from Frydman and his businesses, each of whom search Frydman's and his businesses' names on search engines and view the prominent display of websites, domains, blogs and other Internet postings wrongfully created, posted, published and/or transmitted by Verschleiser and one or more of the other Class A Defendants.

595.   Plaintiffs have contractual and prospective contractual relationships with FINRA member broker dealers and registered investment advisors in connection with the potential acquisitions or mergers by or with Prime United and its affiliates, each of whom search Frydman's and his businesses' names on search engines and view the prominent display of websites, domains, blogs and other Internet postings wrongfully created, posted, published and/or transmitted by Verschleiser and one or more of the other Class A Defendants.

596.   Plaintiffs have contractual and prospective contractual relationships with professionals such as lawyers, accountants, appraisers, architects and engineers, property management companies, contractors, title companies, insurers and consultants who provide services to real estate investors and which potentially could be retained by Plaintiff and his businesses, each of whom search Frydman's and his businesses' names on search engines and view the prominent display of websites, domains, blogs and other Internet postings wrongfully created, posted, published and/or transmitted by Verschleiser and one or more of the other Class A Defendants.

597.   Plaintiffs have contractual and prospective contractual relationships with employees, potential employees, head hunters and recruiters, each of whom search Frydman's

and his businesses' names on search engines and view the prominent display of websites, domains, blogs and other Internet postings wrongfully created, posted, published and/or transmitted by Defendant Verschleiser and one or more of the other Class A Defendants.

598.     Plaintiffs have contractual and prospective contractual relationships with institutional investors, such as pension funds, endowments, and other real estate developers, who provide joint venture capital, institutional capital and/or joint venture opportunities each of whom search Frydman's and his businesses' names on search engines and view the prominent display of websites, domains, blogs and other Internet postings wrongfully created, posted, published and/or transmitted by Verschleiser and one or more of the other Class A Defendants.

599.     Plaintiff Prime United and its affiliates have entered into a contract to effect the Transaction referenced above, and which was the subject of the Second Defamatory Lawsuit, and which Defendants Verschleiser, Gulko, Akerman, Wright, and the LP Defendants have intentionally sought to interfere with, by inter alia, filing the Second Defamatory Lawsuit.

## COUNT XVI

### TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL OR BUSINESS RELATIONS

600.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

601.     This Count is against Verschleiser and the other Class A Defendants.

602.     Defendant Verschleiser and the other Class A Defendants have known of the existing contractual or business relationships between the persons or classes of persons identified above and Plaintiffs and their businesses, and their conduct in tortuously interfering with those relationships with the foregoing consumers, investors, professionals, lenders and other business associates has been wrongful, intentional, malicious and/or criminal, as described above.

- 135 -

603.     There is no privilege or justification for such conduct.

604.     As a result of such conduct, Plaintiffs' existing contractual or business relationships with the persons or classes of persons identified above have been and continue to be exposed repeatedly to false, derogatory, defamatory, negative and intentionally misleading "information" about Frydman and his businesses which appear whenever one undertakes an Internet search.

605.     As a result of the myriad of wrongs committed by Verschleiser and the other Class A Defendants as complained of here, the persons or classes of persons with whom Plaintiffs have existing contractual or business relationships are deceived or confused into visiting the fake websites, domains, blogs and Internet postings of Verschleiser and one or more of the other Class A Defendants when searching for information on Frydman and his businesses.

606.     By virtue of the myriad of wrongs committed by Verschleiser and the other Class A Defendants as complained of here, which includes tortious, intentional, malicious and/or criminal conduct, Verschleiser and the other Class A Defendants interfered and continue to interfere with Plaintiffs' existing contractual or business relationships with investors, soliciting broker dealers, registered representatives associated with said soliciting broker dealers, employees, contractors, professionals and others with whom Plaintiffs and their businesses have such relations.

607.     In doing so, the Class A Defendants acted with specific purpose and/or intent to harm Plaintiffs and did so without proper justification, privilege or consent.

608.     The statements made in websites, domains, subdomains, blogs, Internet postings and advertisements created, published, posted, disseminated, transmitted and otherwise distributed by Verschleiser and one or more of the Class A Defendants about Frydman and his businesses, including without limitation United Realty, were and are false.

609. The Class A Defendants were aware of the existence valid selling agreements, investor subscriptions, loan agreements, subleases and other contracts between Plaintiffs and third parties.

610. The Class A Defendants actions as above set forth were intended to procure breaches of said contracts without justification.

611. As a result of the actions of the Class A Defendants as above set forth third parties in privity of contract with plaintiffs suspended, breached or terminated contracts with Plaintiffs and their affiliates.

612. As a result, Plaintiffs and their affiliates have suffered damages to their existing contractual or business relations. Accordingly, the Class A Defendants' conduct constitutes tortious interference with existing contractual or business relations under the common law.

613. As a result of that conduct, Plaintiffs have been, and absent injunctive relief will continue to be, irreparably harmed.

614. Plaintiffs have no adequate remedy at law for the foregoing wrongful, intentional, malicious and/or criminal conduct of Verschleiser and the other Class A Defendants.

615. Verschleiser and the other Class A Defendants' intentional interference with Plaintiffs' existing contractual or business relations has damaged Plaintiffs in an amount to be determined at trial believed to be not less than $160 million.

616. Plaintiffs also request that Verschleiser and the other Class A Defendants be preliminarily and permanently enjoined from creating, posting, publishing, operating, transmitting and otherwise using websites, domains, subdomains, blogs, Internet posts, advertisements and the like that in any way directly or indirectly name or relate to Frydman or his businesses.

617.    In addition to such damages, Plaintiffs seek punitive damages as a result of the egregious conduct committed by Defendant Verschleiser and the other Class A Defendants.

## COUNT XVII

### TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL OR BUSINESS RELATIONS

618.    The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

619.    This Count is against Verschleiser and the other Class A Defendants.

620.    Plaintiffs and their affiliates have had numerous opportunities to enter into contracts with prospective broker dealers who considered joining the selling group; with broker dealers considering selling Plaintiffs and their affiliates their businesses or merging with Plaintiffs; with licensors of branded trademarks considering entering into licensing agreements with Plaintiffs; with sellers of assets, including, without limitation, real property assets, with Plaintiffs, with investors who were considering entering into subscription agreements to invest with Plaintiffs or their affiliates, with lenders considering entering into loan transactions with Plaintiffs and their affiliates, with sub-landlords considering entering into leases with Plaintiffs, with prospective employees and consultants considering entering into agreements with Plaintiffs and their affiliates, and with other prospective contractual opportunities.

621.    By virtue of the myriad of wrongs committed by Verschleiser and the other Class A Defendants as complained of here, which includes tortious, intentional, malicious and/or criminal conduct, Verschleiser and the other Class A Defendants interfered and continue to interfere with Plaintiffs' prospective contractual or business relations with investors, soliciting broker dealers, registered representatives associated with said soliciting broker dealers,

employees, contractors, professionals and others with whom Plaintiffs and their businesses pursue contractual or business relationships.

622.    In doing so, the Class A Defendants acted with specific purpose and/or intent to harm Plaintiffs and did so without proper justification, privilege or consent.

623.    The statements made in websites, domains, subdomains, blogs, Internet postings and advertisements created, published, posted, disseminated, transmitted and otherwise distributed by Verschleiser and one or more of the other Class A Defendants about Frydman and his businesses, including without limitation United Realty, were false.

624.    Plaintiffs' prospective contractual or business relations search the Internet in undertaking due diligence on Frydman and his businesses.

625.    Defendant Verschleiser and the other Class A Defendants have known that Plaintiffs actively pursue new contractual and business relations.

626.    Through their tortious, intentional, malicious and/or criminal conduct as above set forth, Verschleiser and the other Class A Defendants are tortiously interfering with Plaintiffs' prospective contractual or business relations with prospective investors, soliciting broker dealers, registered representatives associated with said soliciting broker dealers, employees, contractors, professionals and others with whom Plaintiffs and their businesses pursue contractual or business relationships.

627.    But for Verschleiser and the other Class A Defendants conduct as above set forth, Plaintiffs and their affiliates would have entered into those prospective contracts.

628.    There is no privilege or justification for such conduct.

629.    As a result of such conduct, Plaintiffs' prospective contractual or business relationships have been and continue to be exposed as set forth herein, Plaintiffs' prospective business relations are exposed repeatedly to false, derogatory, defamatory, negative and

intentionally misleading "information" about Frydman and his businesses which appear whenever a prospective contractual or business relation undertakes an Internet search.

630.    As a result of the myriad of wrongs committed by Verschleiser and the other Class A Defendants as complained of here, Plaintiffs prospective contractual or business relations are deceived or confused into visiting the fake websites, domains, blogs and Internet postings of Verschleiser and one or more of the other Class A Defendants when searching for information on Frydman and his businesses.

631.    By virtue of the myriad of wrongs committed by Defendant Verschleiser and the other Class A Defendants as complained of here, which includes tortious, intentional, malicious and/or criminal conduct, Verschleiser and one or more of the other Class A Defendants knowingly and tortiously interfered, and continue to interfere, with Plaintiffs' prospective contractual or business relations with investors, soliciting broker dealers, registered representatives associated with said soliciting broker dealers, employees, contractors, professionals and others with whom Plaintiffs and their businesses pursue such relations.

632.    In doing so, the Class A Defendants acted with specific purpose and/or intent to harm Plaintiffs and did so without proper justification, privilege or consent.

633.    The statements made in websites, domains, subdomains, blogs, Internet postings and advertisements created, published, posted, disseminated, transmitted and otherwise distributed by Verschleiser and the other Class A Defendants about Frydman and his businesses, including, without limitation, United Realty, were and are false.

634.    As a result, Plaintiffs have suffered and continue to suffer damages to their prospective contractual or business relations, which would have ripened into actual contractual relations but for the foregoing wrongful conduct of Verschleiser and the other Class A

Defendants. Accordingly, the Class A Defendants' conduct constitute tortious interference with prospective contractual or business relations under the common law.

635.    As a result of that conduct, Plaintiffs have been, and absent injunctive relief will continue to be, irreparably harmed.

636.    Plaintiffs have no adequate remedy at law for the foregoing wrongful, intentional, malicious and intentional conduct of Verschleiser and the other Class A Defendants.

637.    Verschleiser and the other Class A Defendants' intentional interference with Plaintiffs' prospective contractual or business relations, have damaged Plaintiffs in an amount to be determined at trial believed to be not less than $160 million.

638.    Plaintiffs also requests that Verschleiser and the other Class A Defendants  be preliminarily and permanently enjoined from creating, posting, publishing, operating, transmitting and otherwise using websites, domains, subdomains, blogs, Internet posts, advertisements and the like which in any way directly or indirectly name or relate to Frydman or his businesses.

639.    In addition to such damages, Plaintiffs seek punitive damages as a result of the egregious conduct committed by Defendant Verschleiser and the other Class A Defendants.

## COUNT XVIII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

640.    The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

641.    This Count is against Verschleiser and the other Class A Defendants.

642.    The wrongful, intentional, malicious and/or criminal actions of Verschleiser and the other Class A Defendants as above described constitute extreme and outrageous conduct, in

that it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and should be regarded as atrocious, and utterly intolerable in a civilized society.

643.    Such actions constitute a deliberate and malicious campaign of harassment and intimidation undertaken by Verschleiser and the other Class A Defendants with the intent to cause, or in disregard of a substantial probability of causing, severe emotional distress to Plaintiff Frydman.

644.    It is foreseeable that a causal connection would exist between such campaign and the resulting injury to Frydman of severe emotional distress.

645.    As a direct and proximate result of Verschleiser and the other Class A Defendants' wrongful, intentional, malicious and/or criminal actions as above described, Frydman has suffered and will continue to suffer severe emotional distress.

646.    As a direct and proximate result of Verschleiser and the other Class A Defendants' intentional infliction of emotional distress, Frydman has been damaged in an amount to be determined at trial believed to be not less than $50 million.

647.    In addition to such damages, Plaintiffs seek punitive damages as a result of the egregious conduct committed by Defendant Verschleiser and the other Class A Defendants.

## COUNT XIX

### CIVIL CONSPIRACY

648.    The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

649.    This Count is against Verschleiser and the Class A Defendants.

650.    Verschleiser and the other Class A Defendants agreed to and conspired with one another to undertake the wrongful, intentional, tortious, illegal, malicious, and/or criminal conduct complained of here.

651.     Verschleiser and the other Class A Defendants committed numerous overt acts in furtherance of the conspiracy as above set forth.

652.     As a direct result of Verschleiser and the other Class A Defendants' civil conspiracy, Plaintiffs have been damaged in an amount to be determined at trial believed to be not less than $160 million.

653.     The Class A Defendants' conspiracy was willful and malicious and performed with an evil motive and with reckless indifference to the rights of others, entitling Plaintiffs to punitive damages.

654.     In addition to such damages, Plaintiffs seek punitive damages as a result of the egregious conduct and public harm committed by Defendant Verschleiser and the other Class A Defendants.

## COUNT XX

### UNREASONABLE INTRUSION UPON SECLUSION

655.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

656.     This Count is against Verschleiser and the other Class A Defendants.

657.     Verschleiser and the other Class A Defendants by their actions as above set forth have intentionally intruded upon the solitude or seclusion of Frydman and his private affairs or concerns.

658.     Verschleiser and the other Class A Defendants have, by virtue of the wrongful acts detailed herein, conducted an investigation or examination into the private concerns of Frydman.

659.     The methods and actions undertaken by Verschleiser and the other Class A Defendants in conducting said investigation or examination into the private concerns of Plaintiff

Frydman constitutes an intrusion which is highly offensive to Frydman, and would be highly offensive to a reasonable person.

660.    As a result of Verschleiser and the other Class A Defendants' unreasonable intrusion upon seclusion, Frydman has been damaged in an amount to be determined at trial believed to be not less than $50 million.

661.    In addition to such damages, Plaintiffs seek punitive damages as a result of the egregious conduct and committed by Defendant Verschleiser and the other Class A Defendants.

## COUNT XXI

### VIOLATION OF SECTION 51 OF ARTICLE 5 OF THE NEW YORK CIVIL RIGHTS LAW - RIGHT OF PRIVACY - MISAPPROPRIATION OF A PERSON'S NAME OR LIKENESS

662.    The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

663.    This Count is against Verschleiser, Onica, DelForno and Pinhasi.

664.    Verschleiser, Onica, DelForno and Pinhasi wrongfully and illegally used the name and likeness of Frydman within New York State, for advertising or trade purposes; and without his written consent.

665.    As such, the conduct of Verschleiser and Onica, DelForno and Pinhasi as above described constitutes a violation of Section 51 of Article 5 of the New York Civil Rights Law.

666.    Verschleiser and Onica, DelForno and Pinhasi use of Frydman's name and likeness was undertaken intentionally and with actual malice in that its numerous uses were to create false and fraudulent websites, domains, blogs, Internet postings and advertising representations about Frydman with a severe degree of falsity, intending to deceive the public.

667.    Verschleiser and Onica, DelForno and Pinhasi knew that Frydman had not consented to the use of his identity. As such, pursuant to Section 51 of Article 5 of the New York

Civil Rights Law, Frydman is entitled to punitive damages in order to deter future violations of Section 51.

668.    As a result of Verschleiser and Onica, DelForno and Pinhasi's violations of Section 51 of Article 5 of the New York Civil Rights Law, Frydman has been, and absent injunctive relief will continue to be, irreparably harmed.

669.    Plaintiff Frydman has no adequate remedy at law for the foregoing violations of Section 51 of Article 5 of the New York Civil Rights Law.

670.    Verschleiser and Onica, DelForno and Pinhasi's violations of Section 51 of Article 5 of the New York Civil Rights Law has damaged Frydman in an amount to be determined at trial believed to be not less than $50 million.

671.    Frydman requests that Verschleiser and Onica, DelForno and Pinhasi use of Frydman's name and likeness be preliminarily and permanently enjoined.

## COUNT XXII

### PRIMA FACIE TORT

672.    The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

673.    This Count is against Verschleiser and the other Class A Defendants.

674.    Certain of Defendant Verschleiser and the other Class A Defendants conduct as above set forth constitutes a prima facie tort, in that such conduct was intentionally undertaken to inflict harm on Plaintiffs, resulting in special damages without excuse or justification, by a series of acts that would otherwise be lawful.

675.    Defendant Verschleiser and the other Class A Defendants conduct was solely motivated by malevolence towards Plaintiffs.

676.     As a direct result of Defendant Verschleiser and the other Class A Defendants prima facie torts, Plaintiffs have been damaged an amount to be determined at trial believed to be not less than $160 million.

677.     In addition to such damages, Plaintiffs seek punitive damages as a result of the egregious conduct and committed by Defendant Verschleiser and the other Class A Defendants

### COUNT XXIII

### NEGLIGENCE / INNKEEPER LIABILITY

678.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

679.     This Count is against Caesars.

680.     Caesars is the owner and an operator of the Caesars Palace & Convention Center in Las Vegas, Nevada.

681.     As such, Caesars is an innkeeper.

682.     As an innkeeper, under the common law doctrine of *infra hospitium*, Caesars is strictly liable for loss or damage to a guest's property unless the property is lost or destroyed by an act of God, public enemy, by the fault of the guest, or from some irresistible force other than the act of God or from an inevitable accident without fault by the innkeeper.

683.     Plaintiff Frydman was a guest of Caesars at the Caesars Palace & Convention Center at the aforementioned national REISA conference held on September 14 – 16, 2014.

684.     Caesars owed Frydman a duty of care not to permit trespassers to enter upon its property to commit wrongs upon its guests, including Frydman.

685.     Caesars breached its duty of care to Frydman by permitting one or more Doe Defendants to trespass upon its property on September 15, 2014 and again on September 16, 2014 and commit the wrongs as above described.

686.     As a proximate cause of Caesars' breach of its duty of care to Frydman, Frydman was harmed in that false and fraudulent advertising flyers were distributed to approximately 1,000 REISA conference attendees and false and fraudulent advertising posters were plastered over the real posters in the common areas of the Convention Center, and Frydman suffered the indignity of dealing with said flyers and posters.

687.     As a result of Caesars' negligence, Frydman have been damaged in an amount to be determined at trial believed to be not less than $1,000.

**COUNT XXIV**

**BREACH OF CONTRACT**

688.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

689.     This Count is against Verschleiser.

690.     Plaintiffs performed all of the terms and conditions of the Separation Agreement on their part to be performed.

691.     The conduct of Verschleiser constitutes one or more breaches of the Separation Agreement.

692.     As a result of Verschleiser's breaches of the Separation Agreement, Plaintiffs have been damaged in an amount to be determined at trial believed to be not less $160 million.

**COUNT XXV**

**BREACH OF CONTRACT**

693.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

694.     This Count is against Akerman, FF, Vegh, JH, WF, and Appel, each of whom are limited partners in United Realty, and each of whom subscribed to become  a limited partner

pursuant to that Subscription Agreement executed by each, which made them limited partners bound pursuant to  that certain Partnership Agreement (the "Partnership Agreement") of United Realty, made as of August 1, 2011 and amended as of December 24, 2012 (all capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Partnership Agreement).

695.    At Section 15 of the Subscription Agreement each of Akerman, FF, Vegh, JH, WF and Appel, acknowledged and agreed that (i) he or it received and will in the future receive certain confidential information ("Confidential Information") regarding the Partnership, the General Partner, the REIT, the Sponsor, the BD and the Entities (collectively, the "Partnership Entities") as well as the other Subscribers and/or Partners, (ii) such Confidential Information contains trade secrets and is proprietary, (iii) disclosure of such Confidential Information to third parties is not in the best interest of any of the Partnership Entities or the Partners and (iv) disclosure of such Confidential Information would cause substantial harm and damages to the Partnership Entities and the Partners.

696.    Pursuant to  Section 14 of the Subscription Agreement each of Defendants Akerman, FF, Vegh, JH, WF and Appel, agreed, to the fullest extent permitted by applicable law, to indemnify and hold harmless the Partnership, the General Partner, the REIT and each officer, director, shareholder, partner or member of the Partnership, the General Partner, the REIT and each other Person that controls, is controlled by, or is under common control with, any of the foregoing within the meaning of Section 15 of the Securities Act, from and against any and all losses, claims, damages, expenses and liabilities relating to or arising out of (a) any breach of any representation or warranty, or any breach of or failure to comply with any covenant or undertaking, made by or on behalf of the Subscriber in the Subscription Agreement or in any

other document furnished by the Subscriber to any of the foregoing in connection with acquiring Interests…

697.     Pursuant to Section 10.1 (b) of the Partnership Agreement entitled "Confidential Information; Non Disclosure," each of Akerman, FF, Vegh, JH, WF and Appel, acknowledged and agreed as follows: All Confidential Information is the property of the Partnership and/or other Covered Persons.  Unless the General Partner otherwise provides its prior written consent and subject to the other provisions of Section 10.1(b), each Partner shall not, and shall not permit such Person's affiliates to, directly or indirectly use, rely on, disclose, divulge, furnish or make accessible to anyone any Confidential Information, except in each case as (and only to the extent) necessary or required by law or such Person's duties and responsibilities to any Covered Person.

698.     On December 15, 2015, FF, Vegh, JH, WF and Appel, filed the Second Defamatory Lawsuit, which revealed one or more of the Stolen Trade Secrets, in express violation of their covenants and agreements to the contrary in the Subscription Agreement and the Partnership Agreement.  So too with Akerman's filing of the Third Defamatory Lawsuit.

699.     As a result, and pursuant to Section 14 of the Subscription Agreement the indemnity obligations of Akerman, FF, Vegh, JH, WF and Appel were triggered.

700.     Pursuant to Section 10.2(a)(i) of the Partnership Agreement: "promptly upon notification of an obligation to indemnify the Partnership, the Indemnifying Person shall make a cash payment to the Partnership equal to the full amount to be indemnified."

701.     On January 30, 2015 United Realty issued an indemnification demand on each of Akerman, FF, Vegh, JH, WF and Appel.

702.     Akerman, FF, Vegh, JH, WF and Appel, failed to timely make payment pursuant to their contractual undertakings.

703.     Such failures constitute breach of contract.

- 149 -

704.     United Realty performed all of the terms and conditions of the Subscription Agreement and the Partnership Agreement on its part to be performed.

705.     As a result of Akerman, FF, Vegh, JH, WF and Appels' breaches of contract, Plaintiffs have been damaged in an amount which will be determined at trial believed to be at least $8 million.

## COUNT XXVI

### INDEMNIFICATION

706.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

707.     This count is against Defendant Verschleiser.

708.     As a result of, and by reason of his conduct, Verschleiser is bound under the common law indemnified Plaintiffs against any losses, claims, damages, demands and liabilities directly or indirectly arising in any manner as a result of his conduct.

709.     Plaintiffs are thus is entitled to payment by Defendant Verschleiser for their legal fees and costs incurred in defense of the First Defamatory Lawsuit, the Second Defamatory Lawsuit, the Third Defamatory Lawsuit and the False Claims Letter.

710.     Verschleiser's failed to meet his common law indemnification obligations.

711.     Verschleiser's conduct as herein set forth, among other things, Plaintiffs have been forced to bring this action as well as the Related Case and the Frydman State Court Action.

712.     Plaintiffs accordingly are entitled to their attorneys' fees and costs incurred in connection therewith, and in connection with defending against the First Defamatory Lawsuit, the Second Defamatory Lawsuit, the Third Defamatory Lawsuit and the False Claims Letter.

## COUNT XXVII

## INDEMNIFICATION

713.     The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

714.     This Count is against Akerman, FF, Vegh, JH, WF and Appel.

715.     In the Subscription Agreement, each of Akerman, FF, Vegh, JH, WF and Appel agreed to indemnify and hold Plaintiffs harmless from and against any and all losses, claims, damages, demands and liabilities relating to or arising out of any breach of the Partnership Agreement and their respective Subscription Agreements.

716.     Plaintiffs are thus entitled to payment by Akerman, FF, Vegh, JH, WF and Appel for their legal fees and costs incurred in defense of the Second Defamatory Lawsuit, and by Akerman for their legal fees and costs incurred in defense of the Third Defamatory Lawsuit and the False Claims Letter, and Akerman, FF, Vegh, JH, WF and Appel's other breaches of the Partnership Agreement and their respective Subscription Agreements.

717.     Akerman, FF, JH, WF, Vegh and Appel's failure to meet their indemnification obligations under their respective Subscription Agreements, constitute breaches of same.

718.     Based on Akerman, FF, Vegh, JH, WF and Appel's conduct as herein set forth, among other things, Plaintiffs have been forced to bring this action.

719.     Plaintiffs accordingly are entitled to their attorneys' fees and costs incurred in connection therewith, and in connection with defending against the Second Defamatory Lawsuit and the Third Defamatory Lawsuit and the False Claims Letter.

720.     There is a strong likelihood that as a result of by Akerman, FF, Vegh, JH, WF and Appel's actions as above described, and in initiating the Second Defamatory Lawsuit, the Third

Defamatory Lawsuit and the False Claims Letter, Plaintiff Prime United will lose the benefit of its bargain with respect to the Transaction.

721.   Similarly, as a result of his wrongful conduct in causing Akerman, FF, Vegh, JH, WF and Appel to initiate the Second Defamatory Lawsuit, and causing Akerman to initiate the Third Defamatory Lawsuit and the False Claims Letter, Plaintiff Prime United loses the benefit of its bargain with respect to the Transaction, Verschleiser is obligated under the common law to indemnify Plaintiffs for such losses.

722.   In the event that Prime United loses the benefit of its bargain under the Transaction agreement, Prime United shall have lost the proceeds thereof. In such event, Akerman, FF, Vegh,, JH, WF and Appel's indemnification pursuant to their respective Subscription Agreements, and Verschleiser, with respect to his common law indemnification obligations, will entitle Prime United to indemnification in the amount of said proceeds.

## COUNT XXVIII

### NEGLIGENCE

723.   The preceding allegations of this Amended Complaint are re-alleged as if fully set forth herein.

724.   This Count is against Intermedia.

725.   The actions of Intermedia as hereinabove described in permitting Verschleiser access to United Realty's Host Pilot administrative dashboard for the email exchange servers hosted by Intermedia for United Realty after express instructions to the contrary from Frydman on or about December 3, 2013 constitutes negligence.

726.   It was foreseeable that if Intermedia were to give Verschleiser access to United Realty's email exchange servers after he was fired and after United Realty expressly provided strict instructions not to permit such access, that Verschleiser would cause damage to Plaintiffs.

727.     As a result of Intermedia's negligence Plaintiffs have been damaged as set forth above, Plaintiffs have been damaged in an amount to be proved at trial which is believed to be not less than $15 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seeks damages and remedies against Defendants and prays this Court enter judgment in their favor on each and every Count set forth above and award them relief, including without not limitation the following:

I.      Entry of an order (on a preliminary and permanent basis) under Counts III, VI, VII and XVI requiring that the Class A Defendants and their officers, agents, servants, employees, owners and representatives, and all other persons, or entities in concert or participation with them, be enjoined and restrained from:

a.   Using in any manner the Frydman name and likeness, or any United Realty name, mark or internet domain name that incorporates Frydman's or United Realty's name or mark which is confusingly similar to or a colorable imitation of the Frydman or United Realty name or mark or any name or mark associated with Frydman or his businesses, including without limitation "LambdaStar", "Hudson York", "Hudson-York Capital", "White Acre", "Senergy", "Surrey", "Tivoli Partners" or any name or mark which is confusingly similar to or a colorable imitation thereof;

b.   Using or displaying Frydman's name or likeness on any websites, domains, blogs, Internet postings or advertising, products, or promotional materials in any false and/or deceptive manner;

c.   Using in any manner any name, mark or internet domain name that incorporates "Frydman" or "United Realty" or any other name or mark which is associated with Frydman or his businesses, including without limitation "LambdaStar", "Hudson York", "Hudson-York Capital", "White Acre", "Senergy", "Surrey", "Tivoli Partners" or any name or mark which is confusingly similar to or a colorable imitation thereof;

d.   Doing any act or thing calculated or likely to cause confusion or mistake in the minds of members of the public or prospective customers, investors or business associates of Frydman or any of his businesses or  products or services sponsored

or offered by Frydman or any of his businesses, as to the source of the products or services sponsored or offered by Frydman or his businesses for sale, distributed, or sold, or likely to deceive members of the public, or prospective customers, investors or business associates of Frydman or any of his businesses into believing that there is some connection between one or more of the Class A Defendants and Frydman;

    e.  Committing any acts which will tarnish, blur, disparage or dilute, or are likely to tarnish, blur, disparage or dilute Frydman's name and likeness or the names or marks of Frydman's businesses;

    f.  Making any representations that Frydman or his businesses have acted in any improper manner; and

    g.  making or inducing others to make any disparaging or false, misleading or deceptive statement of fact, or representation of fact regarding Frydman or United Realty or any of Frydman's businesses, products or services;

II. Entry of an order (on a preliminary and permanent basis) directing that the Class A Defendants permanently remove or cause to be permanently removed:

    a.  all disparaging, or false, misleading or deceptive statement of fact, or representation of fact regarding Frydman or United Realty or any of Frydman's businesses, products or services in any and all postings on any website, domain, blog or Internet post, including, without limitation removing same from wordpress.com, reitwrecks.com, weebly.com, scam.com, linkedin.com, blogspot.com, twitter.com, congoo.com, scamorg.com, ebosswatch.com, boardreader.com, complaintsboard.com, scamguard.com and any other domains and websites on which they appear;

    b.  the Class A Defendants request that all Internet search engines, including without limitation, Google, Bing and Yahoo!, cease indexing or returning any searches which contain any disparaging, or false, misleading or deceptive statement of fact, or representation of fact regarding Frydman or United Realtyor any of Frydman's businesses, products or services in any and all postings on any website, domain, blog or internet post;

    c.  the Class A Defendants transfer to Frydman (at no cost to Frydman) all internet domain names that contain or consist of Frydman's name or the name or marks of United Realty or any other of Frydman's businesses;

d.  the Class A Defendants take all steps necessary to cancel any state or local business registrations, including corporate name registrations and dba filings, that include Frydman's name or the name or marks of United Realty or any other of Frydman's businesses, and to remove any references to any business registrations, including corporate names and dba filings, that include Frydman's name or the name or marks of United Realty or any other of Frydman's businesses.

e.  the Class A Defendants retain and disclose all communications with all individuals and entities with whom they engaged in any transaction relating to or arising from the use of Frydman's name, likeness or the name or marks of United Realty or any other of Frydman's businesses, or otherwise in furtherance of the scheme alleged herein;

f.  the Class A Defendants file with this Court and serve upon Plaintiffs within thirty (30) days after entry of an injunction a written report under oath describing in detail the manner and form in which the Class A Defendants have complied with an injunction; and

g.  the Class A Defendants correct any erroneous impression persons may have derived concerning Frydman and his businesses, including without limitation, delivering a letter to Plaintiffs addressed "to whom it may concern" informing the reader thereof of the prior misrepresentations regarding Frydman and his businesses which were created or included in any publication, website, domain, blog or Internet posting, and clearly identifying same as false misrepresentations made intentionally to harm Frydman and his businesses, and retracting same.

III.  With respect to Count I, that the Class A Defendants be adjudged to have violated the Section 1962(c) of RICO and ordering the Class A Defendants to pay a judgment, jointly and severally, in the amount of Plaintiffs; actual damages as determined at trial believed to be not less than $160 million, and that such damages be trebled to $480 million, and that Plaintiffs be awarded costs, attorneys' fees and expenses;

IV.  With respect to Count II, that the Class A Defendants be adjudged to have violated Section 1962(d) of RICO and ordering the Class A Defendants to pay a judgment, jointly and severally, in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $160 million, and that Plaintiffs be awarded costs, attorneys' fees and expenses;

V.      With respect to Count IV, that the Class A Defendants be adjudged to have violated the Federal Lanham Act and ordering the Class A Defendants to pay a judgment, jointly and severally, in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $160 million, and that such damages be trebled to $480 million, and that Plaintiffs be awarded costs, attorneys' fees and expenses;

VI.     With respect to Count VI, that the Class A Defendants be adjudged to have violated the Anti-Cybersquatting Consumer Protection Act (Cyberpiracy) and ordering the Class A Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $160 million, and that such damages be trebled to $480 million, and that Plaintiffs be awarded costs, attorneys' fees and expenses;

VII.    With respect to Count VII, that the Class A Defendants be adjudged to have unfairly competed against Plaintiffs by using false, deceptive or misleading descriptions or representations of fact and ordering the Class A Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $160 million, and that Plaintiffs be awarded costs, attorneys' fees and expenses;

VIII.   With respect to Count VIII, that the Class A Defendants be adjudged to have committed fraud and ordering the Class A Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $160 million, and that Plaintiffs be awarded costs, attorneys' fees and expenses;

IX.     With respect to Count IX, that Defendant Verschleiser be adjudged to have maliciously prosecuted the First Defamatory Lawsuit and ordered to pay a judgment, in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $20 million, and that Plaintiff be awarded costs, attorneys' fees and expenses;

X. With respect to Count X, that Verschleiser and Akerman be adjudged to have maliciously prosecuted the Third Defamatory Lawsuit  and ordered to pay a judgment, jointly and severally, in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $20 million, and that Plaintiffs be awarded costs, attorneys' fees and expenses;

XII.  With respect to Count XI, that the Libel Defendants be adjudged to have committed libel, ordering the Libel Defendants to pay a judgment, jointly and severally to pay Plaintiffs' actual damages in an amount to be proved at trial, believed to be not less than $160 million, and that Plaintiffs be awarded costs, attorneys' fees and expenses;

XIV.  With respect to Count XII, that the Class A Defendants be adjudged to have committed trade libel and ordering the Class A Defendants to pay a judgment, jointly and severally, in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $160 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XV. With respect to Count XIII, that the Class A Defendants be adjudged to have committed libel per se, ordering the Class A Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $50 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XVI.  With respect to Count XIV, that the Verschleiser, Delforno, Onica Pinahasi, Akerman, Wright, Gulko, FF, Fishoff, Vegh, JH, Jaffa, WF, Rand, Appel and Intermedia adjudged to have Misappropriated Plaintiff's Trade Secrets and ordering said Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $50 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XVII.  With respect to Count XV, that the Class A Defendants be adjudged to have published Injurious Falsehoods and ordering the Class A Defendants to pay a judgment, jointly and severally,

in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $160 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XVIII. With respect to Count XVI, that the Class A Defendants be adjudged to have Interfered with Plaintiff's Existing Contractual and Business Relations and ordering the Class A Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial, believed to be not less than $160 million, and that Plaintiffs be awarded costs, attorneys' fees and expenses;

XIX.   With respect to Count XVII, that the Class A Defendants be adjudged to have Interfered with Plaintiff's Prospective Business and Contractual Relations and ordering the Class A Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $160 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XX.    With respect to Count XVIII, that the Class A Defendants be adjudged to have Intentionally Inflicted Emotional Distress on Frydman and ordering the Class A Defendants to pay a judgment, jointly and severally. in the amount of Frydman's actual damages as determined at trial believed to be not less than $50 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XXI.   With respect to Count XIX, that the Class A Defendants be adjudged to have committed Civil Conspiracy and ordering the Class A Defendants to pay a judgment, jointly and severally in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $160 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XXII.  With respect to Count XX, that the Class A Defendants be adjudged to have committed Unreasonable Intrusion Upon Seclusion on Plaintiff and ordering the Class A Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial

believed to be not less than $50 million, and that Plaintiff be awarded costs, attorneys' fees and expenses;

XXIII. With respect to Count XXI, that the Verschleiser, Onica, Delforno and Pinhasi be adjudged to have violated Sec. 51 of Article 5 Of The New York Civil Rights Law - Right Of Privacy - Misappropriation Of A Person's Name Or Likeness and ordering said defendants to pay a judgment, jointly and severally, in the amount of Frydman's actual damages as determined at trial believed to be not less than $50 million, and that Frydman be awarded costs, attorneys' fees and expenses;

XXIV. With respect to Count XXII, that the Class A Defendants be adjudged to have committed Prima Facie Torts and ordering the Class A Defendants to pay a judgment, jointly and severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $160 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XXV. With respect to Count XXIII, that Defendant Caesars be adjudged to have committed Negligence and ordering Defendant Caesars to pay a judgment in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $1,000, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XXVI. With respect to Count XXIV, that Verschleiser be adjudged to have Breached the Separation Agreement and ordering Verschleiser to pay a judgment in the amount of Plaintiffs actual damages as determined at trial believed to be not less than $160 million, and that Plaintiffs be awarded costs, attorneys' fees and expenses;

XXVII. With respect to Count XXV, that Defendants Akerman, FF, Vegh, JH, WF and Appel be adjudged to have Breached the Partnership Agreement and their respective Subscription Agreements and ordering Akerman FF, Vegh, JH, WF and Appel to pay a judgment, jointly and

severally, in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $8 million, and that Plaintiff be awarded its costs, attorneys' fees and expenses;

XXVIII.   With respect to Count XXVI, that Verschleiser be adjudged to have indemnified Plaintiffs and ordering Verschleiser to pay a judgment in the amount of Plaintiffs' actual damages as determined at trial, and that Plaintiffs be awarded its costs, attorneys' fees and expenses;

XXIX. With respect to Count XXII, that Defendants  Akerman, FF, Vegh, JH, WF, Appel and Intermedia be adjudged to indemnified Plaintiffs and ordering Akerman, FF, Vegh, JH, WF Appel and Intermedia  to pay a judgment, jointly and severally, in the amount of Plaintiffs' actual damages as determined at trial, and that Plaintiffs be awarded costs, attorneys' fees and expenses;

XXX.  With respect to Count XXVIII, that Intermedia be adjudged to have been negligent and ordering Intermedia  to pay United Realty an award in the amount of United Realty's actual damages as determined at trial, believed to be not less than $15 million, and that United Realty be awarded costs, attorneys' fees and expenses; and

XXXI. That Plaintiffs be granted punitive damages as appropriate, prejudgment and post judgment interest; costs associated with the prosecution of this action; and such further relief as the Court may deem just.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiffs demand a jury trial with respect to all claims for relief in this Complaint triable before a jury as a matter of right.

Dated: New York, New York

March 13, 2015

_____

Jacob Frydman

*Pro se*
60 Broad Street, 34th Floor
New York, New York 10004
(212) 388-6800
Jacob.F@urpa.com


And Lewis S. Fischbein, P.C.

By: *Lewyl Fischbein*

Lewis S. Fischbein (LF 3349)
*Attorney for United Realty Advisors,*
*LP   and   Prime   United   Realty*
*Holdings, LLC*
60 Broad Street, 34th Floor
New York, New York 10004
(212) 752-3374

- 161 -

## VERIFICATION

STATE OF NEW YORK        )
                         ) ss:
COUNTY OF NEW YORK  )

JACOB FRYDMAN, being duly sworn, deposes and says:

I am a Plaintiff in this action, and I am the CEO of Plaintiff United Realty Advisor, LP and Manager

of Plaintiff Prime United Realty Holdings, LLC.  I have read the forgoing Verified Complaint and

know the contents thereof. The same is true to my own knowledge, except those matters therein

which are stated to be alleged on information and belief, and as to those matters I believe them to

be true.

Dated: March 9. 2015

      New York, New York

                                                Jacob Frydman

Sworn to before me this

13 day of March 2015

Notary Public