# EXHIBIT A

## MEMBERSHIP INTERESTS SALE
## AND PURCHASE AGREEMENT

THIS AGREEMENT is made as of December 3, 2013, by and among JACOB FRYDMAN ("Frydman"), JFURTI, LLC ("JF"), SUMMER INVESTORS, LLC ("Summer"), WINTER 866 UN LLC ("Winter"), ELI VERSCHLEISER ("Verschleiser"), EVURTI, LLC ("EV"), EVE, LLV ("EVE") and EVUNP Holdings, LLC ("EVUNP").

### BACKGROUND

A.   JF, Summer and Winter are affiliates of Frydman and together with Frydman are collectively referred to as the "Frydman Parties";

B.   EV, EVE and EVUNP are affiliates of Verschleiser and together with Verschleiser are collectively referred to as the "Verschleiser Parties";

C.   EV and JF are all of the Members of United Realty Holdings, LLC, ("UR Holdings") pursuant to United Realty Holdings, LLC Operating Agreement, dated as of August 1, 2011, as the same may have been amended or modified from time to time (the "UR Holdings Agreement"). Each of EV and JF owns a 50% Membership Interest in UR Holdings. UR Holdings is the sole Member and 100% owner of the membership interests in each of (i) United Realty Partners, LLC; (ii) URA Property Management, LLC; (iii) United Realty Capital Markets, LLC; and (iv) URP Investments, LLC. Frydman and Verschleiser were the two original sole managers of UR Holdings. UR Holdings is the sole Manager of: (i) URTI GP, LLC; (ii) URTIGP Investments, LLC; (iii) URA Property Management, LLC; (iv) URTI LP, LLC; (v) United Realty Partners, LLC; (vi) URP Investments, LLC; and (vii) United Realty Capital Markets, LLC. United Realty Partners, LLC is the owner of a 50% Membership Interest in Riverside United Title Agency, LLC.

D.   EV and JF are all of the members of URTI GP Investments, LLC, ("URTIGP Investments") pursuant to URTIGP Investment's Operating Agreement, dated as of August 1, 2011, as the same may have been amended or modified from time to time (the "URTIGP Investments Agreement"). Each of EV and JF originally owned a 48.75% Membership Interest in URTIGP Investments, and by virtue of that certain assignment dated August 16, 2012 from Akiva Company, LLC to EV and JF, each of EV and JF acquired one-half of the 2.5% Membership Interest originally owned by Akiva Company, LLC in URTIGP Investments, so that on the date hereof EV and JF each owns a 50% Membership Interest in URTIGP Investments. URTIGP Investments is the owner of a 66.67% Percentage Interest in URTI GP LCC ("GP") which is the sole General Partner of United Realty Advisor, L.P.. United Realty Advisor, L.P. is the external advisor to United Realty Trust Incorporated ("REIT"), a public non-traded REIT. UR Holdings is the sole Manager of GP. GP is the sole Member and 100% owner of the Membership Interests in URTI LP, LLC. The REIT is the sole General Partner of United Realty Capital Operating Partnership LP, and URTI LP, LLC is the sole limited partner of United Realty Capital Operating Partnership LP.

1



E.     EVE and Summer are all of the Members of Prime United Holdings, LLC, ("PUH") pursuant to PUH's Operating Agreement, dated as of October 25, 2011, as the same may have been amended or modified from time to time (the "PUH Agreement"). PUH is the sole member and 100% owner of the Membership Interests in (i) Cabot Lodge Securities, LLC (f/k/a Prime United Securities, LLC); (ii) CL Wealth Management, LLC; (iii) CL General Agency, LLC; (iv) Cabot Lodge Lending, LLC; (v) American United Securities, LLC; and (vi) AUS Holdings, LLC.   Frydman and Verschleiser were the two original sole managers of PUH.

G.     EVUNP and Winter are all of the members of United 866 Management, LLC ("866 Management") pursuant to 866 Management's Operating Agreement, dated as of September 27, 2013, 2013, as the same may have been amended or modified from time to time (the "866 Management Agreement"). 866 Management is the sole Managing Member of United Realty 866 UN Plaza, LLC. Frydman and Verschleiser were the two original sole managers of 866 Management.

H.     UR Holdings, United Realty Partners, LLC, URA Property Management, LLC, United Realty Capital Markets, LLC, URP Investments, LLC, URTIGP Investments, GP, URTI GP, LLC, URTI LP, LLC, PUH, Cabot Lodge Securities, LLC,  CL Wealth Management, LLC, CL General Agency, LLC, Cabot Lodge Lending, LLC, American United Securities, LLC, AUS Holdings, LLC, 866 Management, United Realty 866 UN Plaza, LLC, United Realty Advisor, L.P., Riverside United Title Agency, LLC, United Realty Trust Incorporated and United Realty Capital Operating Partnership LP, are collectively referred to as the "Entities".

I. Various Verschleiser Parties desire to sell, assign and convey their respective interests described above (collectively, the "Interests") to various Frydman Parties, who desire to take and acquire such Interests and assume various obligations with respect thereto, all as hereinafter described.

## AGREEMENT

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Frydman Parties and the Verschleiser Parties hereby agree as follows:

1.     The recitals in the Background Section above are incorporated into this Agreement and are hereby acknowledged to be true and correct.

2.     Pursuant to the Assignment and Assumption of Membership Interest in the forms attached as Exhibits hereto and identified below, the following transfers are being consummated simultaneously herewith:

a. Transfer of the EV Membership Interests in UR Holdings to JF – **Exhibit A**;

b. Transfer of the EV Membership Interests URTIGP Investments to JF – **Exhibit B**;

c. Transfer of the EVE Membership Interests in PUH to Summer – **Exhibit C**;

2




d. The Verschleiser Parties hereby represent and warrant to the Frydman Parties, that with respect to each of the Membership Interests being transferred simultaneously herewith, that (i) the Membership Interests are free and clear of any and all liens, charges and/or encumbrances, and are owned entirely by the person transferring and assigning same and that the Membership Interests being transferred have not previously been conveyed or assigned by the respective Verschleiser Party to any other party, and (ii) that the respective Verschleiser Party assigning each Membership Interest has full power and authority to execute and deliver this Assignment and the Assignment with respect to same. This paragraph shall survive the assignments contemplated herein and the expiration or earlier termination of this Agreement.

e. The Frydman Parties in their respective capacities as Members and Managers of the entities in which interests are transferred hereby consent to the transfers which are contemplated in this Agreement.

3. Insofar as Verschleiser has been a manager, officer, director and/or employee of any of the Entities, Verschleiser hereby resigns, effective immediately, each and every position or office he currently holds as a manager, officer, director or employee of United Realty Trust, United Realty Advisor, L.P., and each and every of the other Entities, and any entity in which any of the foregoing has an ownership interest. Verschleiser acknowledges that he has voluntarily resigned from each and every position or office he currently holds as a manager, officer, director or employee of United Realty Trust, United Realty Advisor, L.P., and each and every of the other Entities, on the date hereof (the "Separation Date"). After the Separation Date, Verschleiser shall not represent himself as being an employee, officer, manager, member, director, agent or representative of any of the Entities for any purpose. The Separation Date shall be the termination date of Verschleiser's employment for purposes of participation in and coverage under all benefit/pension plans and programs sponsored by or through any of the Entities, or under the terms of the benefit/plans, or as required by law. Simultaneously with the execution hereof Verschleiser shall execute and deliver to the Frydman Parties and the respective Entities the resignation letters in the form set forth in Exhibit E attached hereto. This paragraph shall survive the assignments contemplated herein.

4.    Simultaneously with the execution of this Agreement, the Frydman Parties, jointly and severally, hereby release any and all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present, whether known or unknown, suspected, or claimed against any of the Verschleiser Parties which the Frydman Parties or any of their respective successors or assigns, ever had, now have, or hereafter may have, by reason of any matter, cause, or thing whatsoever, from the beginning of any initial dealings with the Verschleiser Parties and through the time of execution of this Agreement. This release shall survive the assignments contemplated herein and the expiration or earlier termination of this Agreement.

5.    Simultaneously with the execution of this Agreement, the Verschleiser Parties, jointly and severally, hereby release any and all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated

3

 

damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present, whether known or unknown, suspected, or claimed against any of the Frydman Parties which the Verschleiser Parties or any of their respective successors or assigns, ever had, now have, or hereafter may have, by reason of any matter, cause, or thing whatsoever, from the beginning of any initial dealings with the Frydman Parties and through the time of execution of this Agreement. This release shall survive the assignments contemplated herein and the expiration or earlier termination of this Agreement.

6.    (a) All sums invested as capital or advanced as loans by the Verschleiser Parties to GP or Advisor directly or indirectly (which as of the date hereof is $3,405,386.40) is all deemed as capital contributions, and none of which shall be deemed an advance or a loan.

(b) JF hereby agrees that it shall pay to EV Fifty Percent (50%) of each distribution which JF receives from URTIGP Investments and PUH in respect of URTIGP Investment's investment in GP which GP in turn made as an investment as a Limited Partner in United Realty Advisors, LP (the "EV Distribution Percentage Payment(s)"). Each EV Distribution Percentage Payment shall be made by JF to EV within ten (10) business days after receipt of same by JF from URTI Investments.  The payment obligation set forth in this paragraph shall survive the assignments contemplated herein and the expiration or earlier termination of this Agreement. JF agrees that it shall not circumvent this provision by classifying sums which would ordinarily be considered as distributions as loans or fees which are outside of the ordinary course of business.

7.    (a) Frydman hereby indemnifies Verschleiser with respect to the guaranties Verschleiser provided in connection with: (i) that certain promissory Note made by Advisor in favor of 8430985 CANADA INC. dated October 25, 2013; and (ii) that certain promissory Note made by Advisor in favor of AA Investment Management LLC dated August 17, 2013.

(b) The Frydman Parties covenant and agree to exercise best efforts to cause URTI to maintain D&O insurance and to provide that it cover Verschleiser for the time of his service as a director.

8. Verschleiser acknowledges that all employment agreements between Verschleiser and each of the Entities is hereby terminated. Notwithstanding the foregoing, if the Board shall authorize the issuance of Restricted Stock pursuant to the United Realty Trust Incorporated Restricted Stock Plan in favor of senior management of the REIT, Verschleiser shall receive the Restricted Stock which had vested under his employment agreement.  This paragraph shall survive the assignments contemplated herein.

9.    The Verschleiser Parties hereby waive and forever release each of the Entities with respect to any  rights, benefits, distributions, and compensation granted to any of the Verschleiser Parties pursuant to each and every of the operating agreements or partnership agreements of each of the Entities, and hereby agree and acknowledge that each of the operating agreements and partnership agreements of each of the Entities are hereby deemed amended so as to delete therefrom any rights, benefits, indemnifications, distributions, and compensation granted by each of the Entities in favor of any of the Verschleiser Parties. This paragraph shall

4




survive the assignments contemplated herein and the expiration or earlier termination of this Agreement.

10.    (a) The Verschleiser Parties each agree that for a period of eighteen (18) months following the Separation Date: (i) they will neither alone nor in concert with others, directly or indirectly, employ or solicit the employment of, or assist others in employing or soliciting the employment of, any individual employed by any of the Entities, provided however that Verschleiser may solicit and employ Ahuva Shulamit, Dov Shimano or Frank Chandler; (ii) they will not disparage or encourage or induce others to disparage any of the Frydman Parties or any of the Entities. For the purposes of this Agreement, the term "disparage" includes the making of false, defamatory or derogatory comments that could reasonably be expected to damage the reputation of the Frydman Parties or the Entities (or any of their officers, executives, or personnel). This paragraph shall survive the assignments contemplated herein and the expiration or earlier termination of this Agreement.

(b) The Frydman Parties agree they will not disparage or encourage or induce others to disparage any of the Verschleiser Parties. This paragraph shall survive the assignments contemplated herein and the expiration or earlier termination of this Agreement.

11.    Any breach of the provisions of Paragraphs 3 and 10 shall be considered a material breach of this Agreement. In the event that a court of competent jurisdiction finds that any of the Verschleiser Parties commit a material breach of this Agreement, they agree to: (i) consent to the entry of injunctive relief against them, and the cessation by JF of any further EV Distribution Percentage Payments pursuant to paragraph 6 herein, and in addition to the Frydman Parties' and each of the Entities' rights to pursue any and all of their remedies against the Verschleiser Parties under law and in equity, the Verschleiser Parties further agree that the Frydman Parties' and the Entities may pursue and obtain injunctive relief without the posting of a bond; and (ii) the Verschleiser Parties further agree that, in the event the Frydman Parties and/or he Entities, or any of them, pursue legal remedies against the Verschleiser Parties or any of them, the Verschleiser Parties shall pay and reimburse the Frydman Parties and/or the Entities for their reasonable attorneys' fees and costs incurred in the event that the Frydman Parties or the Entities prevail in any such action to enforce their rights under this Agreement. This paragraph shall survive the assignments contemplated herein and the expiration or earlier termination of this Agreement.

12.    For purposes hereof "Affiliate" or "affiliate" means with respect to any person, his/her or its owners, managers, members, partners, shareholders, officers, directors, and any other person which is controlling, controlled by, or under common control with (directly or indirectly through any person) the person referred to and, if the person referred to is a natural person, a family member of such person. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") as used with respect to any person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise. For purposes hereof "person" means any individual, sole proprietorship, partnership, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization, association, corporation, institution or other entity.

5



13.    EVUNP, Winter, Frydman and Verschleier hereby agree that the 866 Management Agreement is hereby modified to delete section 3.1.3 thereof, and that the same, as amended is hereby ratified and shall remain in full force and effect.

14.    This Agreement shall inure to the benefit of, and bind, the Frydman Parties, the Verschleiser Parties and their respective legal representatives, heirs, successors and assigns, as the case may be. No person shall be a third party beneficiary with respect to this Agreement.

15.    This Agreement represents the entire understanding and agreement of the Frydman Parties and Verschleiser Parties with respect to the subject matter hereof, and may not be amended or modified, other than in a writing signed by the party to be charged.

16.    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which shall together constitute one and the same instrument. Electronically transmitted copies of this Agreement, any Exhibit hereto, or signature pages to any thereof, shall have the same force and effect as originals.

17.    This Agreement shall be construed and enforced in accordance with the laws of the State of New York without regard to the principles of conflicts of law. Additionally, any action to enforce the terms of this Agreement shall be commenced exclusively in the federal or state courts New York County, in the City of New York, State of New York. Each of the parties consent to the exclusive jurisdiction of the federal and state courts in New York City, New York and waive any claim under the doctrine of forum non conveniens.

18.    The Verschleiser Parties acknowledge that (a) they have carefully read this Agreement in its entirety; (b) have had an opportunity to consider the terms of this Agreement; (c) are hereby advised by  in this writing, to consult with an attorney before signing this Agreement; (d) fully understand the significance of all of the terms and conditions of the Agreement and have discussed them with an attorney of their choice, or have had a reasonable opportunity to do so; (e) are signing this Agreement voluntarily and of your own free will and agree to abide by all the terms and conditions contained herein and (f) voluntarily waive any review period.

19.    Each of the persons signing on behalf of an entity hereby represent and warrant that they are authorized and empowered to sign this Agreement in their representative capacity and to bind the entity on who's behalf they are signing.

20.    The parties hereto and each of their respective Affiliates hereby agree to keep the terms of this agreement confidential and without the prior written approval of both Frydman and Verschleiser shall not disclose the terms of the Agreement to any person other than  to members, managers, officers, directors and employees of the Entities, or as required by law.

21. The Advisor hereby agrees to not terminate Ahuva Slamovits (aka Ahuva Raibag) from its payroll and/or change, reduce, or discontinue any additional benefits that are currently being provide to her, including but not limited to, medical insurance, until March 1st 2014.




22. The Advisor further agrees to not terminate, change, reduce or discontinue the medical insurance coverage for Mr. Eli Verschleiser and anyone else included in his plan until March 1st 2014.

23. The Advisor hereby agrees to pay NYCityride Inc. its outstanding invoices through the date hereof; however such payment(s) shall not exceed $15,000, and shall be paid no later than March 1, 2014.

24. PUH agrees that it shall not cause Cabot Lodge Securities, LLC to terminate, change, or reduce the employment compensation for Yaron Razak (which does not exceed $1,000 per week) prior to April 1st 2014.

25. Verschleiser hereby agrees to restore all exchange server, web hosting and the Entities' computer servers to their status on or before November 15, 2013 and to provide Frydman with all owner and administrative passwords by the close of business on December 5, 2013.

(Remainder of page intentionally left blank)

7

IN WITNESS WHEREOF, the Frydman Parties and the Verschleiser Parties have executed this Agreement as of the date first above written.

_____
JACOB FRYDMAN

_____
ELI VERSCHLEISER

JFURTI, LLC

By: _____
Jacob Frydman, Manager

SUMMER INVESTORS, LLC

By: _____
Jacob Frydman, Manager

WINTER 866 UN LLC

By: _____
Jacob Frydman, Manager

EVURTI, LLC

By: _____
Eli Verschleiser, Manager

EVE, LLC

By: _____
Eli Verschleiser, Manager

EVUNP HOLDINGS, LLC

By: _____
Eli Verschleiser, Manager

Witnesses:

_____
BARRY FULT

_____
MORTY DAVIS

8

STATE OF NEW YORK      )
                       ) SS.:
COUNTY OF NEW YORK     )

    The foregoing instrument was acknowledged before me this _____ day of _____,
2013, by Eli Verschleiser individually, and on behalf of EVURTI, LLC, EVE, LLC, and EVUNP
HOLDINGS, LLC  as authorized signator. He is _____ personally known to me or _____ has
produced a driver's license as identification.

My Commission Expires:

        [NOTARIAL SEAL]

          ASHER GULKO
      Notary Public, State of New York
         No. 01GU6246911
       Qualified in Nassau County
     Commission Expires 8/15/2015

Print Name: ASHER GULKO
NOTARY SEAL:
Serial No., if any:_____

STATE OF NEW YORK      )
                       ) SS.:
COUNTY OF NEW YORK     )

    The foregoing instrument was acknowledged before me this _____ day of _____,
2013, by Jacob Frydman individually, and on behalf of JFURTI, LLC, SUMMER INVESTORS,
LLC, and WINTER 866 UN LLC  as authorized signator. He is _____ personally known to me
or _____ has produced a driver's license as identification.

My Commission Expires:

[NOTARIAL SEAL]

          ASHER GULKO
      Notary Public, State of New York
         No. 01GU6246911
       Qualified in Nassau County
     Commission Expires 8/15/2015

Print Name: ASHER GULKO
NOTARY SEAL:
Serial No., if any:_____

9

EXHIBIT A

ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST

THIS ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST (this "Assignment") is made as of this ___ day of December, 2013 by and between EVURTI, LLC, a Delaware limited liability company ("Assignor"), and JFURTI, LLC, a Delaware limited liability company ("Assignee").

WITNESSETH:

WHEREAS, Assignor owns a 50% Membership Interest (the "Interest") as a member under the United Realty Holdings, LLC, ("UR Holdings") pursuant to United Realty Holdings, LLC Operating Agreement, dated as of August 1, 2011, as the same may have been amended or modified from time to time (the "UR Holdings Agreement"). ; and

WHEREAS, Assignor desires to sell and assign the Interest to Assignee, and Assignee desires to assume the same, all under the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing, the payment of good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Assignor and Assignee, intending to be legally bound hereby, agree as follows:

1. Assignment; Representations.

     (a)     Assignor hereby assigns all of Assignor's right, title and interest respecting the Interest to Assignee, to have and to hold the Interest unto Assignee, and Assignee's legal representatives, heirs, successors and assigns, as the case may be, forever.

     (b)     Assignor hereby represents and warrants to Assignee that (i) the Interest is free and clear of any and all liens, charges and/or encumbrances, is owned entirely by Assignor and has not previously been conveyed or assigned by Assignor to any other party, and (ii) Assignor has full power and authority to execute and deliver this Assignment.

2. Assumption. Assignee hereby accepts Assignor's assignment of the Interest and assumes the performance and observance of all of the covenants, agreements and conditions on the part of Assignor to be performed and observed respecting the Interest pursuant to the LLC Agreement from and after the date hereof.

3. Survival. The representations and warranties contained in Paragraph 1 shall survive the delivery hereof.

10

IN WITNESS WHEREOF, Assignor and Assignee have duly executed and delivered this Assignment and Assumption of Membership Interest as of the date first above written.

ASSIGNOR:

EVURTI, LLC

By:_____
    Eli Verschleiser, Manager

ASSIGNEE:

JFURTI, LLC

By:_____
    Jacob Frydman, Manager

The undersigned, as Managers (as defined in the LLC Agreement), hereby consent to the foregoing Assignment.

_____
Jacob Frydman

_____
Eli Verschleiser

STATE OF NEW YORK    )
                       ) SS.:
COUNTY OF NEW YORK  )

The foregoing instrument was acknowledged before me this ____ day of _____, 2013, by Eli Verschleiser individually, and on behalf of EVURTI, LLC, as authorized signator. He is _____ personally known to me or _____ has produced a driver's license as identification.

11



My Commission Expires:

       [NOTARIAL SEAL]

Print Name:_____
NOTARY SEAL:_____
Serial No., if any:_____

STATE OF NEW YORK    )
                      ) SS.:
COUNTY OF NEW YORK  )

       The foregoing instrument was acknowledged before me this _____ day of _____, 2013, by Jacob Frydman individually, and on behalf of JFURTI, LLC, as authorized signator. He is _____ personally known to me or _____ has produced a driver's license as identification.

My Commission Expires:

[NOTARIAL SEAL]

Print Name:_____
NOTARY SEAL:_____
Serial No., if any:_____

EXHIBIT B

ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST

THIS ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST (this "Assignment") is made as of this ___ day of December, 2013 by and between EVURTI, LLC, a Delaware limited liability company ("Assignor"), and JFURTI, LLC, a Delaware limited liability company ("Assignee").

WITNESSETH:

WHEREAS, Assignor owns a 50% Membership Interest (the "Interest") as a member under the URTIGP Investments, LLC, ("URTIGP Investments") pursuant to URTIGP Investments, LLC Operating Agreement, dated as of August 1, 2011, as the same may have been amended or modified from time to time (the "UR Holdings Agreement"). ; and

WHEREAS, Assignor desires to sell and assign the Interest to Assignee, and Assignee desires to assume the same, all under the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing, the payment of good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Assignor and Assignee, intending to be legally bound hereby, agree as follows:

1.   Assignment; Representations.

(a)   Assignor hereby assigns all of Assignor's right, title and interest respecting the Interest to Assignee, to have and to hold the Interest unto Assignee, and Assignee's legal representatives, heirs, successors and assigns, as the case may be, forever.

(b)   Assignor hereby represents and warrants to Assignee that (i) the Interest is free and clear of any and all liens, charges and/or encumbrances, is owned entirely by Assignor and has not previously been conveyed or assigned by Assignor to any other party, and (ii) Assignor has full power and authority to execute and deliver this Assignment.

2.   Assumption. Assignee hereby accepts Assignor's assignment of the Interest and assumes the performance and observance of all of the covenants, agreements and conditions on the part of Assignor to be performed and observed respecting the Interest pursuant to the LLC Agreement from and after the date hereof.

3.   Survival. The representations and warranties contained in Paragraph 1 shall survive the delivery hereof.

13

IN WITNESS WHEREOF, Assignor and Assignee have duly executed and delivered this Assignment and Assumption of Membership Interest as of the date first above written.

ASSIGNOR:

EVURTI, LLC

By:_____
    Eli Verschleiser, Manager

ASSIGNEE:

JFURTI, LLC

By:_____
    Jacob Frydman, Manager

The undersigned, as Managers (as defined in the LLC Agreement), hereby consent to the foregoing Assignment.

United Realty Advisor Holdings, LLC

By:_____
    Jacob Frydman, Manager

STATE OF NEW YORK   )
                    ) SS.:
COUNTY OF NEW YORK )

The foregoing instrument was acknowledged before me this _____ day of_____, 2013, by Eli Verschleiser on behalf of EVURTI, LLC, as authorized signator. He is _____ personally known to me or _____ has produced a driver's license as identification.

My Commission Expires:

_____

14

[NOTARIAL SEAL]

Print Name:_____
NOTARY SEAL:_____
Serial No., if any:_____

STATE OF NEW YORK     )
                                        ) SS.:
COUNTY OF NEW YORK   )

The foregoing instrument was acknowledged before me this ____ day of _____,
2013, by Jacob Frydman individually, and on behalf of JFURTI, LLC, and United Realty
Advisor Holdings, LLC  as authorized signator. He is _____ personally known to me or _____ has
produced a driver's license as identification.

My Commission Expires:

[NOTARIAL SEAL]

Print Name:_____
NOTARY SEAL:_____
Serial No., if any:_____

 

<u>EXHIBIT C</u>

<u>ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST</u>

THIS ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST (this "<u>Assignment</u>") is made as of this _____ day of December, 2013 by and between EVE, LLC a _____ limited liability company ("<u>Assignor</u>"), and Summer Investors, LLC a New York limited liability company ("<u>Assignee</u>").

<u>W I T N E S S E T H</u>:

WHEREAS, Assignor owns a 50% Membership Interest (the "<u>Interest</u>") as a member under the Limited Liability Company Operating Agreement of Prime United Holdings, LLC a Delaware limited liability company, dated as of October 25, 2011, as the same may have been amended or modified from time to time (the "<u>LLC Agreement</u>"); and

WHEREAS, Assignor desires to sell and assign the Interest to Assignee, and Assignee desires to assume the same, all under the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing, the payment of good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Assignor and Assignee, intending to be legally bound hereby, agree as follows:

1. <u>Assignment; Representations</u>.

    (a)     Assignor hereby assigns to Assignee the Interest, to have and to hold the Assigned Interest unto Assignee, and Assignee's legal representatives, heirs, successors and assigns, as the case may be, forever.

    (b)     Assignor hereby represents and warrants to Assignee that (i) the Interest is free and clear of any and all liens, charges and/or encumbrances, is owned entirely by Assignor and has not previously been conveyed or assigned by Assignor to any other party, and (ii) Assignor has full power and authority to execute and deliver this Assignment.

2. <u>Assumption</u>.  Assignee hereby accepts Assignor's assignment of the Interest and assumes the performance and observance of all of the covenants, agreements and conditions on the part of Assignor to be performed and observed respecting the Interest pursuant to the LLC Agreement from and after the date hereof.

3. <u>Survival</u>.  The representations and warranties contained in <u>Paragraph 1</u> shall survive the delivery hereof.

16




IN WITNESS WHEREOF, Assignor and Assignee have duly executed and delivered this Assignment and Assumption of Membership Interest as of the date first above written.

ASSIGNOR:

EVE, LLC

By: _____
    Eli Verschleiser, Manager

ASSIGNEE:

SUMMER INVESTORS, LLC

By: _____
    Jacob Frydman, Manager

The undersigned, as Managers (as defined in the LLC Agreement), hereby consents to the foregoing Assignment.

_____
Jacob Frydman

_____
Eli Verschleiser

STATE OF NEW YORK        )
                         ) SS.:
COUNTY OF NEW YORK       )

The foregoing instrument was acknowledged before me this _____ day of _____, 2013, by Eli Verschleiser individually, and on behalf of EVE, LLC as authorized signator. He is _____ personally known to me or _____ has produced a driver's license as identification.

17

 

My Commission Expires:

     [NOTARIAL SEAL]

Print Name:_____
NOTARY SEAL:_____
Serial No., if any:_____


STATE OF NEW YORK   )
                    ) SS.:
COUNTY OF NEW YORK )

     The foregoing instrument was acknowledged before me this ____ day of _____, 2013, by Jacob Frydman individually, and on behalf of SUMMER INVESTORS, LLC, as authorized signator. He is _____ personally known to me or _____ has produced a driver's license as identification.


My Commission Expires:

     [NOTARIAL SEAL]

Print Name:_____
NOTARY SEAL:_____
Serial No., if any:_____

18




<u>EXHIBIT D</u>
INTENTIONALLY DELETED

 

<u>EXHIBIT E</u>

**Eli Verschleiser**
**3501 Avenue T**
**Brooklyn, NY 11234**

December 3, 2013

Board of Directors
United Realty Trust Incorporated
44 Wall Street
Second Floor
New York, NY 10005

Gentlemen:

Please accept this letter as my formal resignation as President of United Realty Trust Incorporated, (the "Company") and as a member of the board of directors of the Company, both effective immediately.

Please also accept this as my waiver of any rights to receive any Restricted Stock which may have vested pursuant to my employment agreement with United Realty Advisors, L.P., the external advisor to the Company.

I continue to wish each of you and the Company continued success.

Very truly yours,

Eli Verschleiser



**Eli Verschleiser**
**3501 Avenue T**
**Brooklyn, NY 11234**

December 3, 2013

United Realty Advisors, LP
44 Wall Street
Second Floor
New York, NY 10005
Attn: Mr. Jacob Frydman, CEO

Gentlemen:

Please accept this letter as my formal resignation as President of United Realty Advisors, LP., (the "Company") and as a member of the board of directors of the Company, both effective immediately.

Please also accept this as my waiver of any rights to receive any Restricted Stock which may have vested pursuant to my employment agreement with the Company.

I continue to wish the Company continued success.

Very truly yours,

Eli Verschleiser

Eli Verschleiser
3501 Avenue T
Brooklyn, NY 11234

December 3, 2013

United Realty Advisor Holdings, LLC
44 Wall Street
Second Floor
New York, NY 10005
Attn: Mr. Jacob Frydman, Manager

Gentlemen:

Please accept this letter as my formal resignation as Manager of United Realty Advisor Holdings, LLC, (the "Company) effective immediately.

I continue to wish the Company continued success.

Very truly yours,

Eli Verschleiser



Eli Verschleiser
3501 Avenue T
Brooklyn, NY 11234

December 3, 2013

Prime United Holdings, LLC
44 Wall Street
Second Floor
New York, NY 10005
Attn: Mr. Jacob Frydman, Manager

Gentlemen:

Please accept this letter as my formal resignation as Manager of
Prime United Holdings,, LLC,  (the "Company) effective immediately.

I continue to wish the Company continued success.

Very truly yours,

Eli Verschleiser

# EXHIBIT B

**Time line of Events:**

- On December 2, 2013:

  o Verschleiser wrongfully and illegally removes Frydman as the account owner by un-assigning Frydman as an account contact and denying Frydman access to his account and by giving himself unfettered control over the entire United Realty company exchange server by making his alias, 2good2b4@att.net, the new owner of the account

  o Seeking to hide their identities, on December 2nd, Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 68.192.185.214.

- On December 4, 2013:

  o Verschleiser wrongfully and illegally enables Frydman's email account but changes the password on that account to one only Verschleiser knows, giving Verschleiser unfettered access to Frydman's email account, but denying Frydman rightful access to his email account;

  o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 38.104.167.138, which is the same IP address from which Verschleiser accessed the United Realty email exchange server on December 2nd, 4th, 9th and 10th 2013 through his alias 2good2b4@att.net; and from which Verschleiser accessed the Multigroup email exchange server on December 10, 2013 through his alias 2good2b4@att.net.

- On December 5, 2013

  o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 38.104.167.138, which is the same IP address from which Verschleiser accessed the United Realty email exchange server on December 2nd, 4th, 9th and 10th 2013 through his alias 2good2b4@att.net; and from which Verschleiser accessed the Multigroup email exchange server on December 10, 2013 through his alias 2good2b4@att.net.

- On December 6, 2013

  o Verschleiser wrongfully and illegally accessed the United Realty exchange server and illegally created backup files for the following

email mailboxes: 'Ahuva.S@urpa.com', 'Asher.G@urpa.com', 'Eli.V@urpa.com', 'jacob.f@urpa.com', 'monica.f@urpa.com' and diverted the notification of same to himself at 2good2b4@att.net so that neither Frydman nor anyone else at the company would know that he has wrongfully accessed and backed up those company mailbox accounts;)

- On December 6, 2013

  o Verschleiser wrongfully and illegally accessed the United Realty exchange server and illegally pst backup files to be exported for 'Ahuva.S@urpa.com', 'Asher.G@urpa.com', 'Eli.V@urpa.com', 'jacob.f@urpa.com', 'monica.f@urpa.com' which he illegally created giving Verschleiser the ability of copying all the data belonging to the company with respect to the mailbox backups he created;

  o On December 6, 2013 Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 38.104.167.138, which is the same IP address from which Verschleiser accessed the United Realty email exchange server on December 2nd, 4th, 9th  and 10th 2013 through his alias 2good2b4@att.net; and from which Verschleiser accessed the Multigroup email exchange server on December 10, 2013 through his alias 2good2b4@att.net.

- On December 8, 2013

  o Verschleiser wrongfully and illegally accessed the United Realty exchange server and created backup files for Frydman's assistant's mailbox: 'cathy.l@urpa.com', and diverted the notification of same to himself at 2good2b4@att.net so that neither Frydman nor anyone else at the company would know that he has wrongfully accessed and backed up those company mailbox accounts;

- On December 8, 2013

  o Verschleiser wrongfully and illegally accessed the United Realty exchange server and created a backup schedule giving Verschleiser the ability to download and copy all the data belonging to the company with respect to the mailbox for 'cathy.l@urpa.com' which he illegally created;

- On December 8, 2013

    o  Verschleiser wrongfully and illegally accessed the United Realty exchange server and gave his assistant, Ahuva Slomovits permissions to access the United Realty exchange server and obtain copies of emails being sent to United Realty employees;

-  On December 9, 2013

    o  Verschleiser wrongfully and illegally created yet another backup file for Frydman's mailbox: 'jacob.f@urpa.com', and diverted the notification of same to himself at 2good2b4@att.net so that neither Frydman nor anyone else at the company would know that he has wrongfully accessed and backed up those company mailbox accounts;

-  On December 9, 2013

    o  Verschleiser wrongfully and illegally accessed the United Realty exchange server and created a backup schedule giving Verschleiser the ability to download and copy all the data belonging to the company with respect to the mailbox for 'jacob.f@urpa.com' which he illegally created;

-  On December 9, 2013

    o  After copying all of the mailbox backup files he created, Verschleiser wrongfully and illegally deleted each of the following mailbox backups permanently depriving United Realty of the data in these mailboxes: 'Ahuva_Slamovits_12-06-2013.pst' , 'Asher_Gulko_12-06-2013.pst' , 'Eli_Verschleiser_12-06-2013.pst', 'Jacob_Frydman_12-06-2013.pst', 'Monica_Frydman_12-06-2013.pst', and 'Cathy_Larson_12-08-2013.pst';

-  On December 9, 2013

    o  Verschleiser wrongfully and illegally accessed United Realty's exchange server and wrongfully and illegally created a new owner contact for the United Realty exchange server under the name 'eli.v@multigroups.com' in order to give himself on-going undetectable access to the United Realty email mailboxes and the United Realty exchange server so that he can continue to control and have unfettered access to the exchange server and all the email mailboxes contained therein and gave him the ability to then permanently delete his email account 'eli.v@urpa.com' so that he could continue to have unfettered access to the United Realty exchange server without being easily detected;

- On December 9, 2013

  o Verschleiser wrongfully and illegally deleted the Active Directory for User 'Eli.V@urpa.com'; deleted  the mailbox 'Eli.V@urpa.com'; deleted all "My Services" logins to Outlook for 'Eli.V@urpa.com' and deleted ActiveSync service for ActiveSync 'Eli.V@urpa.com'  thereby permanently  deleting important company data and all traces of his emails which were owned by the company, depriving the company of its rightful data and causing the company to be in violation of its legal requirements and its Sarbanes-Oxley requirements;

- On December 9, 2013

  o Verschleiser wrongfully and illegally accesses the United Realty exchange server and created a Distribution List 'eli.v@urpa.com' in order to be able to forward unread emails which were to go to Frydman's and other employees mailboxes so that they could be diverted to or intercepted by Verschleiser and give him the ability to read emails not intended for him;

  o On December 9, 2013 Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 38.104.167.138, which is the same IP address from which Verschleiser accessed the United Realty email exchange server on December 2nd, 4th, 9th  and 10th 2013 through his alias 2good2b4@att.net; and from which Verschleiser accessed the Multigroup email exchange server on December 10, 2013 through his alias 2good2b4@att.net.

- On December 10, 2013

  o Verschleiser wrongfully and illegally deleted Frydman's email mailbox backup File 'Jacob_Frydman_12-09-2013.pst' thereby permanently deleting important company data and depriving the company of its rightful data and causing the company to be in violation of its legal requirements and its Sarbanes-Oxley requirements;

- On December 10, 2013

  Verschleiser wrongfully and illegally created another Distribution List 'Ahuva.s@urpa.com' in order to be able to forward unread emails which were to go to Frydman's and other employees mailboxes so that they

could be diverted to or intercepted by Verschleiser's assistant, Ahuva
Slomovitz, and give her the ability to read emails not intended for her;

- On December 10, 2013

  o Verschleiser wrongfully and illegally deleted  the Active Directory for
    User Ahuva.S@urpa.com'; and deleted  the mailbox
    'ahuva.s@urpa.com' thereby permanently  deleting important
    company data and all traces of his emails which were owned by
    United Realty , depriving the company of its rightful data and causing
    the company to be in violation of its legal requirements and its
    Sarbanes-Oxley requirements;

- On December 10, 2013

  o Verschleiser wrongfully and illegally created a new owner contact for
    the United Realty exchange server under the name
    'ahuva.s@multigroups.com' in order to give his assistant, Ahuva
    Slomovitz on-going undetectable access to the United Realty email
    mailboxes and the United Realty exchange server so that she can
    have unfettered access to the exchange server and all the email
    mailboxes contained therein; (see log A attached   at line 2488)

- On or before December 10, 2014

  o In express breach of paragraph 10 of the Separation Agreement
    Verschleiser solicited Raul Delforno, then a United Realty employee
    and head of technology for United Realty, to become employed by
    Verschleiser while still employed by United Realty, to act as his agent
    in undertaking illegal activities in giving Verschleiser on-going access
    to United Realty's exchange server and other networks, as well as to
    act as Verschleiser's IT employee in setting up Verschleiser's and his
    new organization -- Multigroup's -- technology, including, without
    limitation, the establishment of a Multigroup hosted exchange server
    at Intermedia, the purchase of technology and equipment, including
    the purchase and installation of a new telephone system from
    Telebroad for Verschleiser's new offices at 2294 Nostrand Avenue,
    Suite 1017, Brooklyn, NY and 4741 N. 35th Street, Hollywood Florida;

- On December 10, 2013

- o On December 10, 2013 Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 108.14.1.14, an IP address believed to tie to Verschleiser's residence.

- On December 11, 2013

    - o Seeking to hide their identities, Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 68.192.185.214.

    - o On December 11, 2013 Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 108.14.1.14, an IP address believed to tie to Verschleiser's residence.

- On December 17, 2013

    - o Seeking to hide their identities, Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 68.192.185.214.

- On December 18, 2013

    - o On December 18, 2013, Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 162.218.88.187 believed to tie back to Surfeasy, a foreign company that provides IP addresses that are difficult to trace and are generally used by persons who are hiding their identities, and that was used by Verschleiser and/or Delforno during all relevant times relating hereto.

- On December 22, 2013

    - o Seeking to hide their identities, Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 68.192.185.214.

- On December 30, 2013

    - o While Frydman was recovering from surgery in a hospital in Connecticut, Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address from 198.23.167.181 also believed to tie back to Surfeasy.

- On January 1, 2014

    o  While Frydman was burying his mother who passed away the night
       before, in Baltimore, MD, Verschleiser and/or Delforno, without
       authorization, accessed Frydman's email account secretly
       impersonating Frydman by using his login-credential
       'jacob.f@urpa.com' from IP address 192.3.173.21 believed to tie back
       to Surfeasy.

- On January 9, 2014

    o  Verschleiser wrongfully and illegally caused Raul Delforno, as his
       agent to access the United Realty exchange server to create an active
       directory under the name 'catchall@urpa.com' and then cause a
       POP/IMAP Email forwarding system to be created for
       'CatchAll@urpa.com' so as to permit Verschleiser and his agents to
       diverte and intercepted emails that were being sent to Frydman and
       other company employees to be forwarded to Verschleiser, his
       assistant, and his agents and give him the ability to read emails and
       other sensitive company documentation not intended for him;

- On January 13, 2014

    o  Verschleiser and/or Delforno logged on to Frydman's email account
       as if they were Frydman from IP address 172.245.7.155 believed to tie
       back to Surfeasy.

- On January 15, 2014

    o  Verschleiser and/or Delforno logged on to Frydman's email account
       as if they were Frydman from IP address 172.245.7.155 believed to tie
       back to Surfeasy.

- On January 16, 2014

    o  Verschleiser and/or Delforno logged on to Frydman's email account
       as if they were Frydman from IP address 74.108.218.147 from
       Verschleiser's computer named ELI-X1-CARBON, which is the same IP
       address from which Verschleiser accessed his Eli.v@multigroups
       email account on January 1st and 16th , 2014, from Verschleiser's
       computer named ELI-X1-CARBON, and from which IP address
       Verschleiser accessed his Magenu account through his alias

2goo2b4@att,net on January 16th and 30th, 2014, on February 3, 2014, and on March 3, 2014.

- On January 20, 2014

    o Seeking to hide their identities, Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 68.192.185.214.

- On January 22, 2014

    o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 162.243.193.134 believed to tie back to Digital Ocean, a service that provides users a way to mask their identities;

- On January 22, 2014,

    o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 208.43.237.204 believed to tie back to SoftLayer Technologies, a service that provides users a way to mask their identities;

- On January 24, 2014

    o Seeking to hide their identities, Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 68.192.185.214.

- On January 24, 2014

    o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 23.92.22.84 believed to tie back to Linode, a service that provides users a way to mask their identities, and that was used by Verschleiser and/or Delforno during all relevant times relating hereto.

- On January 27, 2014

    o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 162.243.193.134 believed to tie back to Digital Ocean, a service that provides users a way to mask

their identities, and that was used by Verschleiser and/or Delforno during all relevant times relating hereto.

- On January 28, 2014

  o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 23.92.22.84 believed to tie back to Linode, a service that provides users a way to mask their identities, and that was used by Verschleiser and/or Delforno during all relevant times relating hereto.

- On January 29, 2014

  o On January 29th, 2014, Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 108.14.1.14, an IP address believed to tie to Verschleiser's residence.

- On January 29, 2014

  o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 208.43.237.204 believed to tie back to SoftLayer Technologies, a service that provides users a way to mask their identities, and that was used by Verschleiser and/or Delforno during all relevant times relating hereto.

- On February 2, 2014

  o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 208.43.237.204 believed to tie back to SoftLayer Technologies, a service that provides users a way to mask their identities, and that was used by Verschleiser and/or Delforno during all relevant times relating hereto.

- On February 3, 2014

  o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 208.43.237.204 believed to tie back to SoftLayer Technologies, a service that provides users a way to mask their identities, and that was used by Verschleiser and/or Delforno during all relevant times relating hereto.

- On February 4th 2014

- o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 68.192.185.214 and 50.57.175.32.

- On February 10th 2014

  - o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 173.254.227.108, an IP address believed to tie back to Surfeasy, and which Verschleiser also used on February 4th, 2014 to access his Multigroups email account through his alias 2good2b4@tt.net, as well as to access his Magenu email account through his alias 2good2b4@tt.net, as well as to access his Eli.v@eliv.com email account on his Eliv email exchange server. On February 4, 2014 this same IP address, 173.254.227.108, was used to access the account maintained byDelforno on the Multigroup email exchange server, as well as the mailbox Rauldelforno@gmail.com on the Magenu email exchange sever.

- On February 10, 2014

  - o Using a service provided by Surfeasy, Verschleiser wrongfully and illegally and without authorization, accessed Jacob Frydman's email mailbox from IP address 173.254.227.108 and learned from reading highly confidential company emails that Frydman was negotiating a $10 Million loan with Bancorp to finance the acquisition of a $15 million medical facility in Myrtle Beach South Carolina, through communications with Kinzie Geldbach at Bancorp.

- On February 11, 2014

  - o Using the same service provided by Surfeasy it is our belief that Verschleiser opened an email account titled 'informedconsumer@mail.com' with mail.com, an anonymous email provider through IP address 173.254.227.116 which he intended to use to send disparaging emails to persons with whom Frydman was doing business in an effort to interfere with Frydman's business relationships.

- On February 11, 2014

  - o Using the same service provided by Surfeasy, an email which we believe was sent by Verschleiser was sent from 'informedconsumer@mail.com' to Kinzie Geldbach at Bancorp from

IP address 173.254.227.108, the same IP address Verschleiser used to access Frydman's email account on February 10, 2014, stating: "You are about to enter into an agreement with an individual who alledgedly [sic] does anything and everything NOT to pay his vendors and or circumvent any written agreement he or his affiliated entities have. As long as it is to his benefit he "may" pay in partial, but as soon as he chooses to he will 100% stop paying and choose to litigate the matter. Do a simple Nexus Lexus search and look closely into his litigous [sic] nature and background. Do a google search " Jacob Frydman Fraud" "Jacob Frydman Lawsuit" and think twice. Ask yourself, why so many compoany [sic] names over such a short period of time? Every two to 4 years a new "venture"? Be an informed consumer, dont [sic] get hurt …"

- As a result of that email United Realty lost the $10 million loan it was negotiating with Bancorp.

- On February 10, 2014

    o Using the same service provided by Surfeasy, Verschleiser wrongfully and illegally and without authorization, accessed Jacob Frydman's email mailbox from IP address 173.254.227.108 and learned from reading highly confidential company emails that Frydman was negotiating a sublease for new corporate office space for United Realty at 180 Maiden Lane, New York, NY in a $1.4 Million transaction with Opera Real Estate as the sublandlord.

- On February 11, 2014

    o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 174.254.160.91.

- On February 11, 2014

    o an email which we believe was sent by Verschleiser was sent from 'informedconsumer@mail.com' to Amy Weins at Opera  Real Estate stating: "You are about to enter into an agreement with an individual who alledgedly [sic] does anything and everything NOT to pay his vendors and or circumvent any written agreement he or his affiliated entities have. As long as it is to his benefit he "may" pay in partial, but as soon as he chooses to he will 100% stop paying and choose to litigate the matter. Do a simple Nexus Lexus search and look closely into his litigous [sic] nature and background. Do a google search "

Jacob Frydman Fraud" "Jacob Frydman Lawsuit" and think twice. Ask yourself, why so many compoany [sic] names over such a short period of time? Every two to 4 years a new "venture"? Be an informed consumer, dont [sic] get hurt …"

- As a result of that email United Realty lost the corporate headquarters lease it was negotiating with Opera Real Estate.

- On February 24, 2014

  o a second anonymous email account named 'FriendsOfEli@gmx.com' which we believe was created by Raul Delforno at Verschleiser's instruction, and as his agent, with an affiliate of mail.com from the offices of United Realty at IP address 38.104.66.182, an IP address used on an on-going basis by Delforno.

- On February 24, 2014

  o an email which we believe was sent by Verschleiser or at his direction from 'FriendsOfEli@gmx.com' to Craig Gould, the CEO of Cabot Lodge Securities, LLC, the FINRA Broker Dealer owned by affiliates of Frydman, was sent, which email stated:  If you haven't seen Eli's filing last week jump online and take a look... Look at **Eli's letter terminating Jacob**... Be careful – you might want to exit before the sexual harassment suits, class action suits, Eli and [M]orty's suits all coming! Warning you, better have insurance protecting you!  You've been warned.  It will be a messy 30 days.  Be careful! (emphasis added).

- On March 8, 2014

  o Verschleiser and/or Delforno logged on to Frydman's email account as if they were Frydman from IP address 69.112.232.185.

- On March 21, 2014

  o Verschleiser posted a disparaging report on ripoffreport.com, allegedly by an "Ex Employee Whistle Blower" entitled "Jacob Frydman," with subheading, "Jacob Frydman, Jake Frydman, Jake the snake Frydman, Jacob A Frydman, United Realty Partners, United Realty Trust, … Master of deception, Megalomaniac, Scam, Fraud, Thief, Criminal, Ponzi New York New York," was posted on Ripoffreport.com. The March 21, 2014 ripoff report states: "Jacob Frydman is trying to raise money from the public through a Non Traded REIT, United Realty Trust.  He has induced many to work for his failing company by promising them stock as an

- o   we believe that Verschleiser posted yet another disparaging post on
  REITwrecks.com claiming that "i [sic] searched Jacob Frydman and see
  fraud cases with this ceo [sic] of united realty [sic]".

- On April 14, 2014, at a hearing held in this matter, Justice Bransten admonished
  Mr. Verschleiser's counsel stating:

"Listen carefully to me. If I hear Mr. Verschleiser, whatever his name is, that
he's got a communication of any kind disparaging anybody, is doing anything,
anything connected with this, if I see one communication, true, I don't have a TRO,
but have a long memory, and really, Mr. Cooper, tell your client don't do that to me,
because I get very annoyed, and an annoyed judge is guess what? Somewhat
vengeful. You don't want that. So I don't expect anything to happen during this time
…. The standstill remains completely enforced until I see you again. I'm not putting a
TRO in, but if I again here there's been anything done by your client during this very
sacred time and the time we put it over to accommodate everybody, that's going to
be something I'm going to very, very, very annoyed about." (See transcript of April
14, 2014 hearing page 21 lines 14 – 23 and page 22 lines 24 attached hereto as
exhibit "___").

Notwithstanding Justice Bransten's clear directives not to continue with
these disparaging post, Mr. Verschleiser, in total disregard to Justice Bransten's on
the record statements, continued to make disparaging posts on the internet, and as
time has passed since the April 14 hearing, he has increased the velocity of his
vituperative disparaging postings, where they are now coming on almost a daily
basis.

- On April 17, 2014
  - o   we believe that Verschleiser posted yet another disparaging post on
    Ripoff Report.com claiming that "Jacob Frydman will do anything to hurt
    anyone".

- On July 11, 2014

  - o   we believe that Verschleiser posted yet another disparaging post on
    REITwrecks.comclaiming that: "United Realty Trust Jacob Frydman Fraud
    by PutJacobInJail » Sat Jul 12, 2014 12:05 am look into the CEO before
    giving them money. He clearly has many issues relating to FRAUD. Jacob
    Frydman of http://www.urpa.com has been sued many times for fraud
    One lawsuit alleges that Mr. Frydman defaulted on his personal guaranty
    of a $12 million loan PAF Capital made to McDonald Ave. Acquisition LLC.
    The suit claims that after defaulting on his guaranty, Mr. Frydman
    represented to PAF Capital that he could not afford to honor his guaranty
    and provided PAF Capital with what they now believe are fraudulent

financial statements in an effort to get PAF Capital to settle with Mr.
Frydman for a significant haircut. He can end up in Jail.

- On July 12, 2014

    o   we believe that Verschleiser posted yet another disparaging post, and in
        fact violated Frydman's privacy rights, by illegally using his name and
        likeness to create a blog A titled: "JacofFrydmanFraud" through which he
        posted the following words under a large banner that stated: "FRAUD"
        with a large picture of Mr. Frydman's face that stated: "JACOB FRYDMAN
        SCAM Posted by jacob It is amusing to see that the SEC and FINRA lets a
        complete fraud take place with a public company
        http://www.unitedrealtytrust.com Jacob Frydman steals old peoples
        money, has his friends and lawyers on his independent board, then buys
        notes with other notes and gives it to the public in exchange for cash he
        NEVER paid for it." .

- On July 15, 2014

    o   we believe that Verschleiser posted yet another disparaging post on
        ScamGuard.com stating: "Jacob Frydman and United Realty - Beware:
        The too good to be true United Realty - Frydman new scam.  The CEO has
        many lawsuits against him especially FRAUD….".

# EXHIBIT C

**DJZV Holdings, LLC**
**Brooklyn NY 11234**

December 18, 2013

<u>Via Electronic Mail and FedEx Overnight Mail</u>

Peter Cowan
Citi Private Bank
111 Huntington Avenue
Boston, MA 02199
<u>Peter.m.cowan@citi.com</u>

RE:   **DJZV Holdings LLC et al. v. Jacob Frydman et al.**
**United Realty 866 UN Plaza, LLC, United Realty Partners LLC**

Dear Sir and/or Madam:

Please take notice that our attorneys Itkowitz PLLC located at 305 Broadway, New York, NY 10007 are seeking an immediate temporary and preliminary injunction restraining Jacob Frydman and/or any entities he is associated with, including but not limited to United Realty Partners LLC, United 866 Management, LLC, United Realty 866 UN Plaza, LLC, from transferring any funds out of any of these entities. (see *Notice sent by attorneys to Jacob Frydman* attached hereto as <u>Exhibit A.</u>

A copy of the court filed complaint will be sent to you in the morning.

Please be further advised that any transaction relating to this entity must require the unanimous written consent of both Managers. Please be guided accordingly.

**DJZV Holdings, LLC**

DR. JENNIFER ZOLDAN
Its, Manager

CC:   Joseph LoParrino, Chief Accounting Officer - United Realty Partners, LLC
Brian Warren, Comptroller United Realty Partners, LLC
Marty Bell, General Counsel United Realty Partners, LLC

**EXHIBIT A**

☺ This message was sent with High Importance.

From:      Jay B Itkowitz <jitkowitz@itkowitz.com>
To:        Jacob.f@urpa.com; yf@husdon-york.com
Cc:        Isaac Tilton; Michele Maratio
Subject:   DJZV Holdings LLC et al. v. Jacob Frydman et al.

Sent:   Wed 12/18/2013 1:00 AM

Mr. Frydman,

This shall advise that this office represents DJZV Holdings LLC, EVUNP Holdings LLC and Eli Verschleiser.

This office is advised that in violation of the Operating Agreement of United 866 Management, LLC ("866 Management"), you and entities you control, yesterday contracted on behalf 866 Management and an entity it controls, namely, United Realty 866 UN Plaza, LLC ("URT") with Meadow 866 UNP Owner LLC ("Meadow") and/or 866 UN Plaza Venture LLC ("866 UN Plaza") for the return of amounts deposited on behalf of URT for the purchase of certain real property located at 866 UN Plaza, New York, New York (the "Property") and other consideration and, without any legal authority, diverted such funds given to you by investors to an unrelated entity controlled by you, namely, United Realty Partners LLC.

Further, in plain violation of Article 3.1.5 and 3.1.5(a),  you have taken actions on behalf of 866 Management and URT to "sell, exchange or otherwise transfer all or any portion of the assets of the Company..." without *"the unanimous prior written approval of both Managers."*  In doing so, you have committed a breach of contract, violated your fiduciary duties, converted funds you were not entitled to receive and conveyed  such funds received to an entity solely controlled by you and not 866 Management.

Finally, in plain breach of your fiduciary duty, you violated the Power of Attorney Investors gave to 866 Management to manage, control and protect such funds by causing such funds, without the required "unanimous authority" to be diverted to an entity not controlled by the managers of 866 Management and wholly unrelated to the unlawful transaction you engaged in without lawful authority.

Accordingly, this shall further advise that this office intends to file an order to show cause at the earliest possible time this morning seeking an immediate temporary and preliminary injunction restraining and/or enjoining you and/or any entities you are associated with, including but not limited to United Realty Partners LLC, from disbursing any of the funds received from Meadow and/or any entities it controls including, but not limited to, 866 UN Plaza.

Please advise at your earliest convenience if you will be retaining counsel so that this office can advise when we expect to be bringing our injunction before a Justice of the Supreme Court, County of New York.

Best,

Jay B. Itkowitz

<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<
Jay B. Itkowitz
Itkowitz PLLC
305 Broadway, 7th Floor
New York, New York 10007
jitkowitz@itkowitz.com
(646) 822-1801-o
(646) 996-6597-c
(212) 822-1402-fax

# EXHIBIT D



UNITED REALTY
**ADVISORS**

November 29, 2013

<u>VIA HAND DELIVERY</u>

Mr. Jacob Frydman
44 Wall Street, Second Floor
New York, New York 10005

Mr. Frydman:

Reference is made to that certain employment agreement entered into by and between you and United Realty Advisors, LP (the "Company"), dated January 4, 2012 (the "Agreement"). Capitalized terms not otherwise defined herein shall have the same meaning ascribed to such terms in the Agreement.

This letter is intended to advise you that the General Partner of the Company has determined that you have failed to adequately perform your duties in that amongst other things:

i)   You have failed to obtain prior written approval of both Managers for, and then making unauthorized distributions to yourself or your affiliates from the Partnership, which have not been cured by repaying same to the Company. This also constitutes a breach of Section 3.1.4 (c) by drawing upon checking and other accounts of the Company or any company of which the Company is a manager or general partner, where the sum involved exceeds $50,000, without the signature of both Managers;

ii)  You have failed to devote at least 90% of your normal, professional business time (subject to limited charitable endeavors and, retention of all of their existing other business interests which exists on the date hereof) to the business and the affairs of the Group;

iii) You used the services of employees of the Company to prepare marketing materials and other promotional materials for The Brem Foundation, and office resources to host fundraising event(s), without disclosing same to the other Managers and the Members, and without having obtained the unanimous written



**UNITED REALTY
ADVISORS**

affirmative consent of all of the Managers and Members and the transactions being unfair to the Advisor;

iv)    You used the Partnership's computer servers as the computer servers for The Brem Foundation, without any compensation therefore, and without disclosing same to the other Manager and the Members, and without having obtained the unanimous written affirmative consent to same and the transactions being unfair to the Advisor;

v)     You wrongfully caused the Company to hire vendors to install telephone systems and/or technologies in your home and/or your Affiliate's spaces, at the Company's costs;

vi)    You were allegedly involved in possible fraud with respect to certain written disclosures made to the Securities and Exchange Commission ("SEC") that repudiated or otherwise denied allegations of your wrongful and unlawful control of the affiliated Independent Broker-Dealer, Cabot Lodge Securities LLC ("CLS"). You managed, and still manage day-to-day operations and maintain total control over CLS, including its Chief Executive Officer and Compliance Department, thereby putting the Company and its affiliates at risk for potential claims and liability.

vii)   You allegedly made fraudulent representations and fraudulently induced certain investors, including Mr. Alan Stahler, to make loans to the Company and/or its affiliates that were collateralized against the net income earned from a property owned by the REIT, albeit in direct contravention to the applicable charter and possible securities regulations.

viii)  Your potential fraudulent activity in connection with a transaction referred to as the Parker Note, which took place in the first quarter of 2013, wherein you, without the prior consent of counsel or the requisite approval by the Board of Directors, allegedly wrongfully transferred property into the REIT in order to meet the criteria required to pass the "Asset Test" so as to continue to qualify as a public REIT. In addition to the nature of this transaction being potentially fraudulent and deceitful to both, the public and other regulatory authorities, you further damaged the Company and/or its affiliates by your knowing alleged transfer of a bad and debilitating asset to the REIT, which aside from providing direct and personal benefits to you, the transfer of said asset had no actual beneficial financial impact on the Company and/or its affiliates;

 
UNITED REALTY
ADVISORS

ix)     You allegedly conspiring to defraud investors by causing distributions to be paid to investors from the MMFO;

x)      You allegedly made materially dishonest representations of fact at public conventions and conferences with regard to the size and structure of the Company and/or its affiliates, and for allegedly fraudulently inducing employees to enter employment agreements with the Company and/or its affiliates by offering a sham Stock Incentive Plan that was entirely impracticable, as it required the Company and/or its affiliates to meet certain financial goals that were both unrealistic and unlikely.

xi)     You wrongfully entered into employment agreements with certain employees, including, Mr. Sam Akabas, Ms. Catherine Larson, and Mr. Rick Vitale, each agreement being in excess of $50,000 and made the without prior unanimous written approval of both Managers.

xii)    You hired Ms. Catherine Larson without prior written approval by both Managers, and in so doing, expended and continue to expend Company assets and monies for her to work in the capacity of one of your several personal assistants that handle matters that relate to you and not the Company and/or its affiliates.

xiii)   Your alleged morally reprehensible conduct involving employees of the Company and/or its affiliates, including certain remarks made at a Company outing in San Diego, California that involved allegedly sexist, condescending and vulgar sexual references, as well as in course of conduct while terminating certain employees, as provided in the Exit Interview by Ms. Jennifer Mazza have put the Company at risk for harassment and other claims. In addition, you have demonstrated similar morally unacceptable behavior in having certain employees, by example and not by limitation, Ms. Twighlight Johnson, dress more provocatively and solicit potential investors by offering to meet in person.

xiv)    You failed to disclose to your partners or other necessary authorities of certain pending litigation, known as the PAF action that involved substantial allegations of fraud against you, and which has caused and continues to cause direct actual damage to the Company and/or its affiliates.

xv)     The foregoing constitutes breaches of your fiduciary duty to the Company; and the foregoing constitutes willful acts of misconduct or gross neglect in the conduct of your Company duties.



**UNITED REALTY ADVISORS**

As a result of the foregoing, the General Partner has determined that your employment with the Company should be, and is hereby terminated, effective immediately.

Very truly yours,

URTI GP LLC
By: United Realty Advisor Holdings, LLC
Its Manager

Eli Verschleiser, Manager

EVURTI, LLC
44 WALL STREET, SECOND FLOOR
NEW YORK, NEW YORK 10005

November 29, 2013

<u>VIA HAND DELIVERY</u>

Mr. Jacob Frydman
44 Wall Street, Second Floor
New York, New York 10005

<u>NOTICE OF REMOVAL</u>

PLEASE TAKE NOTICE take notice that pursuant to Section 3.1.3 of that certain
*Operating Agreement* of United Realty Advisor Holdings LLC (the "Company") made as of August
1, 2011, by and among JFURTI, LLC ("JF"), EVURTI, LLC ("EV"), Jacob Frydman ("Frydman")
and Eli Verschleiser ("Verschleiser") (the "Agreement"), said Eli Verschleiser hereby removes
Jacob Frydman as a Manager for Cause, effective immediately. Capitalized terms not otherwise
defined herein shall have the meaning ascribed to such terms in the Agreement.

The reasons for said removal include but are not limited to the following alleged acts and
or omissions:

i) Breaches by Frydman of the provisions of Section 3.1.5 (a) of the Agreement by
failing to obtain prior written approval of Verschleiser for, and then making
unauthorized distributions to himself or his affiliates from the Partnership, which
have not been cured by repaying same to the Company. This also constitutes a
breach of Section 3.1.4 (c) by drawing upon checking and other accounts of the
Company or any company of which the Company is a manager or general partner,
where the sum involved exceeds $50,000, without the signature of Verschleiser;

ii) Breaches by Frydman of the provisions of Section 3.10 of the Agreement by failing
to devote at least 90% of his normal, professional business time (subject to
limited charitable endeavors and, retention of all of their existing other business
interests which exists on the date hereof) to the business and the affairs of the
Group and such other joint enterprises that Verschleiser and Frydman have
agreed to undertake jointly;

Page 1 of 4

**EVURTI, LLC**
**44 WALL STREET, SECOND FLOOR**
**NEW YORK, NEW YORK 10005**

iii) Breaches by Frydman of the provisions of Section 3.1.7 of the Agreement by causing transactions between the Partnership and Frydman's affiliates, and specifically The Brem Foundation, to use the services of employees of the Company to prepare marketing materials and other promotional materials for The Brem Foundation, and office resources to host fundraising event(s), without disclosing same to the other Managers and the Members, and without having obtained the unanimous written affirmative consent of all of the Managers and Members and the transactions being unfair to the Advisor;

iv) Breaches by Frydman of the provisions of Section 3.1.7 of the Agreement by causing transactions between the Partnership and Frydman, and specifically The Brem Foundation, to use the Partnership's computer servers as the computer servers for The Brem Foundation, without any compensation therefore, and without disclosing same to the other Manager and the Members, and without having obtained the unanimous written affirmative consent to same and the transactions being unfair to the Advisor;

v) Breaches of the provisions of Section 3.1.7 of the Agreement and waste of Company assets by Frydman, by wrongfully causing the Company to hire vendors to install telephone systems and/or technologies in Frydman's home and/or his Affiliates, at the Company's costs;

vi) For allegedly committing fraud with respect to certain written disclosures made to the Securities and Exchange Commission ("SEC") that repudiated or otherwise denied allegations of his wrongful and unlawful control of the affiliated Independent Broker-Dealer, Cabot Lodge Securities LLC ("CLS"). Frydman managed, and still manages day-to-day operations and maintains total control over CLS, including its Chief Executive Officer and Compliance Department.

vii) For allegedly making fraudulent representations and allegedly fraudulently inducing certain investors, including Mr. Alan Stahler, to make loans to the Company and/or its affilates that are collateralized against the net income earned from a property owned by the REIT, albeit in direct contravention to the applicable charter.

viii) For certain allegedly potential fraudulent activity in connection with a transaction referred to as the Parker Note, which took place in the first quarter of

EVURTI, LLC
44 WALL STREET, SECOND FLOOR
NEW YORK, NEW YORK 10005.

2013, wherein Frydman, without the prior consent of counsel or the requisite approval by the Board of Directors, allegedly wrongfully transferred property into the REIT so as to meet the criteria required to pass the "Asset Test" so as to continue to qualify as a public REIT. In addition to the nature of this transaction being fraudulent and deceitful to both the public and other regulatory authorities, Frydman further damaged the Company and/or its affiliates by his knowing alleged transfer of a bad and debilitating asset to the REIT, which aside from providing direct and personal benefits to him, the transfer of said asset had no actual beneficial financial impact on the Company and/or its affiliates;

ix)     For allegedly conspiring to defraud investors by causing distributions to be paid to investors from the MMFO;

x)      For allegedly making materially dishonest representations of fact at public conventions and conferences with regard to the size and structure of the Company and/or its affiliates, and for allegedly fraudulently inducing employees to enter employment agreements with the Company and/or its affiliates by offering a sham Stock Incentive Plan that was entirely impracticable, as it required the Company and/or its affiliates to meet certain financial goals that were both unrealistic and unlikely.

xi)     Breaches by Frydman of the provisions of Section 3.1.5 (f) of the Agreement by entering into employment agreements with certain employees, including, Mr. Sam Akabas, Ms. Catherine Larson, and Mr. Rick Vitale, each agreement being in excess of $50,000 and made the without prior unanimous written approval of both Managers.

xii)    Breaches by Frydman in hiring Ms. Catherine Larson without prior written approval by both Managers, and in so doing, expended and continues to expend Company assets and monies for her to work in the capacity of one of his several personal assistants and handle matters that relate to him and not the Company and/or its affiliates.

xiii)   For his allegedly morally reprehensible conduct involving employees of the Company and/or its affiliates, including certain remarks made at a Company outing in San Diego, California that involved allegedly sexist, condescending and vulgar sexual references, as well as in course of conduct while terminating certain employees, as provided in the Exit Interview by Ms. Jennifer Mazza. In addition,

Page 3 of 4

EVURTI, LLC
44 WALL STREET, SECOND FLOOR
NEW YORK, NEW YORK 10005

Frydman has demonstrated similar morally unacceptable behavior in having certain employees, by example and not by limitation, Ms. Twighlight Johnson, dress more provocatively and solicit potential investors by offering to meet in person.

xiv)   For breaches in failing to disclose to Verschleiser or other necessary authorities of certain pending litigation known as the PAF action that involved substantial allegations of fraud against Frydman, which has caused and continues to cause direct actual damage to the Company and/or its affiliates.

xv)    The foregoing constitutes breaches of Frydman's fiduciary duty to the Company; and the foregoing constitutes willful acts of misconduct or gross neglect in the conduct of his Company duties.

PLEASE TAKE FURTHER NOTICE that as a result of the immediate removal of Frydman for Cause, then, in addition to any rights which the Company, the other Manager or the Members may have against Frydman, Frydman shall not be entitled to any indemnification by the Company or any company of which the Company is a manager or general partner, and Frydman shall be liable to the Company or any company of which the Company is a manger or general partner, for all damages suffered by the Company or any company of which the Company is a manager or general partner, resulting from Frydman's wrongful actions or failures to act. In addition, pursuant to Section 3.7.3 of the Agreement, upon removal, a removed Manager shall no longer be entitled to receive any compensation as manager or any salary as an employee, from the Company, the General Partner, the Partnership, or any company of which the Company is a manager or general partner.

Very truly yours,

EVURTI, LLC

By: _____
Eli Verschleiser, Manager

Page 4 of 4

# EXHIBIT E

FILED: NEW YORK COUNTY CLERK 02/18/2014

NYSCEF DOC. NO. 58

INDEX NO. 654346/2013

RECEIVED NYSCEF: 02/18/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X

DJZV HOLDINGS LLC, EVUNP HOLDINGS LLC,
and ELI VERSCHLEISER,

Index No.: 654346/2013

Plaintiffs,

-against-

**AFFIDAVIT IN SUPPORT**

JACOB FRYDMAN, WINTER 866 UN LLC,
UNITED REALTY PARTNERS LLC,

Defendants.

-------------------------------------------------------------X

STATE OF NEW YORK     )
                      ) ss.
COUNTY OF NEW YORK    )

ELI VERSCHLEISER, being duly sworn, deposes and says:

1.     I am a Plaintiff in the above captioned proceeding, and submit this Affidavit on

behalf of myself and the Plaintiffs herein in Support of Plaintiffs' motion pursuant to CPLR §

2221 for leave to reargue the Decision and Order issued by this Court on January 13, 2014 and

entered on January 16, 2014 (the "Order"), which dismissed Plaintiffs' complaint ("Complaint")

against Jacob Frydman, Winter 866 UN LLC, and United Realty Partners, LLC (collectively

"Defendants"), and upon granting of such leave, reversing the Order and reinstating the

Complaint.

2.     I am fully familiar with the facts and circumstances surrounding this action based

upon my own personal knowledge of the matters set forth herein and the file maintained by my

office, and the statements contained herein are true and correct to the best of my knowledge.

3.     Jacob Frydman ("Frydman") and I (collectively, the "Parties"), directly and

indirectly through a variety of affiliates, jointly owned and/or controlled several public and

private entities (collectively, the "Entities"). As of December 1, 2013, Frydman's interests were owned through three affiliates, JFURTI, LLC, Summer Investors, LLC, and Winter 866 UN, LLC. In addition to the Entities, Frydman and I currently, directly and indirectly through various affiliates, jointly own, operate, advise, and/or control several public and/or private entities (collectively, the "Additional Entities").

4.    Prior to December 1, 2013, Frydman and I were the members of United Realty Advisor Holdings, LLC, ("UR Holdings"), each owning a 50% interest therein. UR Holdings is the sole member and 100% owner of each of: (i) United Realty Partners, LLC; (ii) URA Property Management, LLC; (iii) United Realty Capital Markets, LLC; and (iv) URP Investments, LLC. Frydman and I were the two original sole managers of UR Holdings. UR Holdings is the sole manager of: (i) URTI GP, LLC; (ii) URTIGP Investments, LLC; (iii) URA Property Management, LLC; (iv) URTI LP, LLC; (v) United Realty Partners, LLC; (vi) URP Investments, LLC; and (vii) United Realty Capital Markets, LLC. United Realty Partners, LLC is the owner of 50% of Riverside United Title Agency, LLC.

5.    Likewise, prior to December 1, 2013, Frydman and I were the members of URTI GP Investments, LLC, ("URTIGP Investments"), with each owning a 50% of URTIGP Investments. URTIGP Investments is the owner of a 66.67% interest in URTI GP LLC ("GP") which is the sole General Partner of United Realty Advisor, L.P. United Realty Advisor, L.P. is the external advisor to United Realty Trust Incorporated (the "REIT"), a public non-traded REIT. UR Holdings is the sole manager of GP. GP is the sole member and owner of URTI LP, LLC. The REIT is the sole general partner of United Realty Capital Operating Partnership LP, and URTI LP, LLC is the sole limited partner of United Realty Capital Operating Partnership LP. (For the convenience of the Court, an Organizational Chart is attached hereto as **Exhibit A**).

2

6.·  After successfully navigating through its fair share of regulatory hurdles with the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"), the REIT was approved in August 2012.

7.  However, soon thereafter, due mainly to the gross mismanagement by Frydman, the REIT and affiliated broker-dealer found themselves in dire financial straits.

8.  Frydman's mismanagement included, *inter alia*, hiring or causing the REIT, the broker-dealer, and their various affiliates (the "REIT Companies"), to wrongfully hire multiple management teams, paying excessive salaries for personal assistants to the CEO, committing wrongful acts that triggered an investigation by regulatory authorities and creating exposure to potential significant liability, and consistently exercising unreasonably poor business judgment and direction, all seemingly fueled by personal ego and need to micromanage.

9.  As is evident from exit interviews conducted with now former employees, as well as numerous emails I received, Frydman continuously ignored the business advice and directives of others, even when the advice was generated by his very own employees who were experts in their respective industries, and were hired to handle those specific concerns. (Emails from Frank Chandler to me, dated September 22, 2013 and September 24, 2013, are attached as **Exhibit B**).

10.  The weak financial state of the REIT Companies as a result of Frydman's mismanagement led to mass employment terminations, actual or anticipated litigation by unpaid vendors, and numerous complete overhauls of management teams.

11.  On November 29, 2013, following a series of breaches, misrepresentations, and "bad boy acts" (as defined in the United Realty Holdings, LLC Operating Agreement), Frydman was removed for cause as a Manager of United Realty Holdings, LLC. (A copy of the Notice of Removal for Cause is attached hereto as **Exhibit C**).

3

12.    In addition, the General Partner of United Realty Advisors, LP terminated Frydman's employment with United Realty Advisors, LP.  (A copy of the termination of employment letter is attached hereto as **Exhibit D**).

13.    After being served with the Notice of Removal for Cause and the Notice of Termination of Employment, Frydman allegedly served me with substantially similar notices and wrongfully attempted to remove me as an administrator of the company email exchange servers. As a result, I temporarily lost access to his email accounts.

14.    Frydman's actions were intentional and premeditated and caused irreparable harm to my businesses and reputation.

15.    Frydman allegedly deceived the third party email hosting company (Intermedia.Net), by impersonating me in an effort to persuade the hosting company's personnel to do as he instructed, and misrepresented facts and submitted false documents in the process. (A copy of the email to Intermedia is attached hereto as **Exhibit E**).

16.    In response, I immediately notified Intermedia of the fraud by Frydman and regained control of the company email exchange server and reset the administrator rights to all company information technology servers.

17.    At approximately 12:10 a.m. on December 4, 2013, Frydman and I entered into a certain Membership Interests Sale and Purchase Agreement.  (A copy of the "P&S Agreement" is attached hereto as **Exhibit F**).

18.    However, notwithstanding Frydman's undertaking pursuant to section 6(b) of the P&S Agreement, Frydman distributed or caused to be distributed funds to personal or other unauthorized accounts without making the requisite EV Distribution Percentage Payments.  See **Exhibit G**.

4

19.     Further, notwithstanding Frydman's undertaking pursuant to section 10(b) of the P&S Agreement, upon information and belief, the Frydman Parties disparaged, and encouraged and induced others to disparage me and my affiliates.

20.     As evidenced from Frydman's blatant and repeated breaches of the P&S Agreement almost immediately after executing same, Frydman acted in bad faith and with the desire to do anything he wants, whether contractually or legally impermissible – in an effort to defraud, harm, manipulate and defame, me.

21.     In or about the first quarter of 2013, I learned that 866 UN Plaza, New York, New York (the "Property") had been removed from the for-sale market.

22.     I asked a vice chairman at Jones Lang Lassalle ("JLL") with whom I had a personal and business relationship, to approach Vornado Realty ("VNO" or "Seller") on my behalf in order to acquire the Property (the "Transaction").

23.     The Transaction envisioned the acquisition of the property for approximately $188 million, requiring approximately $45 million in equity.

24.     On September 9, 2013, JLL accompanied me to a meeting with the senior management at VNO, and a deal was reached for me to acquire the Property.

25.     After the meeting, JLL sent an email to VNO confirming the agreed upon deal.

26.     I asked my team leaders at United Realty, including Stephen Tober, the then Vice President of Acquisitions and Barry Funt, President of Capital Markets, to work on the Transaction.

27.     On September 15, 2013, VNO sent to me the first draft of the Purchase and Sale Agreement ("PSA").

28.    At about the same time, Frydman hired an external company, Maverick Capital Partners, LLC, to seek debt for the Transaction, despite my objection to hiring Maverick Capital Partners, LLC, as Mr. Funt had sufficient expertise for this task.

29.    Several days later, on September 18, 2013, JLL sent a brokerage commission agreement to me and shortly thereafter on September 18, 2013, VNO's counsel, Proskauer Rose, LLP, sent the first revised PSA.

30.    Due to the religious holidays, spanning from September 18, 2013 through September 27, 2013, my ability to participate in negotiations of the Transaction with VNO was limited, however, I continued to conduct negotiations with potential equity partners, including Ira Sax, an individual I had recently introduced to Frydman, who had formed a relationship with Jeff Kaplan of Meadow Partners.

31.    While the PSA was being negotiated with the Seller, Frydman, Meadow Partners and I formed a joint venture entity known as 866 UN Plaza Venture LLC, which had two members, Meadow 866 UNP Owner, LLC (a/k/a the Meadow entity), and United Realty 866 UN Plaza, LLC ("URT," a/k/a the United entity) (the "Joint Venture").  (A copy of the Joint Venture Agreement is attached hereto as **Exhibit H**).

32.    The Joint Venture with Meadow Partners required that URT fund not less than 12.5% of the necessary equity, or approximately $5.7 million, although it was expected that URT would ultimately fund half of the equity, or approximately $25 million.

33.    The Joint Venture also required that the equity contribution be deposited no later than 20 business days prior to the closing date. URT was entitled to a pro rata share of all distributions, and accordingly sought to raise capital from third party investors, offering investors an annualized preferred return of 10% on un-recouped equity, a return of the equity and 50% of

6

all profits in excess of the preferred return of 10%. Had URT raised the expected $25 million, we anticipated that its interest would be worth in excess of $60,000,000.

34.     However, as a result of Frydman's ego and dishonesty to the partners involved in the Transaction, the Parties suffered irreparable harm and lost the opportunity to make tens of millions of dollars.

35.     I, and other parties involved, informed Frydman that the promote structure in the Transaction would not work for most of the investors we knew, and further advised Frydman that he should not be so greedy, or they will not be able to raise the money for the deal.  Frydman disagreed.

36.     Over the six (6) months prior to this point in time, I had begun to lose all trust in Frydman.  Consequently, on November 13, 2013, I told Frydman that I wanted to have an operating agreement drawn up for our management entity.

37.     Several days later, I followed-up with Frydman, reiterating that since I no longer trusted him, there must be an operating agreement in place.

38.     On November 18, 2013, Frydman held a general company meeting and told all those present that "I have 60 million dollars circled" and whomever "wanted to make a commission for bringing in capital" better hurry as "we are way oversubscribed."

39.     Throughout the process, Frydman continued to tell his partners and all those involved in the Transaction that he had personally raised funds in excess of the Transaction's requirement.

40.     The following day, I emailed Frydman with a copy to Attorney Martin Bell, as follows:

7

> Do you have a draft of the [Management Entity] OA for this entity? Or shall I have one prepared. I want to have this [Management Entity] OA executed as soon as possible so we can finalize our investor group.

41.   With only several days remaining for URT to meet its deadline, Bell sent to Frydman and me the United 866 Management, LLC ("Management Entity") Operating Agreement ("Operating Agreement") (A copy of the Operating Agreement is attached hereto as Exhibit I).

42.   I, and many of the parties involved, had <u>many</u> investors who refused to participate in the Transaction so long as Frydman was involved. This further confirmed to me my prior suspicions and distrust of Frydman.

43.   On November 24, 2013, Frydman attempted to copy the hard drive of my personal computer without my knowledge; however, as an administrator, I was notified of same and confronted Frydman. Again, I continued to realize there was something wrong.

44.   On November 25, 2013, sometime after 5:00 p.m., Frydman recognized that he would not be able to solicit enough funds from investors and as a result signed the United 866 Management, LLC Operating Agreement, in apparent anticipation that I would have funds ready to go from my investors.

45.   Frydman told me that he had a group 100% committed to take whatever portion my investors are not committed to fund. I told Frydman to proceed with his group, as "a bird in the hand is better than two in the bush."

46.   On November 27, 2013, after many attempts by me and the parties involved to change the deal structure in favor of potential investors, Frydman realized the deal structure was not advantageous to investors, panicked and agreed to do "side agreements with anyone interested."

8

47.    Later that day, Frydman, in frustration, asked me: "[W]here are your investors?"

48.    After 9:00 p.m. on the same day, Frydman wrote to me as follows: "I am extremely disappointed that you were unable to raise a single dollar of equity for this deal."

49.    Early morning on the following day, I responded:

> I have been extremely disappointed in you for months now. To me, this exercise was merely more proof to me of what I have been disappointed in. I just counted 6 emails I sent you regarding my **NOT** moving forward until you sign the operating agreement between us. You continuously respond only to emails that you wish to deal with and ignore the ones you wish to ignore.

50.    Later that same day at 12:28 p.m., I wrote again to Frydman:

> [B]efore I go through this step by step I want to reiterate and make it clear that I am ready to wire half of what we [URT] need. According to the email from Jeff it's is a total of 625 [thousand dollars]. Are you? Will you? Let's draw up an agreement today or yes we will likely lose the deal tmrw. (See Exhibit J).

51.    In addition to the promote interest which the Management Entity would have been entitled to, the Joint Venture Agreement provided that other affiliates of same are entitled to certain fees. Collectively the management fees were worth in excess of $6 million.

52.    The Joint Venture Agreement further provided that should Meadow permit United Realty 866 to remain in the transaction with less than 12.5% of the capital being invested, that "URT nor any of its Affiliates shall have any rights under this Agreement other than pro rata distribution rights (e.g. no right to appoint a member of the Executive Committee; no right to any fees; no Buy-Sell rights, nor property management agreement or commercial condominium development services agreement, etc.)." (See Exhibit H, Page 3).

53.    As a result of Frydman's ego and dishonesty to the partners involved in the Transaction, the Parties suffered irreparable harm and lost the opportunity to realize tens of millions of dollars in fees and profits.

9

54.    URT was required to provide approximately $5.8 million of equity capital to the Joint Venture, but actually expected to raise $25 million.

55.    At the direction of Frydman, the Parties' affiliated broker-dealer raised only $5.35 million while Frydman continued to promise and represent that he had ALL the funds raised.

56.    On November 29, 2013, Meadow sent URT a Notice of Failure to make capital contribution. Said notice provided:

> This letter shall serve as notice that URT failed to make the full URT Capital Contribution by no later than 20 business days prior to the Closing date. Therefore, pursuant to section 10.D of the Agreement, Meadow, in its sole discretion may elect (one) that URT shall now be deemed to have withdrawn from the Company, that neither the Company nor Meadow shall have any further obligation to URT, and that URT shall promptly assign its interest in the Company to Meadow.

57.    Moreover, the notice also confirmed that neither URT nor any of its affiliates shall have any rights to appoint a member of the Executive Committee; there would be no right to any fees; there would be no buy-sell rights, nor any property management agreement nor any commercial condominium development services agreement.

58.    Thus, as a result of the lies and ego of Frydman, URT lost its rights with respect to the Joint Venture, and its rights to have its affiliates receive fees.

59.    Many individuals that were allegedly entitled to fees from this Transaction, including brokers and their affiliates, individuals within the Capital Markets team and others, requested that I not contact the individuals at Meadow Partners. They stated "we need to show a unified front and cannot let Meadow see any disagreements between you [Verschleiser] and Frydman, as we may still be able to salvage the deal." In accordance with their request, I agreed to do so.

60. Frydman continued to try and salvage the Transaction, but it was to no avail. On December 16, 2013, Frydman told me, "I got Meadow to agree to pay us $3,000,000 to walk away from the Transaction."

61. Shortly thereafter, Frydman had Martin Bell draft and send an agreement to me, pursuant to which Frydman and I would agree to split any funds received from Meadow after payment of the fees to brokers, their affiliates, and individuals within the Capital Markets team or others. (See Exhibit K attached hereto).

62. I did not agree to Frydman's demands that exorbitant amounts of monies should be paid to the investors only to induce to re-invest.

63. On December 16, 2013 at 11:30 p.m., I sent the following email to Frydman:

Jacob, it is obvious that once again we cannot come to an agreement. I therefore propose that the 60% of the funds that belong to the capital markets team (Barry [Funt] and Co.) go to them and we not make them collateral damage as they clearly deserve what they earned. The rest of the funds in its entirety should go into an escrow account until we settle our disagreements.

(Why the childish behavior of disconnecting my email again this evening is beyond me but I guess kindergarten is where you enjoy spending your time.)

64. On December 16, 2013, Frydman individually and as a manager of United Realty 866 Management, LLC, without the requisite knowledge, consent or unanimous agreement of both managers, including DJZV Holdings, LLC, fraudulently induced Meadow to enter into a certain Release Agreement, wherein Meadow agreed to make payment in the amount of $2 million, in exchange for URT's release of Meadow and the lenders in the 866 UN Plaza Transaction. (A copy of the December 16, 2013 Release Agreement is attached hereto as Exhibit L).

65.     In express violation of the 866 Management Agreement, which required the unanimous agreement of its two managers to any real estate and banking transactions, and in violation of the 866 Management Agreement's resolution to Citibank, which required dual signatures of the managers, Frydman and I, to transfer and/or convey any funds in the 866 Management account, Frydman transferred the sum of $6,950,033.51 to United Realty Partners, an unrelated entity controlled by Frydman, and/or to entities controlled by him.

66.     The transfer of these funds out of the control of 866 Management included $4,950,033.51 in investor funds raised from accredited investors, which were given to 866 Management pursuant to a "Power of Attorney."

67.     866 Management is governed by its Operating Agreement, which required unanimous consent of Frydman and I before funds can be transferred and/or conveyed.

68.     The funds were transferred to United Realty Partners, a company which has no Power of Attorney and/or permission to act on behalf of the investors.

69.     Because such funds were transferred to an unauthorized account, in violation of the 866 Management Agreement and the Power of Attorney issued by the investors, Plaintiffs required an immediate TRO and/or Preliminary Injunction enjoining the movement of such funds pending the hearing and determination of Plaintiffs' application for injunctive relief.

70.     Accordingly, on December 18, 2013, I initiated this action and filed a Summons and Complaint with an Order to Show Cause in connection with Frydman's improper transfer of investor funds seeking an immediate injunction and declaratory relief, together with money damages to safeguard and protect the $6,950,033.51 so that the funds are not disposed of, transferred, utilized and/or converted in violation of the express covenants of the applicable

management agreement, and to prevent irreparable harm to the investors and managers of 866 Management.

71.     During oral arguments on Plaintiffs' motion, Frydman misrepresented that a certain agreement was the final rendition while knowing it was not, and misrepresented certain key facts to the Court.

72.     Additionally, Frydman, in response to the abovementioned filing, was apparently panicked and quickly acted to return the funds to the investors along with an additional payment for approximately 10% of invested equity, a hefty sum by all industry standards.

73.     Defendants electronically filed their Motion to Dismiss on January 9, 2014, together with a proposed Order to Show Cause. I am advised by counsel that such motion was without adequate or timely notice to Plaintiffs.

74.     On January 13, 2014, the Court issued the Order (attached hereto as **Exhibit M**) without Plaintiffs having an opportunity to submit opposition papers in response, and after Plaintiffs having substantially relied on assurances made by the Clerk's Office to their Counsel on January 8, 2014 that only Plaintiffs' motion for a preliminary and permanent injunction would be heard by the Court at Oral Arguments on the return date.

75.     Further, there is no express agreement between all the parties to the action to arbitrate this dispute.

76.     As a result of the foregoing, Plaintiffs respectfully request that the Court grant this instant Motion for Leave to Reargue as relating to the Decision and Order entered in this action on January 13, 2014, and upon reargument, reverse the Decision and Order and reinstate Plaintiffs' Complaint against Defendants.

ELI VERSCHLEISER

Sworn to before me this
18th day of February, 2014

ASHER GULKO
Notary Public, State of New York
No. 01GU6246911
Qualified in Nassau County
Commission Expires 8/15/2015

Notary Public

14

EXHIBIT F

1

1

2    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
3    ------------------------------------------X
     JFURTI, LLC, SUMMER INVESTORS, LLC,
4    WINTER 866 UN LLC and JACOB FRYDMAN,

5                              PLAINTIFFS,

6          -against-          Index No.:
                              650803/2014
7
     ELI VERSCHLEISER, EVURTI LLC, EVE, LLC and
8    EVUNP HOLDINGS LLC,

9                              DEFENDANTS.
     ------------------------------------------X
10

11                    DATE: July 23, 2014

12                    TIME: 1:23 P.M.

13

14

15        VIDEOTAPED EXAMINATION BEFORE TRIAL

16   of the Defendant, ELI VERSCHLEISER, taken

17   by the Plaintiff, pursuant to a Court

18   Order, held at the offices of United

19   Realty, 60 Broad Street, 34th Floor,

20   New York, New York 10004, before

21   Kiyoko Y. Panzella, a Notary Public of the

22   State of New York.

23

24

25

2

1

2    A P P E A R A N C E S :

3

4    DANIEL EDELMAN, ESQ.
         Attorney for the Plaintiffs
5    JFURTI, LLC, SUMMER INVESTORS, LLC, and
     WINTER 866 UN LLC
6    60 Broad Street, 34th Floor
     New York, New York 10004
7    BY: DANIEL EDELMAN, ESQ.

8

9    JACOB FRYDMAN
         Plaintiff Pro Se
10   60 Broad Street, 34th Floor
     New York, New York 10004

11

12   REED SMITH LLP
         Attorneys for the Defendants
13   ELI VERSCHLEISER, EVURTI LLC, EVE, LLC
     and EVUNP HOLDINGS LLC
14   599 Lexington Avenue
     New York, New York 10022
15   BY: STEVEN COOPER, ESQ.

16

17

     ALSO PRESENT:
18     VINCENZO PETULLA, Videographer
             Diamond Reporting & Legal Video
19
       DANIELLE VOLPE, Legal Assistant
20         Daniel Edelman, Esq.

21
                 *         *         *
22

23

24

25

1

2  **221. UNIFORM RULES FOR THE
CONDUCT OF DEPOSITIONS**

3  **221.1 Objections at Depositions**
**(a) Objections in general.** No objections

4  shall be made at a deposition except those
which, pursuant to subdivision (b), (c) or

5  (d) of Rule 3115 of the Civil Practice Law
and Rules, would be waived if not

6  interposed, and except in compliance with
subdivision (e) of such rule.   All

7  objections made at a deposition shall be
noted by the officer before whom the

8  deposition is taken, and the answer shall
be given and the deposition shall proceed

9  subject to the objections and to the right
of a person to apply for appropriate relief

10  pursuant to Article 31 of the CPLR.
**(b) Speaking objections restricted.** Every

11  objection raised during a deposition shall
be stated succinctly and framed so as not

12  to suggest an answer to the deponent and,
at the request of the questioning attorney,

13  shall include a clear statement as to any
defect in form or other basis of error or

14  irregularity.   Except to the extent
permitted by CPLR Rule 3115 or by this

15  rule, during the course of the examination
persons in attendance shall not make

16  statements or comments that interfere with
the questioning.

17  **221.2 Refusal to answer when objection is
made.** A deponent shall answer all questions

18  at a deposition, except (i) to preserve a
privilege or right of confidentiality, (ii)

19  to enforce a limitation set forth in an
order of the court, or (iii) when the

20  question is plainly improper and would, if
answered, cause significant prejudice to

21  any person.   An attorney shall not direct
a deponent not to answer except as provided

22  in CPLR Rule 3115 or this subdivision.
Any refusal to answer or direction not to

23  answer shall be accompanied by a succinct
and clear statement of the basis therefor.

24  If the deponent does not answer a question,
the examining party shall have the right to

25  complete the remainder of the deposition.