4

1

2           **221. UNIFORM RULES FOR THE**
               **CONDUCT OF DEPOSITIONS**
3
    **221.3 Communication with the deponent**
4           An attorney shall not interrupt the
    deposition for the purpose of communicating
5   with the deponent unless all parties
    consent or the communication is made for
6   the purpose of determining whether the
    question should not be answered on the
7   grounds set forth in section 221.2 of these
    rules and, in such event, the reason for
8   the communication shall be stated for the
    record succinctly and clearly.
9

10          IT IS FURTHER STIPULATED AND AGREED
    that the transcript may be signed before
11  any Notary Public with the same force and
    effect as if signed before a clerk or a
12  Judge of the court.

13
            IT IS FURTHER STIPULATED AND AGREED
14  that the examination before trial may be
    utilized for all purposes as provided by
15  the CPLR.

16
            IT IS FURTHER STIPULATED AND AGREED
17  that all rights provided to all parties by
    the CPLR cannot be deemed waived and the
18  appropriate sections of the CPLR shall be
    controlling with respect hereto.
19

20          IT IS FURTHER STIPULATED AND AGREED
    by and between the attorneys for the
21  respective parties hereto that a copy of
    this examination shall be furnished,
22  without charge, to the attorneys
    representing the witness testifying herein.
23

24

25

```
 1                E. VERSCHLEISER
 2             THE VIDEOGRAPHER:  We are on
 3      the record.  The time on the video
 4      monitor is 1:23 p.m. on Wednesday,
 5      July 23, 2014.  My name is Vincenzo
 6      Petulla with Diamond Reporting and
 7      Legal Video.  This deposition --
 8             THE WITNESS:  I'm Eli
 9      Verschleiser --
10             THE VIDEOGRAPHER:  This the
11      deposition of Eli Verschleiser.  This
12      deposition is being held at 60 Broad
13      Street, New York, New York in United
14      Realty offices.  The name of this
15      case Jfurti LLC et al. versus Eli
16      Verschleiser et al., Index No.
17      650803/2014.
18             Counsel will now please
19      identify themselves and the party
20      they represent, please.
21             MR. FRYDMAN:  My name is Jake
22      Frydman.  I am here pro se on behalf
23      of myself.
24             MR. EDELMAN:  My name is Daniel
25      Edelman.  I'm here representing
```

```
 1                   E. VERSCHLEISER
 2         Jfurti, LLC, Summer Investors LLC,
 3         Winter 866 UN LLC.
 4              MS. VOLPE:  Danielle Volpe,
 5         legal assistant.
 6              MR. COOPER:  Steven Cooper,
 7         representing defendants.
 8              THE VIDEOGRAPHER:  The court
 9         reporter is Kiki Panzella, also with
10         Diamond Reporting and Legal Video.
11              Will the reporter please swear
12         in the witness.
13    E L I   V E R S C H L E I S E R, called as
14    a witness, having been first duly sworn by
15    a Notary Public of the State of New York,
16    was examined and testified as follows:
17              THE WITNESS:  I affirm.  My
18         apologies.  I know I'm a little bit
19         late.  I just got caught up and I
20         apologize for that.
21              MR. FRYDMAN:  Thank you.
22    EXAMINATION BY
23    MR. FRYDMAN:
24         Q.   Mr. Verschleiser, as you know,
25    my name is Jake Frydman.  I'll be deposing
```

1                    E. VERSCHLEISER

2      you today in a deposition.

3                    I'll be asking you some

4      questions.  If you don't understand, please

5      let me know and I will try to rephrase my

6      question; do you understand that?

7           A.    I do.

8           Q.    And I notice that you

9      specifically went out of your way to say

10     that you affirmed as opposed to swear

11     today.  Is there a reason for that?

12          A.    I think you know.  Judaism, you

13     don't swear; we affirm.

14          Q.    So you wouldn't take this oath

15     on a swearing?

16          A.    Correct.

17          Q.    Are you comfortable that you

18     understand that you are subject to laws

19     regarding perjury and that your testimony

20     has to be completely honest?

21          A.    Could you repeat that.

22          Q.    Yes.  Are you aware that this

23     deposition, that your testimony is being

24     taken under oath and is expected to be

25     truthful and honest and that it is subject

```
 1                    E. VERSCHLEISER
 2   to the penalties of perjury?
 3             MR. COOPER:   Objection to form.
 4        You can answer.
 5        A.    I'm aware.
 6             MR. FRYDMAN:   I'd also like to
 7        put on the record that it is 1:35,
 8        that we started at about 1:23 this
 9        afternoon.  Mr. Verschleiser's
10        attorney and all of the people on the
11        plaintiff's team have been here, as
12        well as the videographer and the
13        stenographer, since before noon.
14        This deposition was scheduled by
15        agreement of parties to commence at
16        noon and Mr. Verschleiser appeared
17        about an hour and 21 minutes late.
18        Q.    Mr. Verschleiser, are you under
19   the influence of any drugs or medications
20   or other substances which would diminish
21   your mental abilities today?
22        A.    Not to my knowledge.
23        Q.    Have you ever been known by any
24   name other than Eli Verschleiser?
25        A.    Elia Verschleiser.
```

```
 1                      E. VERSCHLEISER
 2          Q.     Any other names?
 3          A.     Not to my knowledge.
 4          Q.     Are you married?
 5          A.     Yes, I am.
 6          Q.     What's your wife's name?
 7          A.     Dr. Jennifer Shany Zoldan
 8   Verschleiser.
 9          Q.     And is she employed by any of
10   the entities that are a party to this
11   lawsuit?
12          A.     No.
13          Q.     Is she the manager of any of
14   the entities that are party to this
15   lawsuit?
16          A.     I need to see the names of the
17   entities that are party to the lawsuit.  I
18   have to double-check.  I -- if she is, I'll
19   get that back to you and tell you.
20               MR. FRYDMAN:  So I would ask
21            that you please produce that to us
22            after this deposition.
23               MR. COOPER:  I'll take it under
24            advisement.
25          Q.     Do you live at 3501 Avenue T in
```

```
 1                    E. VERSCHLEISER
 2    Brooklyn?
 3         A.    I do.
 4         Q.    Do you have any other
 5    residences?
 6         A.    I do.
 7         Q.    Where else do you reside?
 8         A.    I reside at 14 Kingsfield
 9    Drive.  That's in Lakewood, New Jersey, ZIP
10    Code is 08701.
11         Q.    Any other residences?
12         A.    No.
13         Q.    Are you employed?
14         A.    Yes, I am.
15         Q.    Who are you employed by?
16         A.    Multi Capital.
17         Q.    And is Multi Capital the same
18    at Multi Group?
19         A.    I'm not familiar with a Multi
20    Group.
21         Q.    Are you employed by any other
22    entity?
23         A.    No, I'm not.
24         Q.    Are you employed by Magenu?
25         A.    No, I am not.
```

```
 1                      E. VERSCHLEISER
 2          Q.    Are you employed by Our Place?
 3          A.    No, I am not.
 4          Q.    Are you aware of an e-mail
 5   domain named Multi Groups?
 6          A.    Yes, I am.
 7          Q.    How is that related to you, if
 8   it is?
 9          A.    My company owns it.
10          Q.    Your company being Multi
11   Capital owns Multi Group?
12          A.    No.  Multi --
13                MR. COOPER:  Objection to form.
14          A.    Multi Group of Companies, LLC
15   owns it.
16                THE WITNESS:  When you object
17          to form --
18                MR. COOPER:  You can go ahead.
19                THE WITNESS:  All right.
20          Q.    Are you an officer of any other
21   organizations or director of any other
22   organizations?
23          A.    Not-for-profits?
24          Q.    Any organizations.
25          A.    Can you define organization as
```

```
 1                   E. VERSCHLEISER
 2    a corporation?
 3         Q.    No.  I define it as an
 4    organization.
 5               MR. COOPER:  Objection to form.
 6         A.    Again, not-for-profit?  Can you
 7    define --
 8         Q.    Including --
 9         A.    Can you define it.
10         Q.    Yes, a corporation, an LLC, a,
11    an unincorporated association, a
12    partnership, a limited partnership, a
13    general partnership, a not-for-profit --
14         A.    My answer is many, too many to
15    list.
16         Q.    How about any not-for-profits?
17         A.    Yes.
18         Q.    Which ones?
19         A.    Our Place in New York and
20    American Jewish Congress, I'm acting
21    treasurer.
22         Q.    Other than Our Place in
23    New York and American Jewish Congress, are
24    you also an officer of Magenu?
25         A.    Magenu?
```

```
 1                E. VERSCHLEISER
 2        Q.    Magenu, which is an affiliate
 3   or subsidiary of Our Place in New York.
 4        A.    I'm on the board, yes.
 5        Q.    Any others?
 6        A.    I'm affiliated with many
 7   non-for-profits as a -- I spend most of my
 8   time in the philanthropic and charitable
 9   work, so too many to list.
10        Q.    Do you maintain an office?
11        A.    Yes, I do.
12        Q.    And is that the office at 44
13   Wall Street that you spoke about earlier?
14        A.    Yeah, the office that you came
15   into for couple of years.
16        Q.    Any other offices?
17        A.    I don't maintain any other
18   offices.
19        Q.    Since November of 2013, had you
20   maintained any other offices?
21        A.    No, I don't.
22        Q.    Did you maintain an office at
23   2294 Nostrand Avenue, Suite 1017, Brooklyn?
24        A.    No, I did not.
25        Q.    You did not.  Did you maintain
```

                         E. VERSCHLEISER

1

2    an office at 4741 North 35th Street,

3    Hollywood, Florida?

4         A.    No, I did not.

5         Q.    So 44 Wall Street's the only

6    office that you've maintained?

7         A.    That's correct.

8              MR. COOPER:  Can I get that

9         second address again, what was it?

10             MR. FRYDMAN:  North 35th

11        Street, Hollywood, Florida.

12             MR. COOPER:  Thank you.

13        Q.    Are you familiar with the

14   matters that are asserted in this lawsuit

15   and specifically the motion for preliminary

16   injunction scheduled for a hearing on

17   August 6th and 7th?

18             MR. COOPER:  Objection to form.

19        You can answer it.

20        A.    Yes, I am.

21        Q.    As a general rule, do you read

22   and review the papers that are filed with

23   respect to the lawsuit that is the subject

24   matter of today's deposition?

25             MR. COOPER:  Objection to form.

```
 1                    E. VERSCHLEISER
 2          You can answer it.
 3     A.     My attorneys brief me on them.
 4     Q.     Did you go to high school?
 5     A.     Yes, I did.
 6     Q.     Where did you go?
 7     A.     Chaim Berlin.
 8     Q.     That's in Brooklyn, New York?
 9     A.     Yes.
10     Q.     Did you graduate from Chaim
11 Berlin?
12     A.     No, I did not.
13     Q.     At what year did you drop out
14 of high school?
15     A.     I never dropped out of high
16 school.
17     Q.     How is it that you did not
18 graduate and you did not drop out?
19     A.     I went to a different school.
20     Q.     Which high school did you go to
21 next?
22     A.     It's been a long time.  I'm
23 going to try to remember.  I went to a high
24 school in St. Louis, Mississippi.  I don't
25 remember the name of it, and then went to a
```

```
 1                     E. VERSCHLEISER
 2     high school in Rochester, New York, which I
 3     graduated.
 4            Q.    Do you remember the name of
 5     that high school?
 6            A.    No.
 7            Q.    You don't.  Do you remember
 8     what year you graduated?
 9            A.    No, I don't.
10            Q.    Did you go to college?
11            A.    No, I did not.
12            Q.    After high school, did you have
13     any employment?
14            A.    Could you be more specific.
15            Q.    When you graduated high school,
16     what did you do?
17            A.    I went to yeshiva in Israel.
18            Q.    Which yeshiva?
19            A.    Mir.
20            Q.    When did you first start at Mir
21     Yeshiva in Israel?
22            A.    After high school.
23            Q.    Do you recall the year?
24            A.    No, I do not.
25            Q.    Do you know how long you were
```

```
 1                    E. VERSCHLEISER
 2    there?
 3            A.    About a year.
 4            Q.    And then what did you do?
 5            A.    And then I -- since then?
 6    Could you be more specific.
 7            Q.    After you left Mir Yeshiva in
 8    Israel, what did you do next?
 9            A.    I did many things since then,
10    so I don't recall the chronological order
11    of things in my life since then.  It's --
12    it's pretty vague, I think.  Can you be
13    more specific.
14            Q.    Did you hold a job after that?
15            A.    Numerous.
16            Q.    What was the first job that you
17    held after Mir Yeshiva?
18            A.    I worked at a rental car
19    company in Israel.
20            Q.    Do you recall which rent-a-car
21    company?
22            A.    No, I do not.
23            Q.    Do you remember for how long
24    you were working there?
25            A.    No, I do not.
```

```
 1                    E. VERSCHLEISER
 2        Q.    What did you do after that?
 3        A.    After that I worked for a
 4   diamond company.
 5        Q.    Where?
 6        A.    580 Fifth Avenue.
 7        Q.    What year was that?
 8        A.    I don't recall.
 9        Q.    Do you recall the name of the
10   company?
11        A.    Mantor Kuperman Diamonds.
12        Q.    How long were you there?
13        A.    Couple years.
14        Q.    What did you do after that?
15        A.    I went to the real estate
16   world.
17        Q.    What year did you enter the
18   real estate world?
19        A.    Approximately 1994, '95.
20        Q.    And have you been in the real
21   estate world exclusively since then?
22        A.    Not exclusively, but mostly.
23        Q.    At any time, were you in the
24   online poker business?
25        A.    No, I was not.
```

```
 1                    E. VERSCHLEISER
 2         Q.    Do you have any foundations
 3    that you support?
 4         A.    Many.
 5         Q.    Do you have any foundations
 6    that you file foundation tax returns on,
 7    they're yours as opposed to others as well?
 8         A.    Yes, a family foundation.
 9         Q.    What's the name of that
10    foundation?
11         A.    The Verschleiser Family
12    Foundation.
13         Q.    Are there any other foundations
14    that are yours?
15         A.    Exclusively?
16         Q.    You and/or your wife and other
17    family.
18         A.    Yes.
19         Q.    What else?
20         A.    My grandfather started a
21    foundation, my uncle started a foundation,
22    my great uncle started a foundation; I'm
23    involved in all of them.
24         Q.    Is there any other foundation
25    that is of you, your wife and/or your
```

```
 1                    E. VERSCHLEISER
 2   children?
 3        A.    Not to my knowledge.
 4        Q.    Do you belong to any industry
 5   associations?
 6        A.    Personally?
 7        Q.    I would imagine that if you
 8   belonged, it would be personally, yes.
 9        A.    You said you would imagine, you
10   asked me a question --
11        Q.    Do you, personally --
12        A.    So tell me.
13        Q.    Do you belong to any industry
14   associations?
15        A.    No, I do not.
16        Q.    Do you belong to any industry
17   associations through one of your entities?
18        A.    Numerous.
19        Q.    Can you name some of the
20   industry associations that you belong to?
21        A.    Too many to list.
22        Q.    Can you name five?
23        A.    The Board of Real Estate of New
24   York.  I'm probably stating that
25   incorrectly, but something to that effect;
```

1                    E. VERSCHLEISER

2       the numerous charitable -- numerous

3       charitable organizations.  I can get you a

4       list if it's material to this --

5             Q.    Well, you can't --

6             A.    -- matter.

7             Q.    Other than that one, you can't

8       recall any specific?

9             A.    That's correct.

10            Q.    Do you hold any licenses?

11            A.    A driver's license.

12            Q.    In addition to a driver's

13      license, do you hold any licenses?

14            A.    Is a pistol permit considered a

15      license?

16            Q.    I don't know.

17            A.    I don't know.

18            Q.    Do you hold a pistol permit?

19            A.    I'm not sure if it's expired or

20      not.

21            Q.    But at one point, you held a

22      pistol permit?

23            A.    I believe so.

24            Q.    In what state?

25                  MR. COOPER:  You know, I'm

```
 1                    E. VERSCHLEISER
 2       going to object.  Tell me what this
 3       has to do with this --
 4            MR. FRYDMAN:  It's background,
 5       it's background.
 6            MR. COOPER:  This is way far
 7       afield and I've given you lots --
 8            MR. FRYDMAN:  And this is --
 9            MR. COOPER:  I'm not finished
10       talking.  I've given you lots of
11       latitude.  I'm going to direct him
12       not to answer unless you can tell me
13       what a pistol permit has to do with
14       disparagement.
15            MR. FRYDMAN:  A pistol permit
16       has nothing to do with it.  It's a
17       question for credibility; it's a
18       question of impeachment.
19            MR. COOPER:  You don't have the
20       ability to question him on anything
21       you want simply because you think it
22       goes to credibility.  Your questions
23       have to be relevant to preliminary
24       injunction hearing.  A lot of what
25       you've asked is not, but I've given
```

```
 1                    E. VERSCHLEISER

 2          you latitude.  We're not going to go

 3          off on a pistol permit, okay.

 4          Q.    Excluding pistol permits, are

 5    there any other licenses that you hold?

 6          A.    A driver's license.

 7          Q.    Got that, so other than that,

 8    none?

 9          A.    A boating license.

10          Q.    Anything else?

11          A.    U.S. Coast Guard.  I'm part of

12    the U.S. Coast Guard, so they have some

13    sort of license that they issue me; I'm

14    part of the Homeland Security, they have

15    some sort of license that they issue me.  I

16    -- I don't know all off the top of my head,

17    but I can -- if it's material, we can

18    submit it.

19          Q.    Have you ever had a license

20    other than a driver's license or a boat

21    license suspended or revoked?

22          A.    Not to my recollection.

23          Q.    Have you ever been a subject of

24    a disciplinary proceeding with respect to

25    any license or anything else?
```

```
 1                    E. VERSCHLEISER
 2          A.     Not to my recollection.
 3          Q.     Have you ever been the subject
 4   of a regulatory investigation?
 5          A.     Unlike yourself, no.
 6          Q.     Were you subject to a
 7   regulatory investigation by the Florida
 8   Commission on Securities?
 9          A.     Not to my knowledge.
10          Q.     Do you know Raul Del Forno?
11          A.     If he was the employee Raul at
12   our company, then yes, I do.
13          Q.     Are you aware that he was
14   employed by the United Realty?
15          A.     We hired him, so I'm aware.
16          Q.     Do you know what he was
17   employed as?
18          A.     In the technology department.
19          Q.     Would it be fair to say that he
20   headed up technology?
21          A.     Perhaps at the later part of
22   his employment.
23          Q.     Okay.
24          A.     Or if you made him the head of
25   technology.
```

```
 1                    E. VERSCHLEISER
 2          Q.    Well, at the time that you
 3    resigned as president of United Realty
 4    Advisors, was he holding a position of head
 5    of technology for United Realty?
 6                 MR. COOPER:   Objection to form.
 7          A.    I don't recall.
 8          Q.    Do you know Eric Fishgrund?
 9          A.    Yes, I do.
10          Q.    Are you aware that he was
11    employed by United Realty?
12          A.    Yes, I do.  I am.
13          Q.    And do you know in what
14    position he was employed by United Realty?
15          A.    He was in charge of media, as
16    far as I can recall, marketing -- marketing
17    and media.
18          Q.    Do you know Michael Blea?
19          A.    Name does not ring a bell.
20          Q.    Do you recall the person who
21    was the creative director at the time that
22    you resigned as president of United Realty?
23          A.    Nick -- Nick somebody, I
24    believe.
25          Q.    Okay, so you don't recall
```

```
 1                    E. VERSCHLEISER
 2    Michael Blea?
 3         A.    I would have to look back in my
 4    notes, but not off the top of my head.
 5         Q.    Do you know Nick
 6    Constantinescu?
 7         A.    That's the Nick that I was
 8    referring to.
 9         Q.    And are you aware that he was
10    employed by United Realty?
11         A.    Yes, I am.
12         Q.    And do you know what he was
13    employed by?  As, I'm sorry.
14         A.    He was in the creative
15    department under Eric Fishgrund's
16    direction.
17         Q.    Do you know Barry Funt?
18         A.    I do.
19         Q.    And are you aware that Barry
20    Funt was employed by United Realty?
21         A.    No, he was not, never employed
22    by United Realty.
23         Q.    He was employed by United
24    Realty Capital Markets?
25         A.    Is that a question?
```

```
 1                    E. VERSCHLEISER
 2          Q.    Yes, it's a question.
 3          A.    Could you repeat the question.
 4          Q.    To your knowledge, was Barry
 5     Funt employed by United Realty Capital
 6     Markets?
 7          A.    Is that an LLC or a
 8     corporation?  Do you --
 9          Q.    I'm asking --
10                MR. COOPER:  He's just asking
11          if you know.
12          A.    As far as I'm aware, he was
13     employed by one of our affiliated entities.
14          Q.    Thank you.
15                At any time after December 3rd
16     of 2013, did you, alone or in concert with
17     others, directly or indirectly employ or
18     solicit the employment or the -- or assist
19     others in employing or soliciting the
20     employment of Raul Del Forno?
21                MR. COOPER:  Objection to form.
22                Could I have that read back.
23                (Whereupon, the referred-to
24          question was read back by the
25          Reporter.)
```

                    E. VERSCHLEISER

1

2              MR. COOPER:   Object to form.

3        You can answer it if you can.

4        A.    No.

5        Q.    At any time after December 3,

6    2013, did you, alone or in concert with

7    others, directly or indirectly employ or

8    solicit the employment of, or assist others

9    in employing or soliciting the employment

10   of Eric Fishgrund?

11             MR. COOPER:   Same objection.

12       A.    No.

13       Q.    At any time after December 3,

14   2013, did you, alone or in concert with

15   others, directly or indirectly employ or

16   solicit the employment of, or assist others

17   in employing or soliciting the employment

18   of Michael Blea?   That's B-L-E-A.

19       A.    No.

20       Q.    At any time after December 3,

21   2013, did you, alone or in concert with

22   others, directly or indirectly employ or

23   solicit the employment of or assist others

24   in employing or soliciting the employment

25   of Nick Constance, Constantinescu,

```
 1                    E. VERSCHLEISER
 2     C-O-N-S-T-A-N-I-T, I'm sorry,
 3     C-O-N-S-T-A-N-T-I-N-E-S-C-U?
 4          A.    Not to my knowledge.
 5          Q.    At any time after December 3rd,
 6     did you, alone or in concert with others,
 7     directly or indirectly employ or solicit
 8     the employment of or assist others in
 9     employing or soliciting the employment of
10     Barry Funt?
11          A.    Not to my knowledge.
12                THE WITNESS:  I'm sorry, two
13          questions of what you mentioned.
14          Could you read back two questions
15          ago.
16                MR. COOPER:  He's asking
17          basically the same question about
18          Fishgrund, Blea, Constantinescu, and
19          Funt.
20                THE WITNESS:  So I want to --
21                MR. COOPER:  Which one --
22                THE WITNESS:  So I want to
23          change my answer to Blea to "not to
24          my knowledge" as opposed to "no."
25          Q.    Do you currently use a computer
```

```
 1                    E. VERSCHLEISER
 2    that is named Eli X1 Harman?
 3              MR. COOPER:   Objection to form.
 4         You can answer.
 5         A.    I don't know the name of my
 6    computer.  I don't think most people know
 7    the names of their -- I don't give my
 8    computers names.
 9         Q.    Do you own a Levono [sic] X1
10    computer?
11         A.    I don't know what the model of
12    my computer is, but it is an IBM and I
13    believe we submitted all the names of my
14    computers.
15         Q.    Do you have a laptop IBM or
16    what is now known as Levono, because it's
17    now no longer IBM?
18         A.    Lenovo.
19         Q.    Lenovo.
20         A.    Yeah, I do.
21         Q.    And do you know if that's an X1
22    model?
23         A.    Not off the top of my head.
24         Q.    How long have you had that
25    Lenovo laptop computer?
```

```
 1                    E. VERSCHLEISER
 2        A.    Over a year, perhaps two.
 3        Q.    During that year to perhaps
 4   two, did you have any other Lenovo X1
 5   computers?
 6        A.    No. I use the same computer.
 7        Q.    Where is that computer?
 8        A.    Physically?
 9        Q.    Yes.
10        A.    In my office.
11        Q.    Have you ever been arrested?
12        A.    No, I have not.
13        Q.    Have you ever been indicted?
14        A.    Yes, I have.
15        Q.    When and for what?
16             MR. COOPER:  Objection.  Direct
17         him not to answer that question
18         unless you can tell me how it's
19         relevant.
20             MR. FRYDMAN:  It's for
21         impeachment purposes.
22             MR. COOPER:  Okay, yeah, I'm
23         going to direct him not to answer.  I
24         don't know what that has to do with
25         the --
```

```
 1                E. VERSCHLEISER
 2            MR. FRYDMAN:  So -- so,
 3       Mr. Cooper, as I think you're aware,
 4       these issues, while you certainly
 5       have the right to object and you
 6       certainly can put it on the record
 7       and we can proceed for protective
 8       orders, but that, we have the right
 9       to obtain the response subject to
10       your objection, and pursuant to CPLR
11       31.13, "All objections made at the
12       time of the examination are noted and
13       the deposition is required to proceed
14       subject to your right to either seek
15       a protective order to object to the
16       use of it at our hearing."
17            MR. COOPER:  Let's go off the
18       record.  Let me talk to my client
19       outside.
20            THE VIDEOGRAPHER:  Off the
21       record?  I just wanted to make sure.
22       Mr. Frydman, off?
23            MR. FRYDMAN:  I don't
24       understand why we're going off the
25       record.
```

```
 1              E. VERSCHLEISER
 2              MR. COOPER:  Because this
 3       involves attorney/client
 4       communication and discussion and I
 5       don't want to have it be on the
 6       record.
 7              MR. FRYDMAN:  How long do you
 8       think you're going to be?
 9              MR. COOPER:  Few minutes.
10              MR. FRYDMAN:  Fine.
11              THE VIDEOGRAPHER:  We are now
12       off the record at 1:51 p.m.
13              (Whereupon, a short recess was
14       taken.)
15              THE VIDEOGRAPHER:  We are now
16       on the record at 1:53 p.m.
17              MR. COOPER:  He can answer the
18       question.
19              MR. FRYDMAN:  Thank you.
20       Q.    Have you ever been indicted?
21       A.    Yes, I have.
22       Q.    For what?
23       A.    When I was about 15 years old
24   or 16 years old --
25              I don't have the -- I don't
```

```
 1              E. VERSCHLEISER
 2  remember the specifics, but it's publicly
 3  filed in our writ that we filed.  You
 4  actually wrote exactly what the text is to
 5  answer that question to the public, so
 6  kindly refer to it and put it on the
 7  record.
 8       Q.    So you don't recall
 9  specifically?
10            MR. COOPER:  Objection to form.
11       A.    I -- again, it's going to take
12  up too much of our time and it's very short
13  form written by yourself and you can refer
14  to it in the prospectus.
15       Q.    Were you indicted to matters
16  related to bank and other credit card
17  fraud?
18       A.    You know, I was 16 years old.
19  It's a long time.  I don't remember
20  specifically what it was and I'm going
21  answer the same thing:  If you'd like, I
22  see the prospectus sitting on the table.  I
23  can read it to you to put it onto record.
24       Q.    I'm asking your recollection.
25       A.    My recollection is --
```

```
 1                    E. VERSCHLEISER
 2         Q.     Other than that indictment,
 3    were you indicted on any other matter?
 4         A.     No, I have not been.
 5         Q.     Have you ever been accused of
 6    failing to disclose an arrest to any
 7    governmental agency or regulatory agency?
 8         A.     Not to my knowledge.
 9         Q.     In researching for this
10    deposition, I came across a Daily News
11    article that spoke of accusations of you
12    being a drug dealer.  Were you ever
13    indicted or arrested for selling or dealing
14    drugs?
15              MR. COOPER:  Objection to form.
16         A.     Not to my knowledge.
17         Q.     Are you familiar with a
18    mailbox, e-mail box provider called 1and1
19    or mail.com?
20         A.     Not off the top of my head.
21         Q.     Have you ever established a
22    mailbox or an e-mail account on 1and1 or
23    mail.com?
24         A.     Not to my recollection.
25         Q.     Have you ever instructed or
```

```
 1                   E. VERSCHLEISER
 2     directed anyone to establish a mailbox or
 3     an e-mail account on mail.com?
 4          A.     No, I have not.
 5          Q.     Have you ever heard of
 6     informedconsumer@mail.com?
 7          A.     I have not.
 8          Q.     That is not a mailbox that you
 9     formed or created; is that correct?
10          A.     That's correct.
11          Q.     And it's not a mailbox that you
12     or anyone you know created?
13          A.     I would not be able to know
14     what other people do.  I don't know if you
15     created it.  I wouldn't know and I know
16     you, so it would be a difficult question to
17     answer.
18          Q.     Did you direct anyone to create
19     such a mailbox called
20     informedconsumer@mail.com?
21          A.     Not to my recollection.
22          Q.     Do you know anyone named
23     Kinsey Gelbach?
24          A.     I may have, but not to my
25     knowledge or recollection.
```

```
 1                    E. VERSCHLEISER
 2          Q.    Do you know whether in February
 3    of 2010, I'm sorry, February of 2014 you
 4    e-mailed Kinsey Gelbach any e-mails?
 5          A.    Not to my recollection or
 6    knowledge.
 7                MR. FRYDMAN:  63.
 8                MR. EDELMAN:   (Handing.)
 9                MR. FRYDMAN:  Would you please
10          mark this as E.V. 1 for
11          identification.
12                (Whereupon, the aforementioned
13          two-page e-mail chain dated
14          February 11, 2014 was marked as E.V.
15          Exhibit 1 for identification as of
16          this date by the Reporter.)
17          Q.    Mr. Verschleiser, handing you
18    what's been identified, what's been marked
19    as E.V. 1 for identification, can you, and
20    directing your attention to the bottom part
21    of this page, the one that is an e-mail
22    from informedconsumer@mail.com to Kinsey
23    Gelbach, have you ever seen that e-mail
24    before?
25          A.    Not to my recollection.
```

```
 1                    E. VERSCHLEISER
 2          Q.    Did you write that e-mail?
 3          A.    No, I did not.
 4          Q.    Did you send this e-mail?
 5          A.    No, I did not.
 6          Q.    Did you have anyone write or
 7   send this e-mail on your behalf?
 8          A.    Not to my recollection.
 9          Q.    Did you instruct or direct
10   anyone to send this e-mail?
11          A.    Not to my recollection.
12          Q.    Do you know anyone named Amy
13   Weins?
14          A.    No, I do not.
15          Q.    To your knowledge, in February
16   of 2014, did you send Amy Weins any
17   e-mails?
18          A.    No, I did not, not to my
19   knowledge.
20               MR. FRYDMAN:   Can we please
21          mark this as E.V. 2.
22               (Whereupon, the aforementioned
23          e-mail dated February 10, 2014 was
24          marked as E.V. Exhibit 2 for
25          identification as of this date by the
```

```
 1                    E. VERSCHLEISER
 2          Reporter.)
 3          Q.    Mr. Verschleiser, handing you
 4     what's been marked E.V. 2 for
 5     identification, have you ever seen this
 6     e-mail before?
 7          A.    No, I have not.  I may have
 8     seen it -- I may have seen it in some of
 9     these documentations that you --
10          Q.    As an exhibit to something I
11     may have filed; is that right?
12          A.    Possibly, but --
13          Q.    But not, this is not, is, did
14     you write this e-mail?
15          A.    No, I did not.
16          Q.    Did you send this e-mail?
17          A.    Not to my recollection.  If I
18     didn't write it, then I didn't send it,
19     right?
20          Q.    Well, I'm asking you.  Did you
21     send this e-mail?
22          A.    I did not.
23          Q.    You did not.  Did you instruct
24     anyone to send this e-mail?
25          A.    No, I did not.
```

```
 1                    E. VERSCHLEISER
 2         Q.    Did you instruct anyone to
 3    write this e-mail?
 4         A.    No, did I not.
 5         Q.    Did you direct or ask anyone to
 6    write or send this e-mail?
 7              THE WITNESS:  Could you repeat
 8         the last question.  Not this one, the
 9         one before.  I just think he's asking
10         the same question.
11         Q.    I didn't.  I asked before if
12    you instructed and this one I asked if you
13    directed or asked anyone to write or send
14    this e-mail.
15              THE WITNESS:  Could you read
16         back the last question.
17              (Whereupon, the referred-to
18         question was read back by the
19         Reporter.)
20         A.    So you're asking the same
21    question again.
22         Q.    No, I'm not.
23              MR. COOPER:  Just answer.  It's
24         okay.
25              THE WITNESS:  Okay.
```

```
 1                    E. VERSCHLEISER
 2        A.    No, I did not.
 3        Q.    Are you familiar with the
 4   website called GMX.com?
 5        A.    Not off the top of my head.
 6        Q.    Have you ever established a
 7   mailbox or an e-mail account on GMX.com?
 8        A.    No, I did not.
 9        Q.    Have you ever asked, directed,
10   or instructed anyone to, on your behalf,
11   establish a mailbox or an e-mail on
12   GMX.com?
13        A.    No, I did not.
14        Q.    Have you ever heard of
15   friendsofEli@GMX.com?
16              MR. COOPER:  Objection to form.
17        A.    No, I have not.
18        Q.    Is friends of Eli GMX.com a
19   mailbox that you or anyone you know
20   created?
21        A.    No, it has not been.
22        Q.    Did you ever instruct Raul Del
23   Forno to create a mailbox known as
24   friendsofEli@GMX.com?
25        A.    No, I have not.  But just to
```

```
 1                   E. VERSCHLEISER
 2    clarify, and maybe to circumvent and make
 3    this process move faster, I have not
 4    instructed Raul Del Forno to do anything,
 5    ever, other than while he was employed at
 6    our company.
 7         Q.    So that I'm clear and I
 8    understand what you're saying, you were no
 9    longer employed with United Realty as of,
10    at the latest, December 4, 2013; is that
11    correct?
12              MR. COOPER:  Objection to form.
13         A.    I have to look at my documents.
14         Q.    But from that point in time
15    that you were no longer employed with
16    United Realty --
17         A.    I think I'm still employed with
18    United Realty, but we could continue.  You
19    could give me a date.
20         Q.    Well, I'm very interested in
21    knowing how you believe you're employed by
22    United Realty.
23         A.    I don't think it's relevant.
24    You can look at our file, the case that we
25    filed against you, which is very clear.
```

```
 1                  E. VERSCHLEISER
 2        Q.    You've sought rescission --
 3        A.    That is --
 4        Q.    It, you've sought rescission --
 5        A.    That will specifically in
 6   English explain to you how it is --
 7             MR. COOPER:  Just answer this
 8        specific question.  You should know
 9        the answer --
10        Q.    Are you referring to your claim
11   for rescission of a contract dated
12   December 3rd?
13             MR. COOPER:  Objection to form.
14        A.    Again, I'm going make it clear
15   on the record that I have not since
16   December -- since mid-December of 2013
17   instructed Raul Del Forno to do anything,
18   period.
19        Q.    And thank you for that and I
20   would just like to make sure that I
21   understand the dates, okay?
22        A.    Sure.
23        Q.    So after December 3rd, starting
24   with December 4th of 2013, did you instruct
25   Raul Del Forno to do anything for you after
```

```
 1                    E. VERSCHLEISER
 2   December 4th of 2013?
 3                MR. COOPER:  Objection to form.
 4         If you know that specific date,
 5         answer it.
 6         A.    I don't know the specific date
 7   but definitely sometime in mid -- since --
 8   since our separation or our split, I have
 9   not instructed Raul Del Forno to do
10   anything.
11         Q.    And if I were to remind you
12   that your separation or split, as you call
13   it, and your resignation as an employee of
14   United Realty occurred on December 4, 2014
15   [sic] --
16         A.    If that is the date, then that
17   is the date --
18                MR. COOPER:  Objection to form.
19         A.    -- that I have not since
20   instructed any one of those people that you
21   mentioned.
22         Q.    So not Raul, correct?
23         A.    Correct.
24         Q.    Not Barry?
25         A.    Correct.
```

```
 1                   E. VERSCHLEISER
 2      Q.     Not Nick?
 3      A.     Correct.
 4      Q.     Not Michael Blea?
 5      A.     Correct.
 6      Q.     Not Steven Tober?
 7      A.     Correct.
 8      Q.     Do you know Craig Gould?
 9      A.     Yes, I do.  We hired him.
10      Q.     Who is he?
11      A.     He's Craig Gould.
12      Q.     Do you know what he does?
13      A.     Today no, I do not.
14      Q.     Do you know what he did in
15 February of 2014?
16      A.     No, I did not.
17      Q.     Do you know what he did on
18 December 4th of 2014 [sic], the day you
19 resigned from United Realty?
20      A.     December 4th of 2014 is --
21      Q.     I'm sorry, 2013.
22      A.     -- is a long ways from here.
23      Q.     Thank you.  December 4th of
24 2013, do you recall what he did then?
25      A.     I think he was, at the time,
```

```
 1                    E. VERSCHLEISER
 2    the CEO of a broker/dealer that we own
 3    called Kaballah Securities.
 4         Q.    Have you or anyone acting on
 5    your behalf ever sent Craig Gould an e-mail
 6    from a mailbox friendsofEli@GMX.com?
 7         A.    If you refer to the questions
 8    earlier that you asked me, I don't know of
 9    that mailbox and -- and anyone that I know
10    or are affiliated with have not written or
11    sent anything from that.
12         Q.    Thank you.
13              MR. FRYDMAN:  Mark this as E.V.
14         3, please.
15              (Whereupon, the aforementioned
16         e-mail was marked as E.V. Exhibit 3
17         for identification as of this date by
18         the Reporter.)
19         Q.    Have you spoken to Craig Gould
20    since December 4th of 2014?
21         A.    Yes, I have.
22         Q.    When was the most recent time
23    that you spoke to him?
24         A.    Over the last few weeks.
25         Q.    And you don't know what he
```

47

```
 1                    E. VERSCHLEISER
 2    does?
 3          A.     I didn't ask him at the time.
 4          Q.     Handing what you's been marked
 5    as E.V. 3 for identification, can you
 6    identify that e-mail?
 7          A.     Can I -- can I read it on the
 8    record?
 9          Q.     No.  Just tell me if you've
10    ever seen it before.
11          A.     I have not.  It's the same
12    thing that you asked me in the last few
13    questions.
14          Q.     Did you write this e-mail?
15          A.     No, I have not.
16          Q.     Did you send this e-mail?
17          A.     No, I have not.
18          Q.     Did anyone at your request
19    write or send this e-mail?
20          A.     I have not requested anyone to
21    write or send this e-mail.
22          Q.     Did you instruct anyone to
23    write or send this e-mail?
24          A.     I did not instruct anyone to
25    write or send this e-mail.
```

```
 1                    E. VERSCHLEISER
 2          Q.     Are you familiar with a website
 3     called scamguard.com?
 4          A.     Not off the top of my head.
 5          Q.     Have you ever written,
 6     authored, or submitted anything to
 7     scamguard.com?
 8          A.     Not to my knowledge.
 9          Q.     Did you ever instruct or direct
10     anyone or person to write, author, or
11     submit anything to or post anything on
12     scamguard.com?
13          A.     Not to my knowledge.
14               MR. FRYDMAN:   E.V. 4, please.
15               (Whereupon, the aforementioned
16          scamguard.com screen shot was marked
17          as E.V. Exhibit 4 for identification
18          as of this date by the Reporter.)
19               MR. FRYDMAN:   E.V. 5.
20               (Whereupon, the aforementioned
21          two-page scamguard.com article
22          "Flipping Houses 101" was marked as
23          E.V. Exhibit 5 for identification as
24          of this date by the Reporter.)
25               MR. FRYDMAN:   And E.V. 6,
```

49

```
 1                    E. VERSCHLEISER
 2          please.
 3                   (Whereupon, the aforementioned
 4          two-page scamguard.com article
 5          "Medicaid/Medicare Plans" was marked
 6          as E.V. Exhibit 6 for identification
 7          as of this date by the Reporter.)
 8          Q.     Mr. Verschleiser, handing you
 9   what's been marked E.V. 4 for
10   identification, have you ever seen that
11   posting on scamguard.com before?
12          A.     No, I have not.
13          Q.     Did you write the posting on
14   scamguard.com?
15          A.     No, I did not.
16          Q.     Did you post the posting on
17   scamguard.com?
18          A.     No, I have not.
19          Q.     Has, to your knowledge, did
20   anyone at your request or direction write
21   or post that posting on scamguard.com?
22          A.     No.
23          Q.     Handing you what's been marked
24   as E.V. 5 for identification, have you ever
25   seen that posting on scamguard.com?
```

```
 1                    E. VERSCHLEISER
 2         A.    Not to my recollection.
 3         Q.    Did you write that posting on
 4   scamguard.com?
 5         A.    Well, no, I did not.
 6         Q.    Did you post that posting on
 7   scamguard.com?
 8         A.    No, I did not.
 9         Q.    Did anyone at your request,
10   instruction, or direction write or post
11   that posting on scamguard.com?
12         A.    No, but I may know who did it.
13               MR. COOPER:  Don't speculate.
14               THE WITNESS:  Okay.
15               MR. COOPER:  If you know, tell
16         him.
17         Q.    If you know, who did it?
18         A.    Okay.  I'm not going to
19   speculate.
20         Q.    So it's not you or someone at
21   your direction?
22         A.    That is correct.
23         Q.    Why do you think you know who
24   did it?
25         A.    At the time prior to our split,
```

```
 1                      E. VERSCHLEISER
 2    I recall you having numerous issues with
 3    other prominent real estate and individuals
 4    in the business world and I see over here
 5    that that's some of the things that are
 6    written, so I recall that you had some
 7    fraud cases against you.
 8          Q.    We'll get to that shortly, I
 9    can assure you.  You'll have plenty of time
10    to talk about that.
11          A.    You asked me, I'm answering.
12          Q.    Handing you what's been marked
13    as E.V. 6 for identification, have you seen
14    that ScamGuard posting before?
15          A.    No, I have not.
16          Q.    Did you write that ScamGuard
17    posting?
18          A.    No, but I'm looking forward to
19    watching the show "Greed."
20                MR. COOPER:  Same thing.
21                THE WITNESS:  Oh, I'm sorry.
22                MR. COOPER:  Just answer his
23          questions.
24          Q.    Did you post that posting on
25    scamguard.com?
```

```
 1                    E. VERSCHLEISER
 2         A.    No, I have not.
 3         Q.    Did anyone at your direction or
 4   instruction or request write or post that
 5   posting on scamguard.com?
 6         A.    Not to my knowledge.
 7         Q.    Are you familiar with the
 8   website called complaintsboard.com?
 9         A.    No, I am not.
10               MR. FRYDMAN:   E.V. 7.
11               (Whereupon, the aforementioned
12          complaintsboard.com screen shot was
13          marked as E.V. Exhibit 7 for
14          identification as of this date by the
15          Reporter.)
16         Q.    Handing you what's been marked
17   E.V. 7 for identification, have you seen
18   that Complaints Board posting before?
19         A.    Not to my recollection.
20         Q.    Did you write that Complaints
21   Board posting?
22         A.    No, I did not.
23         Q.    Did you post that Complaint
24   Board posting?
25         A.    No, I did not.
```

```
 1                  E. VERSCHLEISER
 2          Q.    Did anyone at your direction or
 3    request or instruction write or post that
 4    Complaints Board posting?
 5          A.    Not to my knowledge.
 6                MR. FRYDMAN:   (Handing.)
 7                (Whereupon, the aforementioned
 8           Congoo screen shot was marked as E.V.
 9           Exhibit 8 for identification as of
10           this date by the Reporter.)
11          Q.    Mr. Verschleiser, I'm handing
12    you what's been marked as E.V. 8 for
13    identification and I will share with you
14    that this comes off a website called Congoo
15    but it's a reprint, as you can tell by
16    looking below, of a posting on Complaint
17    Board on April 12, 2014.
18                MR. COOPER:   Has this been
19           produced in some form before?
20                MR. FRYDMAN:   It has.   It has.
21                MR. COOPER:   Okay.
22          A.    I'm not sure how you are --
23                MR. COOPER:   Well, just let him
24           finish the question.
25                THE WITNESS:   Okay.
```

```
 1                    E. VERSCHLEISER
 2              Go ahead.
 3         Q.    Take a look in the first box.
 4    See where it says, "Complaint Board
 5    April 12, 2014"?
 6         A.    Yes.
 7         Q.    Okay.  Have you seen this
 8    posting before?
 9         A.    No, I have not.
10         Q.    Did you write this posting?
11         A.    If you just said it's a reprint
12    of Complaints Board and -- that means they
13    reprinted it.
14         Q.    What I think I said is that
15    this Congoo website reprinted a posting
16    that was originally on Complaints Board.
17         A.    Then why are you asking me if I
18    printed it?
19         Q.    I'm asking if you posted the
20    original Complaint Board posting.
21         A.    Is it a different one from
22    before or is it the same?  You just asked
23    me that in Exhibit 7.
24              MR. FRYDMAN:  Do you have the
25         other Complaints Board?  There's
```

```
 1                    E. VERSCHLEISER
 2          another Complaints Board.
 3                    All right, so just at a
 4          break --
 5          Q.    Are you familiar with a website
 6    called reitwrecks.com?
 7          A.    Yes, actually.
 8          Q.    Did you ever write or post
 9    anything for or on reitwrecks.com?
10          A.    Not to my recollection.
11          Q.    To your knowledge, did anyone
12    at your instruction or direction or request
13    write or post anything on reitwrecks.com?
14          A.    Not to my knowledge.
15                MR. FRYDMAN:   (Handing.)
16                (Whereupon, the aforementioned
17          two-page reitwrecks.com article was
18          marked as E.V. Exhibit 9 for
19          identification as of this date by the
20          Reporter.)
21          Q.    Handing you what has been
22    marked as E.V. 9 for identification, I'm
23    going to ask you if you have ever seen that
24    posting before.
25          A.    No, I have not.
```

```
 1                   E. VERSCHLEISER
 2        Q.    Did you write that posting?
 3        A.    No, I did not.
 4        Q.    Did you post that posting?
 5        A.    No, I did not.
 6        Q.    Did anybody at your request,
 7   instruction, or direction write or post
 8   that posting?
 9        A.    Not to my knowledge.
10              MR. FRYDMAN:   Where is the next
11         Reit Wrecks?
12              MR. EDELMAN:   (Handing.)
13              MR. FRYDMAN:   (Handing.)
14              (Whereupon, the aforementioned
15         reitwrecks.com post titled "United
16         Realty Trust Jacob Frydman Fraud" was
17         marked as E.V. Exhibit 10 for
18         identification as of this date by the
19         Reporter.)
20              MR. FRYDMAN:  Do you have the
21         third one?
22        Q.    Handing you what's been marked
23   E.V. 10 for identification, have you ever
24   seen that posting on reitwrecks.com?
25        A.    No, I have not.
```

```
 1                    E. VERSCHLEISER
 2          Q.    Did you write that posting on
 3    reitwrecks.com?
 4          A.    No, I did not.
 5          Q.    Did you post that posting on
 6    reitwrecks.com?
 7          A.    No, I did not.
 8          Q.    Did anyone at your request,
 9    instruction, or direction write or post
10    that posting on reitwrecks.com?
11          A.    Not to my knowledge.
12          Q.    Are you familiar with a website
13    called ripoffreport.com?
14          A.    RipOff Report?  I think so.
15          Q.    How is it that you're familiar
16    with ripoffreport.com?
17          A.    I think somebody once posted
18    something about me or about us on that
19    website.
20          Q.    Do you recall what it was?
21          A.    Not off the top of my head.
22    Some disparagement stuff.
23          Q.    Approximately, when was that?
24          A.    While we were working at United
25    Realty together.
```

```
 1                  E. VERSCHLEISER
 2        Q.    So before you and I separated,
 3   you were a victim of a report on
 4   ripoffreport.com; is that right?
 5              MR. COOPER:  Objection to form.
 6        A.    Um --
 7        Q.    Let me change that.  Were you
 8   the subject of a report on
 9   ripoffreport.com?
10        A.    I think we both were, yes.
11        Q.    Do you recall that that was an
12   allegation -- strike that.
13              Other than that one posting on
14   ripoffreport.com, have you ever written or
15   posted anything on ripoffreport.com?
16              MR. COOPER:  Objection to form.
17        A.    I did not write that posting
18   nor any other postings on ripoffreport.com.
19              MR. FRYDMAN:  (Handing.)
20              (Whereupon, the aforementioned
21         two-page ripoffreport.com article was
22         marked as E.V. Exhibit 11 for
23         identification as of this date by the
24         Reporter.)
25        Q.    Handing you what's been marked
```

```
 1                    E. VERSCHLEISER
 2    as E.V. 11 for identification, have you
 3    ever seen that RipOff Reports posting
 4    before?
 5         A.    No.  No, I have not.
 6         Q.    Did you write that RipOff
 7    Report posting?
 8         A.    No, I did not.
 9         Q.    Did you post that RipOff
10    Reports posting?
11         A.    No, I did not.
12         Q.    Did anybody at your
13    instruction, request, or direction write or
14    post that posting on ripoffreports.com?
15         A.    Not to my knowledge.  At least
16    somebody was making the world aware --
17              MR. COOPER:  (Indicating.)
18              THE WITNESS:  You read this
19          stuff?
20              MR. FRYDMAN:  What is this one?
21          Is this different than that one?
22              (Handing.)
23              (Whereupon, the aforementioned
24          ripoffreport.com complaint review was
25          marked as E.V. Exhibit 12 for
```

```
 1                    E. VERSCHLEISER
 2           identification as of this date by the
 3           Reporter.)
 4           Q.    Mr. Verschleiser, handing you
 5    what's been marked E.V. 12 for
 6    identification, have you seen that posting
 7    on ripoffreports.com before?
 8           A.    No, I have not.
 9           Q.    Did you write that posting on
10    ripoffreports.com?
11           A.    No, I did not.
12           Q.    Did you post that posting on
13    ripoffreports.com?
14           A.    No, I did not.
15           Q.    Did anybody at your direction
16    or instruction or request write or post
17    that posting on ripoffreports.com?
18           A.    Not to my knowledge.
19           Q.    Are you familiar with a blog
20    called Jacob Frydman Fraud?
21           A.    Not familiar with any blogs.
22    I'm not familiar with blogs, period.
23           Q.    Because you don't deal with
24    blogs?
25           A.    I don't read blogs, I don't
```

                    E. VERSCHLEISER

1
2    blog.  It's something that came along post
3    my internet learning days.
4         Q.    So you have not participated or
5    done anything in connection with blogs?
6              MR. COOPER:  Objection to form.
7         A.    You have to be more specific.
8         Q.    Have you ever posted anything
9    on a blog?
10        A.    While we were at United Realty
11   together, Eric Fishgrund posted, wrote and
12   posted blogs in our names, my name, your
13   name, for the both of us.  Other than that,
14   I've never posted or -- I don't -- I'm not
15   familiar with blogs other than that.
16        Q.    And other than that, limiting
17   it to exclusively those blogs that Eric
18   Fishgrund was ghostwriting as a marketing
19   opportunity for United Realty and
20   specifically since December 4th of 2013,
21   have you ever created a blog or posted a
22   blog or asked someone else to create or
23   post a blog?
24        A.    Well, I'm a frequent writer in
25   the last -- since I haven't been working,

```
 1                  E. VERSCHLEISER
 2    we haven't been working together, I've
 3    written probably a half a dozen to a dozen
 4    articles that have been published in major
 5    publications and whether those were put
 6    onto blogs I don't know, but for the most
 7    part, the answer is I do not create --
 8    create blogs.
 9         Q.    That was not my question, and
10    it's very nice that you write articles of
11    great interest, but I'm talking about you
12    creating, directing, or instructing others
13    to create blogs.
14         A.    No.  Answer is no.
15              MR. FRYDMAN:   (Handing.)
16              (Whereupon, the aforementioned
17         Jacob Frydman Fraud screen shot was
18         marked as E.V. Exhibit 13 for
19         identification as of this date by the
20         Reporter.)
21         Q.    Handing you what's been marked
22    as E.V. 13 for identification, have you
23    ever seen that blog posting before?
24         A.    If it is, in fact, a blog
25    posting, I have not seen it before.
```

```
 1                    E. VERSCHLEISER
 2        Q.    Have you ever seen it in any
 3   form?
 4        A.    Other than at the moment, no.
 5        Q.    Did you write that blog or post
 6   or whatever it happens to be?
 7              MR. COOPER:  Objection to form.
 8        A.    No, I did not.
 9        Q.    Did you post that blog or post
10   or whatever it happens to be?
11        A.    No, I did not.
12        Q.    Did anybody at your direction,
13   instruction, or request write or post that
14   blog or whatever it happens to be?
15              MR. COOPER:  Objection to form.
16        A.    Not to my knowledge.
17        Q.    Earlier I asked you if you were
18   familiar with mail.com and 1and1.com; do
19   you recall that?
20        A.    Yes.
21              MR. COOPER:  That one, the
22         number one or is a numeral one or
23         spell it out?
24              MR. FRYDMAN:  It's numeral one
25         A-N-D numeral one.
```

64

```
 1                    E. VERSCHLEISER
 2               MR. COOPER:   Okay, thank you.
 3          Q.    Have you ever heard of that
 4     company before?
 5          A.    I think you asked me it
 6     already.
 7          Q.    Yeah, I did, but -- and I think
 8     you said no, but I am right, is that --
 9          A.    Not to my recollection.  I may
10     -- if it's a hosting company or something
11     to that effect, I may have used it in the
12     past but, in general, generally speaking, I
13     have not heard of it.
14               MR. FRYDMAN:   (Handing.)
15               (Whereupon, the aforementioned
16          six-page e-mail chain dated
17          December 5, 2013, was marked as E.V.
18          Exhibit 14 for identification as of
19          this date by the Reporter.)
20          Q.    Handing you what's been marked
21     as E.V. 14 for identification, can you
22     please identify that.
23               MR. COOPER:   Has this been
24          produced before?
25               MR. FRYDMAN:   It has.
```

```
 1                    E. VERSCHLEISER
 2         A.    What was your question?
 3         Q.    I'm asking if you can identify
 4    this document.
 5         A.    Identify it?  It looks like an
 6    e-mail chain.
 7         Q.    Okay, from whom to whom?
 8         A.    From Ahuva to myself and
 9    aonica@gmail.com.
10         Q.    Who is aonica@gmail.com?
11         A.    I believe it's Alex Onica.
12         Q.    And what is his relationship to
13    you?
14         A.    He's an independent contractor
15    to my companies for many years.
16         Q.    And what is he independent
17    contractor on?
18         A.    Technology.
19         Q.    What's the date of this e-mail?
20         A.    Thursday, December 5, 2013.
21         Q.    And if we go down to the second
22    part of that chain, there's an e-mail from
23    you to Ahuva Slomowitz; is that correct?
24         A.    That's correct.
25         Q.    And who is Ahuva Slomowitz?
```

```
 1                    E. VERSCHLEISER
 2        A.    My assistant.
 3        Q.    You know, it might be easier if
 4   we start from the back and go up.
 5        A.    Sure.
 6        Q.    Why don't we start with the
 7   December 5th, 5:29 e-mail from Ahuva to
 8   you.  Can you explain that to me, please?
 9        A.    You would have to ask her.  I
10   just could read it to you, if you'd like.
11        Q.    Well, she's asking you a
12   question, isn't she?
13        A.    It sounds like she's saying
14   something:
15             "Alex has to switch OP to
16             another hosting website.  We have too
17             many e-mails and many that are not
18             used.  I went through them and only
19             see a few that we need to back up and
20             save before he switches domains.  Any
21             other e-mails that are used that I
22             don't know about?  Does Shani use
23             hers?"
24        Q.    Do you have any idea of what
25   Ahuva was talking about, switching domains?
```

1                    E. VERSCHLEISER

2        A.    Yeah.   I believe that we put

3    Our Place onto Intermedia.

4        Q.    Anything else that you put on

5    Intermedia?

6        A.    We use Intermedia as a hosting

7    company.

8        Q.    I understand.   Which companies

9    or which domains did you put on Intermedia?

10       A.    I would have to ask our tech

11   guys.

12       Q.    You don't know?

13       A.    Correct.

14       Q.    So, now, as we come back up, do

15   you understand what it means, "Alex has to

16   switch OP to another hosting website"?

17       A.    OP is Our Place.

18       Q.    And then as you go up, you

19   asked, "Why the change?" correct?

20       A.    Correct.

21       Q.    Why was there a change

22   necessary?

23             MR. COOPER:  Objection to form.

24       A.    I don't recall at the time.

25   Probably to save money.   Typically, every

```
 1                  E. VERSCHLEISER
 2   so often we --
 3                  MR. COOPER:  Don't speculate.
 4        If you know the answer, you know the
 5        answer.
 6                  THE WITNESS:  Okay.
 7        Q.    Well, take a look at the e-mail
 8   just above that.  Apparently, you were
 9   locked out of the website.  Do you know
10   what that refers to?  Was there any website
11   or e-mail hosting exchange server that you
12   were locked out of at that time?
13        A.    Well, there was a period of
14   time for a day or two that you childlessly
15   [sic] locked me out and our not-for-profits
16   of their e-mails and web access, something
17   to that effect.
18        Q.    So, therefore, you had to move
19   them, right?
20        A.    That's correct.
21        Q.    Go to the next e-mail, the one
22   from Alex Onica to you.  I think it says,
23   Moishe and David are trying to process
24   certain payments through
25   ourplacenewyork.org website and corporate
```

```
 1                E. VERSCHLEISER
 2   because someone, some sure native Linux
 3   function could not be enabled on the
 4   hosting environment.  Do you know what that
 5   means?
 6               MR. FRYDMAN:  Objection to
 7          form.
 8        A.    It means exactly what it says,
 9   that a Linux function could not be enabled
10   in the hosting environment.
11        Q.    See down below it says,
12   "However, 1and1 cannot guarantee e-mail
13   transition"?
14        A.    Yes, I do.
15        Q.    What is that?
16        A.    I guess --
17               MR. COOPER:  If you know.
18               THE WITNESS:  No, I don't know.
19        Q.    But on December 5, 2013, you
20   were having correspondence regarding 1and1,
21   were you not?
22               MR. COOPER:  I don't see him on
23          this e-mail.
24        A.    No.  It looks like Alex Onica
25   was.
```

```
 1                E. VERSCHLEISER
 2        Q.    Do you see that this is in the
 3   e-mail chain sent to you?
 4        A.    It's in the e-mail chain --
 5   looks like it's in the e-mail chain --
 6              MR. COOPER:  Wait.  Want to
 7         show us where that e-mail was sent to
 8         him?
 9              THE WITNESS:  I don't see it.
10              MR. COOPER:  I don't see it if
11         it was.
12        Q.    Go to the first page.
13              MR. COOPER:  No, no, no, this
14         e-mail.
15        A.    The first page is a different
16   e-mail.
17        Q.    Were you aware that your
18   independent contractor, Alex Onica, who
19   handled your IT, was working with 1and1 at
20   this time for some purpose?
21        A.    Not off the top of my head.
22        Q.    But he was working for you?
23        A.    He was.  He still is.
24              MR. FRYDMAN:  The videographer
25         has to stop every hour and 15 minutes
```

```
 1                    E. VERSCHLEISER
 2        to change his disks, so this would be
 3        an appropriate time to do that.
 4               THE WITNESS:  Are you finished
 5        with that?
 6               MR. FRYDMAN:  This exhibit.  We
 7        are far from ending.
 8               THE VIDEOGRAPHER:  We are now
 9        off the record at 2:36 p.m.
10               (Whereupon, a short recess was
11        taken.)
12               THE VIDEOGRAPHER:  This is Tape
13        2.  We are now on the record at
14        2:44 p.m.
15               MR. FRYDMAN:  Can we mark this,
16        please.
17               (Whereupon, the aforementioned
18        e-mail dated April 14, 2014, was
19        marked as E.V. Exhibit 15 for
20        identification as of this date by the
21        Reporter.)
22        Q.    Mr. Verschleiser, handing you
23   what's been marked at Exhibit 15, E.V. 15
24   for identification, can you identify this?
25        A.    "Hi everyone, I'm away for the
```

```
 1                    E. VERSCHLEISER
 2    Pass" -- it looks like an e-mail.
 3         Q.    Right.  The bottom part, the
 4    part that's from Eli Verschleiser --
 5         A.    "I was told that I should share
 6    this with you as it will likely become a
 7    very public story in the near future.  It
 8    seems apparent that the board is unaware of
 9    any of this, but I have -- I feel I have a
10    horais (phonetic) only to you.  Have a
11    wonderful yom tup."
12         Q.    Was this an e-mail that you
13    wrote?
14         A.    Possibly.  I don't recall
15    e-mails, specific e-mails that I write for
16    the most part.
17         Q.    Well, would someone else be
18    writing in your account?
19         A.    Could be that my assistant does
20    from time to time.
21         Q.    Did you instruct her to write
22    this to Mr. Newman?
23         A.    I do not recall.
24         Q.    Did you write this to
25    Mr. Newman?
```

73

```
 1                    E. VERSCHLEISER
 2        A.    I do not recall.
 3        Q.    Is there any reason that you
 4   doubt that you wrote it to Mr. Newman?
 5        A.    No.
 6        Q.    So more likely than not, you
 7   wrote this to Mr. Newman?
 8              MR. COOPER:  Objection to form.
 9        A.    Again, I do not recall writing
10   this e-mail.
11        Q.    Is this, is this an e-mail over
12   your signature?
13        A.    Over my name.
14              MR. COOPER:  Objection to form.
15        Q.    Where were you on Monday,
16   April 14, 2014; do you know?
17        A.    No, I do not.
18        Q.    Did you attach any documents to
19   this e-mail?
20        A.    I do not recall this e-mail.
21        Q.    Do you have any idea what is
22   meant in this e-mail where it says, "I
23   should share this with you"?  What is
24   "this"?
25        A.    I have no idea.
```