```
 1                    E. VERSCHLEISER
 2          Q.    Don't know?
 3          A.    I would have to look back in my
 4    e-mail chains to remind myself.
 5          Q.    There were three attachments to
 6    this e-mail; do you recall that?
 7          A.    No, I do not.
 8                MR. FRYDMAN:  Sorry.
 9                (Handing.)
10                (Whereupon, the aforementioned
11                Summons and Complaint dated April 14,
12                2014, was marked as E.V. Exhibit 16
13                for identification as of this date by
14                the Reporter.)
15                (Whereupon, the aforementioned
16                11-page e-mail chain dated April 18,
17                2014, was marked as E.V. Exhibit 17
18                for identification as of this date by
19                the Reporter.)
20          Q.    Handing you what's been marked
21    as E.V. 17 and 16 for identification, can
22    you identify those?
23                MR. COOPER:  Which is which?
24          Okay.  17, I got it.
25                THE WITNESS:  This is 17
```

```
 1                 E. VERSCHLEISER
 2         (indicating).
 3              MR. COOPER:  Okay.
 4         A.    Which one do you want to start
 5   with?
 6         Q.    Start with 17.
 7         A.    17 looks like the e-mail that
 8   you showed me in 15.
 9         Q.    Okay, but it has an, it has
10   more pages than just the e-mail, right?
11         A.    It has more documents in this
12   exhibit, correct.
13         Q.    How many more documents?
14              MR. FRYDMAN:  You know what,
15         I'd like to do, I'm really sorry, I'd
16         like to mark these two as separate.
17         There's two documents attached.  I'd
18         like to mark them as separate
19         exhibits.  Is that all right with
20         you?
21              MR. COOPER:  That's fine.  Do
22         you want to call them 17A and B?
23              MR. FRYDMAN:  Let's call them
24         17A and B, and will you get me a
25         stapler and a stapler remover.
```

```
 1              E. VERSCHLEISER
 2              THE WITNESS:  So there are
 3    really three documents here, you're
 4    saying the e-mail and the two others?
 5    Which one do you want A and which one
 6    do you want B?
 7              MR. COOPER:  He'll go over it.
 8    He'll figure it out.
 9              MR. FRYDMAN:  We'll get a
10    stapler in a second.  Let's do one of
11    them as A and one of them as B.
12              (Whereupon, the aforementioned
13    six-page notice of removal dated
14    November 29, 2013, was marked as E.V.
15    Exhibit 17A for identification as of
16    this date by the Reporter.)
17              (Whereupon, the aforementioned
18    four-page termination of employment
19    letter dated November 29, 2013, was
20    marked as E.V. Exhibit 17B for
21    identification as of this date by the
22    Reporter.)
23              MR. COOPER:  I actually, I
24    don't think that's the order it
25    opened with.  I think reference is
```

1                    E. VERSCHLEISER
2          made is the first one in the series,
3          if I'm not mistaken.  I think this
4          is --
5                  THE WITNESS:  Yeah, that's what
6          it's marking as.
7                  MR. COOPER:  Yeah, but I don't
8          want it to be misleading --
9                  MR. FRYDMAN:  I'm going to put
10         something on the record.
11                 MR. COOPER:  Okay.
12                 MR. FRYDMAN:  I just pulled
13         apart Exhibit 17, which consisted of
14         three documents, the original, a copy
15         of an e-mail which had three exhibits
16         attached to it.  One of those
17         exhibits was marked 17A, one of those
18         exhibits was marked 17B, and one of
19         those exhibits was marked 18.
20         Q.     And now I'll ask you some
21     questions.
22                 MR. COOPER:  Which one is 18?
23                 MR. FRYDMAN:  (Indicating.)
24                 MR. COOPER:  No, that's 16.
25                 MR. FRYDMAN:  16, I apologize.

```
1                    E. VERSCHLEISER
2         So which one of them's marked 16?
3         One was marked 17A, and one was
4         marked 17B.
5              MR. COOPER:  And I just want to
6         say that I believe 17A preceded 17B
7         as attachments in the original
8         stapled exhibit you gave us, but you
9         can proceed; I just want to state it
10        for the record.
11        Q.    Are you familiar with exhibits
12   16, 17A, and 17B?
13        A.    Yes, I am.
14        Q.    What are they?
15        A.    16 is a summons and complaint.
16   I don't know the legal terminology for it,
17   but it looks like a lawsuit that I filed
18   against you and your entities.
19        Q.    Okay, and can you identify 17A
20   and 17B?
21        A.    17A is a notice of removal by
22   an entity that I am affiliated with and
23   own.
24              Oh, there are two of the same.
25   Oh, it's two notices of the same.  Those
```

```
 1                    E. VERSCHLEISER
 2     are the same page.
 3               MR. COOPER:  Mmm-hmm.
 4               THE WITNESS:  This is the same
 5          page.
 6               MR. FRYDMAN:  Well, you have an
 7          unstapled version.  Can we create a
 8          stapled version?
 9               THE WITNESS:  Yeah.  Page 1,
10          Page 2, Page 3, and Page 4.  Here we
11          go.
12               MR. COOPER:  Problem is, I
13          think there are two notices of
14          removal back to back.
15               THE WITNESS:  They're the same.
16               MR. FRYDMAN:  Yeah, they're
17          identical.
18               MR. COOPER:  So we're turning
19          it into one?
20               MR. FRYDMAN:  Off the record
21          for a second.
22               THE VIDEOGRAPHER:  We are now
23          off the record at 2:55 p.m.
24               (Whereupon, an off-the-record
25          discussion was held.)
```

```
 1                      E. VERSCHLEISER
 2                 (Whereupon, the aforementioned
 3            Exhibit 17A was re-marked as a
 4            four-page exhibit.)
 5                 THE VIDEOGRAPHER:  We are now
 6            on the record at 2:57 p.m.
 7            Q.     Were exhibits 17A, 17B, and 16
 8   attachments to the e-mail to Mr. Newman
 9   that was marked Exhibit 15?
10                 MR. COOPER:  Well, I, the
11            indication here is that they were
12            exhibits to the e-mail to you and
13            other people.  There's no indication
14            that there were attachments to the
15            e-mail that Mr. Verschleiser
16            purportedly send to Mr. Newman.
17                 MR. FRYDMAN:  Well, I
18            appreciate that, Steve, but I
19            respectfully disagree, but I've asked
20            Mr. Verschleiser on Exhibit 15 if he
21            could please tell me what he meant
22            when he wrote, "I was told that I
23            should share this with you as it will
24            likely become a very public story in
25            the near future."
```

```
1                    E. VERSCHLEISER
2        Q.    What is it that you are sharing
3   with Mr. Newman?
4             MR. COOPER:  I think he
5        answered that, but you can answer it
6        again.
7        A.    I don't recall.
8        Q.    If I represent to you that the
9   e-mail you sent to Mr. Newman included
10  three attachments, Exhibit 16, Exhibit 17A,
11  and Exhibit 17B, do you have any reason to
12  doubt that?
13            MR. COOPER:  Objection to form.
14       A.    Yes, many, many, many, too many
15  to list reasons to doubt anything you
16  represent to me.
17       Q.    What is it, then, that you were
18  sharing with Mr. Newman?
19       A.    I do not recall.  I would have
20  to go look at my e-mail chains to see our
21  conversation.  We -- Mr. Newman --
22            MR. COOPER:  Just answer him
23       what you were sharing.
24            THE WITNESS:  Okay.
25            I do not recall.  Mr. Newman
```

```
 1                E. VERSCHLEISER
 2           has a not-for-profit committee --
 3           Q.    Did you at any time, did you at
 4      any time send Mr. Newman --
 5                Do you know who David Newman
 6      is?
 7           A.    I know a few David Newmans.
 8           Q.    Do you know David Newman at
 9      brockcapital.com?
10           A.    Yes, I do.
11           Q.    Is that the David Newman that
12      is copied on this e-mail?
13           A.    That's the David Newman that
14      this e-mail was sent to, so it seems.
15           Q.    And --
16           A.    Actually, it was sent to a
17      David Newman, DnewLnew@AOL.com, so I'm not
18      sure.
19           Q.    And cc'ed to --
20           A.    To two David Newmans.
21           Q.    Or maybe they're the same
22      person at two different addresses?
23           A.    That could be.
24           Q.    And do you see that, do you
25      know a David Newman to be a member of the
```

```
 1                    E. VERSCHLEISER
 2    board of directors of United Realty Trust?
 3         A.    Yes, I do.
 4         Q.    All right.  Is that the David
 5    Newman that responded, or that wrote the
 6    e-mail on the top of Exhibit 17?
 7         A.    I don't know.  You would have
 8    to ask him.
 9         Q.    Well, it says D Newman at Brock
10    Capital.  Would that be your expectation,
11    based on that?
12         A.    I would assume so.
13         Q.    'Kay, and did you write
14    Exhibits 17A and 17B?
15              MR. COOPER:  Objection to form.
16         A.    Yes.
17         Q.    Did you sign Exhibits 17A and
18    17B?
19         A.    That's my signature.
20         Q.    And when were those --
21              MR. COOPER:  Check both of
22         them.
23              Objection to form.
24         Q.    You've checked, are they both
25    your signatures?
```

```
1                    E. VERSCHLEISER

2               MR. COOPER:  Objection to form.

3       A.      Yes, they are.

4       Q.      And did you intend to send

5  those letters to me?

6               MR. COOPER:  Objection to form.

7       A.      Did I intend to send those

8  letters to you?

9       Q.      Yes.

10       A.      I handed them to you.

11       Q.      So you say, but your testimony

12  is --

13               MR. COOPER:  Objection to form.

14       Q.      -- that you handed them to me

15  when?

16       A.      Whatever it's dated probably in

17  the -- within that day or two.

18       Q.      Well, was it on November 29th?

19       A.      I have to look up what day of

20  the week it was.

21       Q.      That was a Friday.

22       A.      So then it probably was not on

23  November 29th.

24       Q.      Well, because you and I were

25  not together on November 29th, right?
```

1               E. VERSCHLEISER

2               MR. COOPER:   Objection to form.

3        Do you know?

4        A.     I don't recall.

5        Q.     But it's your testimony, was

6   that you handed those to me?

7        A.     I put them on your desk.

8        Q.     And November 29th was the first

9   night of Chanukah.

10       A.     Okay.

11       Q.     Does that refresh your

12   recollection?

13       A.     If it's Friday, the first night

14   of Chanukah?  A little bit.

15       Q.     Do you recall where you were

16   during the entire day of Friday,

17   November 29th?

18       A.     No, I do not.

19       Q.     Were you in the office at 44

20   Wall Street where you just claim to have,

21   first you said, I think, that you handed

22   them to me and then a minute later, I think

23   you said that you left them on my desk?

24       A.     I left them on your desk.

25       Q.     You didn't hand them to me?

1              E. VERSCHLEISER

2        A.    Not handing specifically.

3        Q.    So your first statement was

4    incorrect; is that right?

5              MR. COOPER:  Objection to form.

6        A.    Well, by handing them to you in

7    my terminology and means putting them on

8    your desk.

9        Q.    I see, and you're certain that

10   you put them on my desk on the 29th?

11             MR. COOPER:  Objection to form.

12       A.    I'm certain that I put them on

13   your desk.

14       Q.    On the 29 of November?

15             MR. COOPER:  He didn't say

16       that.  Objection to form.

17       A.    I didn't say that.

18       Q.    Did you put them on my desk on

19   November 29, 2013?

20       A.    I don't recall when.  It was

21   sometime between November 29th -- it was

22   over the weekend, over that weekend.

23       Q.    Do you know where you were

24   during that weekend?

25       A.    Sure.  I was at home with my

```
 1                    E. VERSCHLEISER
 2   family.
 3          Q.     Were you in the office at 44
 4   Wall Street at any time November 29th?
 5          A.     I don't recall.
 6          Q.     And were you in the office at
 7   44 Wall Street on Saturday the 30th or on
 8   the following Sunday?
 9          A.     I don't recall.
10          Q.     But you recall that you put
11   them on my desk?
12          A.     Correct.
13          Q.     But you don't recall on what
14   date?
15          A.     Correct.
16          Q.     Could it have been --
17                 THE WITNESS:  Is this relevant
18          to this case?
19                 MR. COOPER:  No, it's not.  I
20          gave you a little --
21                 MR. FRYDMAN:  It is relevant.
22          It is relevant and I'm going to tell
23          you why, because these are
24          disparagements and we're going to go
25          through them as disparagements.
```

```
 1                E. VERSCHLEISER
 2          MR. COOPER:  You've made that
 3     argument before many times and it has
 4     been rejected by the judge each time,
 5     including in a recent transcript.
 6     You were not entitled to do discovery
 7     regarding the November 29th
 8     writing --
 9          MR. FRYDMAN:  I respectfully
10     disagree.
11          MR. COOPER:  You can
12     respectfully disagree.  You're
13     respectfully disagreeing with the
14     judge, not with me.
15          You can ask about the
16     transmission of this e-mail as a
17     purported disparaging communication,
18     but the derivation of these
19     documents, and I've given a little
20     leeway on it, is not germane to this
21     proceeding and the judge has
22     stated --
23          MR. FRYDMAN:  Okay, so I will
24     -- I will move on to April when this
25     e-mail was sent, but I object to
```

```
 1                    E. VERSCHLEISER
 2        your, to the way that you have
 3        purported to identify this.
 4        Q.    In any event, on April 18th of
 5   2014 --
 6        A.    Yes.
 7        Q.    -- what was your purpose in
 8   sending these to Mr. Newman?
 9        A.    I don't recall sending it to
10   him, but I guess my purpose is --
11                MR. COOPER:  Don't guess.  If
12        you know --
13                THE WITNESS:  So I don't know.
14        Q.    I am representing to you that
15   you did.  If you did, why would you have
16   done it?
17                MR. COOPER:  You don't have to
18        accept any representations.  If you
19        know, please answer the question.
20        A.    I don't know.  I think the
21   e-mail is fairly clear, so --
22        Q.    So why don't you explain what
23   you meant by that e-mail.
24        A.    I was told that I should share
25   this with you.  Not sure what "this" is.
```

```
 1                      E. VERSCHLEISER
 2     That could have been -- it may have been I
 3     was trying to --
 4                      MR. COOPER:  No, don't
 5             speculate.  If you know, answer the
 6             question.
 7                      THE WITNESS:  I don't know.  I
 8             apologize.
 9          Q.     Do you know what was likely to
10     become a public story in the near future as
11     of April 14, 2014?
12          A.     No, I do not.
13          Q.     Do you have any idea what you
14     meant by, "It seems apparent the board is
15     unaware of any of this but I feel," of any
16     of this, just, let's leave it there, what
17     does that mean?
18          A.     I don't know.
19          Q.     You wrote it but you don't
20     know?
21          A.     I would have to go back and
22     look at the e-mail chain for me to recall.
23          Q.     Well, apparently there's no
24     e-mail chain.  This was an initial e-mail
25     from you to Mr. Newman.
```

E. VERSCHLEISER

1

2        A.     He may have replied to me.   Why

3   would you have that as opposed to me?   He

4   actually -- we have had many conversations

5   so I would just have to go look at that

6   e-mail chain.

7        Q.     The attachments to Mr. Newman

8   in April, on April 14th, the content of

9   your alleged November 29th letters to me

10  listed what type of matters?

11       A.     I don't know that these were

12  the contents ever attached to the e-mail.

13  You're just telling us that it is.

14       Q.     So just forget whether they

15  were or not.   We'll have Mr. Newman testify

16  as to that.

17              Take a look at 17A and 17B.

18       A.     Yes.

19       Q.     What are 17A and 17B?

20       A.     One's a notice of removal and

21  one is a termination of employment.

22       Q.     Okay.   Let's look at the notice

23  of removal.   You assert at sub I that I

24  stole $50,000 from the company.   What do

25  you have to support that allegation?

```
 1                  E. VERSCHLEISER
 2         A.    In the lawsuit that we filed
 3    against you, we will give you all that
 4    information.
 5         Q.    No, I'm not asking to you give
 6    to me in the future.  When you wrote this
 7    on whatever date you wrote it that you now
 8    are not sure, what --
 9         A.    Oh, I'm sure when I wrote it,
10    but --
11         Q.    -- what did you mean?  What did
12    you mean when you wrote that I made
13    unauthorized distributions to myself or my
14    affiliates in the amount of $50,000 or
15    more?
16         A.    That you made unauthorized
17    distributions in the amount of $50,000 to
18    you or your affiliates.
19         Q.    Okay.  When?  Do you have a
20    check, do you have a, any evidence at all
21    of that alleged unauthorized distribution?
22         A.    Yes, I do.
23         Q.    Okay.  What is it?
24         A.    It's the Quickbooks file from
25    the company.
```

```
 1                    E. VERSCHLEISER
 2         Q.     Okay, and what, when was this
 3    unauthorized distribution made?
 4         A.     We'll provide it to you in our
 5    case.
 6         Q.     You don't have a specific
 7    recollection as we sit here today?
 8         A.     No.  Our forensic accountants
 9    have that all laid out.
10         Q.     Paragraph 2, you allege,
11    breaches by me of Section 310 of our
12    agreement --
13              THE WITNESS:  Did you want to
14         do this?
15         Q.     -- by failing to devote at
16    least 90 percent of my normal professional
17    time to the business affairs of our joint
18    enterprise.  What's that based on?
19              MR. COOPER:  We're not going to
20         go through this.
21              MR. FRYDMAN:  We are.  You can
22         object.
23              MR. COOPER:  No, I'm going
24         object and direct him not to answer
25         and I'm going to rely on the judge's
```

```
 1              E. VERSCHLEISER
 2     order where you asked for this
 3     material and she told you it was out,
 4     quote/unquote, Page 9 of the June 23,
 5     2014 hearing.  You asked for the
 6     material related to the November 29th
 7     file, the original native file --
 8              MR. FRYDMAN:  I'm not talking
 9     about the native file.
10              MR. COOPER:  -- of each draft
11     contained, let me finish, contained
12     in the November 29th notices
13     referenced in the friend of Eli and
14     Verschleiser e-mail to David Newman
15     and the original native file of each
16     copy of each PDF of each of the same.
17     You made the exact same argument
18     you're making now, that this is
19     somehow disparaging comment and the
20     judge said this is out.  This is
21     limited to disparagement, okay.
22              MR. FRYDMAN:  I respectfully
23     disagree with the judge's file,
24     native file.  I don't have the native
25     files here.  I'm not asking about the
```

```
 1                    E. VERSCHLEISER
 2        native file.
 3              THE WITNESS:  What's a native
 4        file?
 5              MR. FRYDMAN:  What I am asking
 6        about is the substance of this
 7        communication on December, on -- on
 8        April 18th from Mr. Verschleiser to
 9        Mr. Newman.
10              MR. COOPER:  Okay, but you
11        have --
12              MR. FRYDMAN:  And -- and I am
13        asking him about the disparaging
14        statements that are set forth in this
15        communication.
16              MR. COOPER:  Okay.  First of
17        all, April 18th transmission was from
18        Newman to you, Daniel Ornsenz, Robert
19        S. Levine, and Rick Vitali.  That's
20        the only e-mail that indicates there
21        were attachments.
22              MR. FRYDMAN:  Okay.
23              MR. COOPER:  There's nothing
24        that indicates that there was an
25        attachment to the April 14, 2014,
```

1                    E. VERSCHLEISER

2          communication.

3                    MR. FRYDMAN:  The fact that it

4          is on the e-mail from Mr. Newman to

5          me and the other people is the

6          forwarding of, you see it says FW?

7          Subject, FW.  That's a forwarding of

8          an e-mail.

9                    MR. COOPER:  Well, there's no

10         indication --

11                   MR. FRYDMAN:  And the

12         indication is that those are

13         attachments that are forwarded.

14                   MR. COOPER:  No, I understand,

15         and --

16                   MR. FRYDMAN:  So, you know

17         what, just object.  I'm going ask my

18         questions and if you're right, it

19         will be excluded.

20                   MR. COOPER:  No.  I will, you

21         can ask your questions.  We're not

22         going into the substance of the

23         notices of termination.  It's already

24         been ruled on.

25                   MR. FRYDMAN:  The substance on

```
 1                    E. VERSCHLEISER
 2         April 14, 2014, is not been ruled on.
 3         What has been ruled on, as you just
 4         quoted, is the access to native
 5         files, which I respectfully disagree
 6         with the judge, but yes, she said we
 7         were not entitled to the native files
 8         and -- and I expect that she will
 9         reconsider her view on that, but
10         nonetheless, nonetheless I will not
11         go into the native file.  I was, have
12         no intention of asking about the
13         native files.
14              I'm asking solely about the
15         disparaging statements that were made
16         as attachments in April of 2014,
17         which is the --
18              THE WITNESS:  Presently I'm not
19         going to answer the questions as per
20         the judge and the attorney.
21              MR. FRYDMAN:  We'll mark this,
22         we'll go to court and we'll ask about
23         it.  We'll come back to it some other
24         time.  I reserve the right to keep
25         this deposition open to resolve this
```

```
 1                    E. VERSCHLEISER
 2          for as long as it takes.
 3          Q.    Mr. Verschleiser, do you recall
 4     when I fired you from United Realty Trust?
 5                 MR. COOPER:  Objection to form.
 6          Do you understand the question?
 7                 THE WITNESS:  No.
 8                 MR. COOPER:  Okay.
 9          Q.    Do you recall --
10          A.    Could you explain that.
11                 MR. FRYDMAN:  Can I see 106.
12                 THE WITNESS:  This is, again,
13          going into our lawsuit.
14                 MR. COOPER:  (Indicating.)
15                 MR. FRYDMAN:  (Handing.)
16                 (Whereupon, the aforementioned
17          eight-page notice of removal for
18          cause dated December 2, 2013, was
19          marked as E.V. Exhibit 18 for
20          identification as of this date by the
21          Reporter.)
22          Q.    I'm going to hand you
23     Exhibit 18 for identification.  I'm
24     actually not going to go into the subject
25     matter of this exhibit, I just want to get
```

```
 1                    E. VERSCHLEISER
 2     dates straight, okay, so handing you what's
 3     been marked as Exhibit 18 for
 4     identification, it's a package of three
 5     documents.
 6                    MR. COOPER:  Do I have it?
 7                    MR. FRYDMAN:  Oh, I'm sorry,
 8          Steve.
 9          Q.    Have you seen them before and
10     can you identify them?
11          A.    In a second.
12                 Yes, they look like -- like
13     what you tried to do after I fired you and
14     removed you from our company.
15          Q.    When exactly did you fire me
16     and remove me from our companies?
17          A.    You put in as an exhibit, 17A.
18     It's dated November 29, 17B dated
19     November 29th.
20          Q.    No, those that you testified
21     you didn't recall when you delivered them
22     to me.
23                    MR. COOPER:  Objection to form.
24          Q.    Is that right?
25          A.    That's not correct.
```

```
 1                    E. VERSCHLEISER
 2          Q.    Okay, so when did you deliver
 3    them to me?
 4          A.    We're not going into that.
 5    That's my lawsuit against you that we'll
 6    discuss it at that time.
 7          Q.    No, no, no, I'm asking you on
 8    the record, okay.  You just testified
 9    before, first you said that on November
10    29th you handed them to me, then you
11    recanted that and you said you left them on
12    my desk, then you said, oh, if it was a
13    Friday, I wasn't in the office so maybe it
14    was some other time over the weekend.
15          A.    You're putting words into my
16    mouth.
17              MR. COOPER:  I got it, I got
18          it.
19          Q.    So I'm asking you again, do you
20    know when you allegedly delivered Exhibits
21    17A and 17B to me?
22              MR. COOPER:  Okay.  It's been
23          asked and answered, you misstated the
24          testimony, and it's irrelevant.  You
25          don't have to answer it.  You
```

```
 1                    E. VERSCHLEISER
 2           answered it already.  We gave him a
 3           lot of leeway on this.
 4           Q.    So just going to the date of
 5   Exhibit 18, did you receive that on
 6   December 2nd?
 7           A.    I don't know what date I
 8   received it.  I have to go look at my
 9   notes, but I received it sometime in the
10   beginning of December.
11           Q.    Do you have any reason to doubt
12   that it was December 2nd?
13           A.    Could have been December 3rd.
14           Q.    Could it have been
15   December 2nd?
16           A.    It could have been
17   December 2nd.  I can assure you that it was
18   after I fired you.
19                 MR. COOPER:   Okay.
20           Q.    And you fired me pursuant to
21   those November 29th letters, right?
22           A.    That's correct, but I'm not
23   going to discuss it further.
24           Q.    Did you type, did you type
25   those letters, the November 29th letters?
```

102

```
 1                    E. VERSCHLEISER
 2              THE WITNESS:  Do I have to
 3         answer?  I'm not going to discuss
 4         these further.
 5              MR. FRYDMAN:  Can we mark the
 6         transcript here.  Thank you.
 7         Q.    I'd like to understand your
 8    technical experience, okay.  Are you
 9    familiar with the term "internet browsing"?
10              MR. COOPER:  Objection to form.
11         A.    I've heard the words before.
12         Q.    You don't know what it is?
13         A.    In my definition, the words
14    "internet browsing" means looking around on
15    the internet through a browser.
16         Q.    Okay.  Do you know what an
17    "internet service provider" is?
18         A.    My definition of an internet
19    service provider is a provider of service
20    of the internet.
21         Q.    Do you know what an "e-mail
22    exchange server" is?
23         A.    Yes, I do.
24         Q.    What is it?
25         A.    It's a server that hosts
```

```
 1                    E. VERSCHLEISER
 2    Microsoft Exchange, which is a software
 3    that receives, organizes, and sends
 4    e-mails.
 5         Q.    And those are either hosted or
 6    not hosted, right?
 7         A.    Anything could be hosted.
 8         Q.    Okay, and --
 9         A.    I believe so.
10         Q.    -- do you know what an "e-mail
11    address" or an "e-mail mailbox" is?
12         A.    Yes, I do.
13         Q.    And do you know where one can
14    obtain an e-mail address or an e-mail
15    mailbox?
16         A.    From their tech guy.
17         Q.    Any particular type of tech
18    guy?
19         A.    I guess one that knows how to
20    set them up.
21         Q.    Have you ever created an e-mail
22    address or an e-mail exchange server or an
23    e-mail mailbox?  Do you have the technical
24    skill to do that, is really what I'm asking
25    you.
```

```
 1                    E. VERSCHLEISER
 2         A.    To do what specifically?
 3         Q.    To establish or create an
 4    e-mail mailbox.  Have you ever done it?
 5         A.    You're -- you're -- an e-mail
 6    mailbox?  You need to be more specific.
 7         Q.    If you wanted to create an
 8    account that's called, let's say,
 9    Eli@AOL.com --
10         A.    Yes.
11         Q.    -- do you know how you could do
12    that?
13         A.    Not off the top of my head, but
14    I'm sure I can figure it out.
15         Q.    How about Eli@gmail.com?
16         A.    I'm sure I can figure it out.
17    I think it's fairly simple.
18         Q.    Do you know what an "IP
19    address" is?
20         A.    Not exactly.
21         Q.    Do you know what a "white list"
22    is with respect to an IP address?
23         A.    Never heard that.
24         Q.    Never, and do you know what a
25    "black list" is with respect to an IP
```

```
 1                    E. VERSCHLEISER
 2    address?
 3         A.    I think it's -- it has -- I'm
 4    not -- not sure.
 5         Q.    But you've never been involved
 6    in looking to search whether IP addresses
 7    are either white listed or black listed; is
 8    that correct?
 9         A.    That's correct.
10         Q.    Are you familiar with the term
11    "anonymous browsing"?
12         A.    No.
13         Q.    Do you know any ways to browse
14    the internet anonymously?
15         A.    Not off the top of my head, no.
16    I'm sure I can -- if there is such a thing,
17    I'm sure I could find it.
18         Q.    From December 3, 2013, until
19    now, have you ever anonymously browsed in
20    the United Realty exchange server?
21              MR. COOPER:   What's that mean,
22         what's that term mean, "anonymously
23         browsed"?
24         A.    Yeah, I'm not sure what that
25    term means.
```

1                    E. VERSCHLEISER

2         Q.    Have you ever, well, let's

3    start here, from December 3, 2013, on; have

4    you ever accessed the United Realty e-mail

5    exchange server?

6         A.    Not to my knowledge.

7         Q.    And from and after, and did you

8    ever access it, trying to hide your

9    identity?

10        A.    I just said I --

11        Q.    You never even accessed it, so

12   obviously you couldn't have done it hiding

13   your identity, correct?

14        A.    Correct.

15        Q.    Is that correct?  I didn't hear

16   you.

17        A.    That's correct.

18        Q.    And from and after December 3,

19   2013, did you ever encourage, ask, direct,

20   or instruct anyone else to anonymously

21   browse in the United Realty e-mail exchange

22   server?

23        A.    I don't know what that means.

24        Q.    What anonymously browse --

25        A.    From my perspective, it's

1                    E. VERSCHLEISER

2    impossible to browse an exchange server, so

3    I'm not sure how you're putting those two

4    words together.  I know how you can browse

5    the internet, but I don't know how -- you

6    -- you can't -- from -- I don't see how you

7    can browse an exchange server.

8         Q.    Did you ever access an exchange

9    server, seeking to hide your identity?

10             MR. COOPER:  Asked and

11         answered.

12             MR. FRYDMAN:  No, not browse;

13         access.  I'm using the word "access."

14             MR. COOPER:  Yes, it is, but go

15         ahead.

16         A.    Did I ever access an exchange

17    server seeking to hide my identity; is that

18    your question?

19         Q.    Yes.

20         A.    Again, I don't know how to

21    access anything -- I don't know how to

22    access anything hiding identities, so I

23    would assume not.

24         Q.    So you've never heard of a way

25    to browse the, to go online and either mask

```
 1                    E. VERSCHLEISER
 2    your IP address --
 3                    Do you know what masking your
 4    IP address means?
 5                    MR. COOPER:  Objection to form.
 6        A.    No, I do not.
 7        Q.    You do not know.  Do you know
 8    what encrypt your IP address means?
 9        A.    No, I did not.
10        Q.    Do you know what hiding your IP
11    address means?
12        A.    No, I do not.
13        Q.    You have no idea how to hide,
14    mask, or encrypt your IP address?
15        A.    I just said that, correct.
16        Q.    So if you don't know how, I
17    imagine that it's presumptive but I'll ask
18    anyhow, did you ever access the United
19    Realty exchange server or any mailbox on
20    the United Realty exchange server either
21    masking your IP address, hiding your IP
22    address, or encrypting your IP address,
23    or -- tell me just those three.
24                    MR. COOPER:  Objection to form.
25        A.    If United Realty exchange
```

```
1                    E. VERSCHLEISER
2       server --
3                    MR. COOPER:   Just answer yes or
4           no.   I mean, if you know the answer.
5                    THE WITNESS:   Okay.
6                    Not to my knowledge.
7           Q.      Did you ever ask anyone else or
8       instruct anyone else, direct anyone else to
9       access either the United Realty e-mail
10      exchange server or any mailbox on the
11      United Realty e-mail exchange server
12      anonymously or hiding their IP address or
13      encrypting their IP address?
14          A.      Not to my recollection.
15          Q.      Since December 3, 2013, did you
16      ask, encourage, direct, or instruct any
17      person to access the United Realty e-mail
18      exchange server or any mailbox on that
19      server for you or on your behalf?
20                   MR. COOPER:   Objection to form.
21          A.      Not to my recollection.
22                   I just want to put it on the
23      record that I've accessed United Realty
24      mailbox servers probably hundreds of
25      thousands of times and so I don't know what
```

                    E. VERSCHLEISER

1
2    dates --
3         Q.    I'm asking, I'm asking from
4    December 3, 2013 forward.  My question
5    was --
6         A.    I don't know the dates
7    specifically.
8         Q.    Okay, well, we're going to get
9    into dates, so let's chop that down then.
10   In all the times that you've accessed the
11   hundreds of thousands, I think you just
12   said, the hundreds of thousands of times --
13        A.    I don't know the number but
14   it's a large --
15        Q.    A large, of the large number of
16   times that you accessed the United Realty
17   e-mail exchange server, did you ever do so
18   hiding your IP address?
19        A.    I don't know what it means to
20   hide your IP address, so if I did it,
21   hiding my IP address, it would be
22   unbeknownst to me.
23        Q.    So let me ask it this way:  At
24   any time ever did you intend to access the
25   United Realty exchange server or any

```
 1              E. VERSCHLEISER
 2   mailbox thereon hiding your IP address?
 3        A.    I don't know what hiding an IP
 4   address means so I don't know --
 5        Q.    Beyond --
 6        A.    It could be that every time I
 7   accessed United --
 8        Q.    I ask you, intended.
 9              MR. COOPER:  How can he intend
10        to do something he doesn't
11        understand?
12              MR. FRYDMAN:  Well, that's
13        precisely the question.
14              MR. COOPER:  Well, then, the
15        question makes precisely no sense.
16              MR. FRYDMAN:  Therefore he
17        could not have intended to do so.
18        I'm asking him to --
19              MR. COOPER:  No, you're asking
20        him about something that he doesn't
21        understand and then you're asking him
22        a series of questions to see if he
23        intended to do the thing he didn't
24        understand, and that is an improper
25        question.  You have to have an
```

                        E. VERSCHLEISER

1
2           understanding of what you're talking
3           about that he understands, for him to
4           correctly answer the question.
5                   MR. FRYDMAN:  That's a fair --
6           that's fair point, Steve.
7           Q.     Mr. Verschleiser, are you aware
8    that when you access an e-mail exchange
9    server or any mailbox or an e-mail mailbox,
10   you leave behind an IP address?
11          A.     No, I'm not.
12          Q.     Okay, so let me tell you that
13   when you do that, when you access it, you
14   do leave behind an IP address.
15                  MR. COOPER:  Objection to form.
16          A.     Yeah.  Could be, with all due
17   respect, you have zero --
18                  MR. COOPER:  No, no, just, it's
19           a statement.
20                  THE WITNESS:  I'm not aware and
21           I'm not going to take your --
22          Q.     So my only question to you is,
23   did you ever --
24                  THE WITNESS:  -- facts.
25          Q.     Did you ever intend to access

```
 1              E. VERSCHLEISER
 2    the United Realty exchange server or any
 3    e-mail account on that server so that one
 4    would not be able to detect that it was
 5    you?
 6         A.    I do not understand the
 7    question.  You need to repeat the question.
 8         Q.    Did you ever try to come into
 9    the United Realty e-mail exchange server
10    hiding your identity?
11              MR. COOPER:  Objection to form.
12         A.    Again, I do not understand the
13    question.  I don't know how you come into a
14    server and I don't know how you hide your
15    identity.
16         Q.    Did you ever log in to either
17    Host Pilot or a mailbox or OA -- or OWA --
18         A.    I don't know what Host Pilot
19    is, I don't know what OWA is.
20         Q.    You do not know what Host Pilot
21    is?
22         A.    No, I do not.
23         Q.    You've never been on Host
24    Pilot?
25              MR. COOPER:  Objection to form.
```

```
 1                    E. VERSCHLEISER
 2        A.    I may have.  I don't know what
 3   it is.
 4        Q.    I'd like to understand how you
 5   could have been on something that you don't
 6   understand what it is.
 7              MR. COOPER:  Objection to form.
 8        A.    The internet is a --
 9        Q.    Right.
10        A.    -- huge, vasts of technical
11   data and ways and et cetera, et cetera, and
12   I don't know, if I go on Yahoo, what I'm
13   going on.  I just know it says Yahoo, so --
14        Q.    Did you ever go onto
15   intermedia.net or intermedia.com, and I
16   think it's mentioned before that you have
17   multiple domains on Intermedia; is that
18   right?
19        A.    That's correct.
20        Q.    Multi Groups is on Intermedia;
21   is that right?
22        A.    I don't know.
23        Q.    Magenu is on Intermedia?
24        A.    I don't know.
25        Q.    Well, I think Our Place
```

```
 1                    E. VERSCHLEISER
 2   New York is on Intermedia?
 3        A.    I don't know.
 4        Q.    I think that's what your
 5   testimony was, but --
 6              MR. COOPER:   Objection to form.
 7        Q.    -- have you ever gone on
 8   intermedia.net?
 9        A.    Possibly.
10        Q.    For what purpose?
11        A.    I don't recall specifically.
12        Q.    Do you ever recall going on
13   intermedia.net and logging into something
14   called Host Pilot?
15        A.    I do not recall.
16        Q.    Since December 3rd of 2013, did
17   you ever access United Realty's e-mail
18   exchange server on internet, and by
19   "access" I mean either by logging in or by
20   having someone else login for you to be
21   able to go in there and do something?
22        A.    I don't know dates
23   specifically, but as I testified before,
24   I've apparently logged in through -- I
25   receive an extremely large amount of
```

```
 1                    E. VERSCHLEISER
 2    e-mails from United Realty's e-mail
 3    servers.  That's how I understand it.
 4         Q.    So let's make this very simple.
 5    Let's exclude your receiving or sending any
 6    e-mails, okay?  Excluding that, are we okay
 7    with that?
 8         A.    Sure.
 9         Q.    Okay.  Are you familiar what an
10    administrator does on an e-mail mailbox
11    exchange server?
12         A.    They could do many things.
13         Q.    Okay.  Can you give me some
14    examples of it?
15         A.    Depends what rights that
16    administer has.
17         Q.    Okay.  Let's assume the
18    administrator has all rights, ownership
19    rights.  What can that administrator do?
20         A.    What the ownership rights
21    allows her to do.
22         Q.    Does it allow you to create
23    mailboxes?
24         A.    It depends on what application
25    you're on.
```

```
 1                    E. VERSCHLEISER
 2        Q.    So you're aware of that?
 3        A.    Aware what was?
 4        Q.    That an owner right or the
 5   highest administrative rights on an e-mail
 6   exchange server gives you the ability of
 7   doing certain things, right?
 8        A.    I'm assuming so.  I'm not
 9   specifically familiar with what an
10   administrator in an e-mail exchange server
11   can and cannot do.
12        Q.    Have you ever accessed the
13   United Realty e-mail exchange server as an
14   administrator and/or owner?
15        A.    Possibly.
16        Q.    When?
17        A.    I don't remember specifically.
18   If I was in an administrator and an owner,
19   then I possibly did or somebody did on my
20   behalf.
21        Q.    After December 4th or 3rd, I'm
22   sorry, of 2013, did you access the United
23   Realty e-mail exchange server in the
24   capacity of an administrator or an owner?
25        A.    I don't recall the dates
```

```
 1                    E. VERSCHLEISER
 2    specifically, so behalf, before -- like I
 3    said --
 4              Q.    Let me ask you this --
 5              A.    Possibly hundreds of thousands
 6    of times.
 7              Q.    When was the last time, the
 8    last possible time that you ever accessed
 9    the United Realty e-mail exchange server as
10    either an administrator or an owner?
11              A.    I don't know.
12              Q.    Well, did you do it last week?
13              A.    Possibly.
14              Q.    Why would you be in the United
15    Realty e-mail exchange server last week?
16              A.    I didn't say that I was.
17              Q.    I'm asking you, were you?
18              A.    I don't recall.  I don't know.
19              Q.    When was the last time you
20    recall being in the United Realty e-mail
21    exchange server --
22              A.    I don't know what it means to
23    be in an e-mail exchange server, so you
24    need to define that.
25              Q.    Having logged into Host Pilot
```

```
 1                    E. VERSCHLEISER
 2    on --
 3         A.     I don't know what Host Pilot
 4    is.  You need to define that.
 5         Q.     Okay.  I just want to make sure
 6    I understand your testimony.  Is it your
 7    testimony that you don't know what Host
 8    Pilot is on the internet?
 9         A.     Intermedia.net, I'm not
10    familiar with it.
11         Q.     And because you're not familiar
12    with it, is it correct for me to also
13    assume that you do not, on an ordinary
14    basis, or ever, go in there and tinker?
15              MR. COOPER:  Objection to form.
16         A.     That's the end of my question?
17         Q.     That's the end of my question.
18              MR. COOPER:  On many levels.
19         A.     Again, I do not understand
20    these --
21         Q.     Okay.
22         A.     -- words that you're taking --
23    it's difficult to answer them.
24         Q.     I'm going to take --
25              THE WITNESS:  Do you know what
```

1                    E. VERSCHLEISER

2         a "Host Pilot" is?

3                    MR. COOPER:   (Indicating.)

4         Q.    That's fine.  Let me ask this.

5         A.    We should have had the

6    technicians here.

7         Q.    Do you know how to forward an

8    e-mail account on an exchange server so

9    that an e-mail can be forwarded without the

10   recipient knowing?

11                   MR. COOPER:  Do you want it

12        read back, did you hear it?

13                   THE WITNESS:  I heard it but I

14        don't understand it.  Could you read

15        it back, please.

16        Q.    Do you --

17                   MR. FRYDMAN:  You can read it.

18        (Whereupon, the referred-to

19        question was read back by the

20        Reporter.)

21        A.    I have no idea.

22        Q.    Okay, so I imagine you've never

23   done that, correct?

24        A.    No, that's not correct.

25        Q.    If you, you have no idea --

```
 1                   E. VERSCHLEISER
 2        A.    If it's trivial then I could
 3   potentially figure it out on the spot,
 4   but --
 5        Q.    But have you done it?
 6        A.    Do I have active knowledge of
 7   how to do it, no.
 8        Q.    Do you have knowledge today
 9   that you have, in the past, forwarded
10   someone's e-mail account without the actual
11   recipient knowing?
12        A.    I don't recall.
13        Q.    Since December 3, 2013, did you
14   ever instruct or direct any other person to
15   forward e-mails from the United Realty
16   e-mail exchange server of someone's e-mail
17   account, intending that the recipient would
18   not know?
19               THE WITNESS:  Could you reread
20          that question.
21               (Whereupon, the referred-to
22          question was read back by the
23          Reporter.)
24        A.    I don't recall.
25        Q.    You -- does "do not recall"
```

```
 1                    E. VERSCHLEISER
 2   mean that you could have done it?
 3        A.    I do not recall.  I don't
 4   remember.  It's -- you're asking me this
 5   fairly interesting technical specific
 6   question --
 7        Q.    But you don't even know how to
 8   do it?
 9        A.    -- that I don't know what it
10   means exactly.
11        Q.    Well, I'm having a hard time
12   understanding how you cannot recall
13   something you don't know how to do.
14        A.    That's why I do not recall.
15        Q.    Well, so your testament was
16   that you do not know how to do it and then
17   I asked if you ever instructed or directed
18   or asked anyone how to do it and you do not
19   recall if you did.  Wouldn't you have to
20   know how to do that, whether to instruct or
21   direct or ask someone to do it?
22        A.    So you're telling me your
23   question is a silly question.
24        Q.    It may be silly but my question
25   to you is, did you ever instruct or direct
```

```
 1                  E. VERSCHLEISER
 2   or ask any other person to forward an
 3   e-mail account on the United Realty e-mail
 4   exchange server without the intended
 5   recipient knowing?
 6              MR. COOPER:  Objection to form.
 7        A.    I do not know specifically what
 8   that means and how to do any of that.
 9        Q.    Okay.
10        A.    I, therefore, do not recall
11   instructing anyone to do that.
12        Q.    So would it be fair for me to
13   assume that you never did that?
14        A.    No.
15        Q.    No, it would not because you
16   may have asked somebody to do that?
17        A.    Possibly.
18        Q.    Do you have a recollection of
19   asking anybody to do that?
20        A.    No, I do not.
21        Q.    Did you ever ask Raul Del Forno
22   to do that?
23        A.    No. As I testified earlier, I
24   never asked Raul Del Forno to do anything.
25        Q.    Did you ask Alex Onica to do
```

```
 1                     E. VERSCHLEISER
 2     that?
 3          A.    No, I did not.
 4          Q.    Did you ask Ofir Parnasi to do
 5     that?
 6          A.    No, I did not.
 7          Q.    Did you ask Kevin Moore to do
 8     that?
 9          A.    No, did I not.
10          Q.    Do you know what a
11     "distribution list" is?
12                MR. COOPER:  Objection to form.
13          A.    Specific to what?
14                MR. COOPER:  In what context?
15                THE WITNESS:  Yeah, in what
16          context?
17          Q.    In an e-mail exchange server,
18     do you know what a distribution list is?
19          A.    Not exactly.
20          Q.    Do you have a, some sense of
21     what a distribution list is?
22                MR. COOPER:  Objection to form.
23          A.    Not exactly.
24          Q.    So you do not know what a
25     distribution list is?
```

1              E. VERSCHLEISER

2        A.    Not exactly.

3        Q.    Well, that's double negative.

4    I'm just trying to understand.  How about

5    this, do you or do you not know what a

6    distribution list is?

7        A.    I don't -- I know in numerous

8    contexts what distribution lists are and --

9    and you're being too vague about it.

10        Q.    So on Host Pilot --

11        A.    I don't know what Host Pilot

12    is.

13        Q.    Okay, so, therefore, you don't

14    know what a distribution list on Host Pilot

15    is; is that correct?

16        A.    Not necessarily.  I may be -- I

17    may know something on a computer that does

18    something but not know what it's called, so

19    it could be that it's called a distribution

20    list or Host Pilot or --

21        Q.    Let me try it this way --

22        A.    -- or Yahoo or Google.

23        Q.    I got it.  Since December 3rd,

24    2013, did you ever create, modify, change,

25    delete, or disable a distribution list or

```
 1                    E. VERSCHLEISER
 2    add, delete, or modify any member to a
 3    distribution list on the United Realty
 4    e-mail exchange server?
 5              MR. COOPER:  Objection to form.
 6         A.    I think we're going in a
 7    circle.  I -- again, I just explained to
 8    you that I do not in a specific context
 9    understand what you mean by --
10         Q.    Okay.
11         A.    -- a distribution list so if
12    you can explain it to me and it makes sense
13    to me and I believe it, then I'll be able
14    to answer it.
15         Q.    Okay.
16         A.    If you're making facts --
17         Q.    A distribution list --
18         A.    -- then I will not
19    necessarily --
20         Q.    -- is a term of art.
21         A.    A term of art?
22         Q.    Yes.  It means something very
23    specific and it means something on Host
24    Pilot, and my question to you was,
25    irrespective of what it means, did you ever
```

```
 1                    E. VERSCHLEISER
 2    add, create, delete, modify, or change a
 3    distribution list in the United Realty
 4    e-mail exchange server?
 5              MR. COOPER:  Jacob, that is
 6         such a fundamentally unintelligible
 7         question --
 8              MR. FRYDMAN:  I'll take it --
 9              MR. COOPER:  -- when you
10         started by, "irrespective what it
11         means," and asking the question.  You
12         can't ask that question.
13              MR. FRYDMAN:  Okay, I'll try it
14         this way.
15         A.    Could you explain to me what
16    you believe Host Pilot is?
17         Q.    You can ask your counsel to ask
18    me that tomorrow and I'd be happy to answer
19    it.
20         A.    Okay.  Well, until I
21    understand --
22         Q.    Did you --
23              THE WITNESS:  Ask him what Host
24         Pilot is tomorrow.
25         Q.    Did you, since December 3,
```

```
 1                    E. VERSCHLEISER
 2    2013, ever access Host Pilot --
 3         A.    I don't know what Host Pilot
 4    is.
 5         Q.    So you never accessed Host
 6    Pilot since December 13 [sic]?
 7              MR. COOPER:  You've asked this
 8         question multiple ways and he's
 9         answered it over and over again.
10         Q.    Do you know --
11              MR. COOPER:  He can't know
12         something about Host Pilot if he
13         don't know what Host Pilot is, so if
14         you can move on --
15              MR. FRYDMAN:  Fine, so I'm
16         going to keep asking and he's going
17         to keep telling me no.
18              MR. COOPER:  No, no, no, so
19         that's wasting time.
20         Q.    Do you know what an "account
21    contact" is?
22         A.    What an account contact is?
23         Q.    In Host Pilot.
24              MR. COOPER:  Objection to form.
25         A.    I don't know what Host Pilot
```

1                    E. VERSCHLEISER
2      is.
3           Q.     In an e-mail exchange server.
4           A.     In an e-mail exchange server,
5      not specifically, no.
6           Q.     Since December 3, 2013, did you
7      ever assign, un-assign, create, modify,
8      change, delete, or disable an account
9      contact on the United Realty e-mail
10     exchange server?
11              MR. COOPER:  Objection to form.
12          A.     Again, I didn't -- your
13     question assumes --
14              MR. COOPER:  Just answer.  If
15          you know, you know.
16              THE WITNESS:  I don't know.  I
17          don't know.
18          Q.     I think we can make this a lot
19     easier.  You know, I just have a couple
20     more questions, then I think there's a way
21     to shortcut this.
22              Do you know what an "active
23     directory" is on an exchange server?
24          A.     No, I did not.
25          Q.     Okay, therefore I assume you

1                    E. VERSCHLEISER

2    never created, not modified, changed,

3    deleted, or disabled an active directory on

4    the United Realty e-mail exchange server;

5    is that right?

6                    MR. COOPER:  Objection to form.

7            That does not follow.

8            A.    That's not correct.

9            Q.    So did you ever create, modify,

10   change, delete, or disable an active

11   directory on the United Realty e-mail

12   exchange server?

13                   MR. COOPER:  Objection to form.

14           A.    I do not know.

15           Q.    Since December 3, 2013, did you

16   ever instruct and direct any other person

17   to create, modify, change, delete, or

18   disable an active directory on the United

19   Realty e-mail exchange server?

20                   MR. COOPER:  Objection to form.

21           A.    I do not know.

22           Q.    Do you know what an "active

23   directory user" is?

24           A.    No, I do not.

25           Q.    Since December 3, 2013, did you

1                    E. VERSCHLEISER

2    ever create, modify, change, delete, or

3    disable an active directory user on the

4    United Realty e-mail exchange server?

5         A.    I don't know what an active

6    directory user or an active directory is.

7    I may know it if I see it or I may be doing

8    something that has something to do with it,

9    but in that terminology and in that

10   context, I have no idea what it is.

11        Q.    Since December, do you know

12   what "permissions" are with respect to an

13   e-mail exchange server?

14             MR. COOPER:   Objection to form.

15        A.    No, I did not.

16        Q.    Sorry?

17             MR. COOPER:   I said objection

18        to form.

19        Q.    Sorry?

20        A.    No.

21        Q.    No, you don't know what

22   permissions are, so, therefore, am I

23   correct to assume that since December 3rd

24   of 2013 you never created, modified,

25   changed, deleted, or disabled anybody's

                    E. VERSCHLEISER

permissions on the United Realty e-mail

exchange server?

            MR. COOPER:  Objection to form.

    A.    Again, I do not know what it is

so I do not know if I could have done it or

not.

    Q.    Okay.  Do you know whether

you've ever asked anybody since December 3,

2013 to change, modify, create, alter,

anybody's permissions on the United Realty

e-mail exchange server?

            MR. COOPER:  Objection to form.

    A.    I do not know what -- how an

exchange server functions other than it

sends and receives e-mails, and more than

that I could not answer you anything

related to it.

    Q.    Okay.  Do you know what

passwords are with respect to an e-mail

exchange server?

            MR. COOPER:  Objection to form.

    A.    I do not know anything except

that an exchange server receives and sends

e-mails, and other than that, I could not

```
 1                    E. VERSCHLEISER
 2    answer any specifics.
 3         Q.    Did you ever create, modify,
 4    change, delete, or alter any passwords on
 5    the United Realty e-mail exchange server
 6    since December 3, 2013?
 7              MR. COOPER:  Objection to form.
 8         A.    Please refer to my last answer.
 9    It's the same.
10         Q.    So that's no; is that correct?
11              MR. COOPER:  Objection to form.
12         Q.    That's that you don't know what
13    it is, so you didn't do it?
14              THE WITNESS:  What was my last
15         answer?
16              (Whereupon, the referred-to
17         answer was read back by the
18         Reporter.)
19         A.    That's the same answer.
20         Q.    Is it also fair to say that you
21    don't know what "settings" are on an e-mail
22    exchange server?
23              MR. COOPER:  Objection to form.
24         A.    Please refer to my last answer.
25    It's the same.
```

                         E. VERSCHLEISER

1

2        Q.     I'll take that to mean that you

3    do not know what a "settings" is?

4               MR. COOPER:  Objection to form.

5        Q.     Is that correct?

6               MR. COOPER:  Objection to form.

7        A.     Please refer to my last answer.

8    It's the same.

9        Q.     And so would it be fair to say

10   that since December 13 [sic], 2013 you did

11   not establish, modify, change, delete, or

12   disable any settings on the United Realty

13   e-mail exchange server?

14               MR. COOPER:  Objection to form.

15       A.     Please refer to my last answer.

16   It's the same.

17       Q.     I take that to be no.

18               MR. COOPER:  Well, you can take

19          it to whatever you want but his

20          answer is his answer.

21       Q.     Do you know what a manager for

22   an organizational unit is on an e-mail

23   exchange server?

24       A.     Please refer to my last answer.

25               MR. COOPER:  A manager for

1              E. VERSCHLEISER
2         what?
3              MR. FRYDMAN:  I asked him if he
4         knew what a manager for an
5         organizational unit is on an e-mail
6         exchange server.
7              THE WITNESS:  Please refer to
8         my last answer.  It's the same.
9         Q.    Okay.  Since December 3,
10   2013 --
11             MR. COOPER:  Wait, don't talk
12        now.
13        Q.    -- did you ever modify,
14   establish, change, delete, or disable any
15   manager for an organizational unit on the
16   United Realty e-mail exchange server?
17        A.    Please refer to my last answer.
18   It's the same.
19        Q.    Since December 3, 2013, did you
20   ever ask, instruct, direct any other person
21   to create, modify, change, delete, or
22   disable any manager for an organizational
23   unit on the United Realty e-mail exchange
24   server?
25        A.    Please refer to my last answer.

                    E. VERSCHLEISER

1

2      It's the same.

3          Q.    Do you know what a "backup" is

4      on an e-mail exchange server?

5                MR. COOPER:  Can you tell me

6           what this has to do with the

7           defamation claims?

8                MR. FRYDMAN:  Yes.

9                MR. COOPER:  It seems like

10          you're --

11               MR. FRYDMAN:  Yes.

12               MR. COOPER:  -- very, very far

13          afield.  At least tell us.

14               MR. FRYDMAN:  Well, I will.

15               So it is our contention that

16          Mr. Verschleiser secretly and without

17          authorization accessed the United

18          Realty e-mail exchange server, took

19          control of it, and proceeded to give

20          himself and his agents access to

21          modify, change, and delete passwords,

22          organizational unit members, managers

23          for organizational units, pass --

24          permissions, directories, create

25          forwards of e-mail accounts, all so

```
1              E. VERSCHLEISER
2       that he could obtain data from which
3       he would then send disparaging
4       e-mails, allegedly anonymously, to
5       those people as alleged in our
6       complaint, and so if he's not able to
7       access those things and we're not
8       able to show that, obviously we must
9       be wrong and he didn't do it, but I
10      need to find out if he understands
11      how to do this or not.
12           MR. COOPER:  You're asking him
13      a glossary of terminology that he
14      doesn't know.  Why don't you just ask
15      him questions relating to your
16      allegations --
17           MR. FRYDMAN:  My allegations
18      are --
19           MR. COOPER:  -- that he maybe
20      sent these e-mails.
21           MR. FRYDMAN:  My allegations
22      are that he created backups and
23      deleted him.
24           MR. COOPER:  Well, ask --
25      Q.   Did you ever create a backup on
```

```
 1                    E. VERSCHLEISER
 2    the United Realty e-mail exchange server
 3    after December 3, 2013?
 4              MR. COOPER:  What does that
 5         have to do with the communication,
 6         creating the backup?
 7              MR. FRYDMAN:  I'm going to show
 8         -- you know what, we're going to hear
 9         that in my hearing.  I don't want to
10         get into my trial prep and my work
11         product.  This is all going to tie
12         together.
13              MR. COOPER:  No, no, no.  If
14         you have a question that has
15         something to do with sending a
16         communication, that's one thing.
17         Copying a backup, some of these
18         questions have no plausible --
19              MR. FRYDMAN:  Excuse me.
20              MR. COOPER:  -- connection to
21         what you are alleging here.
22              MR. FRYDMAN:  It is plausible
23         and it's going to be proven and we're
24         going to show it but I need to get
25         this discovery --
```

1            E. VERSCHLEISER

2            MR. COOPER:  Going to show

3      what?

4            MR. FRYDMAN:  That he did

5      exactly --

6            MR. COOPER:  So if he copied a

7      backup.  What if he did?  If he did,

8      what does that have to do with your

9      defamation claim?

10           MR. FRYDMAN:  And it's going to

11     prove that he did send e-mails that

12     he just testified that he didn't.

13           MR. COOPER:  I --

14           MR. FRYDMAN:  It's going to

15     prove that he sent these e-mails, so

16     you've gotta permit me to --

17           MR. COOPER:  I've given you

18     probably 40 minutes about inquiring

19     about every possible function on an

20     internet exchange server.

21           MR. FRYDMAN:  I am -- I'm just

22     about done.  I am just about done.

23           MR. COOPER:  If you wrap it up

24     in the next few minutes, fine.

25           MR. FRYDMAN:  Five more minutes

                         E. VERSCHLEISER

1        on the internet exchange server,

2        okay.

3        Q.     Do you know what "my services

4   logins" are on Outlook?

5        A.     Not familiar to me.

6        Q.     Okay.  Are you familiar with

7   what a, what e-mail archiving is?

8        A.     I know that my e-mail -- my

9   Outlook client or software archives my

10  e-mails.  That's what I know about it.

11       Q.     Are you familiar with the way

12  to go in and archive everybody's e-mails in

13  an organization?

14       A.     Go in where?

15       Q.     Excuse me, an e-mail, an

16  administrative rights area in an e-mail

17  exchange server to do that.

18       A.     Please refer to that same --

19       Q.     So the answer is you're not

20  aware, you're not familiar with it?

21                THE WITNESS:  Could you read me

22            back that, the same, so that I can

23            write it down and keep on repeating

24            it.

1          E. VERSCHLEISER

2          MR. COOPER:  No, just --

3     Q.    Just tell me, are you familiar

4  with how to do that or not?  Do you know

5  how to go into an exchange server and cause

6  all the e-mails in that account or some of

7  them to be archived?

8          THE WITNESS:  I'm sorry, can

9          you read me back that response that I

10         -- we had so many times repeated,

11         please.

12         THE REPORTER:  It's going to

13         take me a minute to find it.

14         THE WITNESS:  Okay, thank you.

15         (Whereupon, the referred-to

16         answer was read back by the

17         Reporter.)

18    A.    That is the same answer for

19  your last question.

20    Q.    Okay.  Do you know how to

21  create mailbox PST files on an e-mail

22  exchange server?

23    A.    Same answer for the last

24  question.

25    Q.    Do you know what a "proxy

1              E. VERSCHLEISER
2  address" is on an e-mail exchange server?
3         A.     Same answer for the last
4  question.
5         Q.     And finally, do you know, well,
6  not finally, two more questions, do you
7  know what a "catch-all list" is on an
8  e-mail exchange server?
9         A.     It's the same answer --
10        Q.     And do you know --
11        A.     -- as the last question.
12        Q.     -- what a POP IMAP function is
13  on an e-mail exchange server?
14              MR. COOPER:  A POP what?
15              MR. FRYDMAN:  Slash IMAP
16       function is.
17              MR. COOPER:  I-M-A-P?
18              MR. FRYDMAN:  Yes.
19        A.     Again, I don't know anything
20  other than an exchange server sends and
21  receives e-mails, and that's my limited
22  knowledge of an exchange server.
23        Q.     Okay, so -- so would it then be
24  fair to say, Mr. Verschleiser, that all
25  those things we talked about, POP IMAPs and

```
 1                    E. VERSCHLEISER
 2      mailbox MPST file backups and company-wide
 3      archiving and all those things that you
 4      didn't know about, that you also didn't
 5      direct anyone else to do since
 6      December 13th [sic] -- since December 3,
 7      2013, is that --
 8              MR. COOPER:  Objection to form.
 9         Asked and answered.
10         A.    I don't understand your
11      question.  You assumed a bunch of things in
12      there.
13         Q.    Did you, at any time since
14      December 3, 2013, direct, instruct, or ask
15      any other person to either --
16              THE WITNESS:  We're going to go
17         through all those things again?
18         Q.    -- creat a distribution list --
19              MR. COOPER:  I think you asked
20         these questions.  Again, each time
21         you followed it up with that
22         question --
23              MR. FRYDMAN:  Okay, so I --
24              MR. COOPER:  -- and you get the
25         same answer over and over again.
```