1          E. VERSCHLEISER

2          MR. FRYDMAN:  I just want to

3     close the loop again.

4          THE WITNESS:  I didn't ask to

5     create a setting.

6     Q.    I'm talking about the

7     following:  Creating a setting on an

8     internet search engine, I'm sorry, an

9     e-mail exchange server, a manager for

10    organizational unit on an e-mail exchange

11    server, a backup on an e-mail exchange

12    server, a my services log-in to Outlook on

13    an e-mail exchange server, an e-mail

14    archiving function on an e-mail exchange

15    server, a mailbox PST file on an e-mail

16    exchange server, or a proxy address on an

17    e-mail exchange server.  As to any of

18    those, did you at time since December 3,

19    2013, ask, instruct, or direct any other

20    person to create, modify, delete, copy, or

21    change any of those?

22         MR. COOPER:  Objection to form.

23    A.    You need to go through those

24    individually because there were too many

25    terminologies that I really don't --

```
 1                    E. VERSCHLEISER
 2        Q.    Okay, well, then we'll do that.
 3        A.    Okay.
 4        Q.    Did you --
 5              THE WITNESS:  Are we going to
 6        go over this?
 7        Q.    Did you, since December 3,
 8   2013, ask or direct any person to create,
 9   modify, delete, or change any settings on
10   the United Realty e-mail exchange server?
11        A.    It's the same answer as I gave
12   before.
13        Q.    Did you, since December 3,
14   2013, ever ask, instruct, or direct any
15   other person to create, modify, change,
16   delete, or disable any manager for an
17   organizational United Realty on the United
18   Realty e-mail exchange server?
19        A.    Any question that you ask
20   related to an exchange server, if it's
21   other than the fact that it sends and
22   receives e-mails, and, I guess, stores
23   them, I do not understand the terminology
24   or the functions pertaining to that
25   exchange server, so any of these
```

```
 1              E. VERSCHLEISER
 2    terminologies that you're going to ask me
 3    questions will be -- the answer will be
 4    answered the same.  If you'd like to
 5    continue to do this for another half hour,
 6    my attorney thinks it's appropriate, we
 7    could continue doing that.
 8              MR. COOPER:  I think you have
 9         your answer.  You want to move on.
10         Q.    Is it then fair to say, with
11    respect to all these things, you don't know
12    what they are?  That you also didn't ask
13    somebody else to do them for you?
14         A.    If I don't know what they
15    are --
16              MR. COOPER:  Objection to form.
17         A.    -- then how can I ask somebody
18    else to do them for me?
19         Q.    So, would you please tell me
20    whether or not whether you did or did not.
21    Did you or did you not ask someone else to
22    do those things?
23              MR. COOPER:  He said he can't
24         answer the question.  It's perfectly
25         appropriate because he doesn't know
```

```
 1                    E. VERSCHLEISER
 2       what he's asking somebody to do.
 3       We've been over this repeatedly.
 4            MR. FRYDMAN:  Okay.  We're
 5       ready for a five-minute break with
 6       the videographer.
 7            THE VIDEOGRAPHER:  We are now
 8       off the record at 3:56 p.m.
 9            (Whereupon, a short recess was
10       taken.)
11            (Ms. Volpe and Mr. Edelman did
12       not return from the break.)
13            THE VIDEOGRAPHER:  This is Tape
14       3.  We are now on the record at 4:06
15       p.m.
16       Q.    Mr. Verschleiser, do you know
17   Jerry Elfassy?
18       A.    Not to my recollection.
19            MR. COOPER:  How do you spell
20       the last name?
21            MR. FRYDMAN:  E-L-F-A-S-S-Y.
22            MR. COOPER:  Thank you.
23       Q.    At any time since December 3,
24   2013, did you ask any of the following
25   people to access the United Realty e-mail
```

```
1                    E. VERSCHLEISER
2    exchange server on your behalf:  Raul Del
3    Forno?
4         A.    Access -- and I don't know
5    other than an e-mail exchange server sends
6    and receives e-mails.
7         Q.    So the answer is no?
8              MR. COOPER:  Objection to form.
9         A.    That's my answer pertaining to
10   anything related to an e-mail exchange
11   server.
12        Q.    So did you instruct or ask Raul
13   Del Forno to access the e-mail exchange
14   server, whatever it does, on your behalf?
15             MR. COOPER:  Objection to form.
16             Asked and answered.
17        A.    I don't know anything other
18   than an e-mail exchange server sends and
19   receives e-mail.  I don't understand
20   accessing it.  I don't understand anything
21   other than that.
22        Q.    Okay.  Did you ask any of the
23   following people to log in on your behalf
24   into the United Realty e-mail exchange
25   server:  Raul Del Forno?
```

```
 1                    E. VERSCHLEISER
 2        A.    It's the same answer as before.
 3              MR. COOPER:  It will probably
 4        be easier to say, "I don't know," you
 5        know --
 6              THE WITNESS:  As regards to the
 7        whole statement?
 8              MR. COOPER:  All right, say
 9        what you're saying.
10        A.    I don't know other than an
11   e-mail exchange server sends and receives
12   e-mails.  I don't know anything --
13        Q.    That's unresponsive to my
14   question.  The question is not what it
15   does, my question is, did you ask Mr. Del
16   Forno to log in on your behalf into the
17   United Realty e-mail exchange server?
18              MR. COOPER:  I think the
19        fundamental problem is you're asking
20        him whether he knowingly did that.  I
21        think he's telling you that he
22        doesn't know what these things are.
23              MR. FRYDMAN:  That's fair,
24        Steve.
25        Q.    Did you knowingly ask Mr. Del
```

E. VERSCHLEISER

1
2   Forno to log in on your behalf into the
3   United Realty e-mail exchange server after
4   December 3, 2013?
5        A.    No, I did not.
6        Q.    Did you knowingly ask any of
7   the following people to access, log in to
8   the United Realty e-mail exchange server
9   after December 13, 2013 --
10       A.    You just need to explain what
11  logging into the exchange server means.
12       Q.    Signing in to access the
13  administrative area of, of what I refer to
14  as Host Pilot and you say you don't know
15  what it is.
16            You know, what it might be
17  easier, you have a number of domains on
18  Intermedia; isn't that right?
19            MR. COOPER:   Observation.
20       Q.    You have a Multi Groups domain;
21  is that correct?
22       A.    I don't know.  I have to look.
23       Q.    You testified that you did.
24            MR. COOPER:   Objection to form.
25       A.    Oh, did I?

151

```
 1              E. VERSCHLEISER
 2       Q.    Your testimony earlier is that
 3  you did.
 4       A.    If we find that and we find
 5  that's the case, could we stop the
 6  testimony today?
 7       Q.    Your testimony was --
 8            MR. COOPER:  Just ask him a
 9       question.  That's the easiest thing.
10       Don't tell him what his testimony,
11       was, just ask him a question.
12       Q.    Do you, Eli Verschleiser, have
13  administrative rights or ownership rights
14  on any e-mail exchange server?
15            MR. COOPER:  Objection to form.
16       A.    I do not know.
17       Q.    You do not know if you do?
18       A.    That's correct.
19            MR. COOPER:  Asked and
20       answered.
21       Q.    Since you don't know, if you do
22  have administrative rights on, or ownership
23  rights on any e-mail exchange server, have
24  you ever used those administrative rights
25  or those ownership rights?
```

```
 1               E. VERSCHLEISER
 2               MR. COOPER:  Objection to form.
 3          That's unanswerable.  It's a
 4          hypothetical and it's unanswerable.
 5     A.     Please refer to the last
 6  answer, as it's the same.
 7     Q.     I'm terribly sorry because it's
 8  probably my fault because I am
 9  technologically, you know, not as
10  sophisticated as I wish I were, but let me
11  try it.
12     A.     Neither am I.  You're asking me
13  questions that you probably don't
14  understand and I'm answering you that I
15  don't understand, so we're going to spend
16  hours going through this and I'm going to
17  keep on referring to my last question.
18     Q.     Let me try it this way.
19               (Whereupon, Ms. Volpe returned
20          to the deposition at 4:12.)
21     Q.     That when I say access as an
22  administrator and owner, that means log in
23  to that special part of an e-mail exchange
24  server where an administrator or an owner
25  has rights to do things that standard
```

1                    E. VERSCHLEISER

2    mailbox users don't; can we accept that

3    definition?

4                    MR. COOPER:  Objection to form.

5         A.    I will not accept any

6    definition of something that you're

7    defining.

8         Q.    Have you accessed any e-mail

9    exchange server as an administrator or

10   owner?

11        A.    Please refer to my answer as I

12   don't know anything other than an exchange

13   server sends and receives e-mails.

14        Q.    Okay.  We'll make this much

15   easier now, something you know about.  You

16   know about e-mail mail boxes, right?  You

17   know you have some, right?

18        A.    I have an e-mail mailbox and in

19   my Outlook software, which -- yes, that's

20   my definition of it.

21        Q.    Gives you the ability of --

22        A.    To read e-mails.

23        Q.    -- of writing and receiving and

24   sending e-mails, correct?

25        A.    I'm not going to define it, but

154

E. VERSCHLEISER

1        E. VERSCHLEISER

2   I know that I read e-mails in my Outlook

3   software.

4        Q.    Okay, how do you access your

5   Outlook software?

6        A.    I turn it on.

7        Q.    Do you have a password?

8        A.    I don't know.

9        Q.    You don't know if you have a

10  password.  Do you have to log on to

11  Outlook?

12       A.    No, I do not.

13       Q.    So anybody can go on your

14  computer and log in to your e-mail account

15  without a password?

16       A.    Correct.

17       Q.    Have you ever gone into my

18  e-mail account, Jacob.F@URPA.com without

19  authorization?

20            MR. COOPER:  Objection to form.

21       What's the e-mail address, Jacob?

22            MR. FRYDMAN:  Dot F at

23       URPA.com.

24       A.    Many, many times.

25       Q.    Okay.  Did you ever do -- when

```
 1                    E. VERSCHLEISER
 2    did you do that?
 3         A.    As long as I have ownership in
 4    a company that I -- I have the rights to
 5    look at anyone's e-mails in that company.
 6         Q.    Okay.  After you no longer had
 7    ownership in the company, did you continue
 8    to do that?
 9         A.    After I had --
10              MR. COOPER:  Objection to form.
11         A.    -- had no longer ownership in
12    what company?
13         Q.    United Realty Advisors LP.
14         A.    I have ownership in the
15    company.
16         Q.    Really.  I'd like you to
17    explain that to me.
18         A.    I don't think it's relevant to
19    this.
20         Q.    Are you --
21         A.    Well, we'll discuss it in
22    our --
23         Q.    Excuse me, is it your testimony
24    that as we sit here today, you are an owner
25    of United Realty Advisors LP?
```

1                    E. VERSCHLEISER

2          A.     You have to define what an

3     "owner" is in your words.

4          Q.     Well, do you have any equity

5     membership interests of any nature

6     whatsoever?

7          A.     I believe so.

8          Q.     What do you have?

9          A.     I'm going to have to ask my

10    attorneys to define it.

11         Q.     Well, I'm asking you what you

12    have.

13         A.     I believe I own half of the

14    company.

15         Q.     You do.  You didn't sell that

16    to anybody?

17         A.     I still -- I believe that I

18    still have --

19                To answer that question

20    specifically, I and my affiliates invested

21    all the money to the tune of between 10 and

22    15 million dollars to bring United Realty

23    Advisors and its affiliates to where it is

24    and you put no money in.

25                I, at some point in time in

```
 1                    E. VERSCHLEISER
 2    December, decided that I did not want to
 3    sit in a company that has fraudulent
 4    activities being done by its CEO and be
 5    involved any further.  I since have
 6    resigned from the company and still have my
 7    economic interest in the company as I
 8    always had.  That's my testimony.
 9         Q.    So your testimony under oath is
10    that you own the same thing today that you
11    owned on December 3, 2013?
12              MR. COOPER:  Objection to form.
13         Q.    Is that right?
14         A.    You can read back my last
15    answer.  That's my testimony.
16         Q.    No, I'm asking you.  Do you own
17    today --
18              MR. COOPER:  What does this
19         have to do with the defamation?
20              MR. FRYDMAN:  Well, he's --
21         he's answering things that are
22         clearly, in my view, incorrect and
23         completely --
24              THE WITNESS:  Well, in our
25         lawsuit against you, your view will
```

```
 1                    E. VERSCHLEISER
 2        be determined.
 3              MR. COOPER:  Wait, wait, wait.
 4        Stop, stop, stop.
 5        Q.    Let me ask you this:  Did you
 6   assign a hundred percent of the membership
 7   interest that your affiliates owned --
 8        A.    No.
 9        Q.    -- in United Realty Advisors to
10   one of my affiliates on December 3rd or
11   4th, 2013?
12              MR. COOPER:  Okay.  We're not
13         going down this road.  This is the
14         other lawsuit.  The judge has been
15         clear --
16              MR. FRYDMAN:  I'm just -- Im
17         just --
18              MR. COOPER:  The judge is
19         crystal clear.
20              MR. FRYDMAN:  This is this
21         response to his last statement, which
22         is blatantly incorrect and which is
23         completely -- completely negated by
24         the documentary evidence, okay, so --
25         so --
```

```
 1                    E. VERSCHLEISER
 2            But you know what, I shouldn't
 3       really be surprised because I --
 4            THE WITNESS:  But the whole --
 5            MR. COOPER:  Whoa, whoa, no,
 6       please don't talk.  Please don't
 7       talk.
 8            MR. FRYDMAN:  No, but you
 9       mentioned something earlier.
10            MR. COOPER:  If you have a
11       question, ask the question.
12            MR. FRYDMAN:  I do.
13       Q.    You said that you no longer
14   wished to participate in an enterprise
15   where its CEO committed fraud on an ongoing
16   basis.
17       A.    I did say that.
18       Q.    Yes.  I would like to know what
19   fraud the CEO committed.
20            MR. COOPER:  We're not going
21       there.  I direct him not to answer.
22            MR. FRYDMAN:  We are going
23       there.
24       A.    I will show --
25       Q.    You are directed to answer
```

E. VERSCHLEISER

1
2   that.
3           MR. COOPER:  No.
4       Q.    You just made a statement which
5   is disparaging on the record.
6           MR. COOPER:  You don't get
7           disparagement in a deposition.
8       Q.    What fraud is it that you
9   assert I commit?
10          MR. COOPER:  You're not
11          answering the question.
12      A.    It's public document.
13          MR. COOPER:  If you want it ask
14          about defamation --
15          MR. FRYDMAN:  Please mark it.
16          MR. COOPER:  Mark it.  Let's go
17          back to the defamation.  Is there
18          anything else on it?
19      Q.    Okay.  Are you familiar with
20   any companies that provide private browsing
21   services so that one can browse privately
22   or securely on the internet without leaving
23   behind any search history, passwords, or
24   user names?
25      A.    I don't know anything technical

1                    E. VERSCHLEISER

2    other than you can use a browser to look

3    and browse the internet.  Other than that,

4    I don't have any other technical knowledge

5    of browsing the internet.

6         Q.    Are you familiar with any

7    companies that provide private browsing

8    services so that one can browse by

9    encrypting his or her identity?

10        A.    Please refer to my last answer.

11        Q.    Are you familiar with what

12   "setting up a proxy" means?

13        A.    No, I'm not.

14        Q.    Since December 3, 2013, have

15   you set up any proxies on the United Realty

16   exchange server?

17             MR. COOPER:  Objection to form.

18        A.    Please refer to my last answer.

19        Q.    Since December 3, 2013, have

20   you instructed or directed any other person

21   to set up a proxy on the United Realty

22   exchange server?

23        A.    Please refer to my previous

24   answer.

25        Q.    Now, we asked you in discovery

```
 1                    E. VERSCHLEISER
 2     to identify all the e-mail addresses that
 3     you used since December 1, 2013 and you
 4     initially identified Eli.V@MultiGroups,
 5     Eli.V@URPA.com, and Eli.V@Magenu.org.
 6     Since then you provided us with
 7     supplemental discovery requests that added
 8     Eli.V@multigroups.com, or continued it,
 9     added Eli.V@Multi-capital.com,
10     HR@multigroups.com, press@multigroups.com,
11     EliV@ATT.net, togoodtobefore@att.net,
12     E-L-I-V-M-U-L-T-I@gmail.com, and
13     E-L-I.V@ourplacenework.com.
14          A.     That should be .org.
15          Q.     I'm sorry, .org.  Other than
16     those, are there any other e-mails that you
17     didn't provide us with and may now recall?
18          A.     No.
19          Q.     That's the exhaustive list of
20     e-mails that you've used during that
21     period?
22          A.     I believe so.
23          Q.     Did you ever use an e-mail
24     E-L-I-V@UnitedRealty, one word, .com?
25          A.     Please repeat that.
```

1                    E. VERSCHLEISER

2          Q.    E-L-I-V@unitedrealty.com.

3          A.    Unfamiliar with it.  I may

4    have, but I'm unfamiliar with it.

5          Q.    E-L-I.V1@unitedrealty.com?

6          A.    I may have, but I'm not

7    familiar with it.

8          Q.    E-L-I.V@E-L-I-V.com?

9          A.    Any e-mail address at

10   E-L-I-V.com belongs to me.  It's my private

11   domain.

12         Q.    So you have a private domain,

13   E-L-I-V.com?

14         A.    That's correct.

15         Q.    But you did not disclose that

16   before, right, you forgot?

17         A.    If I didn't, then I probably

18   forgot.

19         Q.    How about

20   E-L-I.V@unitedRBETA.com?

21         A.    I'm not familiar with it.

22         Q.    How about E-L-I.V@

23   EL.hostpilot.com?

24         A.    Not familiar with it.

25         Q.    Are you familiar with an

```
 1              E. VERSCHLEISER
 2    address ELI.V@unitedrealty.com, one word
 3    for United Realty?
 4         A.    Not familiar with it.
 5         Q.    Are you familiar with
 6    ELI.V@sidebase.com?
 7         A.    Not familiar with it.  I know
 8    what Side Base is, though.
 9         Q.    What is Side Base?
10         A.    It's a data infrastructure, I
11    believe, a data infrastructure technology
12    company.
13         Q.    I may have asked you this
14    before, and if I did, I apologize, but I
15    don't think I asked you specifically this:
16    Did I ask you if you had been an
17    administrator on any Intermedia domain for
18    an exchange server?
19              MR. COOPER:  If you know.
20         A.    I don't know anything technical
21    other than an e-mail exchange server sends
22    and receives e-mails.
23              (Whereupon, Mr. Edelman
24         returned to the deposition at 4:24
25         p.m.)
```

```
 1                    E. VERSCHLEISER
 2        Q.     Okay, so we have finished with
 3    that technical line of questions.
 4               Are you familiar with a company
 5    called Surf Easy?
 6        A.     I don't surf.
 7        Q.     Sorry?
 8        A.     I don't surf.
 9        Q.     You don't surf.  You've never
10    heard of a company named Surf Easy?
11        A.     No.  I may have, but not to my
12    recollection.
13        Q.     To your -- are you -- do you --
14    did you ever use or purchase or subscribe
15    for any services from a company called Surf
16    Easy?
17        A.     I don't surf, Jacob.
18        Q.     I know you don't surf, Eli.
19        A.     Okay.
20        Q.     I'm still asking you the
21    question.
22        A.     Not to my recollection.
23        Q.     Did you ask anyone acting on
24    your behalf to purchase, use, or subscribe
25    for any service or product from Surf Easy?
```

```
 1                  E. VERSCHLEISER
 2       A.     Not to my recollection.
 3       Q.     Are you familiar with a company
 4  called Virtual Internet?
 5       A.     Not to my knowledge.
 6       Q.     Or VI.com?
 7       A.     Not to my knowledge.
 8       Q.     Did you ever purchase, use, or
 9  subscribe any service or product offered by
10  Virtual Internet or VI.com?
11       A.     Not to my recollection.
12       Q.     Did you ever ask anyone acting
13  on your behalf to purchase, use, subscribe,
14  or otherwise access services or products
15  from Virtual Internet or VI.com?
16       A.     Not to my recollection.
17       Q.     Do you know a company called
18  websitewelcome.com?
19       A.     Not off the top of my head.
20       Q.     Do you ever use, purchase, or
21  subscribe for any services or products from
22  websitewelcome.com?
23       A.     Not to my recollection.
24       Q.     Did you ask any person on your
25  behalf to purchase, use, or subscribe to
```

1                    E. VERSCHLEISER

2    any service or product from

3    websitewelcome.com?

4          A.    Not to my recollection.

5          Q.    Since December 1, 2013, did you

6    or anyone acting on your behalf use,

7    purchase, or subscribe or otherwise obtain

8    any services or product from Rex (phonetic)

9    Based Hosting?

10         A.    Not to my recollection.

11         Q.    Since December 1, 2013, did you

12   or anyone acting on your behalf purchase,

13   use, subscribe, or otherwise obtain access

14   to any service or product from Sign Designs

15   Inc.?

16         A.    Not to my knowledge.

17         Q.    Since December 1, 2013, did you

18   or anyone acting on your behalf purchase,

19   use, subscribe, or otherwise obtain access

20   no any service or product from Linode,

21   L-I-N-O-D-E, a company in New Jersey?

22               MR. COOPER:  L-I-N-D-O?

23               MR. FRYDMAN:  L-I-N-O-D-E.

24               MR. COOPER:  O-D-E.

25         Q.    Mr. Verschleiser?

E. VERSCHLEISER

1

2      A.     I'm just writing out my
3    response because I'm going to need it
4    repeated, I see, many times.
5            As a chairman of my company, I
6    do not get involved in the day-to-day
7    activities of technical or other type of
8    day-to-day activities and, therefore, I
9    would not know the answer to any of these
10   questions.
11     Q.     Okay.  My questions aren't
12   about any activities, they're about whether
13   you --
14     A.     Any of these specific types of
15   activities.
16     Q.     I'm only asking if you
17   purchased, used, or subscribed or had
18   anyone else on your behalf purchase, use,
19   or subscribe products or services from, and
20   so far I'm asked you about Surf Easy,
21   Virtual Internet, websitewelcome.com, Rex
22   Space Hosting, Sign Designs Inc., Linode.
23   I'm now going to add a few more so we can
24   do this in one shot:  Digital Observation,
25   Callow Crossing, Quadranet, Packnet,

E. VERSCHLEISER

1
2       Trusted Alias, Cybase, Cloud Fit, Cloud
3       Flare, Chicago VPS.com; any of those
4       companies, did you or anyone on your behalf
5       since December 1, 2013 purchase, use, or
6       subscribe for any of their services or
7       products?
8               A.      As the chairman of my company,
9       I do not get involved in the day-to-day
10      technical subscriptions or other type of
11      accounts pertaining to any of these names
12      that you've listed.
13              Q.      Okay.  Did you, not in any
14      capacity other than you, Eli Verschleiser,
15      did you ever purchase, use, or subscribe
16      for any products or services from any of
17      the 14 companies that we just talked about?
18              A.      Not to my recollection.
19              Q.      Do you know what a "native
20      file" is?
21              A.      No, I do not.  Native file?
22              Q.      Mmm-hmm.
23              A.      No, I do not.
24              Q.      At any time since December 3,
25      2013, did you or anyone acting on your

1                    E. VERSCHLEISER
2      behalf or at your direction create a
3      distribution list on the United Realty
4      e-mail server called Eli.V@multigroups.com?
5           A.     I don't know anything technical
6      other than --
7                  I'm sorry, can you explain to
8      me where a distribution list resides?
9           Q.     On an e-mail exchange server.
10          A.     I don't know anything technical
11     other than an e-mail exchange server sends
12     and receives e-mails.
13          Q.     So I take it that you did not
14     create a distribution list called
15     Eli.V@multigroups.com?
16          A.     You take a lot of things
17     obviously not the way the rest of the world
18     does, so --
19          Q.     I'm asking you.  I'm asking
20     you, did you create a distribution list
21     called Eli.V@multigroups.com?  That's a yes
22     or no.
23          A.     I have no idea.
24          Q.     You don't know if you did or
25     not?

1                    E. VERSCHLEISER

2        A.     That's correct.

3        Q.     You could have, it's completely

4   possible?

5               MR. COOPER:   Objection to form.

6        A.     It's completely possible.

7        Q.     Okay.   How would it be

8   possible?

9        A.     If I go onto a computer and

10  create it.

11       Q.     Do you know how to do it?

12       A.     Not -- I have no technical

13  knowledge.

14       Q.     So that's what I'm saying.   Did

15  you intentionally create a distribution --

16       A.     I don't know what a

17  distribution list is.

18       Q.     Okay.

19       A.     I can't do it intentionally or

20  not intentionally done.

21       Q.     So you couldn't have done it,

22  right?

23       A.     That's correct.   I think we

24  went through this like six times already.

25               MR. COOPER:   We did.

```
 1                     E. VERSCHLEISER
 2          Q.     Did you create a distribution
 3     list or a distribution list user by the
 4     name of Ahuva.S@multigroups.com on the
 5     United Realty e-mail exchange server at any
 6     time after December 3, 2013?
 7          A.     Please refer to my last answer
 8     pertaining to e-mail exchange server.
 9               MR. FRYDMAN:  You know, I can't
10          seem to get an answer out of his
11          client.
12               MR. COOPER:  You're asking him
13          questions that he can't exactly
14          answer.
15               MR. FRYDMAN:  He can't answer
16          whether he did something or not?
17          Q.     Did you eat dinner last night?
18               MR. COOPER:  Objection to form.
19          A.     Yes, I did.
20               MR. COOPER:  Don't answer.
21          Q.     You did, great.
22               MR. COOPER:  There's nothing
23          technical about eating dinner.
24          You're asking him technical questions
25          that apparently neither of you really
```

```
 1                    E. VERSCHLEISER
 2           understand and then you're asking him
 3           all sorts of questions around things
 4           that neither of you really
 5           understand.
 6                THE WITNESS:  Which you said so
 7           about ten minutes ago, so I'm glad
 8           you keep on asking things that you
 9           don't even know what it is.
10                Maybe tomorrow we'll ask all
11           the questions back to him.
12      Q.    Since December 3, 2013, did you
13 use your e-mail account
14 togoodtobefore@at&t.net?
15      A.    I typically don't use it, so I
16 don't recall.
17      Q.    Did you use it at any time
18 after December 3, 2013 to log on to the
19 United Realty e-mail exchange server?
20      A.    I typically don't use it, so I
21 don't recall.
22      Q.    Did you ever use it since
23 December 3, 2013, to log in to my personal
24 e-mail account on the United Realty e-mail
25 exchange server?
```

E. VERSCHLEISER

A.     Please refer to the last
answer.  It's the same.

Q.     Did you ever use
togoodtobefore@at&t to access or log in to
your Multi Groups e-mail account on your
Multi Groups e-mail exchange server?

A.     I don't know how it's
technically possible so I don't know how
any of these questions actually function,
but I typically don't use it so my answer
remains the same as last answer.

Q.     Did you ever use
togoodtobefore@at&t.net to access e-mail
accounts on the Magenu e-mail exchange
server?

MR. COOPER:  I don't know what
this has to do with the defamation.
We're not going just go through every
possible contingency here.  I mean,
you've asked a ton of these questions
already.

MR. FRYDMAN:  I'm happy to move
on.

MR. COOPER:  Let's move on.

```
 1                    E. VERSCHLEISER
 2             MR. FRYDMAN:  I'm happy to move
 3       on.
 4             MR. COOPER:  We've been very
 5       patient.  Let's move on.
 6             MR. FRYDMAN:  Okay.
 7       Q.    Other than you, is anyone else
 8  authorized to use togoodtobefore@at&t.net?
 9       A.    I don't know.
10       Q.    You don't know whether you
11  granted anyone else permission?
12       A.    Correct.
13       Q.    How would someone have
14  permission to use it if you don't know?
15       A.    If they set it up, I guess.
16       Q.    No.  If you -- it's yours,
17  right?  You own -- you own
18  togoodtobefore@at&t.net; is that correct?
19       A.    I don't know if I own it.
20       Q.    You don't know if that's one of
21  your e-mail accounts?
22       A.    It's an e-mail account that
23  I've used, I think, once in my life or
24  maybe a couple times.
25       Q.    When did you use it?
```

1                        E. VERSCHLEISER

2          A.     I don't recall the dates

3    specifically.

4          Q.     What do you use it for?

5                 MR. COOPER:  We're still doing

6          the same thing.  You have to have

7          more pointed questions or we're not

8          going to continue this.  This is

9          going on and on and on.

10                MR. FRYDMAN:  You know what,

11         can I see 161?  That's fine.  161.

12                Here, I got it.

13         Q.     We've had a lot of testimony

14   today about your not accessing and not

15   knowing anything about these technical

16   things, right?

17                MR. COOPER:  Objection to form.

18         A.     Yes.

19                MR. FRYDMAN:  (Handing.)

20                (Whereupon, the aforementioned

21         e-mail dated December 4, 2013, was

22         marked as E.V. Exhibit 19 for

23         identification as of this date by the

24         Reporter.)

25         Q.     Mr. Verschleiser, handing what

```
 1                    E. VERSCHLEISER
 2   you's been marked Exhibit 19 for
 3   identification, can you identify this?
 4          A.     Looks like an e-mail from Raul
 5   Del Forno to Eli Verschleiser.
 6          Q.     About what?
 7          A.     Says, "Eli, enable my account
 8   using Raul.D.CL." -- it's in English, so if
 9   you'd like to read it.
10          Q.     Just explain it to me.  What is
11   this all about?
12          A.     I don't know.  It's an e-mail
13   from Raul.
14          Q.     You have no idea what this is
15   about?
16          MR. COOPER:  Objection to form.
17          You have a specific question, ask it.
18          Q.     Do you know what permissions
19   Raul was talking about?
20          THE WITNESS:  Can we take a
21          two-minute break?
22          MR. COOPER:  Sure.
23          MR. FRYDMAN:  No, not now.  Not
24          while I'm asking on this exhibit.
25          MR. COOPER:  You can take a
```

```
 1                    E. VERSCHLEISER
 2          break after the question but you
 3          don't to have to finish the exhibit.
 4                   Re-read the question.
 5                   THE WITNESS:  Repeat the
 6          question.
 7          Q.    Can you explain to me what Raul
 8   meant when he said to you, or what you
 9   understood him to mean when you asked him
10   to enable his account by using his password
11   and/or to fix the permissions to the
12   following, what was he meaning?
13          A.    You have to ask him.  I don't
14   know specifically here.  Looks like he was
15   asking me to enable his account, exactly
16   what it says.
17          Q.    Why would he do that?
18                   MR. COOPER:  Objection to form.
19          Q.    Do you know?
20          A.    Because he needed his account
21   enabled.
22          Q.    Why would you be the person to
23   do that?
24          A.    I don't know.  You have to ask
25   him.
```

```
 1              E. VERSCHLEISER
 2        Q.    Well, let me show you another
 3   e-mail.
 4              MR. COOPER:  Do you want two
 5        minutes?
 6              THE WITNESS:  Yeah.  I'm going
 7        to take a break.
 8              THE VIDEOGRAPHER:  We go off
 9        the record?
10              MR. FRYDMAN:  Yeah, off the
11        record.
12              THE VIDEOGRAPHER:  We are now
13        off the record at 4:37 p.m.
14              (Whereupon, a short recess was
15        taken.)
16              THE VIDEOGRAPHER:  We are now
17        on the record at 4:42 p.m.
18              MR. FRYDMAN:  See if you go
19        through this and find the same one
20        without the pictures because it has
21        all, the one thing that leads up to
22        it.
23        Q.    All right.  Earlier I asked you
24   about blogs; do you recall that?
25        A.    I do.
```

1                    E. VERSCHLEISER

2         Q.    And I think you had said to me

3    that you didn't know anything about blogs,

4    right?

5         A.    Vaguely.

6         Q.    All right.

7               MR. FRYDMAN:  Can you, I don't

8          have copies of this.  Can we make a

9          few copies of this, then we'll come

10         back to that.

11        Q.    Do you, are you familiar with

12   an e-mail address called

13   webmaster@Magenu.org?

14        A.    Not off the top of my head.

15        Q.    Do you know someone named

16   Andrew Skirowitz?

17        A.    I know a Rabbi Skirowitz.

18        Q.    Avram Skirowitz?

19        A.    Yes.

20        Q.    Do you know if you ever gave

21   Rabbi Skirowitz an e-mail address on the

22   United Realty e-mail exchange server?

23        A.    An e-mail address on -- not to

24   my recollection.

25        Q.    Who is Rabbi Skirowitz?

```
 1                    E. VERSCHLEISER
 2        A.    Rabbi Skirowitz is Rabbi
 3   Skirowitz.
 4             MR. COOPER:  Okay, keep going.
 5        Q.    Do you know if he works for any
 6   of your organizations?
 7             MR. COOPER:  What's the
 8        difference?
 9             MR. FRYDMAN:  I'm inquiring.
10             MR. COOPER:  No.  We're not
11        sitting here for two hours asking
12        about Rabbi Skirowitz.  I'm directing
13        him not to answer that.
14             MR. FRYDMAN:  You're directing
15        him not to answer?
16             MR. COOPER:  Yes, unless you
17        can tell me how it's relevant because
18        we've wasted a ton of time.
19             MR. FRYDMAN:  I'll tell you how
20        it's relevant, because Rabbi
21        Skirowitz did the same thing you did
22        here that they did to other people
23        posting derogatory and defamatory and
24        just --
25             MR. COOPER:  Okay.
```

E. VERSCHLEISER

1

2          MR. FRYDMAN:  -- and

3     disparaging blogs and e-mails on the

4     internet and they're subject to, and

5     Mr. Verschleiser is now involved in

6     the matter of the petition to squash

7     a subpoena duces tecum directed to

8     Eli Verschleiser in connection with a

9     case by Rabbi Steven Botkins against

10    Rabbi Skirowitz where

11    Mr. Verschleiser is being accused of

12    doing --

13         THE WITNESS:  This

14    Mr. Verschleiser?

15         MR. FRYDMAN:  -- exactly what

16    he's done here.

17         THE WITNESS:  That's this

18    Mr. Verschleiser?

19         MR. COOPER:  Ask him, then.  Is

20    it you?

21         THE WITNESS:  I don't even know

22    what he's talking about.

23    Q.    You don't know what I'm talking

24    about?

25    A.    No, I don't.

1                    E. VERSCHLEISER

2       Q.     Okay, fine.

3              THE WITNESS:  What does this

4       have to do with that?

5              MR. COOPER:  Okay, hold on.

6              MR. FRYDMAN:  Can you mark

7       this, please.

8              (Whereupon, the aforementioned

9       two-page e-mail chain dated

10      December 20, 2013, was marked as E.V.

11      Exhibit 20 for identification as of

12      this date by the Reporter.)

13      Q.     Handing you what's been marked

14  as Exhibit 20, can you identify it?

15      A.     Looks like an e-mail.

16      Q.     From whom to whom?

17      A.     Looks like from DDH Rush.

18      Q.     To?

19      A.     Raul.D@URPA slash Eli

20  Verschleiser slash Eli.V@URPA.

21      Q.     Do you know who DDA rush is?

22      A.     No, I do not.

23      Q.     Did Raul Del Forno do any work

24  for you with respect to anything after

25  December 3, 2013, uh, 2013?

E. VERSCHLEISER

1

2    A.    No, he did not.

3    Q.    Do you have any idea what he's

4  doing in this e-mail?  What is this e-mail

5  about; do you know?

6    A.    You need to ask him.

7    Q.    Do you know?

8    A.    No, I do not.

9    Q.    You have no idea what this is?

10   A.    No, I do not.

11         MR. FRYDMAN:  And -- and with

12     can we mark --

13         This is already photocopied and

14     marked, right?  Do you -- do you --

15     do we have -- that's not the one I

16     want.

17         THE WITNESS:  Are we finished

18     with this one?

19   Q.    Did you have Raul Del Forno set

20  up the Multi Groups exchange, e-mail

21  mailbox exchange server on intermedia.net

22  after December 3, 2013?

23   A.    I already answered.  I have --

24  I did not have Raul Del Forno do anything

25  for me.

```
 1                  E. VERSCHLEISER
 2      Q.    And did you have Raul Del Forno
 3 deal with buying phones for your offices in
 4 Florida and on Nostrand Avenue after
 5 December 3, 2014 [sic]?
 6            MR. COOPER:  Objection to form.
 7      A.    Please refer to my last answer.
 8      Q.    Which is no, you did not?
 9      A.    Which is, again, I did not have
10 Raul Del Forno do anything for me.
11      Q.    Do you know a gentleman by the
12 name of Jay Glatzer?
13      A.    No, I do not.
14      Q.    Do you know a company called
15 Bug-Off Exterminating?
16            MR. COOPER:  What's it called?
17            MR. FRYDMAN:  Bug-Off, B-U-G
18      hyphen O-F-F.
19      A.    No, I do not.
20      Q.    Do you have any business
21 dealings with Mr. Glatzer or his company?
22            MR. COOPER:  Do you know?
23            THE WITNESS:  He just asked me
24      if I knew him.
25      Q.    I asked you if you knew Jay
```

```
 1                E. VERSCHLEISER
 2    Glatzer.  Do you know any Mr. Glatzer?
 3         A.    I know Chaim Glanz.
 4               MR. COOPER:  No, that's a
 5         different name.
 6         Q.    Glatzer, G-L-A-T-Z-R.
 7               MR. COOPER:  E-R or Z-R?
 8               MR. FRYDMAN:  G-L-A-T-Z-E-R.
 9         A.    Not to my recollection.
10         Q.    You never transacted any
11    business with him?
12         A.    I may have, but nothing
13    substantial because he doesn't -- the name
14    does not ring a bell.
15         Q.    Did Magenu have an office on
16    Nostrand Avenue?
17         A.    Magenu does have an office on
18    Nostrand Avenue.
19         Q.    At what address on Nostrand
20    Avenue?
21         A.    I don't know it off the top of
22    my head.
23               MR. FRYDMAN:  What's the
24         address, 22 -- you have it in there.
25               MR. EDELMAN:  2294.
```

```
 1                    E. VERSCHLEISER
 2          Q.    2294 Nostrand Avenue.
 3          A.    I don't know it off the top of
 4   my head.
 5          Q.    Have you ever been there?
 6          A.    To Magenu's office?
 7          Q.    Yeah.
 8          A.    Probably twice.
 9          Q.    Do you know anyone else on that
10   same block?
11          A.    Anyone living there or --
12          Q.    Officing [sic] there.
13          A.    Not -- no.
14          Q.    No.
15          A.    I may, but not that I know of.
16          Q.    Do you know Elan Jaffe, Jaffa?
17          A.    Yeah, sure.
18          Q.    Do you know where Elan Jaffa
19   offices?
20          A.    On Nostrand Avenue.
21          Q.    Do you know what address?
22          A.    Not specifically.
23          Q.    Okay, and you don't know
24   Mr. Glatzer at 2392 Nostrand Avenue?
25          A.    Is that the same --
```

```
 1                E. VERSCHLEISER
 2            THE WITNESS:  He said 22
 3        something, right?  Is that --
 4            MR. COOPER:  You asked if he
 5        knew Glatzer, he said no, so let's
 6        move on.
 7        Q.    So you never had any
 8    discussions with Mr. Glatzer about me?
 9            MR. COOPER:  Why would you ask
10        that question?
11            MR. FRYDMAN:  I'm asking 'cause
12        he says he didn't know him.
13            MR. COOPER:  He says he doesn't
14        know whether he knows him, it does
15        not ring a bell.  That's what he
16        said.
17            MR. FRYDMAN:  All right.
18        Q.    Do you know Jeffrey L. Glatzer?
19        A.    Same thing.
20        Q.    Works at Reed Smith.
21        A.    Do I?
22        Q.    No, okay?
23            THE WITNESS:  Do I know?
24        A.    I may.  I don't know.  The name
25    doesn't ring a bell.
```

```
 1                  E. VERSCHLEISER
 2        Q.    With respect to Alex Onica,
 3    have you ever had any discussions with
 4    Mr. Onica after December 3, 2013, about me?
 5        A.    I'm sure I did.
 6        Q.    Do you have any recollection
 7    what you said?
 8        A.    No, I do not.
 9            MR. COOPER:  You can ask him
10        about defamation issues, not anything
11        he's ever said about me.
12            MR. FRYDMAN:  Okay.
13        Q.    Did you ever say anything
14    disparaging about me to Mr. Onica?
15        A.    To mister?
16        Q.    Onica.
17        A.    Not to my recollection.
18        Q.    Do you know Sarah Federman?
19        A.    No, Sarah Federman, yeah.
20        Q.    She works for Magenu.  Do you
21    know her?
22        A.    Sarah Feder -- Sarah -- I know
23    her under a different name, but yes.
24        Q.    Have you ever had any
25    communications that are, that meet the
```

```
 1                    E. VERSCHLEISER
 2    definition of disparagement in our
 3    December 3rd agreement about me with
 4    Ms. Federman?
 5                MR. COOPER:   Objection to form.
 6        A.    I don't know what the
 7    definition of "disparagement" is in a legal
 8    form and way.
 9        Q.    Do you want me to read it to
10    you?
11        A.    No, it's okay.
12                MR. FRYDMAN:   I'm gonna -- I'm
13            gonna use that later.
14        Q.    Do you know Mark Apel?
15        A.    Who?
16        Q.    Mark Apel.
17        A.    Yes, I do.
18        Q.    Who is he?
19        A.    Mark Apel is Mark Apel.
20        Q.    What's your relationship with
21    him?
22        A.    He's an investor of mine and he
23    sits on a board of some organizations with
24    me.
25        Q.    Do you ever have any
```

                        E. VERSCHLEISER

1
2       conversations with Mr. Apel about me since
3       December 3, 2013?
4               A.      A lot.
5               Q.      How many?
6               A.      I have no idea.  I don't count
7       them.
8               Q.      Do you know who Elan Jaffa is?
9               A.      You asked me this before.
10                      MR. COOPER:  You asked him
11              before.
12              Q.      Oh, yeah, I'm sorry.  Did you
13      discuss with Mr. Jaffa bringing suit
14      against me for alleged fraud and against
15      members of the board of directors of United
16      Realty Trust?
17                      MR. COOPER:  This, we're not
18              going into this area.  It's
19              outside --
20                      MR. FRYDMAN:  Yes, we are.
21              This is disparagement.
22                      MR. COOPER:  This is another
23              area where you sought discovery and
24              you were told you could not.
25                      MR. FRYDMAN:  This is -- I'm

1                    E. VERSCHLEISER
2          absolutely taking this over your
3          objection.
4          Q.    Did you have any conversations
5    with Mr. Jaffa where you asserted that I
6    committed fraud or -- or -- or acted
7    inappropriately with the books and records
8    of United Realty Trust?
9                    MR. COOPER:   Objection to form.
10              You can answer that narrow question.
11         A.    Not to my recollection.
12         Q.    You may have?
13                  MR. COOPER:   Objection to form.
14         A.    Not to my recollection.
15         Q.    Do you know Benjamin Fishoff?
16         A.    Yes, I do.
17         Q.    Did you ever have any
18   discussions with Mr. Fishoff about me since
19   December 3, 2013?
20         A.    Many times.
21         Q.    Did you ever suggest to
22   Mr. Fishoff that he should hire a lawyer to
23   sue me and to sue United Realty Trust board
24   of directors?
25                  MR. COOPER:   Objection to form.

```
 1                    E. VERSCHLEISER
 2        You don't have to answer that
 3        question.
 4             If you want to ask him if he
 5        disparaged, but we're not getting
 6        into lawsuits.
 7             MR. FRYDMAN:  I'm asking him --
 8             MR. COOPER:  I heard what you
 9        asked him.
10             MR. FRYDMAN:  And I'm entitled
11        to ask him.
12             MR. COOPER:  No.
13             MR. FRYDMAN:  That is
14        disparagement, by the way.
15             MR. COOPER:  Okay.
16        Q.    And did you suggest that he has
17    a basis to hire a lawyer to sue me for
18    fraud in connection with the financials of
19    United Realty Trust?
20             MR. COOPER:  Okay.  That's
21        outside the scope.  You don't have to
22        answer it.  Next question.
23             MR. FRYDMAN:  That is -- that
24        is disparagement on its face.
25             MR. COOPER:  I haven't seen it
```

1                    E. VERSCHLEISER
2         anywhere in any of your papers.
3              MR. FRYDMAN:  Okay, the
4         discovery is not about what I already
5         know.  Discovery is about what I get
6         to learn.
7              MR. COOPER:  Mmm-hmm.
8              MR. FRYDMAN:  You're not going
9         answer that question?
10             MR. COOPER:  No, because you
11        already asked the judge if you can
12        ask about supposed --
13             MR. FRYDMAN:  That's not
14        correct.
15             MR. COOPER:  -- plans to sue
16        you and she said it's outside the
17        scope.
18             MR. FRYDMAN:  That's not
19        correct.
20             MR. COOPER:  Okay.
21        Q.    Did you tell Mr. Jaffa or
22   Ms. Kirschenbaum or Mr. Fishoff that I took
23   money inappropriately from United Realty
24   Trust?
25             MR. COOPER:  Objection to form.

```
1                    E. VERSCHLEISER
2           You can answer that narrow question.
3           A.    Not to my recollection.
4           Q.    You could have?
5                 MR. COOPER:  That's not what he
6           said and --
7           Q.    I need you to say yes or no.
8                 MR. COOPER:  -- he doesn't
9           recall.
10                MR. FRYDMAN:  If he doesn't
11          recall then he could have; is that
12          right?
13                MR. COOPER:  I don't think
14          could have --
15          Q.    So Mr. Verschleiser --
16                MR. COOPER:  The sun, the
17          moon --
18          Q.    Could you have -- could you
19    have said to Mr. Fishoff to
20    Ms. Kirschenbaum and to Mr. Jaffa that I
21    stole money from United Realty Trust?
22                MR. COOPER:  Could you do
23          something is an inappropriate
24          question.  You do not have to answer
25          that because anything is possible,
```

```
 1                E. VERSCHLEISER
 2      Mr. Frydman, absolutely anything.
 3      Q.    Did you --
 4            MR. COOPER:  You asked him that
 5      question.  You may not like the
 6      answer, but you asked him that
 7      question.
 8            MR. FRYDMAN:  Doesn't recall.
 9      Q.    Well, if Mr. Fishoff and
10 Ms. Kirschenbaum and Mr. Jaffa hired a law
11 firm to assert those allegations, do you
12 have any idea where they would have gotten
13 that idea from?
14            MR. COOPER:  Objection.  You
15      don't have to answer that question.
16      A.    You would have to ask them.
17      Q.    I fully intend to.
18            Are you familiar with the law
19 firm of Clancy, Binko, and Goldberg?
20            MR. COOPER:  What does that
21      have to do with the defamation?
22            MR. FRYDMAN:  It will establish
23      the defamation.  I have a letter from
24      them that establishes what they were
25      told.
```

```
 1                    E. VERSCHLEISER
 2              MR. COOPER:  Let me see the
 3       letter.  Have you produced it?
 4              MR. FRYDMAN:  I haven't.
 5              MR. COOPER:  Okay.  We're not
 6       going into this.
 7              MR. FRYDMAN:  I'm not going
 8       into it, I'm asking him a question.
 9              MR. COOPER:  Good.
10              MR. FRYDMAN:  Does he know that
11       law firm?
12              MR. COOPER:  Do you know that
13       law firm?
14              THE WITNESS:  No, I don't, no.
15              MR. COOPER:  Okay.  End of it.
16       Q.     Do you know a lawyer named
17       Louis Bariarki?
18       A.     No, I did not.
19       Q.     Do you know Jack Rosen?
20       A.     Yes, I do.
21       Q.     Did you ever have any
22       conversations with Mr. Rosen about me?
23       A.     Many.
24       Q.     Did you tell Mr. Rosen that I
25       have done inappropriate things with respect
```

```
 1                    E. VERSCHLEISER
 2    to our business dealings?
 3         A.    Not to my recollection.
 4         Q.    But you're unable to say that
 5    you did not?
 6              MR. COOPER:  You keep doing the
 7         same thing.  That's his answer.
 8         Q.    Do you know Yanki Saks?
 9         A.    Yes, I do, very well.
10         Q.    Have you had any conversations
11    with Yanki Saks since December 3, 2013,
12    about me?
13         A.    Many.
14         Q.    Did you say anything to
15    Mr. Saks that would involve a suggestion
16    that I have committed fraud, acted
17    inappropriately, took money from the
18    company, or did anything else that you
19    think is wrong?
20              MR. COOPER:  Objection to form.
21         A.    Not to my recollection.
22         Q.    Do you know Morty Davis?
23         A.    Who?
24         Q.    Morty Davis.
25         A.    Yes, I do.
```

```
 1                  E. VERSCHLEISER
 2        Q.    Ever have any conversations
 3   since December 1st -- I'm sorry, since
 4   December 3, 2013, have you had any
 5   conversations with Morty Davis about me?
 6        A.    Many.
 7        Q.    In any of those conversations,
 8   did you assert that I inappropriately took
 9   any monies from any companies or did
10   anything else that was not a hundred
11   percent appropriate?
12              MR. COOPER:   Objection to form.
13        A.    Not to my recollection.
14        Q.    Do you know Ellis Murski?
15        A.    Yes, I do.
16        Q.    Who is Ellis Murski?
17        A.    Ellis Murski is Ellis Murski.
18        Q.    Do you know what he does for a
19   living?
20        A.    I know he's an attorney.
21        Q.    Do you know who he represents?
22   Do you know if he represents Dr. Alexandro?
23        A.    Not specifically.
24        Q.    You don't know if he represents
25   Dr. Alexandro?
```

1                E. VERSCHLEISER

2        A.    I do not specifically know if

3    he represents Dr. Alexandro.

4        Q.    Has he ever represented to you

5    that he represents Dr. Alexandro?

6        A.    Not to my recollection.

7        Q.    Did you have any conversations

8    with Mr. Murski and Dr. Alexandro asking

9    them to please initiate a lawsuit against

10   me?

11            MR. COOPER:  You don't have to

12        answer that question.

13       Q.    Yes, you do.

14       A.    I'm going to listen to my

15   attorney.

16       Q.    Did you have any conversations

17   with Mr. Murski or with Miss, Dr. Alexandro

18   about me since December 3, 2013?

19       A.    Many.

20       Q.    In any of those conversations,

21   did you suggest that I acted in any way

22   inappropriately?

23       A.    Not to my recollection.

24       Q.    Do you know Allan Stahler?

25            MR. COOPER:  What's the last

```
 1                    E. VERSCHLEISER
 2         name?
 3              MR. FRYDMAN:   S-T-A-H-L-E-R.
 4         A.    From the Stahler Organization?
 5    Can you repeat the name?
 6         Q.    Allen Stahler.
 7         A.    Yes, I do.
 8         Q.    Glad that you recalled, and --
 9    and have you had any conversations with
10    Mr. Stahler since December 3, 2013, about
11    me?
12         A.    Yes.   The last one was about 15
13    minutes ago.
14         Q.    Okay.   In any of those, did you
15    say anything that suggested that I acted in
16    any way inappropriately?
17         A.    Not to my recollection.
18         Q.    Do you know Shaul Greenwald?
19         A.    The name rings a bell but
20    not -- vaguely.   Shaul -- what -- where
21    does he work?
22         Q.    Yep.   Did you have any
23    conversations with Mr. Greenwald about me
24    since December 3, 2013?
25         A.    Not to my recollection.
```

```
 1                    E. VERSCHLEISER
 2        Q.    Do you know Joel Zeigelbaum?
 3        A.    Yes, I do.
 4        Q.    Do you have any conversations
 5   with Mr. Zeigelbaum since December 3, 2013,
 6   about me?
 7        A.    Many.
 8        Q.    In any of those conversations,
 9   did you suggest that I did anything
10   inappropriate?
11        A.    Not to my recollection.
12        Q.    Do you know Steven Vay?
13        A.    Yes, I do.
14        Q.    Did you have any conversations
15   with Steven Vay since December 3, 2013,
16   about me?
17        A.    Many.
18        Q.    In any of those conversations,
19   did you say to Mr. Vay that I did anything
20   inappropriate?
21        A.    Not to my recollection.
22        Q.    Do you know your cousin
23   Eli Verschleiser?
24        A.    I have many cousins
25   Eli Verschleiser.
```

                    E. VERSCHLEISER

1
2          Q.      Do you know your cousin
3    Eli Verschleiser that invested in United
4    Realty Advisors?
5          A.      Sure.
6          Q.      Since December 3, 2013, did you
7    ever have any conversations with
8    Eli Verschleiser, your cousin, about me?
9          A.      Many.
10         Q.      In any of those conversations,
11   did you suggest that I did anything
12   inappropriate?
13         A.      All the people that I had many
14   conversations with that you asked me about
15   you, I always tell them to call you and to
16   talk to you directly so --
17         Q.      My question is --
18         A.      -- so the answer is the same as
19   the last one.
20         Q.      So did you say anything --
21         A.      Not to my recollection.
22         Q.      -- to them that I acted
23   inappropriately?
24         A.      Not to my recollection.
25         Q.      Did you ever say anything to

1                    E. VERSCHLEISER
2    anyone about me that caused your cousin to
3    become concerned about his investments at
4    United Realty?
5         A.    I have no idea.  How am I
6    supposed to know?
7         Q.    Did you ever get an e-mail from
8    your cousin suggesting that something you
9    said to the press has caused him
10   nervousness?
11        A.    Said to the press?  Not -- I
12   don't -- not to my recollection, and I
13   don't talk to the press.
14        Q.    Do you write to the press?
15        A.    Do I write to the press?  You
16   have to define what the "press" is more for
17   me to answer that question.
18             MR. COOPER:  He told you
19         earlier he submits articles.
20        Q.    You don't write to the press,
21   right; isn't that what you said?
22             MR. COOPER:  You see.
23        A.    I'm sorry.
24             MR. FRYDMAN:  Can you please
25         mark this.

1                    E. VERSCHLEISER

2              (Whereupon, the aforementioned

3         four-page "Real Deal" article was

4         marked as E.V. Exhibit 21 for

5         identification as of this date by the

6         Reporter.)

7         Q.    At any time after December 13,

8    2013 did you write to any media

9    organization asserting that --

10              MR. COOPER:  Does he have the

11         exhibit?

12              MR. FRYDMAN:  No, I didn't give

13         him anything yet.

14              MR. COOPER:  Because you gave

15         it to me.

16         Q.    Did you, at any time after

17    December 13, 2013, write to any media

18    outlet that, I quote, I don't quote yet,

19    that you resigned as president and

20    treasurer of United Realty Trust, now I'm

21    quoting, "due to the fraud and actions of

22    my ex-partner Mr. Jacob Frydman"?

23         A.    Not to my recollection.

24         Q.    Handing you what's been marked

25    as Exhibit 21 for identification.  See the

```
 1                    E. VERSCHLEISER
 2   highlighted portion that says:
 3                    "In a written statement to 'The
 4             Real Deal,' Verschleiser noted," and
 5             I quote, "he lost in court and the
 6             judge did not award him the
 7             injunction.  I ultimately decided to
 8             resign as the president and treasurer
 9             of United Realty Trust due to the
10             fraud and actions of my ex-partner,
11             Mr. Jacob Frydman, as outlined in my,
12             the lawsuits against him."
13        A.    I see it.
14        Q.    Did you write that?
15             MR. COOPER:  Objection to form.
16        A.    It looks like "The Real Deal"
17   wrote this.
18        Q.    Did you write "The Real Deal" a
19   letter or an e-mail stating that; did you
20   write a quote, written statement to "The
21   Real Deal"?
22        A.    Not to my recollection.
23        Q.    Do you notice that "The Real
24   Deal" says that you did?
25        A.    I noticed a lot of things in
```

                         E. VERSCHLEISER

1
2    the media today about Israel and Gaza, too,
3    that are not true, so I see that all day
4    long.
5                MR. FRYDMAN:   Where's 167?
6                MR. EDELMAN:   (Handing.)
7                MR. FRYDMAN:   (Handing.)
8                (Whereupon, the aforementioned
9           two-page e-mail dated December 20,
10          2013, was marked as E.V. Exhibit 22
11          for identification as of this date by
12          the Reporter.)
13       Q.    Handing you what's been marked
14   as Exhibit E.V. 22 for identification, can
15   you identify that, please?
16       A.    It looks like an e-mail.
17       Q.    From?
18       A.    Eliversch@AOL.com.
19       Q.    Do you know who that is?
20       A.    I'm assuming it's -- it could
21   be -- well, it's not my e-mail address so
22   it must be from another Eli Versch or
23   Eli Verschleiser, but I not going to
24   assume.  I don't know.
25       Q.    You don't know if this came

```
 1                    E. VERSCHLEISER
 2    from your cousin Eli Verschleiser?
 3         A.    Not off the top of my head.
 4         Q.    Well, by reading it, can you
 5    tell?
 6         A.    "Who is Shmay Yorten" -- yes,
 7    looks like it did come from him.
 8         Q.    It did, and what was, what was
 9    the subject?
10         A.    I cannot be certain, but you
11    would have to ask him.
12         Q.    Right.  What was the subject?
13         A.    "'The Real Deal'
14    Eli Verschleiser."
15         Q.    And what did Mr. Verschleiser,
16    your cousin, tell you after reading "The
17    Real Deal" article?
18              MR. COOPER:  He started to read
19              the e-mail to you.  Is that what
20              you're asking him?
21              MR. FRYDMAN:  Yeah.
22              MR. COOPER:  It says what it
23              says.  Do you have any other
24              questions?  It says what it says.
25         Q.    What did you understand that to
```

1                    E. VERSCHLEISER

2      mean?

3                    MR. COOPER:  Objection to form.

4           A.      Exactly what it says.  It asks

5      who somebody is and it asks what's going on

6      and it says that he's getting nervous he

7      put in a million dollars and --

8           Q.      Do you have any sense --

9           A.      -- that's a lot of money.

10          Q.      -- why he's getting nervous and

11     what that has to do with "The Real Deal"?

12          A.      "The Real Deal" article that

13     you showed me as Exhibit 21?

14          Q.      Right.

15          A.      Oh, or "The Real Deal" thing --

16     or this on the back here?

17          Q.      I'm asking you what your

18     understanding is.

19          A.      Of what?

20          Q.      Of what he meant by him saying,

21     "I'm getting nervous."

22                   MR. COOPER:  Do you know what

23             that means when he says, "I'm getting

24             nervous"?

25                   THE WITNESS:  Yeah, he's

```
 1                    E. VERSCHLEISER
 2          getting nervous.
 3                    MR. COOPER:  Okay.  That's the
 4          answer.
 5                    MR. FRYDMAN:  You don't have to
 6          ask him.  That's fine.
 7          Q.      Do you know John Kastamides?
 8          A.      Of course.
 9          Q.      Did you have any conversations
10   with him about me since December 1st --
11   3rd, 2013?
12          A.      Many.
13          Q.      In any of those conversations,
14   did you assert that I did anything
15   inappropriate?
16          A.      Not to my recollection.
17          Q.      Do you know Abe Lesser?
18          A.      Yes.
19          Q.      Did you have any conversations
20   with Abe Lesser about me since December 3,
21   2013?
22          A.      Many.
23          Q.      In any of those conversations,
24   did you assert that I did anything
25   inappropriate?
```

                    E. VERSCHLEISER

1

2        A.    Not to my recollection.

3        Q.    Do you know Piny Rand?

4        A.    Who?

5        Q.    Piny Rand.

6        A.    Yes.  He's an investor in our

7   company.

8        Q.    Did you have any conversations

9   with Piny Rand since December 3, 2013,

10  about me?

11       A.    Many.

12       Q.    In any of those conversations,

13  did you assert that I did anything

14  inappropriate?

15       A.    Not to my recollection.

16       Q.    Do you know Mayer Nebibzal?

17       A.    Yes, I do.

18       Q.    Is he your accountant?

19       A.    He's one of my accountants.

20       Q.    Did you ever have any

21  discussions with him since December 3,

22  2013, about me?

23       A.    Many.

24       Q.    In any of those conversations,

25  did you assert that I did anything

```
 1              E. VERSCHLEISER
 2    inappropriate?
 3         A.    Not to my recollection.
 4         Q.    Do you know Sammy Trencher?
 5         A.    Yes, I do.
 6         Q.    Since December 3rd of 2013, did
 7    you have any conversations with Sammy
 8    Trencher about me?
 9         A.    I don't recall.
10         Q.    So I presume you don't recall
11    whether you said anything disparaging about
12    me or not?
13         A.    I don't recall if I had any
14    conversations with him.
15         Q.    Do you know Susan Mann?
16         A.    Not off the top of my head.
17         Q.    Do you know Mayer Gross?
18         A.    Not off the top of my head.
19         Q.    Do you know Shehan Lefcowitz?
20         A.    Sure.
21         Q.    Did you have any conversations
22    with Shehan Lefcowitz about me since
23    December 3, 2013?
24         A.    I don't recall having any.
25         Q.    Do you know Chaim Forte,
```

```
 1                    E. VERSCHLEISER
 2   Fortgang?
 3        A.    Sure.
 4        Q.    Did you have any conversations
 5   with him about me since December 3, 2013?
 6        A.    I may have.
 7        Q.    Did you say anything
 8   disparaging in any of those conversations?
 9        A.    Not to my recollection.
10        Q.    How about Naftali Soloman?
11        A.    Doesn't ring a bell, the name.
12        Q.    How about Jeffrey Zoldan?
13             MR. COOPER:  What's the last
14        name?
15             MR. FRYDMAN:  His wife's last
16        name.
17             MR. COOPER:  What, what's the
18        last name that you just said?
19             MR. FRYDMAN:  Z-O-L-D-A-N.
20        A.    I don't know.
21        Q.    You don't know Jeffrey Zoldan?
22        A.    I may by a different name,
23   but --
24        Q.    Well, what name might you know
25   him by?
```