JACOB FRYDMAN<br>
60 BROAD STREET<br>
34TH FLOOR<br>
NEW YORK, NY 10004<br>
(212) 388-6800

April 7, 2015

Honorable John G. Koeltl
United State District Judge
for the Southern District of New York
500 Pearl Street
New York, New York 10040

**Re:   Frydman v. Verschleiser, 14-cv-8084**

Dear Judge Koeltl:

I write in response to Mr. Gefen's letter to you of April 3, 2015. Mr. Gefen asserts that, pursuant to a certain agreement entered into on February 20, 2015, his client, Al Akerman, was released of all claims asserted against him in the Amended complaint filed in the instant action on March 13, 2015. Respectfully, Mr. Gefen is wrong.

While it is correct that the parties entered into an agreement on February 20, 2015 (the "Agreement"), and that Agreement included a release in favor of Mr. Akerman at Paragraph 4 thereof, that release was conditional and, by its terms, provided that "[i]n the event that Akerman breaches the provisions of paragraphs 1, 2 or 3 hereof, the release provided in this paragraph 4 shall be null and void *ab initio*". This language was quoted by Mr. Geffen in his letter to you.

Mr. Akerman breached the provisions of paragraph 2 of that Agreement in numerous ways as detailed in my letters of March 4th and March 9th 2015 to Mr. Gefen, which he referenced in his letter to you. A copy of my March 9, 2015 letter detailing Mr. Akerman's numerous breaches is attached hereto for your reference. As a result of Mr. Akerman's breaches, and pursuant to the express language of the Agreement, the release in favor of Mr. Akerman is null and void *ab initio*.

Mr. Gefen suggests that because Mr. Akerman violated the Agreement that I have taken the position that I am not bound by the Agreement (see footnote 4 to Mr. Gefen's letter). And on this point Mr. Gefen is also wrong. I have never asserted that I am not bound by the February 20, 2015 Agreement or that the Agreement is no longer effective. To the contrary, I have clearly articulated to Mr. Gefen that "[o]bviously, as contemplated by the Agreement, the voiding of the release running in favor of Akerman, does not, indeed by the express language of the Agreement, cannot, void the balance of the Agreement" (see third paragraph of my March 9, 2015 letter attached). And that is why on March 6, 2015 I executed the Stipulation confirming that I would not seek a contempt citation against Mr. Akerman, which was a distinct undertaking by me at paragraph 7 of the Agreement.

In *WSP United States Corp. v. Marinello*, 2013 U.S. Dist. LEXIS 178419, 9, 2013 WL 6704885 (S.D.N.Y. Dec. 18, 2013) Judge Castel held that "[a] release is a contract, and its construction is governed by contract law." *Cardinal Holdings, Ltd. v. Indotronix Int'l Corp.*, 73 A.D.3d 960, 962, 902 N.Y.S.2d 123 (2d Dep't 2010)... "'[W]hen parties set down their agreement in a clear, complete

document, their writing should as a rule be enforced according to its terms.'" *RKO Props. Ltd. v. Boymelgreen*, 62 A.D.3d 683, 684, 878 N.Y.S.2d 197 (2d Dep't 2009) (quoting *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 198, 764 N.E.2d 958, 738 N.Y.S.2d 658 (2001)). "However, 'if from the recitals therein or otherwise, it appears that the release is to be limited to only particular claims, demands or obligations, the instrument will be operative as to those matters alone.'" *Kaminsky v. Gamache*, 298 A.D.2d 361, 361, 751 N.Y.S.2d 254 (2d Dep't 2002) (quoting Perritano v. Town of Mamaroneck, 126 A.D.2d 623, 624, 511 N.Y.S.2d 60 (2d Dep't 1987)).

Mr. Akerman breached the provisions of paragraph 2 of the Agreement. In fact in his March 6th letter to Mr. Fischbein (copy also enclosed) Mr. Gefen admitted that Mr. Akerman breached the provisions of Paragraph 2 of the Agreement by filing a FINRA arbitration against CL Wealth Management, LLC. That alone constitutes sufficient basis to void the release in accordance with the express un-ambiguous terms of the release agreement. Certainly the parties knew how to, and in fact did, expressly provide for necessary "carve-outs" from their releases and undertakings. For example, Akerman's release of the United Released Persons, expressly excluded "Akerman's claim that he has any rights with respect to a partnership interest in". Similarly, in paragraph 3, with respect to Akerman's discontinuance with prejudice of his lawsuit, the parties knew how to provide for "necessary" exclusions. In that provision, the parties provided that the discontinuance would be with prejudice "with the sole exception of Akerman retaining the right to bring a lawsuit asserting a claim that he has any rights with respect to a partnership interest in United"; and United and its Affiliates expressly reserving "the right to deny same and prosecute a defense of any claims which may be asserted by Akerman in an such lawsuit".

The parties were clearly capable of providing for whatever "necessary" exceptions they agreed to – but nowhere in the Agreement did Akerman reserve the right to either: (i) initiate an arbitration with FINRA against CLW; (ii) seek affirmative relief against CLS or CLW in any such arbitration; or (iii) be permitted to disparage me, United, CLS or CLW in any such arbitration. He could have – but he did not. In fact, he expressly agreed not to do any of those things.

Having entered into an Agreement which expressly voids and negates the release provided at Paragraph 4 of the Agreement in the event of a breach by Akerman of Paragraph 2 of the Agreement, and thereafter breaching Paragraph 2 of the Agreement, and admitting same, Akerman can hardly be heard to assert that the release is now not void, and that the claims asserted against him in the Amended Complaint should be dismissed because they were released.

As there is no longer any release existing in favor of Mr. Akerman, Mr. Gefen's request for a pre-motion conference should be denied as there is no basis for dismissal of the claims against Mr. Akerman based on the now void release.

Respectfully submitted,

Jacob Frydman, pro se

cc: Pro Se Help Desk; cc via email: Steven Reed, Esq., John Sullivan, Esq., Lewis Fischbein, Esq.,



UNITED REALTY
GROUP OF COMPANIES

March 9, 2015

Avrohom Gefen, Esq.
Vishnick, McGovern, Milizio, LLP
3000 Marcus Avenue
Suite 1E9
Lake Success, NY 11042

*Via email: AGefen@vmmlegal.com*

Dear Mr. Gefen:

Please accept this letter as my response to your letter of March 6, 2015 to Lew Fischbein.

In the first instance let me assure you that I did not state that the February 20, 2015 agreement (the "Agreement") is "null and void". To the contrary, that Agreement is fully effective and on-going.

What I stated is that your client, Mr. Akerman, has materially breached that Agreement in numerous ways, and that as a result of his breaches of paragraph 2 of the Agreement, pursuant to paragraph 4 of the Agreement, the *RELEASE* provided in said paragraph 4 is null and void *ab initio*. Obviously, as contemplated by the Agreement, the voiding of the release running in favor of Akerman, does not, indeed by the express language of the Agreement, cannot, void the balance of the Agreement, and specifically does not void nor negate each and every of Akerman's obligations, undertakings, promises, covenants, warranties and/or representations, each of which are executory, continuing, and remain fully subject to enforcement.

You are correct in your statements that my letter claimed that Akerman violated the Agreement by filing a FINRA arbitration against CL Wealth Management, LLC ("CLW") and because Akerman wrongfully sought affirmative relief against both Cabot Lodge Securities, LLC ("CLS") and CLW in express violation of the Agreement; and because Akerman disparaged CLS, CLW, Mr. Gould and myself in statements made to FINRA in his arbitration claim.

You are absolutely, and incontrovertibly wrong, in your statement that "Akerman has complied with everything that was required under the Agreement". In support of that wrong

statement you point merely to three matters, (i) that "[h]e sent the retraction letter"[1]; (ii) that he "declined every opportunity to discuss the matter with the media"[2]; and (iii) that "[h]e also discontinued the Supreme Court action".

Those two items (the second not being an obligation of Akerman's under the Agreement) are hardly "everything that was required" of Akerman under the Agreement. As you know, and as the Agreement explicitly, and un-ambiguously, provides, Akerman was also required, *inter alia,* and as "a material inducement to United entering into" the Agreement, to:

➤ not "commence, maintain, induce or assist any other person in commencing, maintaining or prosecuting any suit, action or arbitration against United, CLS, Frydman or any of their respective Affiliates[3]" (paragraph 2 (ii));

➤ not "communicate with, or provide any documents or information to any person (including any regulator or governmental agency) regarding any matter relating to, concerning or otherwise involving Frydman, United, CLS or any of their respective Affiliates, with the **sole exception** of Akerman seeking to initiate an arbitration with FINRA to expunge the U-5 filed by CLS" (paragraph 2 (iv));

➤ not "disparage or encourage or induce others to disparage United, CLS, Frydman or any of their respective Affiliates (Paragraph 2 (v))[4];

Moreover, with respect to the extremely narrow right granted to Akerman with respect to his seeking to "expunge" his U-5, the Agreement at paragraph 6 provided:

➤ "In the event that Akerman seeks to initiate an arbitration with FINRA to expunge the U-5 filed by CLS *and to seek no affirmative relief against CLS, United, their agents, representatives or Affiliates*, neither CLS nor United nor their agents, representatives or Affiliates will seek to oppose same or assert that Akerman seeking to initiate such an arbitration violates the Temporary Restraining Order issued on January 5, 2015 by United District Court Judge John G. Koeltl in Frydman v. Verschleiser, et al., 14 Civ. 8084 (JGK) (the "TRO"; the "RICO Action"). *Except as aforesaid, Akerman shall not directly or*

---

[1] You state "which Mr. Frydman requested"; however, this was not a "request" this was one of many of Akerman's contractual undertakings.

[2] I do not believe that this was a requirement of the Agreement, and Akerman is free to "discuss the matter with the media" to his heart's content, subject, of course to his other contractual undertakings. And for the record, he did communicate wuith the media, as he was quoted in the Investment News article.

[3] The Agreement defined "affiliates" in paragraph 9 thereof to clearly include CLW.

[4] The Agreement defined "disparage" to include "the making of false, defamatory or derogatory comments, even if true, that could reasonably be expected to tarnish, damage, dilute or otherwise negatively impact the reputation of United, CLS, United Realty Trust Incorporated, Frydman or any of their respective Affiliates. This paragraph will survive the transactions contemplated herein".

***indirectly initiate any action, complaint or claim against any of the United Released Persons[5] with FINRA, the SEC or any other regulatory body or governmental agency***.

There can be no doubt that Akerman breached each and every of the referenced provisions.

You correctly state that "the Agreement specifically allowed Mr. Akerman to commence an arbitration to attempt to expunge the U-5". However, that provision was ***expressly conditioned*** on two things, (i) that the arbitration be initiated only against CLS, and (ii) that the arbitration claim not seek any "affirmative relief" against CLS or any Affiliate. The authorizing provision commenced with conditional language. It states "In the event" Akerman seeks to initiate an arbitration with FINRA "to expunge the U-5", and is thereafter conditioned by express prohibitive language: (i) "***and to seek no affirmative relief against CLS***"; and (ii) "***and to seek no affirmative relief against …Affiliates***" (which by definition includes CLW).

Had Akerman comported to those conditions, paragraph 6 went on to state: that "neither CLS nor United nor their agents, representatives or Affiliates will seek to oppose same." And by extension of that express language, if those conditions were not met, CLS and its Affiliates retained every right to oppose same.

Moreover, Paragraph 6 expressly prohibits the wrongful initiation of an arbitration by Akerman against CLW. In order to make that crystal clear, the last sentence of paragraph 6 expressly provides: "Except as aforesaid, Akerman ***shall not directly or indirectly initiate any*** action, complaint or ***claim against any of the United Released Persons with FINRA***, the SEC or any other regulatory body or governmental agency." And United Released Persons, as defined in paragraph 4 (taking into consideration the definitions in paragraph 9), clearly includes CLW.

Your client violated the provisions of paragraph 6 by ***both*** initiating an arbitration with FINRA against CLW, a***nd*** by seeking affirmative relief beyond just expungement of his U-5 against both CLS and CLW – all in express violation of his agreements to the contrary. I suggest nothing could be clearer.

Your statement that "it was necessary that this arbitration to be brought against both entities", is both wrong and immaterial. Certainly the parties knew how to, and in fact did, expressly provide for necessary "carve-outs" from their releases and undertakings. For example, Akerman's release of the United Released Persons, expressly excluded "Akerman's claim that he has any rights with respect to a partnership interest in United". Similarly, in paragraph 3, with respect to Akerman's discontinuance with prejudice of his lawsuit, the parties knew how to provide for "necessary" exclusions. In that provision, the parties provided that the discontinuance would be with prejudice "with the sole exception of Akerman retaining the right to bring a lawsuit asserting a claim that he has any rights with respect to a partnership interest in United"; and United and its Affiliates

---

[5] The "United Released Persons" by definition includes CLW.

expressly reserving "the right to deny same and prosecute a defense of any claims which may be asserted by Akerman in an such lawsuit".

The parties were obviously capable of providing for whatever "necessary" exceptions they agreed to – but nowhere in the Agreement did Akerman reserve the right to either: (i) initiate an arbitration with FINRA against CLW; (ii) seek affirmative relief against CLS or CLW in any such arbitration; or (iii) be permitted to disparage me, United, CLS or CLW in any such arbitration. He could have sought such exceptions – but he did not.

In fact, he expressly agreed not to do any of those things.

For you to now say that "for expungement to occur, the award from the FINRA arbitrator must recommend that FINRA change the "reason for termination" from "discharged" to "voluntary" and that the answers to questions 7B, 7F(1) and 7F(2) be changed from "yes" to "no", and that the "statement of claim must allege that the statements in the U-5 are untrue, or there can be no expungement" -- rings hollow. I do not believe that there are any rules or regulations which support your statements (and if there are, I request that you immediately provide them to me). But even if there were (and I suggest there are not), it would have been up to Akerman to provide for those rights in the Agreement, rather than expressly agree NOT to do any of those things!

Certainly Akerman could have filed for an arbitration that sought the mercy of the arbitrators. And, frankly, that is precisely what I expected him to do. I thought he would say something to the effect that he was a licensed person for more than 20 years, and prior to his most recent experience with CLS maintained a clean U-4, and come to this arbitration seeking forgiveness and a second chance. And, since CLS would not have been challenging his request, as a matter of law, the arbitration panel should (indeed must) grant his request.

That is precisely what he had the right to do. But he chose not to. I guess that hubris, as the ancient Greeks were all too well aware, results in tragedy.

And it is Akerman's hubris that brings him to this place. Instead of seeking uncontested forgiveness, and rather than take the brunt of the blame, seek forgiveness and know that an uncontested arbitration will likely result in an award in his favor – he simply breached all of his agreements; lied to FINRA by stating that nothing in the U-5 was true; disparaged CLS, CLW, United, Gould and me, all in breach of his express agreements to the contrary, and simply believe that he could somehow get away with that.

Contrary to your assertions, Rule 13308 of the Code of Arbitration Procedure for Industry Disputes, titled: Default Proceedings, states as follows:

13308. Loss of Defenses Due to Untimely or Incomplete Answer

> (a) If a party does not answer within the time period specified in the Code, the panel may, upon motion, bar that party from presenting any defenses or facts at the hearing, unless the time to answer was extended in accordance with the Code. The party may also be subject to default proceedings under Rule 13801, if the conditions of Rule 13801(a) apply.

And, pursuant to Rule 13603, titled Failure to Appear:

> If a party fails to appear at a hearing after having been notified of the time, date and place of the hearing, the panel may determine that the hearing may go forward, and may render an award as though all parties had been present. No hearing shall be held. The arbitrator may request additional information from the claimant before rendering an award.

That was Akerman's route to expungement. That is what the Agreement envisioned – in fact, that is precisely what the Agreement provided for. If Akerman wished some other methodology, he most certainly could have provided for it – just as the Agreement provided for specific rights with respect to other claims and defenses. But that is not what was agreed to.

Moreover, I can assure you that there could be no set of facts pursuant to which I would have agreed that Akerman could freely lie to FINRA, make requests for affirmative relief, or disparage me or any of my affiliates in any public filing, and most assuredly in a filing with a securities regulator. Your suggestions to the contrary are either hollow, ill conceived, or an impotent attempt to cover, after the fact, the numerous breaches by Akerman of his Agreements.

I also challenge your unsupported (and frankly, non-credible) statement that "Since this is the only way to effectuate expungement, this cannot be said to violate the provision of the Agreement in which Mr. Akerman "agreed not to seek affirmative relief". Your admission that Akerman "agreed not to seek affirmative relief", and then, by stroke of your pen, to somehow suggest that that was not really what was meant, or that "the statement of claim does not seek monetary relief or attorneys' fees and costs" does not cleanse Akerman's wrongs. Had we agreed that Akerman could seek "affirmative relief", but could not seek "monetary relief or attorneys' fees and costs", we could have drafted the Agreement to so provide. But we did not!

Nor does your comment that "the arbitration statement is confidential and can only be accessed by the parties and FINRA[6]" cleanse Mr. Akerman's clear disparagements. Our Agreement did not provide that a statement is not disparagement if it were made in a "confidential filing" which "can only be accessed by the parties and FINRA". Disparagement is defined as "the making of false, defamatory or derogatory comments, even if true, that could reasonably be

---

[6] Contrary to your assertion, the following is taken directly from FINRA's *Neutral Corner* publication, April, 2004: "While blanket orders of confidentiality in arbitration might be acceptable if all parties agree, they should be the exception, not the rule. The NASD staff, and the arbitrators on its Roster, are ethically obligated to keep confidential information obtained in an arbitration. However, parties are generally free to disclose details of their own proceeding as they see fit."

expected to tarnish, damage, dilute or otherwise negatively impact the reputation of United, CLS, United Realty Trust Incorporated, Frydman or any of their respective Affiliates". It is not limited by in what type of filing, nor as to what groups may or may not be exposed to it. It is expansive, and relates to any statement which meets the definition. And clearly, Akerman's false statements, which on their face could reasonably be expected to tarnish, damage, dilute or otherwise negatively impact the reputation of United, CLS, me, Gould and CLW meet the definition head on.

You make the statement that "the FINRA arbitration statement of claim takes pains to not disparage CLS or its affiliates and carefully couches its language .. .This is precisely what was contemplated and permitted by the Agreement."

You must be kidding!!!

Can one take anything you say as credible when you make such an outrageous and clearly mendacious claim! The arbitration statement of claim is nothing but a series of false defamatory and clearly disparaging statements!

Can you, in good conscience, and with a straight face, really say that the following statements are (i) true, (ii) not defamatory, and (ii) do not squarely meet the definition of "disparaging" under our Agreement, and that in making the following statements your client took "pains to not disparage CLS or its affiliates" and "carefully couches its language"?

- that CLS and CL Wealth Management, LLC made "untrue and inaccurate comments and answers from the Central Registration Depository (CRD) and the CRD Form U-5 which was recently filed by the Respondents";

- that "CLS unjustifiably terminated Akerman's employment" (after he was caught red-handed stealing our confidential information and turning it over to Verschleiser, and that, after a US federal judge determined that these actions justify a TRO and would granted us the right to seek a contempt citation of that TRO), that: "[t]his unjustified termination was compounded by a series of untrue and inaccurate answers and termination comments contained in the CRD and Form U-5 that was filed by CLS on or about January 15, 2015. These untrue answers and comments have harmed my reputation and prevent me from continuing to be employed in the securities industry";

- that "[t]he untrue U-5 was submitted by the party who now controls CLS who accused me of providing information to his adversary.";

- that "any claim or allegation of theft is untrue";

- that "any information of or documents that were provided to FINRA expose what [Akerman] then believed were certain improper actions and business practices. As

> CLS's CCO, [Akerman] had fiduciary[7] and regulatory-mandated duties and obligations to disclose what I believe to be improper activities to CLS's regulators and other owners to preserve the franchise's value, to report violative business practices and to seek to prevent further damage or related adverse business/financial outcomes.";

- that "By exposing possibly improper act of CLS's management, [Akerman] sought to properly discharge [his] regulatory mandate to reasonably ensure compliance with applicable laws, rules, regulations and industry best practices by upholding the CLS's policies and procedures.";

- that "the untrue and inaccurate CRD form U-5 comments were retaliatory and unjustifiably damaged my otherwise clean 20-plus year securities industry track record.";

- that "[Akerman is] simply requesting that the arbitrator issue and award finding that the CRD and the U5 contain information that is untrue and reputation damaging..".

Who do you think you and Akerman are fooling? I suggest only yourselves! But in any event, I assume you will have the opportunity to persuade a trier of fact that the foregoing neither constitutes a breach by your client of the Agreements he made, and that in making those statements Akerman took "pains" so as not to constitute disparagement. Would you care to wager on how that one gets decided?

Nonetheless, until a judge makes a contrary determination, I continue to take the position that Akerman breached his Agreements, resulting in the release in paragraph 4 being null and void *ab initio*, and giving us the right to challenge the arbitration brought by Akerman against CLS and CLW and assert any and all appropriate counter claims therein, as well as bring any and all other claims we may have against Akerman in any appropriate forum.

Moreover, with respect to your assertion that I disparaged Mr. Akerman in violation of the Agreement – I disagree. Notwithstanding the definition of "disparagement" in our Agreement, even if one were to read into the Agreement that disparagement of Akerman would be expected to tarnish, damage, dilute or otherwise negatively impact the reputation of Akerman (which, as you know, is not the definition in the Agreement), my comments that Akerman is a "LAUGHINGSTOCK" and "a man with NO MORALS, NO ETHICS, NO CREDIBILITY" would not, indeed could not, constitute disparagement, as after his recantation, and the negative press he received as a result thereof, Akerman is considered by those persons who are aware of his actions, as just such a "LAUGHINGSTOCK" and "a man with NO MORALS, NO ETHICS, NO CREDIBILITY" , and therefore, these comments would have done nothing to "tarnish, damage, dilute or otherwise negatively impact the reputation of Akerman", as his reputation was already

---

[7] Here's one we can agree on – Akerman did have fiduciary duties to CLS and the United Released Persons – and I thank you for your admission, as it will come in handily in the future.

Page | 8

tarnished, damaged, diluted and otherwise negative – and these comments did not further damage his already, self-inflicted, damaged reputation.

In any event, if you and he feel otherwise, please feel free to institute an action against me for those statements. I hereby admit making those statements, and I am more than happy to defend any suit you or he may elect to initiate on that basis.

Finally, while we are on the subject of disparagement, I wish to point out to you, that under the terms of our on-going Agreement, and specifically paragraph 8 thereof, my undertaking not to disparage Mr. Akerman *ended* when he failed to "faithfully perform[e] his obligations and agreements [thereunder]".

Rest assured that I will abide by the Agreement. However, please do not further dilute your credibility by falsely stating that "Akerman has not violated the Agreement". You are a better lawyer than that.

For the reasons set forth above, I reject your contentions, and I look forward to seeing you in court and at the FINRA arbitration.

Very truly yours,

Jacob Frydman

Cc: Al Akerman.;
    Andrew Klimer, Esq.;
    Lewis Fischbein, Esq.;
    Daniel Edelman, Esq.



# VISHNICK McGOVERN MILIZIO LLP
## ATTORNEYS AT LAW

March 6, 2015

**Avrohom Gefen**
Associate
t. 516.437.4385 x119
AGefen@vmmlegal.com

*Via Email:lfischbein@wsmblaw.com*
Lewis Fischbein, Esq.
60 Broad Street
New York, NY 10005

    Re:    *Albert Akerman and Jacob Frydman*

Dear Mr. Fischbein:

    This is in response to Jacob Frydman's letter to Albert Akerman dated March 4, 2015 alleging that the February 20, 2015 Agreement between the parties ("Agreement") is "null and void". The letter claims Mr. Akerman violated the Agreement by filing for FINRA arbitration to expunge the U5 which was filed by Cabot Lodge Securities LLC ("CLS") and CL Wealth Management LLC ("CLW"). The letter further alleges that the statement of claim itself violated the Agreement because it requested "affirmative" relief and because it was "disparaging".

    As you and Mr. Frydman know, Mr. Akerman has complied with everything that was required under the Agreement. He sent the retraction letter that Mr. Frydman requested and then declined every opportunity to discuss the matter with the media. He also discontinued the Supreme Court action against Mr. Frydman, with prejudice.

    As you and Mr. Frydman are also aware, the Agreement specifically allowed Mr. Akerman to commence an arbitration to attempt to expunge the U5 and it was agreed that this arbitration would not be opposed. Since the U5 was filed by both CLS and CLW, it was necessary for the FINRA arbitration to be brought against both entities, as Mr. Frydman is well aware. In addition, for expungement to occur, the award from the FINRA arbitrator must recommend that FINRA change the "reason for termination" from "discharged" to "voluntary" and that the answers to questions 7B, 7F(1) and 7F(2) be changed from "yes" to "no". Moreover, the statement of claim must allege that the statements in the U5 are untrue, or there can be no expungement. Since this is the only way to effectuate expungement, this cannot be said to violate the provision of the Agreement in which Mr. Akerman agreed to not seek affirmative relief. Note that the statement of claim does not seek monetary relief or attorneys' fees and costs. In addition, Mr. Frydman should note that the arbitration statement is confidential and can only be accessed by the parties and FINRA.

3000 Marcus Avenue, Suite 1E9 • Lake Success, NY 11042 • t. 516.437.4385 • f. 516.437.4395
830 Third Avenue, 5th Floor, New York, NY 10022 • t. 212.759.3500
www.vmmlegal.com   •   Please direct all correspondence and documents to the Lake Success office.



# VISHNICK MCGOVERN MILIZIO LLP
## ATTORNEYS AT LAW

March 6, 2015
Page 2

  Finally, the FINRA arbitration statement of claim takes pains to not disparage CLS or its affiliates and carefully couches its language. In essence, it simply alleges that Mr. Akerman did what he thought was right and that the statements in the U5 are untrue. This is precisely what was contemplated and permitted by the Agreement. Unfortunately and in contrast, the day after the Agreement was executed, Mr. Frydman sent an email disparaging Mr. Akerman to numerous parties. That email, which you provided to us as Exhibit "C" to Abe George's Amended Complaint, describes Mr. Akerman as a "LAUGHINGSTOCK" and calls him "a man with NO MORALS, NO ETHICS, NO CREDIBILITY" (capital letters in original). This email was not only sent to multiple parties, it is now part of a court record available to the public.

  Since Mr. Akerman has not violated the Agreement in any way, we expect that Mr. Frydman will also abide by the Agreement, that there will be no further disparagement and that the FINRA arbitration claim will remain unopposed. Should you wish to discuss this matter further, please contact me or Andy Kimler.

            Sincerely,

            Avrohom Gefen